# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| HOWARD B. SAMUELS, solely as chapter 7 trustee of the estates of CENTRAL GROCERS, INC., STRACK AND VAN TIL SUPER MARKET, INC. and SVT, LLC,<br><br>                Plaintiffs,<br><br>v.<br><br>CARGILL, INC., JBS USA FOOD COMPANY HOLDINGS, NATIONAL BEEF PACKING COMPANY, TYSON FOODS, INC., | CASE NO.<br><br>**CLASS ACTION COMPLAINT** |

Howard B. Samuels ("Plaintiff"), solely in his capacity as Chapter 7 trustee for the bankruptcy estates of Central Grocers, Inc., Strack and Van Til Super Market, Inc., and SVT, LLC (collectively, "Central  Grocers"), hereby brings this action on behalf of Central Grocers and all persons and entities similarly situated, against Defendants Cargill, Inc. ("Cargill"), JBS USA Food Company Holdings ("JBS"), National Beef Packing Company ("National Beef") and Tyson Foods, Inc. ("Tyson") (when discussed collectively, "Defendants") and unnamed co-conspirators. Plaintiff alleges, based on information and belief and investigation by counsel except where specifically alleged on the basis of personal knowledge, as follows:

## I.    NATURE OF THIS ACTION

1.      This class action is brought on behalf of Central Grocers and all persons and entities who purchased beef[1] in the United States directly from one or more of the Defendants from at least January 1, 2015, until the present (the "Class Period"). Plaintiff alleges that Defendants violated Section 1 of the Sherman Act by conspiring to constrain beef supplies in the United States, thereby artificially inflating domestic beef prices paid by direct purchasers. As a direct result of Defendants' unlawful conduct, Central Grocers and the other Class members suffered antitrust injury for which Plaintiff seeks treble damages and injunctive relief and demands a jury trial.

2.      Defendants are the world's largest meat processing and packing companies, known in the industry as "meatpackers" or "packers." In 2018, they sold approximately 80% of the more than 25 million pounds of fresh and frozen beef supplied to the United States market.

---

[1] In this Complaint, "beef" means boxed and case-ready meat that has been processed from fed cattle by Defendants and other smaller, non-defendant producers. It excludes ground beef made from culled cows. "Cattle" means fed cattle before they are processed into beef and excludes culled cows. "Fed" cattle means steers and heifers raised in feedlots on a concentrated diet for the production and sale of beef.

Collectively, they controlled approximately 81–85% of the domestic cattle processed (or slaughtered) in the market throughout the Class Period. The next largest meatpacker had only a 2–3% market share.

3.      Since at least the start of 2015, Defendants have exploited their market power in this highly concentrated market by conspiring to limit the supply of, and to fix the prices of, beef sold to Central Grocers and others in the U.S. wholesale market (the "Conspiracy"). The principal, but not exclusive, means Defendants have used to effectuate their Conspiracy is a concerted scheme to artificially constrain the supply of beef entering the domestic supply chain. Defendants' collusive restriction of the beef supply has had the intended effect of artificially inflating beef prices. As a result, Central Grocers and other Class members paid higher prices than they would have paid in a competitive market.

4.      Both the U.S. Department of Justice ("DOJ") and the U.S. Department of Agriculture ("USDA") recently launched investigations into whether Defendants unlawfully fixed beef prices in the United States. Although the DOJ has not yet publicly confirmed its investigation, news sources reported on June 4, 2020, that the Department's Antitrust Division sent a civil investigative demand to each of the Defendants seeking information about their pricing practices. While these investigations apparently were triggered most immediately by a spike in beef prices since the COVID-19 outbreak in the U.S., this spike is only one manifestation of Defendants' conspiracy.

5.      In testimony before the Senate Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies on March 12, 2020, Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices. Secretary Perdue expressed serious concern that meatpackers were paying lower prices for live cattle without passing that cost savings to Plaintiffs and other beef purchasers. In

his words, the difference between prices for live cattle and prices for wholesale boxed beef was "historically high."

6.     The existence of a conspiracy among the Defendants was confirmed by at least one account by a confidential witness ("Witness 1"). Witness 1, who was previously employed by one of the Defendants, has confirmed that each of the Defendants expressly agreed to reduce its cattle purchase and slaughter volumes with the purpose and effect of increasing their margins. Transactional data and slaughter volume records reported by Defendants, information published by the U.S. Department of Agriculture, and Defendants' public calls for industrywide slaughter and capacity reductions corroborate Witness 1's account.

7.     In addition to the high concentration in the wholesale beef industry, other structural characteristics of the domestic beef market also facilitate the Conspiracy. Defendants sit atop the supply and distribution chain that ultimately delivers beef to the market. Their vital role is to purchase cattle from the nation's farmers and ranchers, slaughter and pack cattle into beef, and sell beef to Central Grocers and other Class members. Defendants' gatekeeping role has enabled them to collusively control both upstream and downstream beef pricing throughout the Class Period.

8.     Other market characteristics also serve as "plus factors" supporting the inference of collusion among Defendants during the Class Period. These characteristics include high barriers to entry, inelastic demand, and the commodity nature of beef. Collectively, these economic factors encouraged formation of the Conspiracy and continue to foster its successful operation.

9.      Capitalizing on the fundamental mechanism of supply and demand operating in a beef market vulnerable to successful cartel formation and operation, Defendants illegally collaborated to reduce beef supplies in the United States. To do so, Defendants engaged in tactics

including purchasing fewer cattle than a competitive market would otherwise demand and running their processing plants at less than available capacity. These practices created surpluses in the cattle market and shortages in the wholesale beef market. These artificial conditions, in turn, drove down the prices Defendants pay for cattle and boosted the prices Defendants command for beef. The result intended and achieved by Defendants has been higher profit margins (or "meat margins").

10.    This growth of Defendants' margins was aided by the way supply and demand operate in the beef industry. The supply of cattle is insensitive to short-term price changes because of the long lifecycle of livestock, livestock's perishable nature, and the lack of any alternative use for livestock. Beef demand is also relatively insensitive to price fluctuations. As a result, Defendants' margins are very responsive to changes in the aggregate volume of slaughtered cattle.

11.    Defendants furthered the Conspiracy by routinely exchanging supply, pricing, and other competitively sensitive information in several ways. One method was routinely selling beef to each other. In these buyer-seller relationships, Defendants were each other's competitors and customers, thus allowing Defendants to share information that competitive businesses would conceal from each other.

12.    Another form of interaction conducive to Defendants' collusion was frequent meetings between each other's executives and key employees. Trade association conferences and other industry events offer convenient opportunities to exchange information, plans and strategies, and build relationships. As described throughout this Complaint, Defendants seized these opportunities to further their collusive supply restrictions.

13.    By the beginning of 2015, Defendants began exploiting these favorable market conditions to launch the Conspiracy. At that time, they undertook a campaign of throttling the

beef supply that persists today. Publicly available industry data documents Defendants' abrupt transition from competition to collusion.

14.      Figure 1 below compares the average annual beef cattle slaughter by each Defendant and the smaller, non-defendant beef producers in the market collectively before the Class Period (from 2007 through 2014) to the same average during the first three years of the Class Period (from 2015 through 2017, the years for which data is available).

**Figure 1: Average Annual Commercial Slaughter of Cattle**



15.      As this graph demonstrates, each of the Defendants curtailed its annual slaughter volumes during the Class Period, while the smaller beef processors collectively *increased* their slaughter volumes during the same period (without making up the shortfall of beef created by the Conspiracy).

5

16.     As an immediate consequence of Defendants' reduced supply, the beef market experienced a dramatic change of price behavior. Before 2015, prices of cattle and beef predictably moved in tandem. That correlation was the natural economic relationship in a competitive market because beef is simply processed cattle.

17.     But at the start of the Class Period, when Defendants together began to cut production, this fundamental economic relationship between cattle and beef prices abruptly changed. The degree of correlation of cattle and beef prices diverged (to Defendants' benefit) without any credible innocent explanation. The relevant supply and demand factors in the industry no longer explained the prices charged to direct purchasers.

18.     Starting in 2015, wholesale beef prices showed unusual trends. The per-pound price of cattle had historically stayed within 20 to 40 cents of the per-pound average wholesale price of beef. But in 2015, the spread between those prices increased dramatically, as Figures 2 and 3 demonstrate.

**Figure 2**



**Figure 3**

| YEARS | FARM-TO-WHOLESALE PRICE SPREAD | PROPORTIONAL INCREASE |
|---|---|---|
| 2010 through 2014 | $34 | --- |
| 2015 through 2018 | $54 | 59% |
| January 2019 | $69 | 27% |

19.     According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to the present than it was in the preceding five years. From 2010 through 2014, the

7

average farm-to-wholesale spread was about $34, but from 2015 through 2018 it was about $54, a 59% increase.

20.     Defendants' ability to cut beef production while maintaining inflated beef prices during the Class Period is strong circumstantial evidence of the Conspiracy. In a beef market free of collusion, if a competitor reduces its purchase of cattle, other competitors quickly pick up the slack to boost their sales and increase their market shares. In that environment, a competitor would not cut its purchases and suffer lost sales with any hope of increasing its profit margin. Only *colluding* meatpackers would expect to benefit by reducing their purchases and slaughter of cattle. By concertedly slashing their supply output, Defendants have been able to expand their profit margins, confident that none of them would grab volume surrendered by another.

21.     United by the Conspiracy, each Defendant is confident that none of the others would break rank by expanding their beef production to satisfy unmet demand. Armed with this assurance, Defendants steadfastly improved their meat margins by achieving and sustaining an unprecedented gap between cattle and beef prices.

22.     Aided by Defendants' collective market power in the upstream (cattle) and downstream (beef) markets, the Conspiracy allowed Defendants to steadily enlarge their operating margins throughout the Class Period. By the end of 2018, the two publicly traded Defendants, Tyson and JBS, were reporting record margins in their beef business. Tyson reported an operating margin of nearly 7%, almost double its 2014 operating margin; JBS reported a higher beef business margin of 10.2%. Given these swollen margins, it is no

surprise that a leading industry reporter remarked that Defendants "no longer compete against each other," enabling them to reap "gangbuster profits."[2]

23.     In summary, Defendants have colluded during the Class Period to reduce supplies of beef, thereby raising and fixing beef prices at levels higher than those that would have prevailed had the beef market been competitive. As a direct result, Central Grocers and the Class members have suffered antitrust injury by paying artificially inflated prices for beef they purchased from Defendants.

## II.    JURISDICTION AND VENUE

23.     Plaintiff brings this action on behalf of Central Grocers and all similarly situated persons and entities under Section 16 of the Clayton Act, 15 U.S.C. § 26, to secure injunctive relief and damages in excess of $5,000,000 for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

24.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

25.     Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants reside in, are found in, or have an agent or transacted business in this District, and because a substantial portion of the affected interstate commerce was carried out in this District.

26.     This Court has personal jurisdiction over each of the Defendants because, among other reasons, each one has (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and delivered substantial quantities of beef throughout the United States, including in this District; (c) had substantial contacts with the United States,

---

[2] Cassandra Fish, "Whatever Happened to a Fair Fight," The beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/

including in this District; and (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

27.     The activities of Defendants and all co-conspirators alleged in this Complaint were within the flow of, were intended to, and had direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## III.   PARTIES

### A.   Plaintiff

28.     The Trustee, Howard B. Samuels, acting solely in his capacity as Chapter 7 trustee for the bankruptcy estates of Central Grocers, brings this action on behalf of Central Grocers. Central Grocers is a privately owned Illinois corporation with its principal place of business at 2600 Haven Avenue, Joliet, Illinois 60453. Central Grocers directly purchased beef that was processed and sold at prices artificially inflated by one or more of the Defendants, their co-conspirators during the Class Period. Central Grocers has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### B.   Defendants

29.     Cargill is a privately held Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391. During the Class Period, Cargill sold beef in interstate commerce directly to members of the Class in the United States.

30.     JBS is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. During the Class Period, JBS sold beef in interstate commerce directly to members of the Class in the United States.

31.     Tyson is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson sold beef in interstate commerce directly to members of the Class in the United States.

32.     National Beef is a privately owned Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163. National Beef sold beef in interstate commerce directly to members of the Class in the United States.

### C.     Co-Conspirators

33.     Various other unknown persons, firms, and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the Conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether named as Defendants or not.

### D.     Reciprocal Agency of Defendants and Co-Conspirators

34.     Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

35.     Each Defendant and co-conspirator acted as the agent or joint-venturer of the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged by Plaintiff.

### IV.   THE STRUCTURE OF THE BEEF INDUSTRY IS HIGHLY CONDUCIVE TO COLLUSION.

#### A.   The Journey of Beef to Consumers.



**Figure 4**

36.     As illustrated in Figure 4 above, the beef value chain comprises several stages. First, calves are raised by their mothers for six to ten months. When they weigh about 500 pounds, the calves are weaned and sold to the stocker-yearling sector, where they are fed a diet of forage, wheat pasture, and sileage. When a steer or heifer reaches 600–800 pounds, it is sold to a feedlot where it is fed corn and protein supplements in addition to roughage.

37.    Once cattle reach 950–1,300 pounds, they are sold as fed cattle to the beef-packing stage. There, Defendants and other beef producers slaughter and process the animals into edible boxed beef and smaller case-ready consumer cuts. A steer weighing 1,000 pounds typically yields about 450 pounds of edible beef.

38.    Cattle are sold to beef processors through two channels. About 70% of cattle are sold through supply contracts, known in the industry as captive-cattle agreements, with feedlots or, to a lesser extent, ranching operations. The rest of the cattle are sold on the spot market, which is typically the benchmark for prices under the captive-cattle agreements. Because Defendants and other beef producers ordinarily have a steady supply of cattle through these agreements, they are not forced to buy in the spot market. This affords them power to suppress the price of captive cattle and cattle purchased in the spot market.

39.    Next, Defendants and other meatpackers sell the boxed beef and cuts in the wholesale market to businesses like Central Grocers, who distribute the beef to retailers, or directly to grocery chains, restaurants, and other large retailers.

**B.    Numerous Factors in the Beef Meatpacking Industry Are Conducive to Conspiracies.**

40.    The beef meatpacking industry bears all of the characteristics of a highly cartelized market: (1) producer concentration; (2) high barriers to entry; (3) commodity product; and (4) inelastic demand. These characteristics supported Defendants' collusion to constrain the number of cattle entering the supply chain, throttle the volume of processed beef they sold, raise and fix the wholesale price of beef, and maximize Defendants' margins.

**1.    The Beef Market Is Highly Concentrated.**

41.    Market concentration facilitates collusion. Conspiracies are easier to organize and sustain when just a few firms collectively control a large share of the market. Practical matters,

such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players. A high degree of control simplifies coordination because little outside competitive presence exists to undermine the cartel, and cartel participants can more easily monitor each other's actions related to supply and pricing. Moreover, in a highly concentrated market, higher, long-term profits secured by the cartel's artificially elevated prices outweigh transitory gains in profits and market share that producers might achieved by undercutting their cartel price.

42.     The beef industry experienced significant consolidation leading up to and during the Class Period. In 2001, Tyson purchased IBP, Inc., then the nation's largest beef packer. In 2002, Cargill purchased Taylor Packing Co. In 2007 and 2008, JBS acquired Swift & Co. and Smithfield Beef Group, Inc., respectively, the third- and fifth-largest U.S. beef packers.

43.     Through these purchases, Defendants collectively controlled about 81–85% of the cattle slaughter market throughout the Class Period, while the next largest meatpacker had only a 2–3% market share. Defendants' control of the market enabled the Conspiracy to launch in 2015 and prosper since.

### 2.     The Market Has High Barriers to Entry.

44.     Barriers to entry are obstacles that prevent new competitors from easily entering a market. They restrict competition in a market and may make it easier for incumbents to collude.

45.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supra-competitive pricing. But where significant barriers to entry exist, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

14

46.     Barriers to entry kept would-be competitors out of the beef-packing industry. The construction of a large packing plant requires an investment of at least $250 million. It normally takes two years or longer to obtain the necessary permits and plan, design, and build the facility. And new entrants must also comply with numerous regulations, recruit and train a large workforce, and develop and execute a successful marketing plan.

47.     These barriers have caused new entrants to file for bankruptcy shortly after attempting to enter the market. These casualties include substantial enterprises such as Northern Beef Packers, LP, and Sam Kane Beef Processing, LLC.[3] Relative insulation from the threat of new competitors has enabled Defendants to maintain the Conspiracy with impunity.

### 3.     Beef is a Commodity Product.

48.     A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services.

49.     Beef is a commodity. For example, beef roasts from Tyson and Cargill are virtually indistinguishable and have nearly identical nutritional content. The USDA recognizes boxed beef as a commodity, and posts daily boxed beef prices.  Options and futures for the cattle from which boxed beef is produced are traded as commodities on the Chicago Mercantile Exchange.

50.     Markets for commodity products are susceptible to for collusion. Demand for a commodity depends primarily, if not exclusively, on price, as opposed to other attributes such as

---

[3] Northern Beef Packers LP filed under Chapter 11 in July 2013 and ceased operations before selling off its assets in December of that year. "Northern Beef Packers sold to White Oak for $44.3 million," *The National Provisioner*, Dec. 9, 2013.  Sam Kane Beef Processing filed under Chapter 11 in January 2019 and was acquired by STX Beef Co. in February. "Kane Beef plant sale closes, new owner pledges to restart operations," *Daily Adviser*, Mar. 1, 2019.

product quality or customer service. As a result, cartel members can more easily monitor compliance and detect defectors. Any observed prices discrepancies for commodities are more likely to expose cheating, because they can't as readily be attributed to other factors, such as special product features, quality, reliability and durability, or other terms of a transaction.

### 4.   The Demand for Beef Is Inelastic.

51.     "Price elasticity" is a term used to describe the sensitivity of supplier or consumers to changes in the price of a good or service. For example, demand is said to be inelastic if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. Under conditions of inelastic demand, customers have nowhere to turn for alternative, cheaper products of similar quality and continue to purchase despite a price increase.

52.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

53.     Beef demand is relatively insensitive to price changes. According to a recent study of beef demand, industry total revenue increases when prices rise because they have little effect on the volume purchased. The same study concluded that the relative impact of pork and chicken prices on beef demand is economically small. Therefore, supracompetitive prices to Defendants' direct purchasers do not significantly reduce beef sales or lead purchasers to seek protein from other meat sources.

## V.   DEFENDANTS' ANTITRUST VIOLATIONS

54.     By the beginning of 2015, Defendants were forced to confront shrinking profit margins for their beef sales. The earnings calls of the two publicly traded Defendants,

Tyson and JBS, reported the slumping profitability of their beef operations. In a November 7, 2014, earnings call, Tyson reported a quarterly operating margin that was less than half the margin enjoyed by its poultry division. A week later, on a November 13, 2014, earnings call, JBS also announced a badly underperforming beef segment. Its quarterly margin reached only about a third of its pork segment's margin.

55.     Rather than act independently in their individual business interests to restore profitability, Defendants agreed to collectively reduce their purchases of fed cattle and slow beef production to the downstream market, including direct purchasers. The consequent beef shortage ushered in a new era of supra-competitive prices paid by Central Grocers and other direct purchasers in the wholesale beef market.

## A.     Direct Evidence of the Conspiracy.

56.     According to Witness 1, Defendants periodically agreed to reduce their slaughter volumes, resulting in wholesale prices above competitive levels.

57.     Witness 1 is a former employee of one of the Defendants ("Defendant 1"). He worked for this Defendant as quality assurance officer ("QA") at its slaughter plants in the Texas Panhandle/Western Kansas region for over ten years until his employment ended in 2018.

58.     During the Class Period, Witness 1 acted as a head QA with primary responsibility for plant kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed—i.e., the head, hide, and internal organs are removed. The carcasses are then moved to the hotboxes to cool down before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

59.     Witness 1 learned of Defendants' agreement to reduce cattle slaughter from Slaughter Plant 1's fabrication manager who knew about Defendants' conspiracy.

60.     During multiple discussions at Slaughter Plant 1 during the Class period, the fabrication manager explained to Witness 1 that all of the Defendants had agreed to reduce their purchase of fed cattle and slaughter volume. In particular, the fabrication manager, during one conversation, even described Defendants' arrangement as an agreement to reduce their purchase and slaughter volumes.

61.     Even more specifically, Witness 1 was once in the fabrication manager's office when the fabrication manager received an angry phone call from the manager's immediate supervisor who worked at Defendant 1's central office.

62.     After the call, Witness 1 asked the fabrication manager how many head of cattle Slaughter Plant 1 would be cutting—i.e., fabricating—that day. The fabrication manager explained that the cut was going to be steady that day but that the number of cattle kills would be reduced because the cattle price was getting too high.

63.     Witness 1 then asked the fabrication manager whether the number of kills was also being reduced in other Defendants' plants. He answered Witness 1's question in words close to the following: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while."

64.     Witness 1 remembers that the fabrication manager used the word "agreement" in his answer and that he was referring to all of Defendants' plants in the Panhandle Region—in particular, Tyson's in Amarillo, Texas; JBS's in Cactus, Texas; Cargill's in Friona, Texas; and National Beef's in Liberal, Kansas. Each of these plants provides at least 20% of each Defendant's cattle slaughter capacity.

65.     According to Witness 1, the fabrication manager had first-hand knowledge of Defendants' anticompetitive agreement. He had been fabrication manager at Slaughter Plant 1 for over 15 years. As fabrication manager, he needed knowledge of Defendant 1's cattle

buying, cattle slaughter, and beef-sales operations. In performing his duties for Defendant 1, the fabrication manager regularly interacts with personnel involved in all aspects of Defendant 1's beef business, thus allowing him access to Defendants' conspiratorial conversations.

66.     According to Witness 1, the fabrication manager, before working for Defendant 1, worked for several years for another Defendant ("Defendant 2"). While at Defendant 2, the fabrication manager was the head of fabrication for Defendant 2's slaughter plant in the Panhandle Region ("Slaughter Plant 2").

67.     The fabrication manager told Witness 1 that he was in regular contact with his former colleagues at Slaughter Plant 2, including his replacement. The fabrication manager also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at plants operated by other Defendants.

68.     Because of these relationships, the fabrication manager often provided Witness 1 with detailed information concerning the current and future operations of Defendants' nearby packing plants.

69.     According to Witness 1, Slaughter Plant 1 had a 5,500–6,000 head per day slaughtering capacity but sometimes dropped its kill level to around 4,800–5,200 head per day when implementing Defendants' agreement. In addition to implementing Defendants' agreement by buying and slaughtering fewer cattle, Defendant 1 also colluded with the other Defendants to reduce beef supply by running its slaughter plants at reduced hours, operating its plants at lower chain speeds, and scheduling maintenance shutdowns.

**B.     As Planned, the Conspiracy Significantly Reduced Defendants' Beef Processing During the Class Period.**

70.     The impact of the Conspiracy was sudden and dramatic. Defendants'

collusive slaughter reductions throughout the Class Period are illustrated in Figures 5 and 6 below. Figure 5 compares the average annual slaughter volumes of each Defendant, as well as smaller beef producers in the market, before the Class Period (2007-2014) with their corresponding volumes during from 2015 through 2017, which is the portion of the Class Period for which data is available. This comparison shows that each of the Defendants significantly reduced its slaughter volumes during the Class Period while the smaller producers significantly increased their volumes.

**Figure 5: Average Pre- and Post-Class Period Fed Cattle Slaughter – Defendants vs. Smaller/Independents**



71.    Figure 6 also compares the annual slaughter volumes of Defendants and smaller producers before and during the Class Period but breaks these volumes out for each year of the Class Period for which data is available. In every year, each Defendant

slaughtered fewer cattle than it did before the Class Period. Also shown is that, while each of the Defendants gradually increased its slaughter volumes year over year during the Class Period, the rates of increase lagged far behind other producers' rates.

**Figure 6: Pre- and Post-Class Period Fed Cattle Slaughter – Defendants vs. Smaller/Independents by Year**



### C. Defendants Idled and Closed Plants and Refrained from Expanding Processing Capacity.

72.     The Conspiracy also entailed a longer-term strategy to restrict beef supplies. Defendants agreed to permanently close processing facilities without replacing most of the lost capacity. These actions came on the heels of reduced production capacity already caused by a series of plant closures shortly before the Class Period, including these:

      a.     On January 17, 2013, Cargill announced that it would shut down its Plainview, Texas, beef-processing facility, one of Cargill's larger plants, in just two

weeks. This closure cut Cargills's slaughter capacity by 4,650 cattle per day, which was "nearly 4% of the U.S. beef industry current capacity."[4]

b. On February 1, 2013, the same day Cargill shuttered its Plainview facility, Tyson reported a "reduction in live cattle processed" in its Q1 2013 Form 8-K. Tyson did so despite reporting "increased production due to sufficient cattle supply and strong demand for our beef products" for the previous quarter in its Q4 2012 Form 8-K.

c. JBS followed by acquiring an inactive plant in Nampa, Idaho, in April 2013, only to keep it idle. JBS stated that it had "no immediate plans to reopen the facility," which would have been capable of processing about 1,100 cattle per day, and it apparently remains idle to this day.

d. In June 2014, National Beef closed its Brawley, California, plant. This eliminated another 2,000 cattle per day of slaughter capacity.

e. The following month Cargill announced that it would also close its Milwaukee, Wisconsin, plant on August 1, 2014. This closure decreased the industry's slaughter capacity by another 1,300 to 1,400 cattle per day.

f. Also in 2014, Tyson shut down its Cherokee, Iowa, processing plant. Four years later, Tyson agreed to sell the plant to a competitor, but only on condition that "limited the amount of cattle that can be processed at the plant for the next 10 years."

73.     Defendants continued to shrink the beef industry's processing capacity when the Class Period began:

---

[4] Apr. 3, 2013 Votorantim Equity Research Report on JBS.

a. On September 11, 2015, Cargill announced that it would sell the Plainview, Texas, plant that it idled in February 2013.

b. For its part, Tyson reported a "reduction in live cattle processed" for each of the eight quarters from Q2 2014 to Q1 2016 in its Form 8-Ks for those quarters. Tyson did so despite "[l]ow production volumes relative to demand[,]" and "adequate supplies for [its] beef operations." These conditions had contributed the "historically high wholesale beef prices" that Tyson reported in its Ql 2014 8-K. In August 2015, Tyson decreased the industry's slaughter capacity by yet another 2,000 cattle per day by shuttering its Denison, Iowa plant.

74.   Defendants took other actions to restrict supply in the months leading up to and during the Class Period. Tyson closed a Cherokee, Iowa, processing plant in 2014. According to media reports, Tyson officials "told the city they would consider handing over the shuttered plant—but not to any firm that they believe is competition."5 In 2018, four years after the initial closure, Tyson allowed another company to purchase the plant, but only after inserting a requirement into the deed that "limited the amount of cattle that can be processed at the plant for the next 10 years."6

75.   By idling these plants, Defendants collectively slashed the industry's annual slaughter capacity by some two million cattle per year—excluding JBS's continued idling of the Nampa, Idaho, plant.

---

5 *Available at* https://www.desmoinesregister.com/story/money/business/ 2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/.

6 *Available at* https://www.desmoinesregister.com/story/money/business/ 2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/.

76.     Compounding the supply shortage, Defendants also underutilized the remaining capacity. To defend their actions, Defendants offered pretextual reasons, such as a lack of available cattle in the adjacent regions and plant inefficiencies.[7]

77.     Figure 7 below shows the effect of Defendants' underutilization of their cattle-slaughter capacity.

**Figure 7: Annual U.S. Fed Cattle Slaughter Capacity and Utilization Over Time.**



| Utilization Rates | |
|---|---|
| 2000-2012 | 91.3% |
| 2013 | 84.3% |
| 2014 | 81.9% |
| 2015 | 80.5% |
| 2016 | 85.4% |
| 2017 | 87.9% |
| 2018 | 89.3% |

78.     While this graph shows that overall industry slaughter capacity increased slightly between 2015 and 2018, this nominal gain was not the work of any Defendant. Rather, it was attributable to other beef-processing companies. For example, One World Beef Packing restored about 2,000 cattle per day by reopening the Brawley, California, plant closed by National Beef in 2014.

---

[7] National Beef even rejected a significant package of incentives offered by local government, utilities and nearby feedlots when it decided to close its Brawley plant. "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMEN (Mar. 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plantclosing-brawley-facility.

79.     Tyson completed upgrades to its Dakota City, Nebraska, plant in April 2015. But those were made only after repeated delays in a project that was originally scheduled to be completed about two years earlier. These upgrades fell substantially short of replacing the production capacity that Tyson had eliminated shortly before and during the Class Period.

**D.     Defendants Publicly Discussed Their Conspiracy and Encouraged Each Other to Maintain It.**

80.     One method that Defendants used to coordinate, promote, and monitor their Conspiracy (evident now only with the benefit of hindsight afforded by the disclosure of other now-apparent conspiratorial evidence) was to signal and, simply, discuss with each other their activities and plans during earnings calls. Examples of some communications include the following in chronological order:

- During a March 2013 Q4 earnings call, JBS affirmed that it would not increase capacity: "Yeah, so about beef in US like I mentioned and like you mentioned here in the call, we expect and we believe the market will improve in some way from the second quarter on. We are not adding capacity. So we will not increase or improve our capacity utilization in US because we need to balance in our business supply and demand. So everybody knows that the US herd is shrinking and there is less cattle available. So we are not going to increase capacity or to run our plants with better capacity utilization. Actually the other way around, we are also reducing in some extend, reduce some hours to balance better the market and to try to improve margin in our business."

- During a January 2014 Q1 earnings call, Tyson's COO stated that National Beef's decision to close its Brawley, California, plant "is consistent, I guess, with what we've been saying all along, as the calf crop declines and the noncompetitive

25

feedlot areas or noncompetitive plants or the combination thereof, we'll probably have to curtail production . . . to some extent, we've always felt that-and anticipated something like that would happen."

• During a May 2014 earnings call, JBS offered this industry forecast: "For 2015, I think beef will keep being tight. I don't see any increase in beef supply in 2015 in U.S."

• During an August 22, 2014, Q2 earnings call, JBS's Global CEO Wesley Mendonça Batista noted, "In the last 12 months or more, year-and-a-half, we saw five plants that [shut down in the U.S.], and [that definitely] is going to help to balance the supply and the industry capacity to be much more balanced, and we are optimistic that we are going to see good improvement on the beef business." He added, "[A] couple of things that we are more optimistic about the beef business in U.S. First of all is, of course, the industry adjusting capacity is a key factor. Five plants closed in the last year-and-a-half, so this looks almost 8,000 [head] per day out of the market, so for sure this is a key factor to help balance the industry to have a better margin and a better results . . . in our view, the worst period on the beef business is behind."

• The following quarter, Mr. Batista suggested during a November 2014 Q3 earnings call that JBS's recent acquisition of XL Foods' Omaha, Nebraska, plant was probably a mistake, and that slaughter capacity must be reduced in California and at least one other U.S. region. In his words, "If you want to be balanced you need to have capacity to be shut there."

• During a November 2014 Q4 earnings call, Tyson gave the other Defendants this projection: "So as you know with really high beef prices, beef volume is down. …

[W]e already know that the beef supply, the beef herds are going to be down another 4%, which portends pretty high beef prices again into the future."

- During Tyson's 2014 Investor Day, the company announced that high beef prices would prevail in the near future: "Now, if you look at elevated beef prices, coming in to this year, beef supply will be down about 5% or so versus last year. Next year, because we already see the calf crop, we know that next year's beef supply will be down another 4% or so. So, elevated beef prices are here to stay for a while. It would take us several years, maybe out to 2020 to be able to grow the supply of cattle back to FY 2013 number. So we're going to have high beef prices for a while . . . ." Tyson went on to explain how the reduction in supply was contributing to greater profit margins: "By rationing that [cattle] supply, by lowering that volume coming into the market, we're able to generate that margin spread. And that's not going to change anytime soon. As we continue on in these tightened supply periods, we're going to continue to manage margin. And our expectation as we roll into next years, we're going to see similar type earnings as what we've seen."

- During a May 2014 Q4 earnings call, Tyson communicated that it was striving for margin and not market share: "For fiscal 2015, we expect fed cattle supply to be down 5% to 6% from last year. And we think we've experienced the bottom of the beef supply cycle. After this year, we believe we'll see slow incremental improvement in supply. Our beef segment results should improve in the back half of the year, and while profitable for the year, fiscal 2015 results are expected to be below fiscal 2014. It is important to remember that we'll continue to run our beef business for margin not market share."

- During Tyson's Q3 earnings call, its then-CEO Donald Smith stressed the need for further slaughter reductions in the industry: "Because we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate, and conditions are expected to improve for the long term." He also admitted that "industry capacity utilization [was] probably in the low 70s."

- During Tyson's call for the following quarter, Mr. Smith further acknowledged that "excess industry capacity . . . limits [Tyson's] ability to drive margins above[] 1.5% to 3%, we think."

- On JBS's November 12, 2015, Q3 earnings call, Andre Nogueira de Souza publicly praised Defendants' efforts to reduce industrywide slaughter capacity through plant closures, remarking that "the reduction that we saw in the capacity of production in U.S. . . . with the shutdown of 90 plants the last two years reduce the cattle—the capability of U.S. to process 3.5 million," which had placed the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."

- On a May 2016 Ql earnings call, JBS's Mr. Nogueira de Souza described the company's supply strategy: "So I don't see any imbalance in this near future, even cattle is coming back and we're going to see a little bit more production of beef this year and next year. It's still way, way below how it was few years ago and we'll be balancing at this side because a lot of plant was shut but it's too way below our historical production level."

These examples demonstrate Defendants' implementation and development of their Conspiracy.

## VI.   EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS

### A.   As Defendants Intended, the Conspiracy Increased the Spread Between Cattle and Beef  Prices.

81.   Droughts from 2011 through 2013 caused fed cattle prices to steadily increase. Predictably, wholesale prices of beef moved in tandem, maintaining a constant relationship (or margin) between the two. As a result, Defendants' profits on average were trimmed to margins of only 1 to 3%.

82.   DOJ has recognized that when the beef market is functioning competitively a strong relationship exists between the supply of cattle and the price of beef charged to direct purchasers:

> [A]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer  profits.

83.   Thus, in a competitive market lower wholesale beef prices naturally follow lower cattle prices. Once the Conspiracy took hold, the spread between cattle and beef prices grew significantly. Defendants' restriction of the beef supply caused cattle prices to slump while they charged direct purchasers elevated prices for beef that would not have existed in the market but for Defendants' artificial supply restraints.

### B.   Tyson and JBS Falsely Claimed That Their Record Profits Were the Fruit of Market Prescience, Not Supply Constraints.

84.   Tyson and JBS continued to report higher profit margins throughout 2017 and 2018. On earnings conference calls during this period, executives from JBS and Tyson frequently attributed their historically high profits to their ability to accurately foresee the

volume of cattle that would enter the beef supply chain in the upcoming years. Examples of these boasts include the following:

- On August 7, 2017, Tyson reported a beef-business operating margin of 3.7% for the third quarter and emphasized its confidence in the beef business going forward: "With ample supplies of cattle, we see very good conditions for our beef business as far out as 2020, as we enter the early stages of a multiyear expansion cycle. Absent a shock to the system such as a drought or an import ban, our beef business is well-positioned for profitable, long-term growth." Tyson acknowledged that it was considering raising its previously forecasted 1.5–3% normalized operating margins. But despite ample supply of cattle and high demand for beef, Defendants did not increase cattle purchases or cattle slaughter.

- On May 7, 2018, Tyson announced forecasted beef operating margins of 6% for the year—at least twice its normalized operating margin range of 1.5–3%. Tyson claimed the huge jump was attributable to "those cattle on feed reports and knowing that the supplies in our region are exceptionally good."

- On May 15, 2018, JBS reported an EBITDA margin of 6.1% for the quarter and forecasted that the company would enjoy record beef margins for the next two quarters. JBS emphasized that its performance was not based on "taking share from anyone."

- On August 6, 2018, Tyson reported a beef operating margin of 8% for the quarter. Tyson stated that it had an "optimistic outlook" because "we have good visibility into 2021 . . . that's good because we do see the number of animals that are out there."

- On August 15, 2018, JBS reported a beef EBITDA margin of 10.2% for the quarter and stated that it was "moving the overall margin in beef [to] a different level that was in the past." JBS went on to say that it benefitted from shutting several plants in the previous five years, and that it could not see how U.S. beef could "be less profitable in 2019 compared to 2018."

- On November 13, 2018, Tyson reported record beef operating margins of 8.9% for the quarter and 6.7% for the year and stated that it expected similar results in the following years thanks to visibility into cattle supply: "As we look at 2019, 2020, even in 2021 we frankly we don't see a lot of change. The supply appears to be relatively stable. We have a good sense of what that looks like just due to the calf crop that gives us good visibility for at least a couple of years."

## VII.   ADDITIONAL FACTORS FACILITATING THE CONSPIRACY

### A.   Defendants Took Advantage of Numerous Opportunities to Collude.

85.   Defendants are members of industry trade associations and forums and regularly attend industry events, including the events listed below. These events provide opportunities to exchange pricing, supply, and other competitively sensitive information.

86.   For example, the National Cattlemen's Beef Association ("NCBA") holds an annual convention, CattleCon, which includes a summer conference, legislative conference, and regional meetings. The NCBA Product Council, which includes representatives of Defendants, meets quarterly for an invitation-only beef executive forum. Defendants also participate in meetings of the Beef Checkoff program run by the Federation of State Beef Councils, held contemporaneously with the NCBA summer and winter meetings.

87.   The U.S. Meat Export Federation, a trade association that develops export opportunities for U.S. protein producers and whose leadership includes current and former

31

employees and officers of Defendants, also holds both spring and fall conferences and monthly international trade shows.

88.     Defendants were among the founding members of the Global and U.S. Roundtables for Sustainable Beef, and they remain members. Defendants participate in its annual meetings each spring, and JBS and Cargill have leadership positions in some of the working groups.

89.     Defendants also came together for numerous meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute. Each Defendant maintained membership in these organizations throughout the Class Period and populated their boards. These representatives included:

- Cargill's John Keating;

- JBS's Andre Nogueira de Souza, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp;

- National Beef's Tim Klein; and

- Tyson's Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren.

90.     The beef industry's Annual Meat Conference, described on the event's website as "a complete education and networking experience," provides another opportunity for Defendants to confer. Many of Defendants' high-level executives have been attending this conference for years. The list of registered attendees in 2012, for example, included eight executives from JBS, Tyson's then-CEO Donnie Smith, and twelve other Tyson executives.

91.     Until April 2017, NAMI sponsored an annual Meat Industry Management Conference, which offered topics such as economics and general business. That conference was then replaced by an annual Meat Industry Summit. This summit has sponsored

"networking opportunities and social events" including a golf tournament, receptions, an "Issues, Answers, Actions Breakfast," the annual NAMI board meeting, and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

92.     These industry events afford Defendants' top executives and other employees frequent opportunities to discuss pricing, production, and other proprietary information in an informal setting and to monitor compliance with the Conspiracy.

**B.      Defendants Further Exacerbated their Supply Restraints by Reductions in Imports.**

93.     Defendants did not offset their slaughter reductions by importing more cattle into the United States. Rather, imports began decreasing in 2015 and continued to drop throughout the Class Period. Figure 8 captures this trend:

**Figure 8**



Source: ERS calculations using data from U.S. Department of Commerce, Bureau of the Census.

94.     Defendants' reduced domestic slaughtering and reduced cattle imports for slaughter combined to raise above competitive levels beef prices paid by Central Grocers and other Class members.

**C.     Defendants' Market Shares Were Stable During the Class Period.**

95.     In a competitive market, market shares fluctuate as producers compete for and gain business from each other. Stable market shares over time can suggestive anticompetitive behavior like Defendants'.

96.     Although market-share stability does not itself prove collusion, it strongly suggests operation of an effective cartel that has agreed not to compete. A marked decline in

34

market-share volatility over time may suggest a conspiracy in a previously competitive market.

97.     Available data show that Defendants' market shares, measured by wholesale beef sales, became more stable during the Class Period. The same is true for their market shares as measured by slaughter capacity.

## VIII.  ANTITRUST INJURY

98.     The cattle market is an oligopsony consisting of the Defendants which purchase most of the cattle for slaughter and produce most of the beef sold in the wholesale market. When Defendants colluded to restrict supply, the market effectively became a monopsony that left cattle ranchers with no choice but to accept whatever price Defendants offered.

99.     In a competitive market, the volume of cattle purchased by beef producers would equal the volume where supply matches the demand/marginal revenue product curve and the price for that cattle would be the additional revenue that the producers would receive for cattle. When Defendants collaborated to restrict supply, they exercised their monopsony power to compel cattle ranchers to accept the price Defendants offered, thus driving down the market price. In this manner, Defendants' monopsony power enabled them to maximize their profit by purchasing fewer cattle at a lower price.

100.    Further, because imported beef was not offsetting the shortages that Defendants created, the restricted supply of cattle caused a restricted supply of beef in the downstream market to direct purchasers, like Central Grocers. Because Defendants have and had accompanying downstream market power, they were able to maximize their profits by colluding to produce volumes based on their marginal revenue curve instead of the market

demand curve, which increases wholesale prices paid by Central Grocers and other Class members.

101.    Without fear of competition from other meatpackers, Defendants' collusion had the dual effect of (1) artificially decreasing the price which Defendants paid for cattle; and (2) artificially increasing the price they charged for their beef products.

102.    Defendants' collective monopsony power and anticompetitive conduct had the following effects, among others:

- Price competition in the beef market was restrained or eliminated;

- Prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators, and, in turn, by other beef producers, were raised and fixed at artificially high, noncompetitive levels throughout the United States;

- Direct purchasers of beef were deprived of free and open competition; and

- Direct purchasers paid artificially inflated prices.

103.    The purpose of Defendants' and their co-conspirators' conduct was to raise, fix, or maintain the price of beef above a competitive level. As a direct and foreseeable result, Central Grocers and Class members paid supracompetitive prices for beef during the Class Period.

104.    Defendants' violations of the Sherman Act caused Central Grocers and other Class members to suffer injury to their businesses or property.

105.    This harm is an antitrust injury of the type that the antitrust laws were designed to punish and prevent.

IX.    **DEFENDANTS ACTIVELY CONCEALED THE CONSPIRACY.**

A.    **Defendants Fraudulently Concealed The Conspiracy from Central Grocers.**

106.    Throughout the Class period, Defendants used various means and methods to affirmatively and fraudulently conceal the Conspiracy from Central Grocers and other Class members. These actions included but were not limited to secret meetings, surreptitious communications between Defendants by telephone or in-person meetings to prevent the existence of written records, to limit any explicit reference to competitor pricing or supply-restraint communications on documents, and to communicate competitively sensitive data to each another.

107.    By its very nature, the Conspiracy was self-concealing. Beef is not exempt from antitrust regulation, so until recently Central Grocers reasonably believed the beef industry was competitive. A reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' unlawful conduct until recently.

108.    Defendants took the following affirmative acts separate and apart from their Conspiracy, solely to conceal it:

- orchestrating price increases and slaughter behavior to avoid arousing customers' suspicions;

- allocating customers, communicating by phone so as not to leave a paper trail in the normal course of Defendants' business, and giving false reasons for price increases and slaughter behavior that were separate and apart from the true facts affecting Defendants' business;

- offering false or pretextual rationales for the low prices of cattle, which prices were entirely separate from and unrelated to Defendants' actual cattle prices;

- affirmatively lying to customers about why they were closing their plants by fabricating reasons that were separate and apart from Defendants' actual reasons for their plant closings;

- affirmatively concocting messaging separate and apart from the truth that explicitly and implicitly represented that the cattle bids and contract terms offered to Central Grocers and Class members were the product of honest competition and not a conspiracy; and

- affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws.

109.    Until the recently launched DOJ and USDA investigations, no well-publicized or other investigations into the Defendants' conspiracy were underway during the Class period that should have excited Central Grocers' attention by suggesting there was something wrong with the beef market. The fact that the government, during the Class period, was investigating conspiracies into seafood and broilers did not, as a matter of law, mean that beef purchasers were on notice of the potential for a conspiracy in sale of beef because these investigations do not involve beef.

110.    As summarized above, Defendants created and provided justifications for plant closures, slaughter reductions, and withdrawal from the cash cattle trade that were unrelated to the truth and were fabricated for the purpose of disguising Defendants' illegal behavior.

111.    The Conspiracy was inherently self-concealing because it depended on secrecy for its successful operation, contemplated concealment, and its concealment was in furtherance of Defendants' conspiracy. In such a conspiracy, the Court may impute the affirmative acts of concealment of one or more of the Defendants to their co-conspirators for purposes of tolling the statute of limitations.

112.     Had the public learned that Defendants were conspiring to limit supply and fix prices, the Conspiracy could not have survived for long as it did. Central Grocers could not have learned of Defendants' anticompetitive conduct until recent disclosures by Witness 1, an industry insider, of otherwise inaccessible information.

113.     As a consequence of Defendants' fraudulent concealment of the Conspiracy, the statute of limitations has been tolled with respect to Central Grocers' and Class members' Sherman Act claim.

114.     In keeping with the above-expressed standard, examples of Defendants' affirmative fraudulent concealment separate and apart from its regular and collusive business activities include:

       1.     <u>Cargill</u>

115.     To facilitate the Conspiracy, Cargill made public statements concealing Defendants' unlawful activity. For example, Cargill used its 2017 Annual Report to explain that "[r]enewed consumer demand for beef [produced] favorable market conditions in North America." The following year, Cargill proclaimed that its Animal and Nutrition & Protein segment's "strong performance" in 2018 was "fueled by rising domestic and export demand for North American beef" rather than through its price-fixing scheme, which reference Cargill understandably avoided.

116.     Cargill made these false public statements to obscure its role and participation in the Conspiracy. Instead of disclosing that its "strong performance" stemmed from the illegal profits, Cargill concocted fabricated business justifications such as "favorable market conditions" and "rising domestic and export demand."

2.    JBS

117.   To facilitate the Conspiracy, JBS made public statements to conceal

Defendants' unlawful activity. For example, in November 2015 JBS executive Andre

Nogueira declared that "[c]attle price will go down" in the United States because "we are

going to see more cattle available." Similarly, in March 2016 JBS CEO, Wesley Mendonca

Batista, stated that JBS would see "better margin[s]" due to an "increase in the herd in the

U.S." JBS executives continued to make such statements throughout 2016, 2017, and into

2018, regularly claiming that JBS's strong financial performance in the United States was a

result of "more cattle available in the U.S.," "cattle price[s being] back to the normal level,"

and "strong demand for beef."

118.   JBS made these false public statements to disguise its role and participation in

the Conspiracy. Instead of disclosing that the "improvement in EBITDA margin" was the

result of illegal profits from the Conspiracy, JBS offered false business justifications such as

"more cattle available in the U.S." and cattle prices returning "back to the normal level."

3.    National Beef

119.   To facilitate the Conspiracy, National Beef, through its majority shareholders

Jefferies Financial Group Inc. and later Marfrig Global Foods S.A. used public statements to

conceal Defendants' unlawful activity.

120.   On information and belief, National Beef provided every false public statement

made by Jefferies and Marfrig to conceal the Conspiracy. For example, in October 2015

Jefferies stated that the anticipated expansion of the cowherd "bodes well for [meatpacking

industry] margins as it will lead to an increase in the number of fed cattle available for

slaughter." In October 2016, Jefferies explained that the "rebuilding of the domestic US

cattle herd ha[d] dramatically affected the market for fed cattle" when justifying how,

40

"[f]rom June 27, 2015 to June 25, 2016, the average market price per pound  of  fed cattle ha[d] fallen from $1.48 to $1.16."

121.    Jefferies offered similar justifications throughout 2017 and 2018, such as "National Beef generated record results for [the last 12 months] on the back of a more balanced supply of cattle and robust end market demand"; "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016";  "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins"; and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins." These statements were made during Jefferies Financial Group Investor Day presentations in 2015, 2016, and 2017, at which National Beef's CEO and President, Tim Klein, was scheduled to speak on topics related to National Beef's performance.

122.    Marfrig similarly offered false justifications for the low prices caused by the Conspiracy after Marfrig acquired a controlling stake in National Beef.

123.    For example, Marfrig reported in November 2018 that "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."

124.    In 2018, during a third-quarter company earnings call, Marfrig executives reiterated the preceding paragraph's point by claiming that "the U.S. beef industry has delivered record results" because of "an ample supply of cattle" and "strong demand in both the domestic and international markets." Although Marfrig declared that it had attained record results and better margins while reducing cattle slaughter volumes, it misrepresented

that these results were due to "fewer weeks in the third quarter 2018 compared to the third quarter 2017."

125.    National Beef CEO, Timothy M. Klein—referred to by Marfrig CEO, Eduardo de Oliveira Miron, as "CEO of [Marfrig's] North American Operations"—participated in the 2018 call.

126.    Marfrig announced in the fourth quarter of 2018 that it attained a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."

127.    Jefferies and Marfrig made these pretextual public statements on behalf of National Beef—which, as alleged above, was the original source of their pretextual public statements—to obscure its role and participation in the Conspiracy. Instead of disclosing that its record results and better margins stemmed from the illegal prices implemented by the Conspiracy, Jefferies and Marfrig claimed these results were due to ample supply of cattle, higher cattle availability, and strong demand.

#### 4.    Tyson

128.    To facilitate the Conspiracy, Tyson made public statements to conceal Defendants' unlawful activity. For example, Tyson used its SEC filings from 2015 to 2018 to declare that it had "limited or no control" over the pricing and production of cattle, because prices were "determined by constantly changing market forces of supply and demand."

129.    As for the factors that influence the cost of cattle, Tyson identified "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign governments."

130.    Tyson further stated that it "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with current cattle supplies." Tyson claimed that "[t]he beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."

131.    Rather than truthfully disclose that the Conspiracy improved its earnings, Tyson issued false business justifications such as lower fed cattle costs and favorable market conditions. Tyson made these misrepresentations to cover up its role and participation in the Conspiracy.

132.    During the Class period, Defendants also publicly lied about having complied with antitrust laws:

- National Beef's former majority shareholder, Jefferies Financial Group acknowledged in its 2014 Annual Report that National Beef was "subject to extensive government regulation," including the USDA's.

- Tyson's Code of Conduct boasts that "[w]e compete in the market with integrity and comply with competition laws ... We comply with the letter and spirit of competition laws (also referred to as "antitrust" laws) wherever we do business."

- JBS's 2014 Annual Report states that the company has clear policies "[t]o ensure ethical conduct and integrity in the management of its business," including a Manual of Ethical Conduct "that addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices, and other sensitive topics."

- Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built We conduct our business with integrity We compete vigorously, but do so fairly and ethically. We . . . comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reaffirmed this commitment in subsequent Corporate Responsibility reports.

133.    An April 2018 General Accounting Office report did not reveal Defendants' anticompetitive conduct. The GAO had limited investigative authority and "did not obtain and review internal packer documents." This report did not consider whether Defendants engaged in anticompetitive behavior of the type alleged here. Central Grocers and other customers of Defendants have neither obtained nor reviewed internal packer documents.

134.    Defendants' concealment was successful—that is, as a result of Defendants' concealment, Central Grocers failed to discover the existence of its antitrust claim.

135.    Because of Defendants' fraudulent concealment, Central Grocers and the Class members had insufficient information concerning Defendants' misconduct on which to base a complaint and could not have discovered, until recently, Defendants' Conspiracy through the exercise of due diligence.

136.    Central Grocers used due diligence to detect the existence of any Conspiracy, though, because of Defendants' fraudulent concealment, Central Grocers had no real means of discovery in its power. And because nothing done by Defendants created notice or excited Central Grocers' attention (rather, Defendants' behavior encouraged precisely the opposite), Central Grocers' inquiry was not required.

137.    Because of Defendants' preceding affirmatively made public statements that they made separate and apart from their Conspiracy, Central Grocers' attention was not excited sufficient to require it to take affirmative steps to disclose Defendants' Conspiracy. Relatedly, DOJ's investigation into the seafood and broilers industries did not—and could not have been expected to—excite Central Grocers' attention because they did not involve the beef industry. For these reasons, no facts exist suggesting that Central Grocers suspected or should have suspected that Defendants were fixing the beef market.

138.    Central Grocers has acted diligently in seeking to bring its claims promptly. Accordingly, it has tolled the statute of limitations on its and Class members' Sherman Act claim.

**B.      Continuing Violations**

139.    The Conspiracy began operating on or about January 1, 2015, and continues to operate today.

140.    Defendants are involved in a price-fixing that brought about a series of unlawfully high-priced sales during the Class period and sales to Central Grocers and Class members during the class period.

141.    Defendants engaged in the Conspiracy to suppress the supply of fed cattle entering the beef value chain. This induced the higher beef prices paid by Central Grocers and Class members.

142.    As a direct result of Defendants' unlawful conduct throughout the Class period, Defendants were able to and did sell beef to Central Grocers and Class members at artificially inflated prices.

143.    Defendants' above-chronicled statements and actions based upon them in furtherance of the Conspiracy demonstrate that they continued to meet during the Class

period to fine-tune their cartel agreement. Their meetings were overt acts that began a new statute of limitations because they served to further the objectives of the conspiracy.

144.    The discussions that generated the above-chronicled statements and actions based upon them demonstrate how Defendants continued to meet to fine-tune their cartel agreement, as every statement involved different facts and suggestions but sprang from the same seed—Defendants' Conspiracy.

145.    In this manner, Defendants' new overt acts were more than the unabated inertial consequences of Defendants' initial violation. Rather, their acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Central Grocers and Class members.

146.    Defendants' above-chronicled acts, which were new acts beyond the initial price fixing that were required to perpetuate Defendants' agreement, have continued throughout the Class period. Each sale of boxed beef by one of the Defendants at a supracompetitive price was a new overt act that was part of Defendants' antitrust violation that injured Central Grocers and Class members and started the statutory period running again.

147.    Defendants continue to engage in the anticompetitive conduct alleged in this Complaint, still selling beef at artificially inflated prices.

## X.    CLASS ACTION ALLEGATIONS

148.    Central Grocers invokes Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following class:

All persons and entities who purchased beef directly from any of the Defendants, or their respective subsidiaries or affiliates, for use or delivery in the United States from at least January 1, 2015, until the present. Specifically excluded from this Class are Defendants; their officers, directors or employees; any entity in which a Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of a Defendant. Also excluded from this Class are any federal, state, or local governmental entities, any judicial officer presiding over this action, the members of the judicial officer's immediate family and staff, and any juror assigned to this action.

149.   Class Identity: The Class is readily identifiable and one for which adequate records exist.

150.   Numerosity: Due to the nature of the trade and commerce involved, Central Grocers believes there are thousands of Class members. Defendants know the exact number and their identities.

151.   Typicality: Central Grocers' claims are typical of the claims of the Class members because Central Grocers purchased beef directly from one or more Defendant during the Class period and has been injured in the same way—by paying more for beef than it would have but for Defendants' Conspiracy. Central Grocers' claims arise from the same common course of conduct, give rise to the same claims of injury, and seek the same relief as those of the other Class members.

152.   Common Questions Predominate: Questions of law and fact common to the Class, which generate common answers, include but are not limited to:

A.   Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of beef sold in interstate commerce in the United States;

B.   The identity of the participants of the alleged conspiracy;

C.   The duration of the Conspiracy;

> D.      The acts performed by Defendants and their co-conspirators in furtherance
>         of the Conspiracy;
>
> E.      Whether the Conspiracy violated Section 1 of the Sherman Act, 15 U.S.C.
>         §1;
>
> F.      The effect of the Conspiracy on the price of beef sold in the United States
>         during the Class Period;
>
> G.      Whether Central Grocers and other Class members suffered antitrust injury
>         as a result of the Conspiracy;
>
> H.      The appropriate measure of damages for injury suffered by Central
>         Grocers and other Class members; and
>
> I.      Whether Central Grocers and other Class members are entitled to
>         injunctive relief, and the nature and extent of such injunctive relief.

These and other questions of law and fact common to all members of the DPP Class

predominate over questions affecting only individual members of the Class.

153.    Adequacy: Plaintiff will fairly and adequately protect the interests of the Class

because Central Grocers' interests are aligned with, and not antagonistic to, those of the other

Class members. Plaintiff has retained counsel competent and experienced in the prosecution

of class actions and antitrust litigation to represent them and the Class.

154.    Superiority: A class action is superior to other available methods for the fair

and efficient adjudication of this controversy for reasons including the following: (1)

individual joinder of all class members is impractical; (2) prosecution as a class action will

eliminate the possibility of duplicative litigation; (3) prosecution of separate actions by

individual Class members would create the risk of inconsistent or varying decisions and

adjudications, creating uncertain and potentially incompatible standards for adjudicating the

claims and defenses asserted in this action; (4) the relatively small amount of damages suffered by individual Class members, when compared to the expense and burden of individual prosecution of their individual claims, preclude feasible and practical individual actions to seek redress for the violations alleged; and (5) individual litigation would greatly magnify the delay and expense to all parties and to the court system. For these reasons, a class action will reduce case management difficulties and provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

155.    In addition, Defendants have acted on grounds generally applicable to the Class, making final injunctive relief appropriate for the Class as a whole.

## XI.    VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

156.    Central Grocers incorporates and realleges every allegation set forth in the preceding paragraphs of this Complaint.

157.    Beginning at least as early as 2015 and continuing through the present, the exact dates unknown to Central Grocers, Defendants and their co-conspirators entered into and engaged in a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade to artificially fix, raise, and stabilize the wholesale price for beef in the United States, creating anticompetitive effects, in violation of Section 1 of the Sherman Act.

158.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

159.    Defendants and their co-conspirators conspired to conceive and further the objects of the Conspiracy, as alleged above, including but not limited to the following acts, practices, and course of conduct:

- Fixing, raising, and stabilizing the wholesale price of beef; and

- Allocating among themselves and collusively reducing the production of beef.

160. The combination and conspiracy alleged has had these effects, among others:

- Price competition in the sale of beef has been restrained, suppressed, and eliminated in the United States;

- Prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Central Grocers and other Class members who directly purchased beef from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, were deprived of the benefits of free and open competition in the purchase of beef.

161. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for beef throughout the United States because Defendants sell their beef throughout the country and in every state.

162. The conspiratorial acts and combinations have caused unreasonable restraints in the market for beef.

163. Central Grocers and other Class members have been injured and will continue to be injured in their businesses and property by paying more for beef purchased directly from Defendants and their co-conspirators than they would have paid and will pay absent the Conspiracy.

164. The alleged contract, combination, understanding, agreement, or conspiracy is a per se violation of the federal antitrust laws.

165.    Central Grocers and other Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged.

## XII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Central Grocers and other members of the Class, requests that the Court grant the following relief:

A.      Determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Central Grocers as Class representative and its counsel of record as Class counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      Adjudge that the Conspiracy and the acts done by Defendants and their co-conspirators in furtherance thereof violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      Enter judgment for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Central Grocers and other Class members as a result of Defendants' violations of Section 1 of the Sherman Act and costs of this action, including reasonable attorneys' fees, as permitted Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

D.      Award Plaintiff and the members of the Class prejudgment and postjudgment interest at the highest legal rate from commencement of this proceeding, to the extent allowed by law;

E.      Permanently enjoin Defendants and their co-conspirators, their respective affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing, maintaining or renewing the conduct, conspiracy, or combination and

from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect caused by any further violation of the antitrust laws; and

F.      Such other and further relief as the Court may deem just and proper under the circumstances.

## XIII.  JURY TRIAL DEMANDED

Central Grocers demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

| | |
|---|---|
| Dated:  June 6, 2020 | /s/ Vincent J. Esades<br>Vincent J. Esades<br>HEINS, MILLS & OLSON LLP<br>310 Clifton Avenue<br>Minneapolis, MN 55403<br>Tel:  (612) 338-4605<br>vesades@heinsmills.com<br><br>Jason S. Hartley<br>HARTLEY LLP<br>101 W. Broadway, Suite 820<br>San Diego, CA 92101<br>Tel:  (619) 400-5822<br>Email: hartley@hartleyllp.com<br><br>Daniel R. Karon<br>KARON LLC<br>700 W. St. Clair Ave., Suite 200<br>Cleveland, OH 44113<br>Tel: (216) 622-1851<br>Email: dkaron@karonllc.com<br><br>Douglas A. Millen<br>FREED KANNER LONDON &<br> MILLEN LLC<br>2201 Waukegan Road, Suite, 130<br>Bannockburn, IL 60015<br>Tel: (224) 632-4500<br>Email: dmillen@fklmlaw.com<br><br>*Special Litigation Counsel to Howard B. Samuels,*<br>*Chapter 7 Trustee for the estates of Central*<br>*Grocers, Inc., Strack and Van Til Super Market,*<br>*Inc. and SVT, LLC, and the putative Direct*<br>*Purchaser Class* |