# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

*IN RE CATTLE AND BEEF ANTITRUST LITIGATION*

This Document Relates To:

CONSUMER INDIRECT PURCHASER PLAINTIFF ACTION

Case No. 0:20-cv-01319 (JRT/HB)

**CONSUMER INDIRECT PURCHASER PLAINTIFFS' FOURTH AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

***REDACTED VERSION***

# TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION .................................................................................. 1

II.   JURISDICTION AND VENUE .................................................................. 18

III.  PARTIES ...................................................................................................... 19

      A.    Plaintiffs ........................................................................................... 19

      B.    Defendants ........................................................................................ 25

            1.    The Tyson Defendants ............................................................ 25

            2.    The JBS Defendants ............................................................... 26

            3.    The Cargill Defendants .......................................................... 29

            4.    National Beef .......................................................................... 30

IV.   THE MEATPACKING DEFENDANTS CONSPIRED TO ELEVATE THEIR
      MARGINS BY DEPRESSING THE PRICE THAT THEY PAID TO
      ACQUIRE CATTLE .................................................................................... 30

      A.    Industry Background ......................................................................... 31

      B.    The Meatpacking Defendants coordinated to reduce output, elevate
            their margins, and suppress the prices paid to beef farmers. ........... 35

            1.    Mr. Hooker Was Well Positioned to Know About Defendants'
                  Agreement ............................................................................... 37

            2.    Witness 1 Learns of an Agreement Among Defendants ......... 40

            3.    The Available Data Corroborates Witness 1's Account ......... 43

            4.    Meatpacking Defendants Agreed to Slash Cash Cattle Purchases
                  During Slaughter Reductions ................................................. 48

      C.    Meatpacking Defendants Coordinated their Procurement Practices for
            Cash Cattle ....................................................................................... 55

            1.    The Meatpacking Defendants continued to import foreign cattle
                  after it became uneconomical for them to do so. .................. 72

      D.    Meatpacking Defendants Agreed to Restrict Their Slaughtering
            Capacity ............................................................................................ 77

V.   PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE OF
     FED CATTLE TO COLLAPSE AND SUPPRESSED PRICES
     THEREAFTER ................................................................................................ 81

     A.   Meatpacking Defendants' Conduct Precipitated the Collapse in Fed
          Cattle Prices in 2015 ........................................................................... 81

     B.   Meatpacking Defendants' Ongoing Conduct Continues to Depress Fed
          Cattle Prices across 2016 ..................................................................... 94

     C.   Meatpacking Defendants Continue their Scheme in 2017 and 2018
          despite Increased Cattle Availability ................................................. 100

     D.   2019 and 2020 Bring Continued Parallel Slaughter and Pricing
          Behavior, a Fire at a Plant, and Regulatory Investigations............................ 104

          1.   Defendants react to a processing plant fire by dropping cattle
               prices and raising beef prices .................................................. 113

          2.   USDA continues to investigate Meatpacking Defendants' price
               manipulation following the Holcomb fire and during the
               COVID crisis ............................................................................ 119

     E.   Economic Analysis Supports the Existence of the Alleged Conspiracy......... 121

          3.   Supply and Demand Principles Do Not Explain the 2015 Price
               Collapse or Subsequent Low Cattle Prices ......................................... 121

          4.   Explanations Proffered for the Drop in Fed Cattle Prices Do Not
               Withstand Scrutiny.................................................................... 132

VI.  STRUCTURE OF THE BEEF PACKER INDUSTRY  IS CONDUCIVE TO
     THE CONSPIRACY ..................................................................................... 133

     A.   The beef meatpacking industry was highly concentrated. ............................ 134

     B.   The beef packer market featured high barriers to entry. ............................ 137

     C.   Beef is a commodity product. ............................................................. 138

     D.   The beef meatpacking market featured unusual market share stability
          during the relevant period. .............................................................. 139

     E.   The demand for beef is inelastic. ........................................................ 141

     F.   Abnormal pricing during the Class Period demonstrates the success of
          the collusive scheme. .................................................................... 142

G.      Overcharges due to the cartel were passed through to the indirect
        purchaser class. ............................................................................................ 143

H.      The elevation in processor margins during the Class Period is not
        explained by changes in export levels or international demand for beef ........ 147

I.      The Meatpacking Defendants had numerous trade organizations and
        opportunities to meet and collude. ................................................................. 149

J.      The Meatpacking Defendants have significant oversight of each other's
        prices and production decisions. ..................................................................... 151

VII.    THE MEATPACKING DEFENDANTS' CONDUCT IS THE SUBJECT OF
        ONGOING INVESTIGATIONS IN THIS AND RELATED INDUSTRIES .......... 153

A.      The DOJ Is Investigating the Meatpacking Defendants for Price-Fixing,
        Market Manipulation and Unfair Practices in the Cattle and Beef
        Markets. .......................................................................................................... 153

B.      The USDA Is Investigating Defendants' Activities in Light of the Fire
        at Tyson's Holcomb Plant and COVID-19-related Market Disruptions ........ 155

C.      JBA S.A.'s Brazilian Parent and Related Companies Are Guilty of
        Bribery and Corruption ................................................................................... 157

D.      The Conduct Alleged Here is Similar to Conduct in the Broiler Chicken
        and Pork Markets. ........................................................................................... 159

E.      The Meatpacking Defendants actively concealed the conspiracy. ................. 161

F.      The Meatpacking Defendants' conspiracy continues through the
        present. ............................................................................................................ 165

VIII.   CLASS ACTION ALLEGATIONS ........................................................................ 166

IX.     ANTITRUST INJURY .......................................................................................... 172

X.      CAUSES OF ACTION .......................................................................................... 174

VIOLATION OF THE SHERMAN ACT .......................................................................... 174

FIRST CLAIM FOR RELIEF
VIOLATION OF SECTION 1 OF THE SHERMAN ACT  15 U.S.C. § 1
(ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND
EQUITABLE RELIEF) ..................................................................................................... 174

VIOLATIONS OF STATE ANTITRUST LAWS ............................................................... 175

SECOND CLAIM FOR RELIEF
     VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,
     ARIZ. REV. STAT. § 44-1401, *ET SEQ.* (ON BEHALF OF THE ARIZONA
     CLASS) ......................................................................................................... 176

THIRD CLAIM FOR RELIEF
     VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,
     CAL. BUS. & PROF. CODE § 16700, *ET SEQ.* (ON BEHALF OF THE
     CALIFORNIA CLASS) ................................................................................... 177

FOURTH CLAIM FOR RELIEF
     VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT,
     D.C. CODE § 28-4501, *ET SEQ.* (ON BEHALF OF THE DISTRICT OF
     COLUMBIA CLASS) ..................................................................................... 178

FIFTH CLAIM FOR RELIEF
     VIOLATION OF THE ILLINOIS ANTITRUST ACT,
     740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.* (ON BEHALF OF THE
     ILLINOIS CLASS) ........................................................................................ 179

SIXTH CLAIM FOR RELIEF
     VIOLATION OF THE IOWA COMPETITION LAW
     IOWA CODE § 553.1, *ET SEQ.* (ON BEHALF OF THE IOWA CLASS).............. 180

SEVENTH CLAIM FOR RELIEF
     VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT
     KAN. STAT. ANN. § 50-101, *ET SEQ.* (ON BEHALF OF THE KANSAS
     CLASS) ......................................................................................................... 181

EIGHTH CLAIM FOR RELIEF
     VIOLATION OF THE MAINE'S ANTITRUST STATUTE
     ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.* (ON BEHALF OF THE
     MAINE CLASS) ............................................................................................ 182

NINTH CLAIM FOR RELIEF
     VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT
     MICH. COMP. LAWS § 445.771, *ET SEQ.* (ON BEHALF OF THE
     MICHIGAN CLASS) ...................................................................................... 183

TENTH CLAIM FOR RELIEF
     VIOLATION OF THE MINNESOTA ANTITRUST LAW,
     MINN. STAT. § 325D.49, *ET SEQ.* (ON BEHALF OF THE MINNESOTA
     CLASS) ......................................................................................................... 184

ELEVENTH CLAIM FOR RELIEF
     VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT,
     MO. ANN. STAT. § 407.010, *ET SEQ.* (ON BEHALF OF THE MISSOURI
     CLASS) ......................................................................................................... 186

TWELFTH CLAIM FOR RELIEF
  VIOLATION OF THE NEBRASKA JUNKIN ACT,
  NEB. REV. STAT. § 59-801, *ET SEQ.* (ON BEHALF OF THE NEBRASKA
  CLASS)...................................................................................................................... 187

THIRTEENTH CLAIM FOR RELIEF
  VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,
  NEV. REV. STAT. § 598A.010, *ET SEQ.* (ON BEHALF OF THE NEVADA
  CLASS)...................................................................................................................... 188

FOURTEENTH CLAIM FOR RELIEF
  VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,
  N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.* (ON BEHALF OF THE
  NEW HAMPSHIRE CLASS)..................................................................................... 190

FIFTEENTH CLAIM FOR RELIEF
  VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
  N.M. STAT. ANN. §§ 57-1-1, *ET SEQ.* (ON BEHALF OF THE NEW
  MEXICO CLASS)...................................................................................................... 191

SIXTEENTH CLAIM FOR RELIEF
  VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL
  BUSINESS LAW (ON BEHALF OF THE NEW YORK CLASS)........................... 191

SEVENTEENTH CLAIM FOR RELIEF
  VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES,
  N.C. GEN. STAT. § 75-1, *ET SEQ.* (ON BEHALF OF THE NORTH
  CAROLINA CLASS) ................................................................................................ 192

EIGHTEENTH CLAIM FOR RELIEF
  VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST
  ACT,
  N.D. CENT. CODE § 51-08.1, *ET SEQ.* (ON BEHALF OF THE NORTH
  DAKOTA CLASS)..................................................................................................... 193

NINETEENTH CLAIM FOR RELIEF
  VIOLATION OF THE OREGON ANTITRUST LAW,
  OR. REV. STAT. § 646.705, *ET SEQ.* (ON BEHALF OF THE OREGON
  CLASS)...................................................................................................................... 194

TWENTIETH CLAIM FOR RELIEF
  VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,
  R.I. GEN LAWS § 6-36-1, *ET SEQ.* (ON BEHALF OF THE RHODE
  ISLAND CLASS) ...................................................................................................... 195

TWENTY-FIRST CLAIM FOR RELIEF
        VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,
        S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ*.  (ON BEHALF OF THE
        SOUTH DAKOTA CLASS) ...................................................................................... 197

TWENTY-SECOND CLAIM FOR RELIEF
        VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,
        TENN. CODE, § 47-25-101, *ET SEQ.*  (ON BEHALF OF THE TENNESSEE
        CLASS) ....................................................................................................................... 198

TWENTY-THIRD CLAIM FOR RELIEF
        VIOLATION OF THE UTAH ANTITRUST ACT,
        UTAH CODE ANN. §§ 76-10-911, *ET SEQ.*  (ON BEHALF OF THE UTAH
        CLASS) ....................................................................................................................... 199

TWENTY-FOURTH CLAIM FOR RELIEF
        VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,
        W. VA. CODE §47-18-1, *ET SEQ.*  (ON BEHALF OF THE WEST
        VIRGINIA CLASS)...................................................................................................... 200

TWENTY-FIFTH CLAIM FOR RELIEF
        VIOLATION OF THE WISCONSIN ANTITRUST ACT,
        WIS. STAT. ANN. § 133.01(1), *ET SEQ.*  (ON BEHALF OF THE
        WISCONSIN CLASS)................................................................................................... 201

VIOLATIONS OF STATE CONSUMER PROTECTION LAWS ...................................... 203

TWENTY-SIXTH CLAIM FOR RELIEF
        VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW  CAL.
        BUS. & PROF. CODE § 17200, *ET SEQ.* (THE "UCL")  (ON BEHALF OF
        THE CALIFORNIA CLASS)........................................................................................ 203

TWENTY-SEVENTH CLAIM FOR RELIEF
        VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER
        PROTECTION PROCEDURES ACT,  D.C. CODE § 28-3901, *ET SEQ.*  (ON
        BEHALF OF THE DISTRICT OF COLUMBIA CLASS)....................................... 205

TWENTY-EIGHTH CLAIM FOR RELIEF
        VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE
        PRACTICES ACT,  FLA. STAT. § 501.201(2), *ET SEQ.*  (ON BEHALF OF
        THE FLORIDA CLASS)............................................................................................... 207

TWENTY-NINTH CLAIM FOR RELIEF
        VIOLATION OF THE HAWAII REVISED STATUTES ANNOTATED §§
        480-1, *ET SEQ.* (ON BEHALF OF HAWAII CLASS)............................................. 209

THIRTIETH CLAIM FOR RELIEF
      VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE
      BUSINESS PRACTICES ACT,  815 ILL. COMP. STAT. ANN. 505/10A, *ET*
      *SEQ*.  (ON BEHALF OF THE ILLINOIS CLASS)...................................................210

THIRTY-FIRST CLAIM FOR RELIEF
      VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION
      ACT,  MASS. GEN. LAWS CH. 93A § 1, *ET SEQ*.  (ON BEHALF OF THE
      MASSACHUSETTS CLASS).....................................................................................211

THIRTY-SECOND CLAIM FOR RELIEF
      VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT,  MINN.
      STAT. § 325F.68, *ET SEQ*.  (ON BEHALF OF THE MINNESOTA CLASS) ........211

THIRTY-THIRD CLAIM FOR RELIEF
      VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND
      CONSUMER PROTECTION ACT OF 1970,  MONT. CODE, §§ 30-14-103,
      *ET SEQ*., AND §§ 30-14-201, *ET. SEQ*.  (ON BEHALF OF THE MONTANA
      CLASS)....................................................................................................................213

THIRTY-FOURTH CLAIM FOR RELIEF|
      VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,
      NEV. REV. STAT. § 598.0903, *ET SEQ*.  (ON BEHALF OF THE NEVADA
      CLASS)....................................................................................................................214

THIRTY-FIFTH CLAIM FOR RELIEF
      VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,  N.M.
      STAT. ANN. §§ 57-12-3, *ET SEQ*.  (ON BEHALF OF THE NEW MEXICO
      CLASS)....................................................................................................................215

THIRTY-SIXTH CLAIM FOR RELIEF
      VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND
      BUSINESS PRACTICES ACT,  N.C. GEN. STAT. § 75-1.1, *ET SEQ*.  (ON
      BEHALF OF THE NORTH CAROLINA CLASS)...................................................216

THIRTY-SEVENTH CLAIM FOR RELIEF
      VIOLATION OF THE NORTH DAKOTA UNFAIR TRADE PRACTICES
      LAW,  N.D. CENT. CODE § 51-10, *ET SEQ*.  (ON BEHALF OF THE
      NORTH DAKOTA CLASS) .....................................................................................218

THIRTY-EIGHTH CLAIM FOR RELIEF
      VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES
      ACT,  R.I. GEN. LAWS § 6-13.1-1, *ET SEQ*.  (ON BEHALF OF THE
      RHODE ISLAND CLASS) .......................................................................................219

THIRTY-NINTH CLAIM FOR RELIEF
      VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE
      PRACTICES ACT,  S.C. CODE ANN. §§ 39-5-10, *ET SEQ*.  (ON BEHALF
      OF THE SOUTH CAROLINA CLASS).................................................................. 221

FORTIETH CLAIM FOR RELIEF
      VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT,
      UTAH CODE ANN. §§ 13-11-1, *ET SEQ*.  (ON BEHALF OF THE UTAH
      CLASS)............................................................................................................. 222

FORTY-FIRST CLAIM FOR RELIEF  UNJUST ENRICHMENT ...................................... 223

XI.     REQUEST FOR RELIEF ........................................................................................ 224

XII.    JURY TRIAL DEMANDED ...................................................................................... 226

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons and entities who purchased beef indirectly from a defendant or co-conspirator for personal use in the United States from at least January 1, 2015 until the present (Class Period). Plaintiffs bring this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of the several states against defendants, and demand a trial by jury.

## I.      NATURE OF ACTION

1.      The defendants in this case (the Meatpacking Defendants) are the largest meatpacking companies in the world and the leading processors of approximately $100 billion in annual commerce in the retail beef industry. These defendants entered into a conspiracy to maximize profits from the distribution channel of beef—by both extracting all gains from the ranchers who raised the cattle, as well as artificially inflating the price of beef being sold to the consumer. The defendants engaged in a concerted scheme to suppress their output of beef, artificially depressing both the amount of cattle they purchased and the amount of processed beef they sold to retail operations. The purpose of the scheme was to lower beef supply and thus maximize the margins they received from sale of beef. The result of the scheme was that the defendants both underpaid the cattle ranchers by artificially depressing demand for cattle, and simultaneously overcharged consumers by reducing their output of beef and thus inflating consumer prices.

2.      Defendants' scheme was successful, in part, because of the structure of the beef industry. The slaughter and packing of beef is an essential part of the beef supply

- 1 -

chain. A small number of meatpackers – the Meatpacking Defendants – control this crucial step of the distribution chain. The Meatpacking Defendants purchase fed cattle from farmers, process them into beef, and then sell the beef to retailers. Defendants and their co-conspirators collectively control over 70 percent of the wholesale beef market.

3.     An industry insider familiar with the operations of the Meatpacking Defendants stated that the "beef industry is very unique." According to insiders, much of the business operations for the beef industry operate in a "gray area" and that "**meat works like the mafia**." The business operations of the Meatpacking Defendants are intertwined because, due to vertical integration into various stages of the distribution stages of beef, the Meatpacking Defendants frequently sell meat to each other which is then processed for retail sale. The result is that "someone may be a competitor but also a customer." Given these frequent interactions, executives at companies in the Meatpacking Industry "all know each other."

4.     The Meatpacking Defendants, Tyson Foods, Inc., Tyson Fresh Meats, Inc. ("Tyson Fresh") (collectively, "Tyson")), Inc., JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc. (collectively, "JBS"), Cargill, Incorporated, Cargill Meat Solutions Corporation (collectively, "Cargill"), and National Beef Packing Company, LLC ("National Beef") (and all collectively, the Meatpacking Defendants) entered into a conspiracy from at least 2015 to the present to fix, raise, maintain and stabilize the price of beef.[1]

---

[1] For the purposes of this complaint, beef includes beef meat purchased fresh or frozen.

5.    Packing Defendants control the U.S. market for the purchase of slaughter-weight fed cattle.  Following a series of mergers and acquisitions beginning in the 1980s and culminating in 2013, Packing Defendants, through their operating subsidiaries, Tyson Fresh, Swift/Packerland, CMS, and National Beef have purchased and slaughtered between 82% and 87% of all fed cattle sold within the United States on an annual basis.[2] Figure 1 demonstrates Packing Defendants' overwhelming dominance of the market for the purchase of fed cattle:

**Figure 1: Meatpacking Defendants' Share of Annual U.S. Fed Cattle Slaughter Volumes**



---

[2]    Cattle Buyers Weekly, "Top 30 Beef Packers" Annual Reports, 2008-2019, http://www.cattlebuyersweekly.com/users/rankings/index.php ("CBW Top 30 Beef Packers"); *2018 Meat & Poultry Facts*, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11 ("2018 Meat & Poultry Facts").  (Unless otherwise indicated, all websites cited in this Complaint were last accessed on December 22, 2020.)

6.     The principal (but not exclusive) method by which defendants implemented and executed their conspiracy was by coordinating on collusive conduct that depressed the price, and thus future supply, of cattle that they purchased while continuing to maintain an elevated price at which they sold beef to retail operations. As alleged in this complaint, the Meatpacking Defendants have a shared incentive to collectively reduce the amount of beef that they procure, because this artificial restriction on their collective demand for fed cattle will lead to reduced prices that each one must pay for fed cattle. The Meatpacking Defendants increase their profits by widening the spread between the price that they pay for cattle and the price at which they sell beef. The basics of supply and demand mean that an artificially restrained amount of cattle processed by the Meatpacking Defendants leads to a higher price for beef sold to consumers and other purchasers. The Meatpacking Defendants reap increased profits while both the cattle ranchers and consumers are harmed.

7.     Beginning in 2015, the beef market saw a marked change in pricing practices. Before 2015, the prices of cattle and beef moved in tandem. This is a natural relationship because beef is simply cattle that has been processed for sale. After 2015, and during the conspiracy, this fundamental economic relationship was severed. From 2015 through 2020, the price of cattle declined significantly while the price of beef remained elevated. As starkly demonstrated in the following chart, around 2015, the price of live cattle declined (the red line), while the retail price being charged to consumers (the blue bars) remained inflated, and unlike in prior years, almost completely unrelated to the price of live cattle:

- 4 -

**Figure 2: Fed Cattle Prices versus Retail Beef Prices**



8.      Most egregiously, the Meatpacking Defendants all engaged in periodic and parallel slaughter reductions throughout the Class Period. As explained by Tyson Fresh's President, Stephen Stouffer, on the eve of the Class Period, because defendants' beef packing business was "a margin spread game", Tyson Fresh and its competitors could be profitable notwithstanding the shortage of fed cattle they faced in the coming years:

> By rationing that supply, by lowering that volume coming into the market we are able to generate that margin spread. And that is not going to change anytime soon. As we continue

- 5 -

on in these tightened supply periods we're going to continue to manage margin.[3]

9.    The Meatpacking Defendants' joint management of their respective slaughter volumes during the Class Period is immediately apparent from the below figure, which tracks their quarterly slaughter volumes:

**Figure 3: Meatpacking Defendants' Quarterly Fed Cattle Slaughter Volume**



10.    In particular, this figure shows the reduction in each Meatpacking Defendant's slaughter volumes across 2015, precipitating the collapse in fed cattle prices discussed below. It also shows the consistent reductions made by Meatpacking Defendants in the late winter/spring and fall of each year – highlighted in their Q1 and Q4 slaughter figures. The figure also highlights the remarkable extent to which Meatpacking

---

[3] Stephen Stouffer, President, Tyson Fresh, Presentation at Tyson Foods Investor Day (December 10, 2014).

Defendants' quarter-to-quarter slaughter changes move in lockstep, consistent with an agreement to jointly manage their collective demand below the available cattle supply. Remarkably, despite record margins during the Class Period, none of the Meatpacking Defendants sought to increase their profits by competitively increasing their market share of the available cattle.

11.    While the Meatpacking Defendants reaped billions of dollars in profits, consumers suffered financial harm. In a functioning market with unconstrained supply, lower cattle prices would lead to lower beef prices. But, as discussed below, the econometric evidence indicates the Meatpacking Defendants agreed not to compete on the price of beef because during the period of anticompetitive activity, beef prices became severed from underlying cattle prices. Unlike the period prior to the conspiracy, at several points during the class period, the relationship between cattle and beef prices actually inverted – with beef prices rising even as cattle prices fell. Furthermore, the actions of the Defendants artificially reduced demand for cattle, reducing future supply of cattle, and thus elevating prices of beef. Prior to the conspiracy, the U.S. Department of Justice (DOJ) recognized that when the beef market is functioning competitively, there is a strong relationship between the supply of cattle and the price being charged to consumers (the pass-through of the overcharge). The DOJ has stated that:

> [A]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price,

even small changes in industry production levels can significantly affect packer profits.

In fact, as the United States pointed out in 2008, concern over anticompetitive conduct by beef processors that harmed both cattle ranchers and beef consumers was a leading driver for the initial passage of the Sherman Act.[4]

12.     The anticompetitive actions of the defendants were successful in severing the relationship between cattle and beef prices. As shown in the following chart, prior to the conspiracy, cattle and beef prices were closely correlated to each other:

---

[4] *See* FED. TRADE COMM'N, ROUNDTABLE ON MONOPSONY AND BUYER POWER 1 (October 13, 2008), *available at* https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/monopsony.pdf ("The 1890 debates in both houses of the United States Congress demonstrated concern with the exercise of market power on both the buying and selling sides of the market. Many legislators singled out large meat packers for condemnation, and they were condemned as much for reducing the prices paid to cattle farmers as for raising prices to consumers. In response, Congress passed the Sherman Act, "aimed at preserving free and unfettered competition as the rule of trade." "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.")

**Figure 4: Relationship of Cattle and Beef Prices (Jan. 2002 to Dec. 2014)**



13.    After the start of the anticompetitive activity in 2015, the strong relationship between cattle and beef prices disappeared as a result of the anticompetitive actions of the defendants. This econometric evidence indicates an agreement among defendants not to compete on price in the beef market. As shown in the following chart, cattle and beef prices had almost no relationship to each other between January 2016 and February 2019:

**Figure 5: Relationship of Cattle and Beef Prices (Jan. 2016 to Feb. 2019)**



14.    As shown in the below chart, during certain periods of time from 2015-2018, the relationship between cattle and beef prices inverted. This is an expected economic consequence of a conspiracy by the Meatpacking Defendants to reduce throughput – artificially reducing both the supply of cattle they purchase and the supply of beef that they sell to retail operations – because the supply reductions on both end of the beef supply chain cause both a reduction in the number of cattle and an elevation in the retail price of beef:

- 10 -

**Figure 6: Cattle Prices Fall While Retail Prices Rise, Early 2018**



15.     Tyson, JBS, Cargill, and National Beef each engaged in periodic and parallel slaughter reductions since 2015. As shown in Figure 7 the below chart, each Meatpacking Defendant reduced its respective annual slaughter volume relative to the pre-Class Period for which data exists. However, other U.S. beef packers – i.e., independent regional packing businesses – increased their slaughter volume as a whole during the same time period.

- 11 -

**Figure 7: Average Pre- and Post-Class Period Fed Cattle Slaughter of Defendants versus Others**



16.    The annual slaughter volumes for each Meatpacking Defendant was lower for each year in the Class Period compared to their pre-2015 averages. The below chart shows the Meatpacking Defendants' and the other U.S. beef packers' annual slaughter volumes pre-2015 and post-2015 – but broken out for each year of the Class Period for which data is available. Figure 8 shows the Meatpacking Defendants' annual slaughter volumes were lower than pre-2015 averages. And, although Tyson, JBS, CMS, and National Beef each increased its slaughter volume during the Class Period, the below figure shows independent regional packing businesses had much higher rates of slaughter volume increases during the same period:

- 12 -

**Figure 8: Average Pre- and Post-Class Period Fed Cattle Slaughter Defendants versus Others.[5]**



17.     As shown in the above figures, each Defendant slashed its fed cattle slaughter levels in 2015, and then maintained artificially low slaughter levels throughout the remainder of the Class Period.

18.     In any market, economic theory predicts it may be more profitable for an industry to produce a smaller amount of output. There are two reasons for this: (1) the industry is able to buy from the subset of suppliers who are able to tolerate lower prices, and (2) the industry is able to sell their output to the subset of consumers that are able to tolerate a higher price. Upstream producers and downstream consumers both lose out as overall level of throughput is constricted – sellers are underpaid as if there were a glut,

---

[5] National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume. Absent that acquisition, its year-over-year slaughter volume was flat against 2018, while independent packers' (others') collective slaughter volume rose by approximately 100,000 head (netting out National Beef's acquisition of Iowa Premium).

- 13 -

while buyers pay a premium as if there were a shortage. The market may eventually adjust to this situation, as suppliers go out of business and consumers learn to pay more or live with less, but the long-term effect is inevitably a smaller industry and a worse-off consumer. Courts recognize such markets harm both producers, here, the cattle ranchers, and the end user consumers, because they lead to higher consumer prices, suboptimal output of the product, reduced product quality, and the substitution of less efficient alternative products.[6]

19.   The econometric data showing the suppression of cattle prices and the artificial maintenance of retail prices for beef from 2015 to the present is indicative of the same underlying agreement to reduce throughput. Indeed, as the econometric evidence shows, the defendant's anti-competitive conspiracy to restrain beef output had consequences both for cattle feeders and consumers. The sharp drop in the price of fed cattle from 2015 onwards reflects a pent-up supply of cattle that packers were not slaughtering, while the unexpectedly high retail price reflects a relative undersupply of beef in the consumer market. By 2016, even though cattle prices had generally been pushed back down to pre-2014/2015 levels, consumers were still paying inflated retail prices as if it were the height of the cattle price spike. Because no packer was willing "break ranks" and increase throughput, connecting the oversupply of fed cattle to the unmet consumer demand for beef, the packer cartel was able to maintain its unprecedented margins.

---

[6] *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1232 (10th Cir. 2007).

- 14 -

20.     Under competitive conditions, however, an industry is prevented from intentionally restricting its production levels in this way because competitors will pick up the slack. A company willing to operate at a tight margin can out-produce and undercut a company that is not, bringing a larger quantity of less expensive goods to the benefit of both consumers and suppliers. The degree to which competing companies can both agree between themselves about the degree to which they will restrain their throughput, and the degree to which all are able to verify that the others are holding to the agreement, is directly proportional to their ability to keep margins high over a long period of time. In short, information sharing regarding present and future plans is a critical ingredient for a successful agreement between competitors to restrain throughput. Here, confidential witnesses confirm that the Meatpacking Defendants were engaging in exactly this kind of information sharing.

21.     Following the collusive scheme by the Meatpacking Defendants to suppress cattle prices, the operating margins of the beef packers steadily grew from 2016 to 2018. By the end of 2018, Tyson and JBS, the two publicly traded beef packers, were reporting record operating margins in their beef business. For example, in 2018, Tyson reported operating margins for its beef business of 7 percent, now above its margin for poultry of 6 percent. Similarly, in the second quarter of 2018, JBS reported margins of 10.2 percent for its beef business, significantly higher than its margin of 7.2 percent for its pork business. The following figure demonstrates the record per-head meat margins for the defendants – a significant departure from previous levels:

- 15 -

**Figure 9: Weekly Packer Per-Head Meat Margin (1,399 lb. Avg. Live Steer 65-80% Choice; 874 Avg. Dressed Carcass)[7]**



22.     Confidential witness accounts confirm the existence of the Meatpacking Defendants' conspiracy to suppress fed cattle prices. To begin with, a witness previously employed by Swift (JBS) at its Cactus, Texas slaughter plant confirmed that each of the Meatpacking Defendants expressly agreed to periodically reduce their respective purchase

---

[7] Table prepared using USDA Market News Service Reports: 5-Area Weekly Live Steer Price per CWT (LM_CT150), National Weekly Boxed Beef Cutout and Boxed Beef Cuts - Negotiated Sales (LM_XB459) and By-Product Drop Value data available here: https://marketnews.usda.gov/mnp/ls-report-config.

and slaughter volumes in order to reduce the prices they would otherwise pay for fed cattle during the Class Period.

23.     In addition, there are numerous "plus factors" in the beef industry during the Class Period, including but not limited to multiple industry characteristics which facilitate collusion, such as high barriers to entry, high beef industry consolidation and concentration, inelastic supply and demand, unusual market share stability, and a homogenous product. These plus factors add plausibility to plaintiffs' allegations of a price fixing scheme.

24.     Defendants' coordination caused plaintiffs to pay artificially elevated prices for beef. Beginning in 2015, the earnings of the Meatpacking Defendants began to increase, as they took an increasing amount of the profits available in the beef industry. In the two years between 2015 and 2017, the average farm value of cattle dropped by 29 percent from its pre-2015 peak value. In contrast to earlier years, however, the relationship between cattle prices and beef prices became severed, as the retail price of beef only dropped around 6 percent. As shown in the below chart, the beef packers have nearly doubled their share of revenues from consumer spending on beef over the relevant time period:

**Figure 10: Average Wholesale Share of Beef Value Chain**



25.     As a result of defendants' unlawful conduct, plaintiffs and the classes paid artificially inflated prices for beef during the Class Period. Such prices exceeded the amount they would have paid if the price for beef had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' conduct.

## II.     JURISDICTION AND VENUE

26.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also bring these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of beef and increasing the price of beef. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction

under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

27.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

28.     This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of beef throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

29.     The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

### III.    PARTIES

**A.    Plaintiffs**

30.     Plaintiff Kenneth Peterson is a resident of Nevada and citizen of the United States. During the Class Period and while residing in Nevada, plaintiff Peterson indirectly purchased beef and beef products for his own use and not for resale that were produced

by one or more defendants or their co-conspirators. Plaintiff Peterson suffered injury as a result of defendants' conduct alleged herein.

31.   Plaintiff Richard Kimble is a resident of Wisconsin and citizen of the United States. During the Class Period and while residing in Wisconsin, plaintiff Kimble indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Kimble suffered injury as a result of defendants' conduct alleged herein.

32.   Plaintiff Sharon Dawson-Green is a resident of Missouri and citizen of the United States. During the Class Period and while residing in Missouri, plaintiff Dawson-Green indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Dawson-Green suffered injury as a result of defendants' conduct alleged herein.

33.   Plaintiff Lisa Melegari is a resident of Florida and citizen of the United States. During the Class Period and while residing in Florida, plaintiff Melegari indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Melegari suffered injury as a result of defendants' conduct alleged herein.

34.   Plaintiff Cindy Abernathy is a resident of Utah and citizen of the United States. During the Class Period and while residing in Florida, plaintiff Abernathy indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Abernathy suffered injury as a result of defendants' conduct alleged herein.

35.     Plaintiff Andrew Cohen is a resident of Arizona and citizen of the United States. During the Class Period and while residing in Arizona, plaintiff Cohen indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Cohen suffered injury as a result of defendants' conduct alleged herein.

36.     Plaintiff Marcelo Lopez is a resident of California and citizen of the United States. During the Class Period and while residing in California, plaintiff Lopez indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Lopez suffered injury as a result of defendants' conduct alleged herein.

37.     Plaintiff Tanya Lewis is a resident of Hawaii and citizen of the United States. During the Class Period and while residing in Hawaii, plaintiff Lewis indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Lewis suffered injury as a result of defendants' conduct alleged herein.

38.     Plaintiff Nicole Gutierrez is a resident of Illinois and citizen of the United States. During the Class Period and while residing in Illinois, plaintiff Gutierrez indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Gutierrez suffered injury as a result of defendants' conduct alleged herein.

39.     Plaintiff Sharon Killmon is a resident of Iowa and citizen of the United States. During the Class Period and while residing in Iowa, plaintiff Killmon indirectly

010808-11/1421601 V1

purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Killmon suffered injury as a result of defendants' conduct alleged herein.

40.     Plaintiff Karen Carter is a resident of Massachusetts and citizen of the United States. During the Class Period and while residing in Massachusetts, plaintiff Carter indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Carter suffered injury as a result of defendants' conduct alleged herein.

41.     Plaintiff Charlie Morgan is a resident of Minnesota and citizen of the United States. During the Class Period and while residing in Minnesota, plaintiff Morgan indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Morgan suffered injury as a result of defendants' conduct alleged herein.

42.     Plaintiff Brent Rasmussen is a resident of Montana and citizen of the United States. During the Class Period and while residing in Montana, plaintiff Rasmussen indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Rasmussen suffered injury as a result of defendants' conduct alleged herein.

43.     Plaintiff April O'Connor is a resident of Nebraska and citizen of the United States. During the Class Period and while residing in Nebraska, plaintiff O'Connor indirectly purchased beef and beef products for her own use and not for resale that were

- 22 -

produced by one or more defendants or their co-conspirators. Plaintiff O'Connor suffered injury as a result of defendants' conduct alleged herein.

44.    Plaintiff Kent Winchester is a resident of New Mexico and citizen of the United States. During the Class Period and while residing in New Mexico, plaintiff Winchester indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Winchester suffered injury as a result of defendants' conduct alleged herein.

45.    Plaintiff Brenda King is a resident of New York and citizen of the United States. During the Class Period and while residing in New York, plaintiff King indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff King suffered injury as a result of defendants' conduct alleged herein.

46.    Plaintiff Chong Lor is a resident of North Carolina and citizen of the United States. During the Class Period and while residing in North Carolina, plaintiff Lor indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Lor suffered injury as a result of defendants' conduct alleged herein.

47.    Plaintiff Michelle Oversen is a resident of North Dakota and citizen of the United States. During the Class Period and while residing in North Dakota, plaintiff Oversen indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Oversen suffered injury as a result of defendants' conduct alleged herein.

- 23 -

48.     Plaintiff William Gee is a resident of the District of Columbia and citizen of the United States. During the Class Period and while residing in the District of Columbia, plaintiff Gee indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Gee suffered injury as a result of defendants' conduct alleged herein.

49.     Plaintiff Jacquelyn Watson is a resident of Tennessee and citizen of the United States. During the Class Period and while residing in Tennessee, plaintiff Watson indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Watson suffered injury as a result of defendants' conduct alleged herein.

50.     Plaintiff John Shup is a resident of Michigan and citizen of the United States. During the Class Period and while residing in Michigan, plaintiff Shup indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Shup suffered injury as a result of defendants' conduct alleged herein.

51.     Plaintiff Martin Jarmulowiczis a resident of Florida and citizen of the United States. During the Class Period and while residing in New Hampshire, plaintiff Jarmulowiczis indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Jarmulowiczis suffered injury as a result of defendants' conduct alleged herein.

52.     Plaintiff Harold M. Nayanjom is a resident of Kansas and citizen of the United States. During the Class Period and while residing in Kansas, plaintiff Nayanjom

- 24 -

indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Nayanjom suffered injury as a result of defendants' conduct alleged herein.

53.     Plaintiff Mark Sperry is a resident of Maine and citizen of the United States. During the Class Period and while residing in Maine, plaintiff Sperry indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Sperry suffered injury as a result of defendants' conduct alleged herein.

54.     Plaintiff Dan Campbell is a resident of Oregon and citizen of the United States. During the Class Period and while residing in Oregon, plaintiff Campbell indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Campbell suffered injury as a result of defendants' conduct alleged herein.

## B.     Defendants

### 1.     The Tyson Defendants

55.     Defendant Tyson Foods, Inc. ("Tyson Foods") is a Delaware corporation with its principal place of business located at 2200 Don Tyson Parkway, Springdale, Arkansas 72762. Tyson Foods is the parent company of the Tyson group.

56.     Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh is a Delaware corporation with its principal place of business located at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049. Tyson Fresh is the principal operating entity within Tyson's U.S. cattle and beef business. Tyson

Fresh owns and operates directly, or indirectly through its subsidiaries, Tyson Fresh's U.S. fed cattle slaughter plants located at: Holcomb, Kansas, Dakota City, Nebraska, Lexington, Nebraska, Amarillo, Texas, Hillsdale, Illinois, and Pasco, Washington. Tyson Fresh is the contracting entity for fed cattle purchased and slaughtered at these plants.

57.    As detailed in Appendix 1, during the Class Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct that caused injury to, and derived direct benefit from, members of both Classes in the United States and in this District.

58.    Defendants Tyson Foods and Tyson Fresh are referred to collectively herein as "Tyson" or the "Tyson Defendants." However, where Plaintiffs ascribe an action to "Tyson," including through use of the defined term "Packing Defendants," unless stated otherwise, the action is alleged to have been taken by Tyson Fresh.  For the avoidance of doubt, Plaintiffs' allegations regarding "Tyson's" purchase and slaughter of fed cattle, the operation of slaughter plants, and sale of resultant beef, are directed at Tyson Fresh, as the operating entity of the Tyson single enterprise.  Allegations as to "Tyson's" participation in the continuing agreement, understanding and conspiracy alleged herein are directed to both Tyson Foods and Tyson Fresh

### 2.    The JBS Defendants

59.    Defendant JBS S.A. is a Brazilian corporation with its principal place of business located at Av. Marginal Direta do Tiete, 500 Bloco 3-3o. andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil. JBS S.A. is the parent company of the JBS group.

- 26 -

60.     Defendant JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. JBS USA is the principal operating entity of JBS's U.S. cattle/beef business. On information and belief, it is the principal operating entity within JBS's U.S. cattle and beef business, and the contracting entity for certain of JBS's purchases of fed cattle in the USA and the freight contracts agreed to transport cattle to JBS's slaughter plants.

61.     Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. Swift operates and owns directly, or indirectly through its subsidiaries, JBS's U.S. fed cattle slaughter plants in Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and Hyrum, Utah plants.

62.     Defendant JBS Packerland, Inc. ("JBS Packerland" or "Packerland") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. JBS Packerland operates JBS' Regional Beef business unit. In that capacity, Packerland owns directly, or indirectly through its subsidiaries, certain of JBS's U.S. fed and dairy cattle slaughter plants, including the Packerland packing plants in Green Bay, Wisconsin, Plainwell, Michigan, Omaha, Nebraska; the Sun Land Beef plant in Tolleson, Arizona; and the Moyer Packing plant in Souderton, Pennsylvania. It also contracts for the purchases of fed cattle to be slaughtered at these plants.

63.    JBS has admitted that JBS USA, Swift and Packerland each employed or engaged various senior staff and executives responsible for the operation of JBS's US fed cattle and beef business during the Class Period.

64.    Defendants JBS USA, Swift, and JBS Packerland were, throughout the Class Period, wholly-owned, direct or indirect subsidiaries of JBS S.A.

65.    As detailed in Appendix 1, during the Class Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct that caused injury to, and derived direct benefit from, members of both Classes in the United States and in this District.

66.    Defendants JBS S.A., JBS USA, Swift, and JBS Packerland are referred to collectively herein as "JBS" or the "JBS Defendants." Swift and JBS Packerland are collectively referred herein as Swift/Packerland. Where Plaintiffs ascribe an action to "JBS," including through use of the defined term "Packing Defendants," unless stated otherwise, the action is alleged to have been taken by Swift and Packerland.  For the avoidance of doubt, Plaintiffs' allegations regarding "JBS's" purchase and slaughter of fed cattle, the operation of slaughter plants, and sale of resultant beef, are directed at Swift and Packerland, the operating entities of the JBS single enterprise.  Allegations as to "JBS's" participation in the continuing agreement, understanding and conspiracy alleged herein are directed at each of JBS S.A., JBS USA, Swift, and Packerland.

### 3.     The Cargill Defendants

67.     Defendant Cargill, Incorporated ("Cargill, Inc.") is a Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391. Cargill, Inc. is the parent company of the Cargill group.

68.     Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("CMS"), a subsidiary of Cargill, Inc., is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202. CMS is the principal operating entity within Cargill's U.S. cattle and beef business and a wholly owned subsidiary of Cargill, Inc. CMS owns and operates, directly, or indirectly through its subsidiaries, Cargill's U.S. fed cattle slaughter plants locate at: Dodge City, Kansas; Schuyler, Nebraska; Friona, Texas; Fort Morgan, Colorado; Fresno, California; Wyalusing, Pennsylvania.[8] CMS is the contracting entity for fed cattle purchased and slaughtered at these plants.

69.     Defendants Cargill, Inc. and CMS are referred to collectively herein as "Cargill" or the "Cargill Defendants."

70.     As detailed in Appendix 1, during the Class Period, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct that caused injury to, and

---

[8] CMS also processes non-fed cattle, principally at its Fresno, CA and Wyalusing, PA plants. Such cattle are estimated to comprise between 11-13% of its total slaughter volume annually.

derived direct benefit from, members of both Classes in the United States and in this District.

71.     Where Plaintiffs ascribe an action to "Cargill," including through use of the defined term "Packing Defendants," unless stated otherwise, the action is alleged to have been taken by CMS.   For the avoidance of doubt, Plaintiffs' allegations regarding "Cargill's" purchase and slaughter of fed cattle, the operation of slaughter plants, and sale of resultant beef, are directed at CMS, as the operating entity of the Cargill single enterprise.   Allegations as to "Cargill's" participation in the continuing agreement, understanding and conspiracy alleged herein are directed to both Cargill Inc. and CMS.

### 4.     National Beef

72.     Defendant National Beef Packing Company, LLC ("National Beef") is a Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163. National Beef owns and operates, directly, or indirectly through its subsidiaries, National Beef's U.S. fed cattle slaughter plants, located at: Dodge City, Kansas; Liberal, Kansas; and Tama, Iowa.[9]

## IV.     THE MEATPACKING DEFENDANTS CONSPIRED TO ELEVATE THEIR MARGINS BY DEPRESSING THE PRICE THAT THEY PAID TO ACQUIRE CATTLE

73.     Starting in at least 2015 and continuing to the present, the Meatpacking Defendants coordinated with each other to increase their margins and thus harm consumers who paid elevated prices for beef as a result. The Meatpacking Defendants'

---

[9] National Beef acquired the Tama, IA plant in June 2019 from Iowa Premium, LLC, a regional Independent Packer.

conspiracy to depress throughput of beef and elevate their margins included anticompetitive activity to depress the prices that they paid to beef ranchers through a variety of coordinated mechanisms.

## A.    Industry Background

74.    The value chain for beef has various components, including ranch and farm grazing operations, feedlot operations, meatpacking operations, and retail operations.

75.    At the first stage, ranch and farm operations are responsible for initially birthing and raising the cattle. There are hundreds of thousands of ranching operations in the United States. The significant majority of these operations are family-owned or individually operated.[10]

76.    At the second stage, feedlot operations take possession of cattle and are responsible for intensive feeding operations that raise the weight of the cattle prior to sale. Once cattle reach between 950 to 1,500 pounds, they are sold to meatpacking operations. These cattle are referred to as fed cattle.

77.    In the third stage, meatpacking operations purchase fed cattle from feedlot operations. The Meatpacking Defendants collectively controlled approximately 75 percent of meatpacking operations in the United States during the relevant period.

78.    Tyson Fresh, Swift, CMS and National Beef all operate a live fed cattle procurement team of employees responsible for procurement of fed cattle. The teams feature "field buyers" who are responsible for procurement within specific territories.

---

[10] National Cattlemen's Beef Association, http://www.beefusa.org/beefindustrystatistics.aspx (last visited Dec. 28, 2020).

Feed buyers negotiate with producers and feedlot operators. Field buyers negotiate directly with the fed cattle producers and their agents within the parameters set by their head buyer.[11]

79.    Tyson Fresh, JBS USA/Swift/Packerland, CMS, and National Beef each conduct daily meetings, typically from their head office, attended by representatives of their respective cattle procurement, plant operations, scheduling, beef sales, and risk management teams, among others, to make decisions regarding their respective cattle and beef operations. Among other matters, the attendees of these meetings will discuss the number of cattle their fed cattle business will procure, the terms on which they will be bought, plant scheduling (including slaughter rates) across each of their slaughter facilities, and beef sales strategy.

80.    Tyson, JBS, Cargill, and National Beef each seek to procure sufficient fed cattle to operate its slaughter plants at its chosen utilization rates without interruption. Weekly plant capacity is determined not only by plant size, but by the number and length of shifts run in a given week, and the "chain-speed" at which those shifts are run.[12] Meatpacking Defendants' average cost of production increases if they underutilize their plant capacity. Thus, it is in the individual interest of each Meatpacking Defendant to make sure that it has timely access to sufficient fed cattle to run its plants efficiently.

---

[11] Producers commonly delegate authority for marketing their cattle to the commercial feedlot which has fed their cattle or to third-party marketing cooperatives. A small portion of the fed cattle sales to Meatpacking Defendants also occur at public auctions.

[12]  "Chain-speed" refers to the head per hour rate at which a plant slaughters and fabricates cattle.

81.     Meatpacking operations slaughter the cattle that they purchase and then process the cattle for sale. The cattle is processed into various cuts that is then sold as "boxed beef" to various retail and foodservice operations. Boxed beef is a commodity product, which means that competition for sales of boxed beef of the same USDA quality and yield grade is primarily on price.

82.     Retail operations purchase processed beef and sell it to retailers or consumers. Retail operations include supermarkets and wholesalers. Retail operations include companies such as Sysco, US Foods, Costco, and Sam's Club.

83.     The supply of fed cattle is insensitive to short term changes of price because of fed cattle's long life cycle and lack of alternative uses. Because beef demand also is relatively insensitive to changes in price, historically the meat margin was highly correlated with changes in the underlying slaughter price. But because of their concerted scheme, the Meatpacking Defendants were able to increase their margins and profitability by artificially suppressing the price they pay for beef while at the same time keeping the retail price of beef elevated.

84.     Fed cattle is sold to processors through two channels: (1) long-term contractual arrangements between processors and suppliers; and (2) individual sales on the spot market.

85.     The Meatpacking Defendants procure the majority of their cattle supply through contractual arrangements with ranch or feedlot operations. The price of cattle under these contracts is usually determined through a price formula that incorporates the price at which cattle are sold in weekly trade on the industry's spot market.

- 33 -

86.     The use of formula contracts that rely on the cash-cattle trade as the price discovery mechanism means that the price that processors pay for fed cattle in the cash-cattle spot market determines the price of almost all fed cattle purchased by the Meatpacking Defendants.

87.     Formula contracts use a stipulated measure of cash-cattle prices at, or just prior to, the date of delivery. These contracts commonly use a specified average cash price reported by the USDA Agricultural Marketing Service's Livestock Mandatory Reporting summaries.

88.     Tyson, JBS, Cargill, and National Beef use contractual agreements for approximately 70 percent of their supply of fed cattle. The widespread use of these contractual agreements, known as captive supply agreements, has facilitated the ability of the Meatpacking Defendants to suppress cash-cattle prices. Cattle sold through these type of contractual agreements are sometimes referred to as captive cattle.

89.     The Meatpacking Defendants are not as reliant on the cash-cattle trade because they have a guaranteed supply of cattle through their captive supply agreements. Therefore, each Meatpacking Defendant can refuse to participate in procuring cash cattle, thus pushing down the price of both cash cattle and captive cattle whose price is set based on cash-cattle sales.

**B.     The Meatpacking Defendants coordinated to reduce output, elevate their margins, and suppress the prices paid to beef farmers.**

90.     From 2009 to 2014, fed-cattle prices increased significantly with beef prices increasing in tandem. By the beginning of 2015, the Meatpacking Defendants faced low margins as a result of the market dynamics in the cattle and beef market.

91.     In response, Defendants conspired to depress and stabilize the price of fed cattle purchased in the United States. At the core of their collusion was an agreement to reduce and then manage their respective slaughter volumes; a classic abuse of monopsony, or unfair buying power. Defendant Meatpackers implemented their conspiracy, by agreeing to periodically restrain or reduce slaughter numbers so as to reduce or "ration" demand for fed cattle, and curtail their purchases of cash cattle during these periods. Defendants also coordinated their procurement practices with respect to the cash cattle they did actually purchase; imported foreign cattle to depress demand for cheaper domestic cattle; and closed or idled slaughter plants and refrain from expanding their remaining slaughtering capacity despite the availability of record margins. At the same, Defendants also benefitted from strong and increasing beef demand throughout the Class Period.

92.     Meatpacking Defendants agreed to reduce their slaughter numbers so as to reduce beef output.

93.     As confirmed by Jason F. ("Witness 1"), based on conversations with James Hooker, head of fabrication at Swift's Cactus plant, each of the Meatpacking Defendants expressly agreed to periodically reduce their respective purchase and slaughter volumes

in order to reduce the prices they would otherwise pay for fed cattle during the Class Period.

94.     Witness 1 is a former employee of Defendant Swift. Witness 1 was a quality assurance officer ("QA") at Swift's Cactus, Texas slaughter plant, located in the Texas Panhandle. He worked there for over 10 years until his employment ceased in early 2018.

95.     During the period of his employment coinciding with the Class Period, Witness 1 was a head QA and had primary responsibility for the plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, *i.e.*, head, hide, and internal organs removed. The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts. Witness 1 learned of the Meatpacking Defendants' collusive purchase and slaughter reduction agreement from Mr. Hooker. As was the head of fabrication at Swift's Cactus plant and, as explained below, was thus in a position to know about the unlawful agreement.

96.     Witness 1 regularly stopped by Mr. Hooker's office prior to starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days. These numbers affected the execution of Witness 1 and his team's responsibilities, including the placement of his team, arrangement of hotbox and cooler space, the number of carcasses they would need to process through the hotbox and coolers that day, and his interactions with USDA inspectors. In addition to the fabrication plan, Mr. Hooker, like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day. If the kill volume was lower but the price of beef remained favorable, the fabrication floor

- 36 -

would continue to process carcasses at typical rates. However, when kill volumes were reduced and the price of beef was unfavorable, Mr. Hooker may order the carcasses to spend a longer time in the hot boxes and coolers before being fabricated into beef cuts so as to improve grading performance. In this circumstance Witness 1 and his team would allow more space between each carcass in the hotboxes. If the kill volume was higher, Mr. Hooker may need to increase the number of carcasses fabricated to ensure there was sufficient space in the hotboxes and coolers, and Witness 1 would need to space the carcasses closer together when filling the hotboxes. Further, the number of carcasses expected to be put into the hotboxes would dictate the amount of air and water Witness 1 and his team used to ensure proper cooling speeds. It was essential to both Mr. Hooker and Witness 1 that they know the plant's planned slaughter figures in order to perform their core job duties.

97.    Witness 1 reports having had a "decent" working relationship with Mr. Hooker.

### 1.    Mr. Hooker Was Well Positioned to Know About Defendants' Agreement

98.    Plaintiffs understand that Mr. Hooker continues to work at Swift's Cactus, Texas plant, where he has worked for over 15 years in that role, including a short stint as head of slaughter operations. Witness 1 reports that prior to working for Swift in the early 2000s, Mr. Hooker worked at Tyson Fresh's Amarillo, Texas slaughter plant, where he was also responsible for fabrication.

99.    As a fabrication manager for Swift, Mr. Hooker reported directly both to Cactus's General Manager, Manny Guerrero [13] and directly to the beef production department of JBS USA/Swift/Packerland's head office in Greeley, Colorado.

100.   As head of fabrication, Mr. Hooker needed to be informed as to cattle buying/scheduling, cattle slaughter, and beef selling aspects of JBS U.S. fed cattle business. He thus interacted with personnel across JBS's business. In particular, in addition to his direct reports, Mr. Hooker would also speak directly to other managers within the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes, and fabrication priorities.

101.   For example, Mr. Hooker would speak directly to Sergio Sampaio Nogueira, Head of Operations and Executive Vice-President of Plant Operations for JBS's Fed Beef Business during the Class Period, when Mr. Nogueira visited the Cactus plant, which occurred regularly. Witness 1 understands that Mr. Hooker would also speak to Mr. Nogueira at other times. Mr. Hooker's contact with senior management reflects that JBS senior executives maintained direct connections with plant-level managers, like Mr. Hooker, during the Class Period. [14]

---

[13]   Mr. Guerrero worked for CMS for approximately 17 years prior to his move to JBS's Cactus Plant. He was Plant Manager for CMS's Fresno, California plant prior to his departure in early 2012.

[14]   David E. Bell & Catherine Ross, *JBS Swift & Co.*, Harvard Business School, N9-509-021, at 7-8 (Dec. 12, 2008), http://cfile234.uf.daum.net/attach/144DF8464F540FDF2D8F22.

102.  Mr. Nogueira was installed by Wesley Batista, JBS S.A.'s former CEO,[15] and was regarded as Mr. Batista's "right hand man" in regards to JBS's U.S. beef operations. Mr. Nogueira had primary responsibility for Swift's fed cattle plant scheduling and/or operations during the Class Period.

103.  In addition, Mr. Hooker was responsible for the Cactus plant in the absence of Mr. Guerrero and the Plant Engineer, along with Ryan Wagnon, Head of Slaughter Operations at Cactus. When acting as the Cactus plant's General Manager, Mr. Hooker would liaise closely with fed beef executives from across JBS's head office.

104.  Therefore, Mr. Hooker spoke regularly to individuals very highly placed at JBS. Indeed, the following recent photo shows the close working relationship he had with such management:[16]

---

[15]  Wesley Batista is one of the sons of JBS S.A. founder Jose Batista Sobrinho. Wesley Batista and his brother Joesley Batista took control of JBS S.A. in the early 2000s, prior to JBS's acquisition of Swift and Pilgrim's Pride. Wesley was CEO of JBS S.A. and directed JBS's takeover of Swift. He remained in that role, and as a director and senior executive of JBS USA, Swift, and Packerland, until he was implicated in a 2017 bribery and corruption scandal in Brazil, for which he was ousted as CEO and spent time in prison.

[16]  From right to left: James Hooker - Cactus Fabrication Operations Manager; Donna Estrada - Cactus Technical Services Manager; Al Almanza - JBS Global Food Safety Director; Sergio Sampaio Nogueira - JBS Corporate Director of Operations; Paul Kieker - FSIS Undersecretary USDA Operations; Dr. Hafeez - Texas USDA FLS; Dr Mindy Brashears - FSIS Undersecretary USDA FS; Brian McFarlane - JBS Corporate Director of Technical Services; Mark DeRaad - Cactus Value Added Manager; Ryan Wagnon - JBS Slaughter Operations Manager. *See* https://www.facebook.com/jbsbeefcactus/photos /a.760788460716768/2857652041030389/?type=3&is_lookaside=1 (last visited Dec. 15, 2020).



105.  Mr. Hooker, Mr. Nogueira, and Mr. Wagnon, are respectively pictured on the far left, fourth from the left, and far right.

106.  In addition to having corporate information for JBS, Mr. Hooker had information regarding the other Defendants. Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo plant, including his replacement there. Mr. Hooker also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Meatpacking Defendants' plants. Mr. Hooker would often provide Witness 1 with detailed information as to the current and future operations of Tyson Fresh, CMS, and National Beef's nearby packing plants.

## 2.  Witness 1 Learns of an Agreement Among Defendants

107.  Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that all of Meatpacking Defendants reduced their purchase and

slaughter volumes in order to reduce fed cattle prices when Meatpacking Defendants viewed fed cattle prices as being or becoming "too high" for their liking. During one such conversation, Mr. Hooker specifically admitted that Meatpacking Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

108.   That conversation occurred sometime in 2015. Witness 1 reports that he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from his immediate supervisor, who worked out of JBS's central office in Greeley, Colorado.

109.   After the call concluded, Witness 1 reports that he asked Mr. Hooker how "many are we [Swift, Cactus] cutting [*i.e.*, fabricating]?" Witness 1 reports that Mr. Hooker replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[17] Witness 1 then reports asking Mr. Hooker whether Swift Cactus's competitor plants were also cutting back their kill. Witness 1 recalls that Mr. Hooker answered Witness 1's question as follows: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

110.   Witness 1 is certain that Mr. Hooker intended to convey that all of the Meatpacking Defendants were reducing their slaughter volumes by agreement in response

---

[17]   Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses the were already hanging in the coolers.

to high prices, and was not simply commenting on the fact that one or some of the Meatpacking Defendants had independently decided to do so.

111.   Witness 1 stated that the purpose of the agreed slaughter reductions was to force cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods, and in doing so, create a condition of oversupply that would encourage producers to either accept lower cash prices for their cattle or commit their cattle in advance on captive supply agreements. Put another way, by creating and encouraging an apprehension among producers that they might not be able to "get their cattle dead," Meatpacking Defendants sought to increase their collective leverage over producers. As Witness 1 noted, once cattle are fed beyond their ideal slaughter-weight, producers face increasing "pressure to drop their prices in order to get rid of their [perishable] cattle."

112.   Witness 1 stated that Swift's Cactus plant had a 5,500-6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800-5,200 head per day when implementing Meatpacking Defendants' agreement. When Swift implemented the Meatpacking Defendants' agreement by buying and slaughtering fewer cattle, consequences included running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns. Witness 1 recalls management at Swift's Cactus plant, including Mr. Guerrero and Mr. Wagnon telling staff during these periods of reduced slaughter during the Class Period that kill levels were being reduced in response to fed cattle prices.

010808-11/1421601 V1

113.   Witness 1 reports that Swift's Cactus Plant would also reduce its slaughter during around November and then regularly maintain lower kill volumes through April the following year.

### 3.   The Available Data Corroborates Witness 1's Account

114.   Public reports, Defendants' slaughter data, and the cattle sales data in Plaintiffs' possession indicate that all Meatpacking Defendants reduced and rationed their slaughter volumes during periods of high or rising prices to suppress price rises in fed cattle.   Meatpacking Defendants also managed their respective slaughter volumes throughout the Class Period in relative lockstep to ensure that their collective demand for cattle did not exceed the available supply.   Meatpacking Defendants did so even as the supply of cattle grew and Meatpacking Defendants' margins ballooned.

115.   Fed cattle prices typically rise in the late winter/early spring, decline in the summer months, typically bottoming in July for a few weeks, before again rising in the fall. Here, the slaughter reductions, while most obvious at the beginning of each year to suppress the seasonal rise in fed cattle prices typically experienced in late winter/early spring, occurred throughout the Class Period. In particular, Meatpacking Defendants moderated their slaughter volume across the second and third quarters of most years in a successful attempt to both lower and to extend the yearly July price trough across a number of months, thereby both minimizing and delaying the effect of the fall's seasonal rise in fed cattle prices.

116.   Notably, Meatpacking Defendants' joint slaughter management throughout the conspiracy period was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had been "off the charts."[18]

117.   Nor did any Defendant break from Meatpacking Defendants' collective restraint and buy more cattle in an attempt to capture greater margin share, despite all posting profit margins that clearly demonstrated no Meatpacking Defendant was running at or near their marginal cost of production. From the end of the first quarter of 2015 through the end of the class period, Meatpacking Defendants posted record per head net margins. Even excluding 2019 and 2020, which saw Meatpacking Defendants' margins skyrocket in the aftermath of the Holcomb fire and COVID disruption (discussed below), Meatpacking Defendants average per head margins across the Class Period for the first, second, third and fourth quarters vastly exceeded their pre-Class Period averages: $37 v. $0, $127 v. $21, $134 v. $25 and $116 v. -$16 respectively.[19]

118.   Meatpacking Defendants' rationing of the fed cattle supply amongst themselves throughout the Class Period is demonstrated through in the figure below, which records each Meatpacking Defendant's estimated quarterly slaughter volume.

---

[18]   *Tyson Fresh Meats: What the Consumer Demands*, John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo (last visited Dec. 28, 2020).

[19]   Per-head net margin estimates cited in the Complaint sourced from the Sterling Profit Tracker produced by Sterling Marketing Inc. and published weekly on www.drovers.com, unless stated otherwise. Pre-class period average per head margins calculated across 1997 to 2014.

**Figure 2: Meatpacking Defendants' Quarterly Fed Cattle Slaughter Volume**



119.   The above figure highlights that Tyson, JBS, and National Beef each dramatically reduced their slaughter across 2015, while Cargill held its slaughter volumes steady following its 2014 cuts. These artificial reductions worked to cause the dramatic decline in fed cattle prices across 2015.

120.   The above figure also shows the consistent reductions made by all Meatpacking Defendants in the first quarters throughout the Class Period to constrain the seasonal rise in fed cattle prices historically experienced in the run up to spring, and the parallel, joint extension of these cuts in 2018 and 2019 to encompass Q4 as well.

121.   This uniform reduction during periods of seasonally lower cattle availability is not evident in the pre-Class Period. For example, in the fourth quarter of 2012, both Cargill and JBS significantly increased their slaughter volumes (3.7% and 12%, respectively on a quarter-over-quarter basis), while Tyson's held its steady (0.1%

increase) and National Beef engaged in notable cuts (-4% decline). Similarly, in Q3 2013, Tyson and National Beef increased their slaughter volumes, while JBS and Cargill reduced theirs. Across 2Q to 4Q 2014, JBS evidently sought to capture market share, first substantially increasing its slaughter volume in second quarter (16.3% increase against other Meatpacking Defendants increases of between 4.8%-10.2%) before holding it steady across the third and fourth quarters while each of the other Meatpacking Defendant's volumes declined noticeably in those two quarters.

122.   This figure demonstrates the remarkable extent to which Meatpacking Defendants' quarter-to-quarter slaughter changes move in lockstep with each other during the conspiracy period. This parallelism is consistent with an agreement to jointly manage their collective demand.

123.   The impact of Meatpacking Defendants' periodic coordinated slaughter reductions throughout the Class Period is further illustrated in Figure 7 and Figure 8, reproduced below. Figure 7 compares the average annual slaughter volume of the Meatpacking Defendants during the pre-Class period and the portion of the Class Period for which data exists against that of the other US beef packers. It shows that Tyson, JBS, Cargill, and National Beef each reduced their annual slaughter volumes relative to the pre-Class Period and allowed Independent Packers, who increased their volume as a whole, to capture market share in response to the record margins on offer.

010808-11/1421601 V1

**Figure 7: Average Pre- and Post-Class Period Fed Cattle Slaughter of Defendants versus Others**



124. Figure 8 also compares the Meatpacking Defendants' and the Independent Packers' annual slaughter volumes during the Class Period and the pre-Class Period, but breaks out the slaughter volumes for each year of the Class Period for which data is available. The graph confirms that Tyson, JBS, Cargill, and National Beef each slaughtered less in every year in the Class Period compared to their pre-Class Period averages. It also shows that while Tyson, JBS, Cargill, and National Beef each gradually increased their slaughter volume from 2015 onward, their rate of increase was far slower than that of the Independent Packers, consistent with a coordinated effort to manage their collective demand for fed cattle below the available supply.

**Figure 8: Average Pre- & Post-Class Period Fed Cattle Slaughter –Meatpacking Defendants vs Independent Packers [20]**



125.   That Meatpacking Defendants each slowly raised their slaughter levels as the availability of fed cattle increased during the Class Period only reinforces the likelihood of a collective agreement to manage slaughter levels after their initial cut – fully 5 years later, none of the Meatpacking Defendants have returned to their pre-2015 levels despite record profitability, while Independent Packers' slaughter is up nearly 50% against their pre-Class Period average, and 25% against their 2015 levels. By managing their collective demand such that it never outpaced supply, Meatpacking Defendants' ensured constant downward pressure on producers' prices, stalled price rallies and extended price troughs.

### 4.   Meatpacking Defendants Agreed to Slash Cash Cattle Purchases During Slaughter Reductions

126.   To place further downward pressure on cattle prices, Meatpacking Defendants also agreed to drastically reduce their cash cattle purchases during periods of

---

[20]   *Id*. National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume. Absent that acquisition, its 2019 slaughter volume was flat as against 2018, while Independent Packers' collective slaughter volume rose by approximately 100,000 head (net of Iowa Premium disposal).

agreed slaughter reduction or restraint. When doing so, Meatpacking Defendants would rely on pulling forward cattle deliverable under previously agreed formula and forward contracts and pressuring would-be cash sellers to commit their cattle on formula trades lest they be left without a marketing outlet.[21]

127. And, because Meatpacking Defendants had each largely transitioned to formula and forward contracts in the decade preceding 2015, which drastically thinned the cash cattle trade already, even small reductions in their cash cattle purchases had an outsized impact on cash cattle demand.

128. Plaintiffs' analysis of fed cattle sales records constituting approximately 4% of all fed cattle sales from 2012-2019, and 11% of all negotiated cash fed cattle sales during that period ("Dataset A")[22] supports the conclusion that each Meatpacking Defendant suppressed cash cattle sales at the start of the conspiracy in 2015 – a dramatic change from their behavior in 2014.

---

[21] *See also* Cassie Fish, *Futures Treading Water; Packers Keep Pressure On*, THE BEEF (Jun. 17, 2015), https://www.thebeefread.com/2015/06/17/futures-treading-water-packers-keep-pressure-on/ ("The news is well known this week and the packer has the upper hand. Boxes are higher and margins are black but packers are keeping kills small. ***The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper***.").

[22] Purchases by Tyson Fresh, Swift, CMS, and National Beef's constitute 93.7% of all sales within Dataset A on a per head basis between 2012 and 2019. Their percentage share of purchases within Dataset A during this period is 15.5%, 23.9%, 24.8%, 29.5%, respectively. Dataset A contains sales from all the major feeding regions, including Colorado (6%), Kansas (31%), Nebraska (16%), Oklahoma (2%), Texas (39%), and Wyoming (5%).

**Table 1: Year-Over-Year Change in Cash Cattle Volumes Recorded in Dataset A: 2015 v 2014[23]**

| Comparison | Tyson Fresh | Swift | CMS | National Beef |
|---|---|---|---|---|
| 2Q2015 v 2Q2014 | -56% | -73% | -56% | -92% |
| 3Q2015 v 3Q2014 | -28% | -29% | -65% | -98% |

129.   Similar declines are seen when Meatpacking Defendants' activity in 2015 is compared against their 2012-2014 average cash cattle purchase volume:

**Table 2: Year-Over-Year Change in Cash Cattle Volumes Recorded in Dataset A: 2015 vs 2012-2014 average[24]**

| Comparison | Tyson Fresh | Swift | CMS | National Beef |
|---|---|---|---|---|
| 2Q2015 v 2Q 2012-14 | -28% | -71% | -83% | -94% |
| 3Q2015 v 3Q 2012-14 | -24% | -69% | -78% | -98% |

130.   By reducing their purchases of cash cattle, Tyson, JBS, Cargill, and National Beef sought to reduce the price of all cattle by utilizing the link between cash cattle prices and the prices paid under formula and forward contracts. As noted above, by reducing their cash cattle purchases for a period of weeks or months, Meatpacking Defendants

---

[23]   These year-over-year declines are even more remarkable given the 8% year-over-year *increase* in total transactions recorded in Dataset A in 2015 (on a per head basis).

[24]   These year-over-year declines are only partially explained by the 11% reduction in total transactions recorded in Dataset A in 2015 (on a per head basis) as compared to the 2012 to 2014 average.

could "back-up" the volume of slaughter-ready cash cattle, thereby encouraging producers to overfeed their cattle and/or accept lower prices.[25]

131.   Meatpacking Defendants also used their market power to force producers to accept formula (including top-of-the market-formulas[26]) or forward contract deals as a condition for getting their perishable cattle sold. Top-of-the-market bids became commonplace when, in parallel, Meatpacking Defendants started to push such bids on cash cattle sellers at the end of 2014.

132.   This practice of pushing top-of the market deals on cash cattle sellers further reduced the number of cattle each Meatpacking Defendant had to purchase in the negotiated cash cattle trade. This reduced demand for cash cattle then further reduced whatever remaining leverage cash cattle sellers had to generate price competition. This in turn helped depress not just cash cattle prices, but all those cattle whose prices were linked to the cash market.

---

[25]   Cassie Fish, *Whatever Happened to a Fair Fight*, THE BEEF (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/ ("The conversation is no longer, what's cash going to be, but rather, who needs any. . . The smaller feeder is left to fight it out. Hoping he can get a buyer to come by and look at his cattle. Pressured to sell cattle with time. Anything to get cattle gone. Those that attempt to fight the market run the risk of making cattle too big even by today's standards or worse, alienate their local buyer. Powerlessness is widely felt by smaller producers on a regular basis.").

[26]   The "basis bid" or "top-of-the-market bid" is a formula contract under which the packer offers to pay the producer attempting to market cattle on the cash cattle market some variant of that week's top reported cash price, with or without a premium. For example, a packer might offer to pay the producer the top price reported by the USDA in relation to Kansas for that week, plus or minus a premium (expressed as a dollar per CWT figure), provided that top price was paid for at least 20% of the reported cattle sales.

- 51 -

133.   Dataset A shows that Tyson Fresh, Swift, CMS, and National Beef each substantially increased the volume of cattle procured on top-of-the-market bids in 2015, as against 2014:

**Table 3: Percentage of Meatpacking Defendant's Total Purchases in Dataset A on "Top-Of the Market" Bids: 2014 vs 2015**

| Year | Tyson Fresh | Swift | CMS | National Beef |
|------|-------------|-------|-----|---------------|
| 2014 | 6.8% | 6% | 0.2% | 4.5% |
| 2015 | 25.7% | 8.4% | 8.6% | 15.8% |

134.   One former feedlot manager, Matt T. ("Witness 2"), explained the limited incentives for a producer to try to bid up Packing Defendants during those periods during which they all limited their cash purchases. [27]   Witness 2 managed a 35,000 head commercial feedlot, Carrizo Feeders, in Texline, Texas, from 2012 until on or around July 1, 2015. [28].   Witness 2 elaborated:

> There was a good chance, during my final 9 months at the feedlot, that you would not get your cattle sold if you rejected the (top of the market) basis bid early in the week. In some cases, holding out for a cash bid would result in you forcing

---

[27]   As manager of the feedlot, Witness 2 was responsible for marketing all of the cattle fed there, whether owned by the feedlot or its customers.  In this capacity, Witness 2 negotiated with field buyers from Tyson Fresh, Swift, CMS, and National Beef on a weekly basis.  Most weeks, Witness 2 would market between 600 and 1,500 head of cattle on behalf of the feedlot.  Witness 2 also managed certain of the feedlot customers' risk positions by trading Live Cattle contracts on their behalf.  The feedlot marketed the majority of its cattle via the cash cattle market.  Witness 2 reports that by 2015, Tyson Fresh, Swift, CMS, and National Beef would predominately offer only top-of-the-market bids for the cattle fed at his feedlot.

[28]   Carrizo Feeders was purchased by DBM Cattle Feeders LLC (part of Oppliger Feeders) in or around April 2015.  Witness 2 continued as manager of the feedlot until his departure on or around July 1, 2015.  Witness 2 continued to be involved in the cattle industry afterwards in various roles.

- 52 -

the packers to raise their cash bid at the end of the week when cash cattle traded. However, if you took this substantial risk and won; all those that didn't take this risk and just accepted the top of the market bid would not only get the higher base price that you worked to negotiate, but they would get the additional premium offered on Mondays to take the cattle out of the cash market (usually $1.50/cwt) that you would not get. The feedlot manager that had rejected the basis bid and taken the risk to help raise the cash basis would then get pressure from owners of cattle angry that other feedlots sold cattle for $1.50/cwt more than their own cattle sold for. But by accepting the top of the market basis bid early in the week and taking the premium to the base market, you added to the packer's captive supply and helped them push the base price down across all their formula purchases. The packers realized that they bought cattle cheaper overall by offering these premiums to take cattle out of the cash market, and thus worked to get the numbers of open cash cattle, whose sale would be used to set the base of their formula purchases, as low as possible.

135.   The lower cash prices realized by Meatpacking Defendants' reduced purchases were then incorporated into Meatpacking Defendants' formula and forward contracts – the latter via a depression of Live Cattle future prices – thereby lowering the costs of all the cattle delivered to Meatpacking Defendants' plants.[29] Once actual or perceived oversupply had been created, Meatpacking Defendants could gradually increase their cash cattle purchases (and slaughter volumes) without putting any significant upward pressure on prices.

---

[29]   Cassie Fish, *Cash Trade Volume Tiny; Futures Shake It Off*, THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet. But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.").

136. For example, having cratered cash cattle prices in 2015, and with it, the leverage of producers they purchased from, each Meatpacking Defendant effectively abandoned their use of top-of the market deals in 2016, preferring instead to buy more cash cattle, and buy them cheaper as they pushed prices lower across 2016. These dramatic parallel changes in each of the Meatpacking Defendant's purchasing practices – both the sudden adoption of top-of the market bids, and their subsequent abandonment – was unlikely to emerge absent agreement.

**Table 4: Percentage of Meatpacking Defendant's Total Purchases in Dataset A on "Top-Of-The-Market" Bids and Cash Trades: 2014 to 2016**

| Year | Tyson Fresh | Swift | CMS | National Beef |
|------|-------------|-------|-----|---------------|
| *2014* | | | | |
| Top-of-the-market | 6.8% | 6% | 0.2% | 4.5% |
| Cash | 46.6% | 81.1% | 78.4% | 85.1% |
| *2015* | | | | |
| Top-of-the-market | 25.7% | 8.4% | 8.6% | 15.8% |
| Cash | 32.2% | 43.2% | 21.7% | 14.3% |
| *2016* | | | | |
| Top-of-the-market | 3.1% | 0.9% | 1.2% | 0.2% |
| Cash | 73.9% | 95.3% | 92.4% | 53.1% |

137. As detailed below, Meatpacking Defendants' joint slaughter management precipitated the dramatic collapse in fed cattle prices in 2015, and was repeatedly used throughout the Class Period to further suppress fed cattle prices.

- 54 -

## C.     Meatpacking Defendants Coordinated their Procurement Practices for Cash Cattle

138.   Another prong of Defendants' conspiracy involved coordinating the means by which each Meatpacking Defendant purchased cattle during the weekly negotiated trade. In particular, Meatpacking Defendants coordinated the timing of their purchases, the bids they would offer, the means of negotiating those bids, and the regions and feedlots where they would offer those bids. These activities exacerbated and reinforced the pressure placed upon producers to sell their fed cattle cheaply or risk being left without a marketing outlet for their perishable commodity. As a result, across the Class Period, producers felt they had no ability to negotiate higher prices with the Meatpacking Defendants. As a result, producers were compelled to either accept whatever low bid for their cattle they did actually receive, or to commit their cattle to Meatpacking Defendants on formula contracts, which further depressed demand for cash cattle.

139.   To begin with, Meatpacking Defendants would each often suspiciously all choose to reserve most of their weekly negotiated cash trade procurement activity for Friday, often after the CME had closed.[30] While the exact time on Friday varied, Meatpacking Defendants would regularly conduct all, or substantially all, of their weekly

---

[30]   A fact regularly commented on by industry participants. *See, e.g.*, Top Third Ag (@TopThird), TWITTER, (Feb. 19, 2016 8:33 PM), https://twitter.com/TopThird/status/700855757500076032 ("Only 4 Places are doing business at 7PM on Fridays: 1. White Castles 2. Bars 3. Whichever nightclub . . . is at. 4. #Cattle Trade"); T Heinle (@ndsuhsker), TWITTER, (Feb. 25, 2019 10:03 PM), https://twitter.com/ndsuhsker/status/1100244930318888960 ("You know it's not the packer selling the fats . . . we as cattle feeders say yes or no to the price. If we don't want the price we can pass, at 5pm on a Friday.").

cash cattle trade during the same 30- to 60-minute window on a Friday. Even when the Meatpacking Defendants' negotiated trade occurred earlier in the week, the bulk of each Meatpacking Defendants' purchases would regularly be conducted during a short window of time. By only purchasing within a short, common window, Meatpacking Defendants sought to condition producers to accept whatever offer they received, lest they be left without a buyer should they try (and fail) to solicit better bids at a different time.

140. Moreover, during that purchasing window, and across each trading week more generally, Meatpacking Defendants would typically adhere to the price level established by the Meatpacking Defendant that opened the weekly cash cattle trade, which would quickly be circulated across the market via the Meatpacking Defendants' field buyers' interactions with producers, word-of-mouth and industry reporting. [31] Meatpacking Defendants' respective head offices would give their field buyers no discretion to offer prices above that price level. In seeking to justify this price to producers, field buyers would claim that this opening trade established "market" and that their head office would permit them to offer no more.

141. In contrast, during the Class Period, Independent Packers purchased cash cattle across nearly each and every day of the week, thereby securing pens of high-quality cattle with limited competition.

---

[31] Meatpacking Defendants, rather than Independent Packers, typically set the market prices for fed cattle during the Class Period. The first trade each week conducted by a Packing Defendant would be used by that Packing Defendant and the other Meatpacking Defendants as setting the market price for that week.

142.   Meatpacking Defendants' use of this coordinated trading window is demonstrated by the data presently available to Plaintiffs.   Dataset A records that Meatpacking Defendants all bought all or the majority of their cash cattle solely on Friday in 36% of all trading weeks between 2015 and 2019, up from 29% from between 2012 and 2014.   Meatpacking Defendants' simultaneous Friday cash cattle trade was particularly prevalent in 2015, occurring 23 weeks of the year, up from 10 in 2014. Even more egregious, Dataset A records that Defendants limited their cash cattle purchases to Fridays during 26 (roughly half) of the trading weeks in 2018.

143.   Meatpacking Defendants' purchase records from January 2, 2019 to April 4, 2019, further show remarkable similarities in the prices paid by each for negotiated fed cattle:

- 57 -



144. Had any of the Meatpacking Defendants sought a greater share of the negotiated cash cattle trade during the Class Period to take advantage of the record beef demand (*see* Figure 12 below), one would expect to see significantly greater divergence in the prices paid by the Meatpacking Defendants. The strikingly similar prices paid by each Meatpacking Defendant for negotiated cash cattle is consistent with their agreement to limit their purchases in order to suppress the reported prices incorporated into their formula agreements.

---

32

010808-11/1421601 V1

145.   Plaintiffs' analysis of the reported cash cattle trade across AMS LMR's five price reporting regions further confirms both that Meatpacking Defendants reduced their participation in the cash cattle trade and that they conducted the bulk of the trading on Fridays. In particular, that analysis finds that, starting in or around 2014 and 2015, Meatpacking Defendants dramatically ***increased*** the number of days per month on which they ***did not conduct any*** cash cattle transactions within the five AMS LMR reporting regions.[33] Figure 12 through Figure 16 below plot these days:

**Figure 12: Days per Month Without Reported Cash Transactions in TX-OK-NM**



---

[33]   This trend is evident in each LMS reporting region except Iowa-Minnesota, which retains a comparably robust cash cattle trade.

**Figure 13: Days per Month Without Reported Cash Transactions in Nebraska**



**Figure 14: Days per Month Without Reported Cash Transactions in Kansas**



010808-11/1421601 V1

**Figure 15: Days per Month Without Reported Cash Transactions in Colorado**



**Figure 16: Days per Month Without Reported Cash Transactions in IA-MN**



146. The data reported above is consistent with the existence of an agreement among Meatpacking Defendants to both: (1) limit their purchases of cash cattle; and (2)

- 61 -

conduct all, or substantially all, of their cash cattle trade in short weekly windows.[34] If any single Meatpacking Defendant took these actions in the absence of such an agreement, that entity would risk failing to secure a sufficient quantity or quality of cattle to operate its plants at the most efficient capacity and/or meet customer demand, without any guarantee that its actions would have the desired impact on fed cattle or beef prices. The graphs are even more striking when one considers that Independent Packers continued to purchase cash cattle throughout the week and thus can be regarded as being responsible for the bulk of the transactions reported mid-week. Independent Packers' behavior is consistent with buyers' behavior in other, more competitive, physical commodity spot markets, such as the grain market, who trade throughout the week, as opposed to across arbitrarily short windows of time.

147. Meatpacking Defendants' increased reliance upon formula and forward contracts and the corresponding decrease in the number of cash cattle transactions does not and cannot explain the pattern observed above. While the number of cash cattle bought

---

[34] But for Meatpacking Defendants' agreement to conduct the majority of their cash cattle procurement on Fridays, there would be fewer days per month with no reported transactions as Meatpacking Defendants could reasonably be expected to conduct their purchases across the week. Because the daily transaction reports published by AMS capture purchases agreed between at or around 2:00 PM Central the prior day until at or around 2:00 PM Central the current day, it is not possible to identify specifically the number of transactions conducted, as opposed to reported, per day. However, analysis does confirm that the vast majority of weekly cash cattle transactions over the Class Period were reported by the AMS on Fridays and Mondays. This is further evidence that the majority of Meatpacking Defendants' cash cattle purchasers are made on Fridays, given that: a) Friday's reports include purchases made between at or around 2:00 PM Thursday and at or around 2:00 PM Friday; b) Monday's reports include purchases made between at or around 2:00 PM Friday and at or around 2:00 PM Monday; and c) very few trades occur on Mondays.

annually, expressed as a percentage of total sales, fell continuously from 2005 to 2015, it was not until 2014/2015 that the data shows a dramatic increase in the number of days without any reported cash transaction. This rise is then sustained despite a slight increase in cash cattle buying year-over-year in the subsequent years.

148.   In short, even though cash cattle slaughter numbers increased slightly after 2015, the number of days per month in which there were no cash cattle transactions also increased. Consequently, the Class Period demonstrates no connection between cash cattle slaughter volumes and active trading days, and Meatpacking Defendants' coordinated reduction in the number of days on which they purchased cash cattle is not explained merely by the decline in the number of cash cattle purchased annually.

149.   Meatpacking Defendants' use of a limited trading window and adherence to common prices reduced producers' ability to generate price competition. Producers who passed on the initial bid they received during the trading window would rarely receive a higher bid from one of the other Meatpacking Defendants. At best, the producer would typically receive the same bid (as all Meatpacking Defendants would adhere to that same price). And if the producer then decided that it was willing to sell at that price, it was required by the queuing convention (discussed immediately below) to return to the initial bidder who was "on the cattle" at that price. However, given the shortness of the trading window, and the limited volume of cash cattle each Meatpacking Defendant would purchase each week, the initial field buyer would regularly be unwilling or unable to renew its bid. The common refrain of the Meatpacking Defendant field buyer in such circumstances was that his/her employer was "full," because it had secured the limited

cash cattle it needed from that week's trade. This forced the producer to return to the second bidder, who was then commonly unwilling or unable to renew its bid as it too was "full" by that stage, even if its initial bid was given mere minutes before. Thus those producers who sought to negotiate higher prices for their cash cattle during the Class Period were often left with no buyer for their perishable product at the end of the week, and were forced to hold them over in the subsequent week's trade. This caused producers selling into the cash market to simply accept any bid they actually received.

150.   In addition to Meatpacking Defendants' reduced cash cattle purchases, short trading window and common pricing, each employed an antiquated "queuing convention" throughout the Class Period which served to limit producers' ability to generate price competition for their cattle.

151.   The queuing convention is an allocation mechanism imposed on the cash market by the packers; it was not chosen by the producers. It depresses fed cattle prices by limiting price competition among beef packers. It does so, in part, by requiring producers to relinquish their current offer in order to seek higher offers, thus reducing their incentives to pass on the initial offer in the hope of generating better offers. The queuing convention and other features of the bidding process also rendered the cash cattle market even more susceptible to collusion as it enabled Meatpacking Defendants to monitor each other's bidding behavior.

152.   The convention, which operated predominately in relation to those cattle sold in the cash market, works as follows: once a producer receives a bid from Packer A, the producer may either accept the bid or pass on it, but may not "shop" that bid to other

packers. If the producer passes on the bid to seek further bids from other packers, the producer must inform the other packers wishing to bid on the pen that it was bid "X per cwt" by Packer A, that it passed on that bid, and that it can, therefore, only accept bids of X+$1 per cwt.[35] If Packer B is willing to pay X+$1 per cwt, the producer may choose to accept that bid (without reverting to Packer A) or pass on it and seek further bids. But again, the producer may not "shop" that higher bid to other packers.

153.   If Packer B is only willing to bid X per cwt and the producer decides that it is now willing to accept that price, or otherwise revise down its reservation price (e.g., from X+$5 to X+$3), the producer is obligated to first return to Packer A, which is "on the cattle" at price X per cwt and provide it with an opportunity to renew its bid at that price or the producer's new reservation price.[36] Only if Packer A declines can the producer offer to sell to Packer B at X per cwt or at the producer's new reservation price. At this point, however, Packer B is under no obligation to purchase from the producer. If a third packer, Packer C, had also offered X per cwt after Packer B's bid, the producer could only offer to sell to it at that price after both Packer A and B declined to renew their bids at that price. Again, Packer C would be under no obligation to purchase from the producer at this price.

---

[35]   In certain instances, it may be acceptable to offer/accept bids in $0.50 per CWT increments.

[36]   The right-of-first-refusal, as well as the requirement that the producer must disclose to other packers the identity and bid amount of the packer whose bid it passed on, provides packers with information relevant for monitoring compliance with collusively set prices among the packers.

154.   By contrast, if the producer had rejected a bid from Packer B of X+$1 per cwt, Packer B would then be "on the cattle." In that case, and assuming the producer received no further bids above X+$1 per cwt, it would be obligated to return to Packer B, rather than Packer A, to offer it an opportunity to buy its cattle X+$1 per if the producer subsequently decided to accept that price or the producer's new reservation price.

155.   The obligation to return to the packer which is "on the cattle" is effectively a right of first refusal granted without consideration under threat of boycott. Tyson, JBS, Cargill, and National Beef have adhered to and enforced the convention for decades, including across the Class Period, and treat it as a mandatory industry custom.

156.   The convention's effect was magnified by the market conditions that prevailed during the Class Period, in particular, the thin cash cattle trade, Meatpacking Defendants' collective shunning of the cash market periodically – and the Meatpacking Defendants' coordination of both their price and trading windows.  In such market conditions, the convention created an artificial sense of urgency that encouraged producers to accept the first offer they received from a Meatpacking Defendant. This effectively reduced competition among Meatpacking Defendants for any particular pen of cash cattle to which Meatpacking Defendant would be first to deliver what essentially amounted to a take-it-or-leave-it offer, with no fear of subsequent price competition.

157.   Witness 2 confirmed that the field buyers from Tyson Fresh (Brian Alsup), Swift (Levi Canales, and prior to him, Chad Miller), CMS (Rick Vogel, and prior to him, Steve Brown), and National Beef (Richard Duffy) who visited his feedlot enforced strict adherence to this convention with threats of retaliation. In particular, each of these field

buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.

158.  Witness 2 further reports that when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and CMS. When he subsequently spoke to the field buyers from Tyson Fresh (Mr. Alsup) and Swift (Mr. Miller) responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids. Witness 2 reports that the Tyson Fresh and Swift field buyers re-commenced visiting the feedlot after he commited to following the convention.

159.  Witness 2 also heard from the Defendants' field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention. In those circumstances, Witness 2 understood that the Meatpacking Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted while shopping the Meatpacking Defendant's bid, or would ex-post pressure the producer for details of its sale.

160.  However, Witness 2 recalls that very few producers or their agents were willing to break with the convention for fear of alienating one or more of the Meatpacking Defendant field buyers who visited their yard. He reports never breaking the convention for this reason. He said that commercial feedlots or third party marketing bodies, such as his feedlot, were unwilling to risk Meatpacking Defendants' retaliation given the duties

they owed to their clients. Cattle owners are not willing to feed their cattle at commercial yards or market their cattle with organizations that have poor relations with Meatpacking Defendants, which constitute most producers' only marketing outlet. Plaintiffs are not aware of examples of producers or their agents breaking with the convention for these reasons. Meatpacking Defendants' threats of boycott were sufficient to ensure adherence to the convention.

161.   In addition to the queuing convention, Witness 2 elaborated on further examples of artificial market dynamics at play. For example, he reports that in late 2014 or early 2015, the Tyson Fresh (Mr. Alsup), Swift (Mr. Canales), CMS (Mr. Vogel), and National Beef (Mr. Duffy) field buyers who attended his feedlot jointly demanded that he determine who had the right to make the first bid each week by having them draw cards in his office. Witness 2 reports that he felt obligated to acquiesce, as he remained anxious to ensure that each Meatpacking Defendant visited his feedlot.

162.   Thereafter, and at least until Witness 2 left the feedlot in or around July 1, 2015, the Meatpacking Defendant field buyers wishing to bid on the cattle being marketed by the feedlot during that week would draw cards to determine who could place the first bid.[37] Witness 2 cannot recall a single week during this period in which one of the other three Meatpacking Defendant field buyers actually raised the initial bid placed by the field buyer who won the card draw. That is, Witness 2 reports that during this period Tyson,

---

[37]   Randomization devices like this have been used by other cartels. For example, the electrical contractors' cartel used the phase of the Moon to determine which of the bidding ring members had the right to bid, free from competition from other members of the ring.

JBS, Cargill, and National Beef did not engage in any price competition for the cattle sold by Witness 2's feedlot.

163.   The field buyers tried to justify the card drawing scheme to Witness 2 by saying it would allow them to avoid attending the feedlot at increasingly early hours in an attempt to place the first bid. In a competitive market, however, in which the purchasers engaged in genuine competition to acquire a producer's products, no purchaser would have a unilateral incentive to propose or adhere to such a scheme (nor would a producer have an incentive to agree to such a scheme). Rather, each purchaser would instead have a unilateral incentive to preserve the right to make an offer to the producer and rely on its ability to offer the best terms to acquire the producer's products. This is especially true when the first bid at a given price carries with it an automatic right of first refusal, which has commercial value.

164.   A Meatpacking Defendant would, for periods of time, sometimes extending across many months, offer the only bid (or the only credible bid) for a particular feedlot's fed cattle week to week, ensuring that the feedlots affected could not regularly procure credible bids from the other Meatpacking Defendants. Buyers for these other Meatpacking Defendants would even routinely fail to take or return calls from the producer until after the Friday trading window had closed, even where their respective employers operated slaughter plants at closer proximity to the feedlot than the other Defendant. These arrangements – akin to a market allocation scheme – point to an agreement among Meatpacking Defendants to respect each other's relationships with their preferred suppliers.

010808-11/1421601 V1

165. Additionally, Meatpacking Defendants would, at times, stop buying cash cattle from feedlots located in a particular region for a number of weeks. In doing so, they intended to back-up cash cattle in those regions and break the resolve of affected producers to hold-out for higher prices. After boycotting a region for a number of weeks, Meatpacking Defendants would then all begin purchasing cattle from that region again during the same week. When executing this scheme, Meatpacking Defendants would often seek to initiate their weekly cash cattle trade in the region recently boycotted. This allowed them to use the lower prices agreed to in that region to set the "market" for the remainder of the trade. In doing so, Meatpacking Defendants were able to influence the prices of fed cattle sales across the United States.[38]

166. The Meatpacking Defendants' conduct across Nebraska, Kansas, and Colorado from late March to early May 2016 is particularly illustrative of this practice. The average live steer price in Nebraska for the weeks heading into April 2016, was steady at around $136/cwt. In the two trading weeks starting Monday, April 4, 2016, Meatpacking Defendants each reduced their purchase of cash cattle across Nebraska.[39] In the subsequent trading week, Meatpacking Defendants were able to take advantage of the artificial surplus of Nebraskan cattle carried over from the prior weeks by buying

---

[38] For similar reasons, Meatpacking Defendants would also, at times, seek to set the market price lower by opening the weekly trade by purchasing a pen of poor quality cattle at a discount.

[39] The AMS reported that negotiated Nebraska sales during those two weeks were 17% and 10% lower than the average reported volume for those corresponding weeks between 2011 and 2014.

- 70 -

significantly more cattle at a lower price of $126/cwt. Consistent with AMS reporting, Dataset A records just 1,176 and 1,340 cash cattle sold in Nebraska in the weeks commencing Monday, April 4 and Monday, April 11, respectively. The Defendant buyers were Swift and National Beef. By contrast it records 3,760 cash cattle sold in Nebraska the week commencing Monday, April 18, 2016, all on Friday April 22, 2016, with each Meatpacking Defendant purchasing lots.

167.   The same thing then occurred in Kansas. The average live steer price in Kansas across the weeks commencing Mondays, April 4 and 11, 2016 was steady at around $133/cwt. In the two trading weeks that started on April 18, 2016, each Meatpacking Defendant reduced its purchase of cash cattle across Kansas, and, at least Tyson Fresh, trucked Texas captive cattle to its Holcomb, Kansas plant.[40] As a result, AMS reported 44% and 28% fewer cash cattle sales in Kansas during those weeks as compared to the average reported volume for those corresponding weeks between 2011 and 2014. Aided by the price suppression begun by the Defendants' prior isolation of Nebraska, live Kansas steer prices were also suppressed, dropping to $127/cwt for the week commencing Monday, April 18, before falling again to $124/cwt for the week ending Monday, April 25, 2016.

168.   Not surprisingly, each Meatpacking Defendant then increased its purchase of cash cattle in Kansas in the first week of May, taking advantage of the artificial supply

---

[40]   The house that $chtr built (@trdaaron), TWITTER, (April 14, 2016, 4:36 PM), https://twitter.com/trdaaron/status/720712349338832896?s=20 ("So tyson pulling lots of contract cattle from TX up to KS next two weeks which pushes rest of my cattle into first week of May.").

glut they had created across the course of the two prior weeks. For this week, AMS reported a total of 24,000 cash sales in Kansas, a 7,000 head increase from the average reported sales of the two prior weeks, and a 2,000 head increase on the weekly average for the period between 2011 and 2014. Despite this significant uptake in purchases, the average price for live steers in Kansas remained low at $127/cwt.[41]

169.   Meatpacking Defendants then moved on to Colorado. Colorado reported 41% and 67% relative declines in reported cash sales for the trading weeks commencing Monday, April 25 and May 2, 2016 as compared to the average reported volume for those corresponding weeks between 2011 and 2014. In the trading week that followed, Colorado cash sales rose 3,000 head to 4,000 head, 7% above historical averages.

170.   These coordinated procurement practices limited competition for cash cattle, thereby reinforcing the price depressive effect of Meatpacking Defendants' coordinated slaughter reductions.

**1.   The Meatpacking Defendants continued to import foreign cattle after it became uneconomical for them to do so.**

171.   Meatpacking Defendants also engaged in coordinated import and shipping practices that reduced demand for domestic fed cattle and suppressed the cash price transaction reports used to set the price of cattle procured under captive supply agreements during the Class Period. In particular, Meatpacking Defendants shipped cattle over

---

[41]   USDA Market News Service Report: LM_CT164 Kansas Weekly Weighted Average Direct Slaughter Cattle - Negotiated. Any of the USDA Market News Service Reports referenced in this complaint can be generated at https://marketnews.usda.gov/mnp/ls-report-config.

uneconomically long distances to their slaughter plants, from locations both inside the United States and from Canada, to avoid bidding up the reported price of cattle in closer AMS LMR reporting regions.[42]

172.   Given the additional freight costs incurred in procuring fed cattle from Canada or regions within the U.S. outside a slaughter plant's typical procurement radius, it is only economical for a Meatpacking Defendant to do so where the prevailing price differences as against domestic/local prices exceeded these additional costs. But Plaintiffs' analysis suggests that Meatpacking Defendants' import of live cattle began to increase slightly in 2014, and continued, even after it became uneconomical for them to do so in or around mid-2015:

---

[42]   In relation to cross-region shipping in the U.S., *see*, for example, El Carnicero (@blakealbers), TWITTER (Nov. 16, 2015, 9:02 am), https://twitter.com/blakealbers/status/66630019433860353 ("The amount of cattle going south to dodge city and the like is incredible"); T. Heinle (@ndsuhsker), TWITTER (Feb. 26, 2016, 7:37 AM, https://twitter.com/ndsuhsker/status/703197081205391360 ("Shipping cattle from wne to ene to be slaughtered #dontfigure!"); and T. Heinle (@ndsuhsker), TWITTER (Apr. 14, 2016, 5:45 PM), https://twitter.com/ndsuhsker/status/720729811241414656 ("Truckers are the packer's best friend, first haul south early now haul north! #everycattlefeederbuytrk!" -- response from Where's The Beef (@CornfedBeef) TWITTER (Apr. 14, 2016, 9:19 PM): "Apparently paying freight must be cheaper than paying up for cash cattle in the region they need them! #BuyLowAndHaul").

**Figure 17: Live Slaughter Cattle Imports into the U.S.**[43]



173.   As can be seen from this graph, live cattle imports gradually declined until 2014 when they stabilized and began a slight upward trend. Throughout this period, imports of Canadian cattle comprised the substantial majority of all live cattle imports for slaughter.

174.   While such imports were originally economical, considering the prevailing price differences from 2005 to early 2015, from mid-2015 onwards, they were often

---

[43]   Fed cattle slaughter volumes sourced from USDA Market News Service Report: LM_CT106-National Daily Direct slaughter, committed and delivered. On information and belief, Plaintiffs understand that Tyson, JBS, and Cargill are responsible for the bulk of all live cattle imports for slaughter.

uneconomical, and became increasingly so as the Class Period continued. Yet Defendants

continued to uneconomically purchase cattle from Canada.

**Figure 18: Difference between Nebraska Fed Cattle Prices and Alberta Fed Cattle Prices Adjusted for Shipping Costs[44]**



175.  As can be seen from Figure 18 above, procuring Canadian cattle for

immediate slaughter from mid-2015 onwards was regularly more expensive than

procuring fed cattle from the adjacent U.S. feeding regions. These periods of

---

[44]  To construct comparable price series for Canadian imports, Plaintiffs adjusted Alberta fed cattle prices for shipping costs and the exchange rate between the U.S. dollar and the Canadian dollar. To do so, Plaintiffs accounted for the following factors which impact shipping cost per CWT: the cost per pound, per loaded truck to haul cattle, the capacity of the trailers used to haul cattle, the distance between Alberta and Nebraska, and fuel costs. AMS LMR price series for Nebraska are selected as the appropriate proxies as they are the nearest U.S. price reporting regions to Alberta. Alberta is the key cattle exporting region of Canada. ALBERTA GOVERNMENT, *Livestock Prices*, accessed December 26, 2018, https://economicdashboard.alberta.ca/LivestockPrices. Canadian dollars per cwt of live cattle in Alberta converted to USD per cwt.

uneconomical imports are identified by the portions of Figure 18 where the live cattle price difference line dips below zero.

176.   Tyson and JBS acknowledge importing fed cattle from Canada for slaughter at their U.S. facilities. For example, in 2016, an executive at JBS stated that "a lot of cattle [were] moving from Canada to U.S." and said that such imports had an "important impact."[45] Similarly, Defendant Tyson acknowledged "buying cattle directly from Canadian cattle feeders" and is reportedly the third largest buyer of Canadian cattle, behind JBS and Cargill.[46]

177.   Suppressing the demand for U.S. fed cattle through the strategic importation of Canadian fed cattle is a practice that Tyson, JBS, and Cargill have used during the Class Period and continue to use. Tyson, JBS, and Cargill have sought and received regulatory approval to import fed cattle for immediate slaughter at their packing facilities, including: a) Tyson's packing plants in Pasco, Washington and Joslin, Illinois; b) JBS's packing plants in Greeley, Colorado; Hyrum, Utah; Plainwell, Michigan; Omaha, Nebraska;

---

[45]   JBS Q1 2016 Earnings Call, (May 12, 2016).

[46]   *Tyson halts Canadian beef imports due to higher costs*, THE CATTLE BUSINESS WEEK (Oct. 31, 2013), https://www.cattlebusinessweekly.com/articles/tyson-halts-canadian-beef-imports-due-to-higher-costs/. While Tyson claimed that it was halting Canadian cattle imports in late 2013 in opposition to Country of Origin Labeling (COOL) requirements, when COOL was repealed in early 2016, Tyson is understood to have increased its imports of live cattle for slaughter.

Souderton, Pennsylvania; and Green Bay, Wisconsin; and c) Cargill's packing plants in Ft. Morgan, Colorado; Wyalusing, Pennsylvania; and Fresno, California.[47]

178. These actions evidence an intent to depress U.S. fed cattle cash prices because a Meatpacking Defendant would not incur the additional costs associated with the import and purchase of foreign or extra-regional cattle in the hope of lowering its fed cattle supply procurement costs unless it was certain that its major competitors would do the same thing.

### D.   Meatpacking Defendants Agreed to Restrict Their Slaughtering Capacity

179. In furtherance of their conspiracy to manipulate the fed cattle market, Meatpacking Defendants also agreed to eliminate their slaughtering capacity and refrain from future capacity expansion.

180. Indeed, during the run-up of fed cattle prices until their precipitous fall in mid-2015, Meatpacking Defendants first sought to reduce demand through a series of plant closures: Cargill closed its Plainview, Texas and Milwaukee, Wisconsin plants (4,000 and 1,300-1,400 head per day capacities, respectively) in February 2013 and August 2014, respectively; National Beef shut its Brawley, California plant (2,000 head per day) in June 2014; Tyson closed its Denison, Iowa plant (2,000 head per day) in

---

[47]   USDA, List of Plants Approved to Receive Immediate Slaughter Animals, https://www.aphis.usda.gov/import_export/downloads/slaughter_list.pdf (last visited Dec. 28, 2020).

August 2015; and, JBS left the Nampa, Idaho plant it acquired in April 2013 closed throughout the Class Period.[48]

181. The 125,500 head per day of industry-wide capacity remaining after Meatpacking Defendants implemented their final plant closure was the lowest in the modern history of the industry.

182. Defendants closed these plants on the pretense of low cattle availability despite the fact that by early 2013, the drought had passed, forage availability in cow-calf producing regions had reached above average levels, and producers' heifer retention rate – that is the percentage of heifers retained for breeding as opposed sent to the feedlot in preparation to slaughter – was already increasing, foreshadowing the gradual increase in slaughter weight fed cattle the industry would witness from 2016 onwards.[49] Defendants

---

[48]   Tyson Fresh additionally closed a beef processing plant in Cherokee, Iowa in September 2014, before telling local government officials that it would not consider selling the facility to "any firm that they believe is competition." Kevin Hardy, *Held 'hostage' by Tyson: An Iowa town's dilemma*, DES MOINES REGISTER (July 8, 2016, updated July 16, 2016), https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/. It ultimately sold the facility to an independent food processing company, pursuant to an agreement which "limits the amount of cattle that can be processed at the plant for . . . 10 years", notwithstanding that Tyson did not use it to slaughter fed cattle. Kevin Hardy, *'No hard feelings': Tyson finally agrees to leave empty Iowa facility as new meat processor opens shop*, DES MOINES REGISTER (September 19, 2018), https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/. The plant was primarily used to produce hot dogs.

[49]   Heifer placements in feedlots as a percentage of total placements fell from 38.2% in January 2012 to 36.3% in October 2012, before continuing to steadily decline to 31% in April 2015, signifying the retention of heifers for breeding. Thereafter, the heifer placement percentages gradually increased again, reaching 39.2% in October 2019.

were undoubtedly aware of the expected gradual rebuild of the beef cattle herd, as they routinely tout their visibility of upcoming supply numbers.[50]

183.   Meatpacking Defendants' slaughter plant closures, even excluding the continued idling of the Nampa, Idaho plant, stripped out approximately two million head from the industry's annual slaughter capacity, thereby limiting demand for fed cattle. In relation to each closure, the relevant Meatpacking Defendant offered pre-textual explanations, such as a lack of available cattle in the adjacent regions and "plant inefficiencies."[51]

184.   Meatpacking Defendants' executives praised each other's efforts to reduce industry-wide slaughter capacity through plant closures. For example, André Nogueira, CEO of JBS USA, Swift and JBS Packerland, noted in November 2015 that the closures had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."[52]

---

[50]   *See, e.g.*, JBS, Q3 2013 JBS SA Earnings Conference Call, Nov 15, 2013, ("we've seen some heifer retention of the US -- some cow retention in the US, which indicates that we're at the beginning of a recovery in the herd size in the US, something we've been talking about for some time."); Tyson, Q3 2014 Tyson Foods Earnings Conference Call, July 28, 2014 ("we expect next year [2015] to look a lot like this year [2014] from a cattle supply . . . and we're starting to see signs of heifer retention"); and Jefferies Financial Group Inc., "Leucadia National Corporate 2015 Investor Day" at slides 113-14 (Oct. 8, 2015), (noting increase in heifer retention, and projecting increase in slaughter weight fed cattle from 2016 onwards).

[51]   National Beef even rejected a significant package of incentives offered by local government, utilities, and nearby feedlots when it decided to close its Brawley, California plant. *National Beef plant closing Brawley Facility*, PROGRESSIVE CATTLEMAN (March 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

[52]   JBS Q3 2015 Earnings Call at 9, (Nov. 12, 2015).

185. Tyson Food's Donnie Smith similarly let slip during Tyson's Q4 2015 Earnings Call that Tyson's preference would be for additional capacity reduction to further reduce producers' negotiating leverage with the Meatpacking Defendants:[53]

> You've got relatively low cattle supply, you've got too much -- well, not to say too much, ***probably not the right way to say it***, but you've got excess industry capacity. And that limits our ability to drive margins above the 1.5% to 3%, we think.

186. As a result of Meatpacking Defendants' closures, the United States experienced both a decline in fed cattle slaughter capacity and an underutilization of that capacity. This decline in marketing outlets for fed cattle producers has been compounded in certain regions, where fed cattle producers now only have one, or possibly two, slaughter plants to which they are able to sell their cattle.

187. While industry wide slaughter capacity increased slightly between 2016 and 2017, this is attributable to One World Beef Packing's reopening of the Brawley, California plant closed by National Beef. Iowa Premium Beef (Tama, Iowa, 1,100 head per day) and Lime Springs Beef (Lime Springs, Iowa, 540 head per day) also entered the market in 2015 to partially offset some of the Meatpacking Defendants' closures.[54] While JBS undertook a capital investment to increase slaughter capacity during the Class Period, its expansion of its Hyrum, Utah plant in 2015 and 2016 was directed at increasing its ***cull***

---

[53] Tyson Foods Q4 2015 Earnings Call, (Nov. 24, 2015).

[54] Burt Rutherford, *Increase in U.S. packing capacity is good news for the beef business*, BEEF (Feb. 2, 2015), https://www.beefmagazine.com/blog/increase-us-packing-capacity-good-news-beef-business.

*cow* slaughter capacity, as opposed to *fed cattle*.[55] And while Tyson finally completed its upgrades to its Dakota City, Nebraska plant in April 2015, the project, commenced in March 2012, had been scheduled for completion in mid-2013, and reported to be near completion as early as March 2013. Further, while slaughter volumes improved from 2014 and 2015's lows, this was driven by Independent Packers.

## V.   PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE OF FED CATTLE TO COLLAPSE AND SUPPRESSED PRICES THEREAFTER

### A.   Meatpacking Defendants' Conduct Precipitated the Collapse in Fed Cattle Prices in 2015

188.   Meatpacking Defendants' coordinated conduct was successful. Responding to the compression of their margins in late 2014, Meatpacking Defendants coordinated a reduction of their respective slaughter volume.

189.   In the first quarter of 2015, Tyson, JBS and National Beef's year-over-year slaughter was down by approximately -1.8%, -11.2%, and -8.5%, respectively. And while Cargill's quarterly slaughter volume rose slightly year-over-year in the first quarter, like the others, its slaughter volume was still down on its fourth quarter 2014 volume.

190.   These declines were reflected in the Defendants' public reporting. Tyson's May 4, 2015 10-Q noted that its "sales volume decreased [in the quarter ending March 28, 2015 year-over-year] due to a reduction in live cattle processed." Jefferies, National

---

[55] *Idaho Cow Market Will Heat Up*, CATTLE BUYERS WEEKLY (February 2, 2015) ("The complete project will allow for the increase of production levels by more than 400 head per day . . . says JBS. All of the 400-head increase will be cows."). National Beef's acquisition of Iowa Premium, which was finalized on June 10, 2019, did not add to industry capacity.

Beef's then majority shareholder, noted in its 10-Q filed May 8, 2015 that National Beef's revenues were down year-over-year for the first quarter "primarily to lower sales volume, as fewer cattle were processed."[56] JBS S.A.'s earnings presentation for the first quarter noted a 1.1% year-over-year decline in the "number of animals processed" by its JBS USA beef unit.[57]

191.  This reduction in slaughter levels had the desired effect. For the first half of 2015, prices fluctuated at or around $160/cwt, $10/cwt lower than the high established in November 2014.

192.  Not satisfied with this, Meatpacking Defendants extended their joint slaughter reduction during the second and into the third quarters of 2015. Across the second quarter, Tyson, JBS and National Beef's year-over-year slaughter was down by approximately -5.4%, -12.8%, and -6.2%, respectively. Cargill continued to hold to its low 2014 volume. While it posted a modest year-over-year growth of 1.8% in the second quarter, this still left it 12.7% below its 2012-14 Q2 average.

---

[56] Leucadia National Corp. (Jefferies Financial Group) 10-Q at 57 (May 8, 2015), *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0000096223/3814a574-db1f-457d-92b2-d62d4e44cdeb.pdf.

[57] JBS S.A. 1Q 2015 Results at 15 (May 13, 2015). JBS USA Beef segment also encompasses JBS S.A.'s much smaller Australian and Canadian beef businesses and Australian sheep operations. This also noted a -1.1% decline in cattle processing (both fed and non-fed) across its US, Australian and Canadian beef businesses. JBS USA's fed cattle to non-fed cattle slaughter ratio throughout the class period was 80% fed, 20% non-fed.

193.   Again, this reduction in cattle purchases was also reflected in Tyson Foods[58], JBS S.A.,[59] and Jefferies (National Beef's)[60] financial reporting.

194.   To place further pressure on cattle prices during 2015, Tyson, JBS, Cargill, and National Beef also drastically reduced their respective purchases of cash cattle, leaning heavily on their captive supplies and, in the case of Cargill and JBS, their own cattle, to satisfy their curtailed kill numbers.[61] Meatpacking Defendants also pressured cash sellers to accept formula trades as a condition for slaughtering their cattle.

---

[58] Tyson's 10-Q for its quarter ending June 27, 2015, recorded year-over-year declines in sales in its beef segment revenue due to a "reduction in live cattle processed." *See* Tyson Foods, Inc., Quarterly Report (Form 10-Q), at 38 (Aug. 3, 2015). *See also* Tyson Foods, Inc. Annual Report (Form 10-K), at 29 (Nov. 23, 2015) (noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing).

[59]     JBS S.A., 2Q 2015 Results, August 13, 2015 at 15, https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/02fd1b6f7f1cee632e5af617767bc7a98017ead954465d63d1e8633b2ec5a3cd/2q15_earnings_release.pdf (noting -0.9% decline in cattle processing (both fed and non-fed) across its US, Australian and Canadian beef businesses).

[60]   Leucadia National Corporation, Quarterly Report (Form 10-Q) (Aug. 5, 2015), at 52, https://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingId=10842047 (noting revenues for three and six month 2015 periods decreased year-over-year "primarily due to lower sales volume, as fewer cattle were processed"); Leucadia National Corporation, Quarterly Report (Form 10-Q) (Nov. 5, 2015), at 53, https://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingId=10990831 (noting the same in relation to 3Q 2015 and first three quarters of 2015).

[61]   Cassie Fish, *Cash Trade Volume Tiny; Futures Shake It Off*, THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156. . . . But . . . it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive. Only problem is, packers weren't able to secure enough cattle cheaper, even when relying on captives, to easily fill

195. Meatpacking Defendants' strategy was immediately successful, with cash cattle – and thus formula cattle – prices falling continuously across June to about $150/cwt.[62] Meanwhile, with lower slaughter volumes and lower boxed beef output, the meat margin expanded rapidly, bloating each Meatpacking Defendants' margins.

196. Meatpacking Defendants' determination to "break" cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases was remarked upon by industry analysts at the time. On June 12, 2015, analyst Cassandra Fish of "The Beef" and formerly a risk manager at Tyson, speculated as to when one of Meatpacking Defendants might break ranks:

> Rarely has this industry segment [the beef packers,] been an all-for-one and one-for-all group. All packers need to buy cattle inventory. Most have cut hours. So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring? Will one short a customer only to find that order filled by a competitor?[63]

197. Ms. Fish answered her own question a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting

---

an even curtailed kill expected this week at 540,000 head. June forward contracts are rumored being called in as a way to offset the absence of negotiated purchases.").

[62] Cassie Fish, *Smack Down*, THE BEEF (Jun. 15, 2015), https://www.thebeefread.com/2015/06/15/smack-down/ ("Cash cattle prices broke hard Friday as packers successfully executed a strategy of slashed kills and limited negotiated purchases.").

[63] Cassie Fish, *Futures Holding Gains; Waiting on Cash*, THE BEEF (Jun. 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.

the kill increase gradually," limiting the ability "of feeders to get all cattle marketed [*i.e.*, sold] in a timely fashion."[64]

198.   During the remainder of 2015, Meatpacking Defendants continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up" and were reaching historically heavy weights.[65] They did so even though underutilizing their plants would hurt their margins.

199.   Tyson's CEO, Donnie Smith, admitted as much August 3, 2015 when discussing Tyson's decreased purchases over the preceding quarter, noting "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term."[66] In response to a question regarding the consequent impact of Tyson's underutilization of its plant capacity Mr. Smith elaborated:

> In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin.[67]

---

[64]   Cassie Fish, *Another Round of the Blues*, THE BEEF (Jun. 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/. Dataset A records that Meatpacking Defendants conducted all or substantially all of their cash cattle purchases on the Friday of the two trading weeks commencing Mondays 11 and 18 June 2020.

[65]   Cassie Fish, *Kills Too Small For Too Long*, THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

[66]   Tyson Foods Q3 2015 Earnings Call, (Aug. 3, 2015).

[67]   *Id.*

010808-11/1421601 V1

200.   While Tyson was unwilling to disclose the impact on its bottom line, the impact on producers was particularly evident in September 2015, when Tyson, JBS, Cargill, and National Beef each utilized the leverage they had collectively established over producers in the prior months to push prices down to $120/cwt by months' end, despite increasing their purchases of cash cattle. Meatpacking Defendants also demanded extended delivery periods of two to four weeks as a condition of trade throughout the month, providing them with further leverage over producers who still had cattle to sell.[68]

201.   Tyson, JBS, Cargill, and National Beef's concerted actions to depress cattle prices across 2015 (and their successes) are summarized by the below two charts. Figures 19 and 20 both compare the price of fed cattle across 2015 against the number of fed cattle slaughtered across 2014 and 2015 at packing plants subject to AMS LMR reporting obligations.[69] These figures are a very good proxy for Tyson, JBS, Cargill, and National Beef's cumulative slaughter volume as they operate the substantial majority of such plants and appear to provide over 90% of the reported transactions.

202.   Figure 19 details the price and slaughter volumes of all fed cattle and tracks Meatpacking Defendants' quarterly slaughter volumes detailed in Figure 2 above. Figure

---

[68]   *See, e.g.*, Cassie Fish, *No bottom in sight*, THE BEEF (Sep. 16, 2015), https://www.thebeefread.com/2015/09/16/no-bottom-in-sight/.

[69]   Figures 19 and 20 were prepared using USDA Market News Service Reports: LM_CT106-National direct slaughter, committed and delivered, LM_CT151-National Weekly-Formula, Forward, Negotiated Net (Domestic), and LM_CT154-Weekly National direct slaughter, negotiated. Fed cattle prices shown in Figure 19 is the weighted average price of all four purchase categories (formula, forward, negotiated (*i.e.*, cash), negotiated grid).

20 details the price and slaughter volumes of cash cattle. The average monthly slaughter volumes between 2010 and 2014 are also detailed. As shown by these figures, the decline in cash cattle slaughter across the second and third quarters of 2015 depressed the price of all fed cattle. This enabled Meatpacking Defendants to boost their slaughter volumes in the final quarter of 2015 by purchasing cheaply the oversupply of cash cattle they had created across the preceding two quarters.

**Figure 19: Total Fed Cattle Slaughter Volumes and Fed Cattle Prices – all purchase types**



- 87 -

**Figure 20: Cash Cattle Slaughter Volumes and Cash Cattle Prices**



203.   Despite increasing their respective slaughter volumes of cash cattle over prior years during the final quarter of 2015 to take advantage of the comparative glut they had created, each Meatpacking Defendant slaughtered between 5.8% and 17.1% fewer cattle in the fourth quarter of 2015 than their 2012 to 2014 average.

204.   Importantly, Tyson, JBS and National Beef's annual slaughter volumes were down 4%, 17%, and 6% on 2014 levels, respectively.[70] While Cargill's slaughter volume remained flat year-over-year as a result of its low 2014 slaughter volumes in the aftermath

---

[70]   CBW Top 30 Beef Packers, *supra* note 2.

of its two plant closures, its 2015 slaughter volume was significantly below historic levels.[71] Moreover, Cargill did participate in Meatpacking Defendants' reduced purchase and slaughter volumes across 2015 before increasing its cash purchase volume in the final months of the year.

205. Moreover, each Meatpacking Defendant's conduct stands apart from Independent Packers' who *increased* their annual slaughter volume in 2015 by 7.8% year-over-year.

206. Tight fed cattle supplies do not explain Meatpacking Defendants' coordinated reduction of their respective slaughter volume across 2015. The drastic drop in prices and the Meatpacking Defendants' unseasonable rise in the slaughter of cash cattle in the fourth quarter of 2015 cannot be attributed to a significant increase in the availability of slaughter weight cattle.

207. An analysis of the USDA's Cattle on Feed reports confirms this.[72] This monthly publication reports data on the number of fed cattle in U.S. feedlots (inventory), the number of cattle being placed into feedlots during the report month (placements), the number of cattle shipped out of feedlots for slaughter during the report month (marketings) and other disappearances (*e.g.*, death loss or move to pasture).[73]

---

[71]  *Id.*

[72]  USDA National Agricultural Statistics Service ("NASS"), *Cattle on Feed*, ECONOMICS, STATISTICS AND MARKET INFORMATION SYSTEM, usda.library.cornell.edu/concern/publications/m326m174z?locale-en ("Cattle on Feed").

[73]  Cattle on Feed reports estimates pertain to fed cattle fed in feedlots with a 1,000 head or greater capacity. Such feedlots typically hold between 80 and 85% of all fed cattle on feed in the United States.

208.  Figure 21 below compares fed cattle inventory across 2014 and 2015. It shows that fed cattle inventory was at or slightly above 2014 levels in almost every month of 2015. While these changes may reflect, in part, the continuing rebuild of the cow-herd, the key driver of the year-over-year increases in inventory was Tyson, JBS, Cargill, and National Beef's respective slaughter reductions. These reductions forced producers to feed their cattle longer, causing feedlots to carryover cattle into subsequent reporting months.

**Figure 21: Cattle on Feed Inventory Levels in 1000+ Head Feedlots – 2014 vs 2015**

209.  The figure below confirms these results. It estimates the number of cattle reaching slaughter weight across each month of 2014 and 2015, sometimes referred to as

a placement against supply estimate. The figure utilizes monthly Cattle on Feed placement

numbers and assumes a standard feeding period of around six months.[74]

**Figure 22: Slaughter Weight Fed Cattle in 1000+ Head Feedlots – 2014 vs 2015**



210.   As can be seen from Figure 22, the number of fed cattle scheduled to reach

slaughter weight in 2015 was down on a year-over-year basis. Therefore, the year-over-

year increases in inventory levels experienced from May to November 2015 was not

driven by an increase in the availability of slaughter weight fed cattle. Rather, it was driven

---

[74]   For example, an estimate of the available number of slaughter weight cattle in July
2015 is derived by advancing the placements numbers from January 2015 forward six
months.

by a decrease in each Meatpacking Defendant's slaughter volume, which caused an artificial glut of supply by forcing producers to feed their cattle beyond their optimal weight.

211.   This artificial increase in inventory levels is also confirmed by Figure 23's comparison (below) of Cattle on Feed reports' record of marketings across 2014 and 2015.

**Figure 23: Marketings in 1000+ Head Feedlots – 2014 vs 2015**



212.   Consistent with Figure 21 and Figure 22 above, Figure 23 shows slaughter volume across the first three quarters of 2015 to be appreciably lower than 2014 levels before rising in the final quarter. In sum, Figure 21 shows that there were more cattle in feedyards in 2015 than in 2014, despite Figure 22 showing that there were fewer cattle

due to reach slaughter weight in 2015 than in 2014. The cause of this was Meatpacking Defendants' slaughter reductions, as shown by Figure 23.

213.  The Meatpacking Defendants' conduct across 2015 was neatly summarized by Ms. Fish, who lamented on November 10, 2015, the "[*p*]*ackers no longer compete against each other to buy fed cattle each week*," and were consequently reaping "gangbuster profits."[75] The financial impact of Meatpacking Defendants' conspiracy can be seen in the chart below, which estimates producers' and packers' respective per head margins:

**Figure 24: Producer vs Packer per-head margins across 2015**



214.  As shown above, during the second half of 2015, after Meatpacking Defendants embarked on their collusive reduction in slaughter volume, producer margins

---

[75]  Cassie Fish, *Whatever Happened to a Fair Fight*, *supra* note 25.

were materially reduced, averaging -$51, -$1 and -$359 per head across the second, third and fourth quarters, respectively. At the same time Meatpacking Defendants posted average per head margins of approximately between $47 and $66 across the three quarters, well above their pre-Class Period averages of between -$16 and $25/head. [76]

**B.    Meatpacking Defendants' Ongoing Conduct Continues to Depress Fed Cattle Prices across 2016**

215.   Because Meatpacking Defendants worked through the glut of cattle they created in the second half of 2015, they were expected to have to pay up to secure their share of limited cattle supplies in 2016. But the Meatpacking Defendants continued to artificially suppress cattle prices in early 2016 by "ration[ing] their new purchases [of cattle]" and running shorter 32-hour weeks in early January, they dampened rising cattle prices and extended the rally in boxed beef prices.[77] Meatpacking Defendants' then further suppressed prices by sustaining low kills across February and March.[78]

216.   Each Meatpacking Defendant reduced its slaughter volumes in the first quarter of 2016.[79] Moreover, each Meatpacking Defendant slaughtered fewer cattle than their average first quarter volume across 2012-2014.[80] Dataset A also records that while each Meatpacking Defendant's cash cattle purchases were higher in the first quarter of

---

[76]   Pre-Class Period average margins calculated between 1997 and 2014.

[77]   Cassie Fish, *Global Sell Off Smacks Cattle*, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/.

[78]   Cassie Fish, *Yet More Consolidation*, THE BEEF (Jan. 6, 2016), https://www.thebeefread.com/2016/01/06/yet-more-consolidation/.

[79]   Tyson (-0.7%), JBS (-16.3%), Cargill (-3.3%), National Beef's (- 4.4%).

[80]   Tyson (-4.5%), JBS (-21.7%), Cargill (-9.3%), and National Beef (-14.9%).

2016 year-over-year (consistent with the drastic price decline they had forced across 2015), it remained below their respective average Q1 cash cattle purchase volume across 2012-2014.

217.   As a result, fed cattle traded sideways in the mid-$130s/cwt through the end of March, well below the expected seasonal high, even as boxed beef enjoyed several rallies. By rationing the available cattle amongst themselves, Meatpacking Defendants posted average weekly margins of approximately $63 per head. At that time, this was one of their "best Q1 in history" and well above their pre-Class Period first quarter average of $0 per head.[81]

218.   Going into Q2 2016, Meatpacking Defendants, knowing that feedlots had been left holding over cattle from the first quarter, increased their kills gradually. As a result, fed cattle prices began to decline, dropping $10/cwt across April and leaving producers well in the red.

219.   After clawing back some of that decline in May, cash prices continued to trade sideways until the trading week ending Friday June 16, when cattle prices broke from $128/cwt to approximately $121/cwt, fueled by Meatpacking Defendants' limited participation in the spot market.[82] Having bought a paltry amount of negotiated cattle,

---

[81]   Cassie Fish, *Futures Weakness Drags On*, THE BEEF (Mar. 29, 2016), https://www.thebeefread.com/2016/03/29/futures-weakness-drags-on/ ("Packers continue to do a masterful job of matching throughput to supply and demand and margins, looking at the comprehensive cutout and $3 lower cash last week- are still solidly black.").

[82]   Cassie Fish, *Another Limit-Down Monday*, THE BEEF (June 20, 2016), https://www.thebeefread.com/2016/06/20/another-limit-down-monday/ ("It is not a stretch that with such a big kill last week and this week coupled with a 5-area negotiated

Meatpacking Defendants were expected to pay up for inventory in the week ending Friday June 25. Instead they continued to step cattle prices down.

220.   After cattle traded down to $114/cwt in last week of July, a level not seen since July 2012, analysts believed that the summer low had been reached.[83] Instead, Meatpacking Defendants extracted further concessions from cattle sellers. Negotiated cash purchases across June and July were down 21% on 2014 levels, despite increased cattle availability, driving a 1% decline in slaughter volumes. Dataset A records Tyson Fresh, Swift, CMS and National Beef's June and July cash purchases were down between 16 and 83% against their 2012-2014 averages.

221.   In August, Meatpacking Defendants each then increased their cash cattle purchases, taking advantage of cattle supply they had generated. Importantly, each maintained steady kills, ensuring that they could easily supply their needs without generating price competition amongst themselves. Cattle prices fell steadily from $118/cwt in mid-August to below $110/cwt in the first week of September, leaving Ms. Fish to remark that "[*t*]*his [2-year consecutive] break in cattle prices stands alone for its magnitude and its lack of an external market-moving event*."[84]

---

cash trade volume of a mere 48k head, that the packer will be forced to buy big volume this week and a significant transfer of ownership from feeder to packer is imminent.")

[83]   Cassie Fish, *Onward and Upward*, THE BEEF (July 28, 2016), https://www.thebeefread.com/2016/07/28/onward-and-upward/; Cassie Fish, *Erode. Erode. Erode.*, THE BEEF (Aug. 24, 2016), https://www.thebeefread.com/2016/08/24/erode-erode-erode/]

[84]   Cassie Fish, *A Grave Time in History*, THE BEEF (Sept. 3, 2016), https://www.thebeefread.com/2016/09/02/a-grave-time-in-history/.

222.   The rout continued through the fall of 2016, as feedlots struggled to sell the excess supply generated by the conspiracy. Meatpacking Defendants bought cattle cheaper, and bought them with time, displacing the start of the typical fall rally in fed cattle. Meatpacking Defendants also quickly responded to any rare rise in prices by dropping their respective slaughter volumes and/or cash cattle purchases the following week, thereby ensuring that no price rally could persist. For example, fed cattle slaughter dropped 20,000 head in the week commencing Monday September 19, 2016, as the Meatpacking Defendants significantly reduced their cash cattle purchases. [85] Not surprisingly, the week prior had seen a modest $4/cwt uptick in cattle prices after declining continuously for over a month. Meatpacking Defendants' strategy worked, with cattle prices declining about $3/cwt by week's end on September 23, 2016, before continuing its downward trajectory the following week.[86] Thereafter, the price of fed cattle continued

---

[85]   Cassie Fish, *Feeders Take the Lead; Packers Play It Cool*, THE BEEF (Sep. 22, 2016), https://www.thebeefread.com/2016/09/22/feeders-take-the-lead-packers-play-it-cool/ ("It has been the behavior of the packer that has slowed down the upward momentum this week. Taking 20k head out of this week's fed kill coupled with adequate inventories seems to have been enough to return the balance of power to the packer for now.") Cassie Fish, *Wild and Wooly*, THE BEEF (Sep. 26, 2016), https://www.thebeefread.com/2016/09/26/wild-and-wooly/ ("Last week's cash cattle trade was inadequate and lots of cattle were carried over into this week. . . . Unquestionably, last week was the lightest movement of negotiated cattle in months coming in at just under 50k. This volume is about half of the normal.")

[86]   Cassie Fish, *And It All Falls Down*, THE BEEF (Sep. 27, 2016), https://www.thebeefread.com/2016/09/27/and-it-all-falls-down/ ("The big carryover of unsold negotiated cattle from last week has gained negative status as the hours have rolled by, with packers willing and able to sit back and lower bids to $104, $6 lower than 2 weeks ago and $3 lower than the few that traded Friday and Saturday"); and Fish, *Despondency*, THE BEEF (Oct. 11, 2018), https://www.thebeefread.com/2016/10/11/despondency/ ("As if on cue, kills this week are now rumored to be cutback to 585k-595k, with a cooler cleaning and Saturday kills

---

to fall across 2016 to a low of approximately $98/cwt in mid-October. In the second and third quarters, each Meatpacking Defendant's kill volume remained below their 2012 to 2014 averages.

223.   Meatpacking Defendants responded to this price decline and cattle glut by unseasonably increasing kill volumes in the fourth quarter. Tyson, JBS, Cargill and National Beef's fourth quarter kills were up an estimated between 8.3% and 21.5% year-over-year and 3.0% to 9.2% on a quarter-to-quarter basis.[87] These increases show Meatpacking Defendants' slaughter restraint across the second and third quarters of 2016.

224.   As a result, industry wide kill levels in November 2016 alone were up 24% and 19% on a year-over-year basis as compared to 2014 and 2015, respectively.[88]

225.   Meatpacking Defendants' success in "backing-up" cash cattle across the summer of 2016 is confirmed by the fact that Meatpacking Defendants were able to raise cash cattle slaughter levels 38% and 24% in the fourth quarter of 2016 as against 2014 and 2015 levels without causing a dramatic rise in prices.[89] Moreover, they were again

---

out. . . . A pull back in the kill with record packer margins cements the reality that easily and efficiently killing our way through the numbers, which used to be a reality, isn't any longer. This makes it difficult for the market to return to fully current marketing status if there is any slowdown in kill.").

[87]   Tyson, Cargill, and National Beef's volume was also up 2.3%, 3.3%, and 10.9%, respectively against their fourth quarter 2012 to 2014 averages.

[88]   Year-on-year comparisons calculated using USDA Market News Service Report: LM_CT106-National direct slaughter, committed and delivered.

[89]   Cassie Fish, *Futures Bounce Amidst Mixed Signals*, THE BEEF (Nov. 8, 2016), https://www.thebeefread.com/2016/11/08/futures-bounce-amidst-mixed-signals/ ("Last week's [negotiated] trade ended up at 90k head though 24k were with a 15-30-day delivery, the second week in a row with numbers at that level.").

able to buy significant portions of the cattle with extended delivery periods, exerting their control into subsequent weeks.[90]

226.   In fact, during the fourth quarter of 2016, prices remained steady at or around $100-$105/cwt until late November, when Packing Defendant's finally bought the bulk of the held over cattle. Prices then traded sideway between $109-$115/cwt before closing at $107 on December 31.[91]

227.   Again, despite the increased availability of fed cattle and Meatpacking Defendants' unseasonably large Q4 harvest, except for Cargill, each Meatpacking Defendant's annual slaughter volume in 2016 remained below (Tyson (-6%) and JBS (-6%)) or flat (National Beef) against 2014 levels.[92] While Cargill's 2016 slaughter volume rose 10% as against 2014, it remained significantly below historic levels (*see* Figure 3 above).[93] Again, by contrast, Independent Packers raised their annual collective slaughter volume by 10.4% year-over-year.

---

[90]   *Id.*

[91]   At these prices, Meatpacking Defendants were purchasing cash cattle at a significant discount even compared to 2015's depressed prices.  Furthermore, the slight price increase in late November/December from the October low was consistent with the seasonal rise in fed cattle prices typically experienced in the fourth quarter of each year as the availability of slaughter-weight cattle declines and beef prices improve. But for the glut in slaughter-ready cattle created by Meatpacking Defendants' coordinated actions, prices would have risen significantly higher, and much earlier, in response to the Defendants' dramatic increase in year-over-year slaughter numbers

[92]   Total industry slaughter was 24.56 million head in 2016, up from 24.11 million in 2014. 2018 Meat & Poultry Facts, at 11.

[93]   CBW Top 30 Beef Packers, *supra* note 2

228. Each Meatpacking Defendant's refusal to break from their collective adherence to suppressing the available cattle supply is all the more remarkable given the margins on offer to Meatpacking Defendants across 2016. In the third and fourth quarter alone, Meatpacking Defendants realized average per head margins on their fed cattle purchases of $123 and $153 per head. Not only were these margins significantly above pre-Class Period averages ($25 and -$16 per head), but they also exceeded the Meatpacking Defendants' most profitable third and fourth quarters in modern times by about $30 and $100 per head, respectively. Meatpacking Defendants therefore had both the incentive and the ability to buy more cattle.

## C. Meatpacking Defendants Continue their Scheme in 2017 and 2018 despite Increased Cattle Availability

229. Going into 2017, Meatpacking Defendants worked to ensure that any increase in their collective slaughter volumes did not outpace the growth in slaughter weight cattle availability. Tyson, JBS, Cargill and National Beef each reduced their volumes in lockstep during the first quarter, before raising them together across the second quarter.

230. And while cattle prices did rise at the beginning of February to a high in the first week of May (similar to pre-Class Period spring highs), Meatpacking Defendants each responded by reducing their kills. Feedlots again struggled to get current and prices fell steadily to a yearly low of $105/cwt in mid-September. This constituted a significant expansion of the typical summer low, historically reached in July. It also enabled Meatpacking Defendants to each post year-over-year and quarter-on-quarter slaughter

increases in the third quarter. Tyson, JBS, Cargill and National Beef slaughtered approximately 8.5%, 9.0%, 16.0%, 17.7% more cattle in the third quarter of 2017 than they did the prior year.

231. As with 2016, Meatpacking Defendants enjoyed substantial profits across 2017, posting then record per-head margins in the second and third quarters ($128 and $147 per head, respectively). Indeed, Meatpacking Defendant's average per head margins for the first and fourth quarter, $42 and $88 per head, respectively, stood second only to the quarterly profits they generated in 2016. And again, each Meatpacking Defendant refused to add cattle to expand its market share despite the obvious profit potential. Instead, they kept their production in lockstep with one another, rationing supply amongst themselves to ensure the continued suppression of cattle prices.

232. Their scheme continued into 2018. Each Meatpacking Defendant then began to tell the market that they had, as a result of the plant closures discussed above, insufficient capacity to slaughter the supposedly large volume of cattle due to reach slaughter-weight in the spring and summer of 2018.[94] They therefore encouraged producers to commit their cattle early on through captive supply agreements to ensure they could "get their cattle dead" before Meatpacking Defendants ran out of "hook" or

---

[94] Cassie Fish, *Still Green*!?!, THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018]. The limitation perception is linked to labor. The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [*i.e.*, on captive supply agreements].").

"shackle space."[95] At the same time, Meatpacking Defendants backed off their respective kill schedules during the first quarter of 2018 and into the beginning of the second to ensure that there would be a glut of slaughter weight cattle available over the summer months of their own making.[96] *See* Figure 3 detailing significant decline in first quarter 2018 slaughter as against fourth quarter 2017: Tyson (-8.6%), JBS (-14.4%), Cargill (-10.5%), and National Beef (-4.7%).

233.   Meatpacking Defendants' tactics succeeded. Cattle prices fell during late winter/spring 2018, despite record strong beef demand and tight supplies of slaughter-ready cattle across March and April. Indeed, prices fell from approximately $126/cwt at the beginning of March 2018 to $110/cwt by the end of May 2018. Prices stayed at or around that mark until mid-November 2018, trading sideways between $106/cwt and $115/cwt, a significant extension of the one- to two-month summer low typically experienced by the market.

234.   And of course, Meatpacking Defendants never did reach slaughter capacity.[97] After having broken cattle prices by early May, each Meatpacking Defendant increased

---

[95]   *See* Cassie Fish, *Holding Gain*, THE BEEF (Apr. 18, 2018), https://www.thebeefread.com/2018/04/18/holding-gains/ ("Cattle feeders, still fearful of growing supplies in May, June and beyond continue to sell cattle for May at substantially lower prices than current values.").

[96]   Cassie Fish, *Futures Trade Both Sides; Cash Poised to Trade Lower*, THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/ ("Looking back at March's fed slaughter rate, it underperformed expectations… . . . Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable.").

[97]   Cassie Fish, *Quiet Conclusion*, THE BEEF (Jun. 1, 2018), https://www.thebeefread.com/2018/06/01/quiet-conclusion/ ("As each week goes by in

its slaughter volume by approximately 11-13% in the second quarter, easily processing the glut they themselves had created. Defendants then, in parallel, held their slaughter volumes across the third quarter so as not to get in front of the available supply, posting remarkably similar quarter-on-quarter slaughter changes: Tyson (0.5%), JBS (-0.7%), Cargill (-0.2%) and National Beef (-0.7%). As the supply of fed cattle decreased into the fourth quarter of 2018, each Meatpacking Defendant reduced their slaughter volumes, posting similar quarter-on-quarter declines: Tyson (-3.7%), JBS (-4.2%), Cargill (-4.0%) and National Beef (-4.1%)

235.   Meatpacking Defendants slaughter restraint resulted in each posting record margins across the second, third and fourth quarters ($229, $198, and $175 per head, respectively). Meanwhile producers suffered per head losses of $30 and $41 per head in the second and third quarters, before a modest $27 per head profit in the fourth, well below the pre-Class Period average of $89 per head.

236.   As a result of their commitment to rationing the available cattle amongst themselves, across 2017 and 2018 Tyson, JBS, Cargill and National Beef's annual slaughter volumes remained between 5.4 and 12.8% below their pre-Class Period averages. By contrast Independent Packers' slaughter volume across 2017 and 2018 was up 46.5% and 56.1%, respectively on their collective pre-Class Period averages.

---

June, the calendar will take the industry into the heart of one of the most well-advertised 'walls' of market-ready cattle in memory. Now that it is a known fact that the industry can kill 540k head of fed cattle and that demand can absorb the largest beef production in 10-years, the panic experienced in March seems overdone.").

**D.**     **2019 and 2020 Bring Continued Parallel Slaughter and Pricing Behavior, a Fire at a Plant, and Regulatory Investigations.**

237.   In the 2018/19 winter, snow storms and bitterly cold weather stripped pounds off cattle in feed yards, driving down slaughter weights as much as 15 pounds year-over-year. After the snow thawed, cattle feeders were hit with a very wet spring, which further eroded their ability to add pounds to their cattle. At the same time, beef demand remained "terrific", encouraging packers to run plants to meet customers' demand.[98] In ordinary times, this would portend a substantial rally in cattle prices, over and above the typical rise experienced in winter/early spring, as Meatpacking Defendants would be compelled to compete to secure a greater number of cattle to make up for their lower weights.

238.   However, Meatpacking Defendants continued to work together to constrain and limit the advance in cattle prices that market conditions warranted. Following their slaughter reductions in the fourth quarter of 2018, Meatpacking Defendants each maintained comparably lighter slaughter volumes across the first three months of 2019, ensuring that their collective demand didn't exceed the available supply.[99]

---

[98]   Cassie Fish, *How About That,* THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").

[99]   *See, e.g.*, Cassie Fish, *And the Beat Goes On*, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/. ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount. Some plants will undertake

239.    Meatpacking Defendants placed further pressure on cattle prices by reducing the volume of negotiated cash cattle they bought during this period. *See* Figure 25 though Figure 34 below. To facilitate this, each Meatpacking Defendant pulled formula and forward contract cattle forward, and pressured cash sellers to sell with "time" (i.e. more than one week before delivery, which is the industry standard).[100] By coordinating their actions in accumulating inventory in this manner, constraining weekly kill volume, and declining to increase production to meet beef demand, Meatpacking Defendants prevented producers form receiving fair market cattle prices.[101]

---

maintenance or upgrade projects and some will honor holidays such as Monday's President's Day. Others will pull back hours to 36-hour work week.").

[100] Cassie Fish, *Picking Up,* THE BEEF (Jan. 16, 2019), https://www.thebeefread.com/2019/01/16/picking-up/ ("In the country, packer bids are virtually non-existent as packers schedule as many formula and contracted cattle as possible."). *See also* Cassie Fish, *CME Cattle Retreat,* THE BEEF (Jan. 4, 2019), https://www.thebeefread.com/2019/01/04/cme-cattle-futures-retreat/ ("Packers are pulling contracts and using the board weakness to their advantage and next week's cash cattle prices may weaken a buck"); Cassie Fish, *Cash Market Slips and Bids Surface,* THE BEEF (Jan. 23, 2019), https://www.thebeefread.com/2019/01/23/cash-market-slips-and-bids-surface/ ("packers have masterly utilized a large number of formula cattle received in January as leverage against negotiated sellers, which has kept a lid on prices").

[101] Cassie Fish, *Here We Are,* THE BEEF (Mar. 8, 2019), https://www.thebeefread.com/2019/03/08/here-we-are/ ("Behind the scenes of this week's negotiated cash cattle trade was the bearish fact that the majority of cattle that traded in the south and the west sold with time, generally 2 weeks. Packers have been masterful at keeping long inventory and forcing producers to sell with time all year thus far- something that will continue and only increase as 2019 goes forward. It's hard to force prices higher if the buyer owns inventory."); Cassie Fish, *Hogs On Fire,* THE BEEF (Mar. 20, 2019), https://www.thebeefread.com/2019/03/20/hogs-on-fire/ ("The packer has done a masterful job managing inventory, buying with time and keeping supply and demand in balance.").

240.   Each Meatpacking Defendants' slaughter reductions were most pronounced in February, with only marginal increases seen in March. The result was that by April, 2019, producers had not sold their available cattle, and a relative supply glut developed. Meatpacking Defendants used this artificial oversupply to "strategically back cash cattle prices down into summer and to keep them down."[102] The results were predictable, with prices rapidly falling from around $127 per/cwt on Friday April 26, 2019, to $123/cwt the following Friday, May 3, and $120/cwt on May 10, 2019. Meatpacking Defendants then took advantage of the pressure they had created, buying increasing volumes of cash cattle at knockdown prices throughout May 2019.



---

[102] Cassie Fish, *A Bounce*, THE BEEF (May. 1, 2019),
https://www.thebeefread.com/2019/05/01/a-bounce/.

010808-11/1421601 V1



010808-11/1421601 V1



- 108 -



010808-11/1421601 V1



010808-11/1421601 V1



241.   The same slaughter pattern detailed in the figures above is observed if one limits the analysis to fed cattle purchased by Meatpacking Defendants from the USDA AMS LMR Five Area states. AMS LMR reports of cash cattle purchases from these states are commonly incorporated into Meatpacking Defendants' formula contracts.

242.   Meatpacking Defendants' efforts to create a glut of cattle across the start of 2019 is demonstrated by Figure 35 below, which shows both that sales of cattle from 1000+ head feedlots in February, March and April were significantly less than the available supply of slaughter weight cattle, and that the cattle consequently held over into the summer were then bought across the summer:

**Figure 35: Cattle on Feed Slaughter Weight Fed Cattle vs. Marketings in 1000+ Head Feedlots – 2019**



243. The resulting impact of Defendants' slaughter restraint at the beginning of 2019 and their continued adherence to a common pricing strategy was that cash prices continued to fall across the summer, working their way to an apparent bottom of about $109-110/cwt ($178-79/cwt dressed) in the end of June. See Figure 13 below. This left producers facing an average $106 per head loss, against Meatpacking Defendants' startling per head profit of $257.[103]

---

[103] Greg Henderson, *Profit Tracker: Feeding Losses Reach Triple Digits*, Drovers (June 26, 2019), https://www.drovers.com/news/industry/profit-tracker-feeding-losses-reach-triple-digits.

244.   With continuing robust beef demand – wholesale beef prices remained higher on a year-over-year basis – fed cattle prices were expected to rise steadily into the fall high. However, prices largely moved sideways, as Meatpacking Defendants worked to extend the summer lows:

> Using the last two years as a roadmap, ***packers pressed feeders hard this week*** and successfully cheapened their inventory at by $1 to $1.50 so far. The smaller packers more dependent on high grading cattle paid steady earlier in the week for the right kind, but the ***majors tipped the market over since***… Attitudes in the country [amongst producers] are discouraged and fatigued. ***Most cattle being sold are losing money***, replacement costs are high and bargaining leverage is slim. Like another world, the ***wholesale beef news is sizzling, but zero of that money is being passed on to cattle feeders***. ... The voraciousness of beef demand is surprising pretty much everyone in the business.[104]

245.   A slight $2-3/cwt rise in prices allowed producers to realize a paltry per head profit of about $24 by the week ending August 9, 2020, against the Meatpacking Defendants' profit of $192 per head.[105]

## 1.   Defendants react to a processing plant fire by dropping cattle prices and raising beef prices

246.   Notwithstanding the predicted cash cattle strength across August, a chance fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019 provided an opportunity for Meatpacking Defendants to work cattle prices lower still,

---

[104] Cassie Fish, *Packers Press and Cash Softens,* THE BEEF (August 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

[105] Greg Henderson, *Profit Tracker: Margins Lower on Soft Cash,* DROVERS (Aug. 13, 2019), https://www.drovers.com/markets/profit-tracker/profit-tracker-margins-lower-soft-cash.

- 113 -

sending producers back into the red. Following the plant fire, Tyson closed the plant indefinitely and Meatpacking Defendants all slashed their fed cattle bids and hiked their beef prices. These actions caused a $5/cwt drop in fed cattle prices and a $14/cwt rise in wholesale beef prices the following trading week. [106] Meanwhile, Meatpacking Defendants' per head margins rose from $191 to $358 in the week ending August 16. The following week, packer margins continued to expand, with the spread between fed cattle prices and boxed beef values extending to a then-record high of $67.17/cwt., $39.51/cwt above the average spread for the same week across 2016-2018.

247. While Meatpacking Defendants blamed the loss of Holcomb's 5,500-6,000 head per day slaughter capacity for these price changes, weekly fed slaughter volume actually remained steady in the weeks that followed the fire (averaging around 521,900 head in the three weeks that followed the fire, as compared to the 521,700 killed in the week of the fire).[107]

248. To support their slashed priced fed cattle bids, Tyson, JBS, Cargill, and National Beef therefore drastically reduced their respective cash cattle purchases after the fire.[108] Tyson, in particular, was largely absent from the cash cattle market in the weeks

---

[106] *Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING INC. (August 20, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf. Live Cattle futures contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

[107] These declines also reflected seasonally declining supplies of fed cattle.

[108] Cassie Fish, *Back from the Brink,* THE BEEF (Sep. 3, 2019), https://www.thebeefread.com/2019/09/03/back-from-the-brink/ ("Last week's negotiated

that followed the fire. This drop became particularly severe in September, as Meatpacking Defendants each sought to defend the wide meat margin they had established in the aftermath of the fire. While National Beef's July and August cash slaughter volume increased quarter-over-quarter, this largely reflects its acquisition of Iowa Premium's Tama, IA plant in mid-June. The Tama plant sourced substantively all of its 1,100 head per day capacity from cash cattle sellers while owned by Iowa Premium, and continued to do so under National Beef's management until at least late 2019 when it finalized arrangements to accept formula grid cattle.

249.  This reduction in cash cattle purchases in the aftermath of the fire placed further pressure on cash cattle prices (and thus reduced the price of each Meatpacking Defendants' contracted cattle). Tyson, JBS, Cargill, and National Beef continued to drop their bids in lockstep and, as a result cash cattle prices continued to slide in the following weeks, bottoming out at around $100/cwt (with some trades as low as $97/cwt) in the week ending September 13, 2019, down from $113/cwt in the week of the fire.

---

cash cattle trade was small for the fourth week running . . . and clean up at the feedyard is lacking. . . . Prices were $2 to $3 lower, averaging $105.54, the lowest since 2018").

010808-11/1421601 V1



250.  Meatpacking Defendants' purchase and kill reductions in the aftermath of the Holcomb fire ensured that their collective demand remained below the available supply of cattle, as evidenced by the noticeable increase in average carcass weights of the cattle slaughtered by each Meatpacking Defendant during this period shown in Figure 36 below. Carcass weights increase the longer a steer or heifer is on feed. Thus, increasing carcass weights are a sign that producers have not been able to stay current with their marketings and have been forced to feed their cattle longer than is optimal. Consistent with the increase in carcass weights shown in Figure 36 below, reported carcass weights were up on average by 6 pounds across October and November, 2019, year-over-year:

010808-11/1421601 V1



251.  Tyson, JBS, Cargill, and National Beef consequently reaped record high margins in the weeks that followed the Holcomb fire by stepping down fed cattle prices and raising beef prices in parallel. By September 13, 2019, the spread between packer and producers' per head margin exceeded $600, with **_packers making over $400 per head_** while **_producers sustained $200 per head losses_**.[110]

252.  Having left many cash cattle producers without a bid for the two months that followed the Holcomb fire, Meatpacking Defendants took advantage of battered producers

---

[109] ███████████████████████

[110] *Sterling Beef Profit Tracker: week ending September 13, 2019*, STERLING MARKETING INC. (September 18, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.

in the final quarter of 2019, drastically increasing cash cattle purchases, and securing cattle with extended delivery periods. Fed cattle prices did not recover to their supposed yearly bottom, set in July, until November 2019, with producers continuing to sell fed cattle at a loss until that point.[111]



---

[111] While Tyson might not have initially taken advantage of the glut of cash cattle supplies to the same extent as Swift/Packerland, Cargill, and National Beef, it, too, drastically increased its cash cattle purchases that December once it reopened the Holcomb plant. Press Release, Tyson Foods Inc., *Tyson Beef Plant in Kansas to Resume Operations in December* (Nov. 18, 2019), https://www.tysonfoods.com/news/news-releases/2019/11/tyson-beef-plant-kansas-resume-operations-december.

### 2. USDA continues to investigate Meatpacking Defendants' price manipulation following the Holcomb fire and during the COVID crisis

253.   On August 28, 2019, the U.S. Secretary of Agriculture announced that Packers and Stockyards Division, the division of the USDA responsible for enforcement of the Packers and Stockyards Act, had launched an investigation into the conduct of the Meatpacking Defendants and other beef packers in the aftermath of the fire at Tyson's Holcomb plant.[112] ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████[113]

254.   By the last week of April 2020, disruptions in U.S. beef production peaked when nearly 40 percent of the nation's beef processing capacity was idled due to COVID-19 illnesses among packing plant employees. During the second week of May, the largest difference – or spread – between the boxed beef cutout value and fed cattle prices since the inception of Mandatory Price Reporting in 2001 was recorded at just over $279/cwt.

---

[112] *Secretary Perdue Statement on Beef Processing Facility in Holcomb, Kansas*, U.S. DEP'T OF AGRIC. (Aug. 28, 2019), https://www.usda.gov/media/press-releases/2019/08/28/secretary-perdue-statement-beef-processing-facility-holcomb-kansas ("I have directed USDA's Packers and Stockyards Division to launch an investigation into recent beef pricing margins to determine if there is any evidence of price manipulation, collusion, restrictions of competition or other unfair practices. If any unfair practices are detected, we will take quick enforcement action.").

[113] 

This constituted a 323% increase from the $66/cwt spread that existed in early April, 2020, which was already close to the prior record set in the aftermath of the Holcomb fire. This gap between cattle and beef prices caused each Meatpacking Defendant to realize the startling margins depicted in Figure 9 and Figure 41, and estimated by Sterling Marketing to reach as high as $891 per head in the first week of June, 2020. In contrast, just a few weeks later, producers actually able to find a marketing outlet for their cattle incurred triple digit losses of around $250 per head.

255.   On July 22, 2020, the USDA AMS issued The Boxed Beef & Fed Cattle Price Spread Investigation Report ("Report") summarizing market conditions, fed cattle prices, boxed beef values, and the spread before and during the COVID-19 pandemic, including the period just after the Holcomb plant fire.[114] The Report stated that the USDA's investigation into potential violations of the Packers and Stockyards Act was ongoing and that the Report did "not examine" such violations.[115] It further stated:

> [The] [f]indings thus far do not preclude the possibility that individual entities or groups of entities violated the Packers and Stockyards Act during the aftermath of the Tyson Holcomb fire and the COVID-19 pandemic. The investigation into potential violations under the Packers and Stockyards Act is continuing.
>
> USDA does not solely own investigatory authority over anticompetitive practices in the meat packing industry and has been engaged in discussions with the Department of

---

[114] *Boxed Beef & Fed Cattle Price Spread Investigation Report*, U.S. DEP'T OF AGRIC. AGRIC. MKTG. SERV. (July 22, 2020), *available at* https://www.ams.usda.gov/sites/default/files/media/CattleandBeefPriceMarginReport.pdf.

[115] *Id.* at 2.

> Justice (DOJ) regarding allegations of anticompetitive practices in the meat packing industry. Should USDA find a violation of the Packers and Stockyards Act, it is authorized to report the violation to DOJ for prosecution.[116]

At the time of filing this complaint, Plaintiffs understand that the USDA's investigation, alongside the DOJ's Sherman Act investigation into the Meatpacking Defendants, remains ongoing.

## E.      Economic Analysis Supports the Existence of the Alleged Conspiracy

256.   Economic analysis corroborates the circumstantial and direct evidence of the alleged conspiracy, including the accounts of Witness 1 and Witness 2. In particular, it confirms that: (a) the collapse in fed cattle prices in 2015 cannot be explained by common supply or demand drivers; (b) from at least January 1, 2015, fed cattle prices were artificially depressed by an average of 7.9%; and (c) other explanations potentially offered for the 2015 price collapse do not withstand scrutiny.

### 3.      Supply and Demand Principles Do Not Explain the 2015 Price Collapse or Subsequent Low Cattle Prices

257.   The prices for fed cattle bought across the United States followed a discernable pattern: increasing consistently from 2009 through 2014 (accounting for seasonal fluctuations in prices), collapsing dramatically in 2015, and then stabilizing below the prior trend line:[117]

---

[116] *Id.* at 10.

[117] The below graphs are not adjusted for seasonal changes in fed cattle prices, which do not explain the dramatic depression of fed cattle prices during the Class Period. Historically fed cattle prices tend to gradually rise during the first quarter until the early part of the second quarter, peaking in March or April. Prices then tend to trend downwards to a summer low typically established in June or July, before commencing an

**Figure 38: AMS LMR Reported Prices for Fed Cattle by Reporting Region**[118]



---

upward trend that typically peaks in November. *Annual and Seasonal Price Patterns for Cattle*, CORNHUSKER ECONOMICS, University of Nebraska-Lincoln (Aug. 19, 2015), https://agecon.unl.edu/cornhusker-economics/2015/annual-and-seasonal-price-patterns-for-cattle.

[118] The series presented are for negotiated cash prices for mixed lots of steers, heifers, and cows, 80% or more choice, delivered live and priced free-on-board (FOB) feedlot.

010808-11/1421601 V1

258.  Fed cattle producers' main cost – purchasing feeder cattle, steers and heifers mature enough to be fattened for slaughter in a feedlot – also increased and decreased during this period. But the decline in feeder cattle costs did not occur until a*fter* fed cattle prices collapsed in 2015:

**Figure 39: Fed Cattle Input Costs - Feeder Cattle Costs**[119]



The same pricing pattern is generally evident in all AMS LMR categories, *i.e.*, for different qualities, for live or dressed, priced FOB feedlot or delivered, whether steers, heifers, or mixed.

[119] Figure 38 through Figure 40 were prepared utilizing Iowa State University's estimate of the break-even price (*i.e.*, the cost) associated with feeding a 750-pound yearling to a market weight of 1,300 pounds. Ag Econ Dep't, Cooperative Extension Service, *Estimated Livestock Returns (Estimated Returns: Finishing Yearling Steers)*, IOWA STATE UNIVERSITY, http://www2.econ.iastate.edu/estimated-returns/.

- 123 -

010808-11/1421601 V1

259.   That a decline in the fed cattle producers' costs did not cause the 2015 decline is even more evident when one compares fed cattle prices to fed cattle producers' total costs:

**Figure 40: Fed Cattle Price vs. Producers' Total Input Costs**[120]



260.   In fact, during 2015, when fed cattle prices underwent a drastic decline, the costs borne by fed cattle producers actually ***increased***. Specifically, from January 2015 to January 2016, fed cattle prices in Iowa and Minnesota, for example, decreased by approximately 20.7%, whereas input costs increased by approximately 2.6%. This reflects

---

[120] *Id.*

the fact that feeder cattle prices, fed cattle producers' number one input cost, typically lag fed cattle prices.

261.  As a result of this dramatic disconnect between fed cattle prices and input costs, fed cattle producers suffered their largest losses in 30 years during 2015 and 2016, as shown below:

**Figure 41: Fed Cattle Producers' Margins Per Head Overtime: IA and MN**[121]



262.  While fed cattle producers did enjoy a profitable 2017, this was largely due to a significant drop in the input costs associated with fed cattle marketed during that year,

---

[121] *Id.* Margins calculated are for Iowa and Minnesota but similar patterns can be observed in other cattle feeding regions.

and in particular, the price of feeder cattle. Meatpacking Defendants were, however, able to constrain the typical seasonal rise in fed cattle prices across the first half of 2017 and continued to profit from historic margins:

**Figure 42: Packers' Estimated Per Head Margins**



263. Changes in beef demand or consumer preferences do not explain the depression of fed cattle prices. As shown in Figure 43 below, while there was a 5.67% decline in retail beef prices from January 2015 to January 2016, prices rebounded in the months that followed, before undulating down, then up again thereafter. Importantly, the spread between retail beef prices and fed cattle prices continued its gradual increase, consistent with its upward trend during the past 20 years, suggesting beef demand remained robust. That beef demand not only remained strong during this period, but actually steadily increased from its prior lows in the immediate pre-collusion period, is also evident from Figure 43 below:

**Figure 43: Retail Beef Prices vs Fed Cattle Prices**[122]



---

[122] U.S. Dep't of Agric., Economic Research Service ("ERS"), *Meat Price Spreads*, https://www.ers.usda.gov/data-products/meat-price-spreads/ (last visited April 16, 2019.

**Figure 44: Monthly Beef Demand Indices, Jan. 1988 – Nov. 2020**[123]



264. Tyson Fresh's Head of Fed Cattle Procurement, John Gerber, expressly acknowledged the striking increase in beef demand at a November, 2018 industry conference:

---

[123] Glynn Tonsor, *Monthly Domestic, Retail All-Fresh Beef Demand Index, 1988-present*, KANSAS STATE UNIVERSITY, https://www.agmanager.info/livestock-meat/meat-demand/monthly-domestic-meat-demand-indices-usdabls-data/monthly-domestic-0. (last visited Dec. 28, 2020). *See also* Glynn Tonsor, Jason Lusk & Ted Schroeder, *Assessing Beef Demand Determinants* at 7-9, CATTLEMEN'S BEEF BOARD (Jan. 18, 2018), https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf (detailing estimate of demand index and calculation of price elasticity). Demand index prepared using USDA ERS record of All-Fresh Retail price and using 1988 as the base year.

[The] [c]onsumer will pay more for beef, and have to pay more for beef because it is worth more. There is value out there in chicken and pork, but unless you have been living under a great big rock the last two years, you know that *beef demand is off the charts*. We have a lot of supply coming at us, but we have been able to hold the price at a pretty good level, because of beef demand, it's been really good, and I think it will stay good.

(emphasis added).

265.   Importantly, what did change in 2015 was the meat margin. As shown in Figure 9 (reproduced below), the meat margins realized by Meatpacking Defendants in the aftermath of the 2015 price collapse – which at times exceeded $800 per head – were historically unprecedented:

010808-11/1421601 V1

**Figure 9: Weekly Packer Per-Head Meat Margin (1,399 lb. Avg. Live Steer 65-80% Choice; 874 lb. Avg. Dressed Carcass)**



266. This widening of the meat margin was acknowledged by Tyson in its Q4 2016, earnings call: "The dynamic is that the livestock prices have not come – they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in both beef . . ."[124]

267. The unprecedented decoupling of the wholesale and retail price of beef from the price of fed cattle after the 2015 collapse led to unheard of levels of profitability in Packing Defendants' beef businesses.  As Figure 45 shows, although Tyson, JBS, and

---

[124] Tyson Q4 2016 Earnings Call (Nov. 21, 2016).

National Beef's margins were initially hampered by their deliberate underutilization of their respective plant capacities across 2015 and 2016, the resulting expansion of the meat margin caused their margins to balloon across the remainder of the Class Period. Cargill, as a private company, does not report its financial performance. However, as CMS pays strikingly similar prices for its cattle, receives the same or similar prices for its beef, and has similar costs structures as the other Packing Defendants, Figure 45 below is also representative of CMS's margin performance during the Class Period.

010808-11/1421601 V1

**Figure 45: Rolling 12 Month Operational Income Percentages of JBS, Tyson, and National Beef US Beef Operations [125]**



#### 4.    Explanations Proffered for the Drop in Fed Cattle Prices Do Not Withstand Scrutiny

268.  The United States Government Accountability Office's ("GAO") 2018

Report identifies certain "supply and demand factors . . . affected fed cattle price changes

---

[125] These Operational Income percentage figures are derived from SEC filings or investor relations materials. JBS S.A. does not report Operational Income at the segment level, so the above figure for JBS represents the EBITDA of its JBS USA beef operations. National Beef's operational incomes were reported by its shareholder U.S. Premium Beef, LLC. Tyson Foods's reported operational income for its U.S. beef business, operated by Tyson Fresh, has been shifted to line up with calendar quarters, as Tyson's fiscal year ends at the conclusion of what would typically be the end of the first quarter.

from 2013 through 2016." [126] However, it ***does not*** conclude that these factors were the sole or dominant cause of the 2015 price collapse, and stresses that potential antitrust violations by beef packers were beyond the scope of its review:

> We did not obtain and review internal packer documents, so **the scope of our analysis did not include a review of whether packers engaged in anticompetitive behavior**. Such specific investigations would typically be carried out by entities with subpoena authority such as the Federal Trade Commission of the Antitrust Division in the Department of Justice.[127]

(Emphasis added).

269.   In any event, the supply and demand factors said by the GAO to have "affected" prices do not explain the dramatic collapse in prices seen in 2015 or the suppression of prices experienced thereafter.

## VI.   STRUCTURE OF THE BEEF PACKER INDUSTRY IS CONDUCIVE TO THE CONSPIRACY

270.   Defendants' conspiracy to constrain the supply of cattle, restrain the amount of processed beef they sold, stabilize the price of beef, and maximize their margins, was facilitated by the structure of the meatpacking market. The beef meatpacking industry has all of the hallmark features found in highly-cartelized markets, including: (1) a highly concentrated market with high barriers to entry; (2) a commodity product; (3) inelastic demand; and (4) unusual market share stability.

---

[126] *Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market* at 12, U.S. Dep't of Agriculture, United States Accountability Office (April 2018), *available at* https://www.gao.gov/assets/700/691178.pdf.

[127] *Id.* at 29.

A.      **The beef meatpacking industry was highly concentrated.**

271.  Market concentration facilitates collusion. Collusive agreements are easier to implement and sustain when there are only a few firms controlling a large portion of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players. Moreover, this high degree of control also simplifies coordination because there is little outside competitive presence to undermine the cartel, and it is easier for cartel participants to monitor each other's actions related to supply and pricing. Also, with fewer firms in the market, the transitory gains that might be achieved by undercutting the cartel price and gaining a transitory increase in market share would be outweighed by the greater long-term profits for a colluding firm in a concentrated industry with artificially elevated prices.

272.  By contrast, if an industry is divided into a large number of small firms, the current gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the cartel's continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully).

273.  Throughout the Class Period, the Defendants purchased and slaughtered between 82% and 87% of all fed cattle sold within the United States on an annual basis.

274.  Throughout the Class Period, Defendants controlled approximately 75 percent of the market for both slaughter capacity and processed beef sales:

**Figure 46: Meatpacking Defendants Share of Total Beef Sales and Slaughter Capacity (2017)**



275.   The Herfindahl-Hirschman index (HHI) is a commonly accepted measure of market concentration. The DOJ considers markets in between 1,500 to 2,500 to be moderately concentrated.

276.   As of 2017, the cattle processing HHI for both slaughter capacity and beef processing sales was over 2,000. Under the HHI ratio, the beef-packing market is more concentrated than either the pork or poultry processing markets:

**Figure 47: Beef Processing Market Concentration**



277.   A highly concentrated market makes it easier cartelists to facilitate their conspiracy by making it easier to make agreements, form understandings, combinations or conspiracies to fix, raise, maintain, and/or stabilize prices, and/or to allocate market shares, and to set and keep prices at artificially high, supra-competitive levels.

278.   The four-firm concentration ratio (CR-4) is a commonly used metric for measuring market concentration that measures the sum of the market shares for the top four firms in a particular market.

279.   The sum of the market shares for the four Meatpacking Defendants is greater than 70 percent in both cattle slaughtering and beef sales. According to the CR-4 typology, a market with this type of market share distribution is classified as a tight oligopoly:

**Figure 48: Four Firm Concentration Ratio**



280.   Prior to and in the beginning of the Class Period, the beef industry underwent a period of increasing market concentration, resulting in a small number of beef processors

010808-11/1421601 V1

controlling a large amount of market share. In 2001, Tyson purchased IBP, then the United States' largest beef packer. In 2002, Cargill purchased Taylor Packing, a beef packer. In 2007 and 2008, JBS acquired Swift & Co and Smithfield Beef Group, respectively the third- and fifth-largest beef packers in the United States.

281.   The level of concentration in the beef industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a small number of meatpackers, it was feasible to manipulate price through coordination between the Meatpacking Defendants, the four dominant players that controlled the market. Further, this coordinated activity was necessary to increase margins because none of the largest producers had sufficient market share to control price through their actions alone.

**B.   The beef packer market featured high barriers to entry.**

282.   Barriers to entry are obstacles which prevent new competitors from easily entering the market. They restrict competition in a market and may make it easier for incumbents to collude.

283.   A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

284.   Barriers to entry kept would-be competitors out of the beef-packing industry. New entry into beef processing is costly and time consuming. The estimated cost of

building a small processing plant, with a slaughter capacity of 1,000-1,500 head per day, would cost an estimated $150 million.

285.   In addition to the cost of opening a plant, new entrants would have to comply with numerous regulations, find and train a large workforce, and successfully market the processed beef.

286.   As a result of these barriers, new entrants into the beef packing market, such as Northern Beef Packers and Kane Beef, have gone bankrupt after attempting to enter the market.

## C.   Beef is a commodity product.

287.   In economics, a commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services. Examples of traditional commodities are sugar, wheat, and rubber. As technologies for markets and goods mature, a product is more likely to be considered a commodity, at least in its more basic implementations.

288.   Markets for commodity products are conducive to collusion. Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes such as product quality or customer service. This factor facilitates coordination because firms wishing to form a cartel can more easily monitor and detect defections from an anticompetitive agreement where any observed differences in prices are more likely to reflect cheating on the conspiracy than any other factor which might affect pricing, such as special product characteristics, service or other aspects of the transaction.

- 138 -

289.   Beef is a commodity. For example, beef roasts from Tyson and Cargill are virtually indistinguishable, as both share similar nutritional values and differ only in branding and packaging.

**D.     The beef meatpacking market featured unusual market share stability during the relevant period.**

290.   In a competitive market, market shares are expected to fluctuate as manufacturers compete and win customer business from one another. Stable market shares over time are consistent with an agreement to divide up a market, fix prices, or restrict output.

291.   Although market-share stability does not prove collusion, it is suggestive of an understanding within a cartel group not to compete over existing business. A distinct drop in market-share volatility between two time periods is consistent with an agreement coming into effect in a previously competitive market.

292.   Market share by sales among the Meatpacking Defendants appears to be more stable during the Class Period as compared to the preceding decade for both beef sales:

**Figure 49: Volatility of Market Share (Beef Sales – Whole Market)**



293.  The same is true for slaughter capacity – the market share amongst the Meatpacking Defendants appears to be more stable during the Class Period than the decade prior:

- 140 -

**Figure 50: Volatility of Market Shares (Slaughter Capacity – Whole Market)**



## E.   The demand for beef is inelastic.

294.   "Price Elasticity" or "Elasticity" are terms used to describe the sensitivity of supplier or consumers to changes in the price of a good or service. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, under conditions of inelastic demand, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

295.   For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates

010808-11/1421601 V1

collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

296. Price elasticity of demand (PED) is a measure used to quantify the degree to which the quantity demanded for a good or service changes in response to a change in price. The formula to calculate the PED is the percentage change in quantity consumed divided by the percentage change in price. A PED value between 0 and -1 indicates an "inelastic" demand for a good or service, i.e. a 1% increase in price induces a less than 1 percent decrease in the quantity demanded.

297. A review of the relevant literature found that the average PED estimate for beef was -0.43, reflecting a relatively inelastic level of demand for beef:

| Good/Service | Elasticity of Demand | % Increase in Price | % Change in Quantity Demanded | Description of Elasticity |
|---|---|---|---|---|
| (Example) Medical Care and Insurance | -0.17 | 1% | -0.17% | Inelastic[2] |
| Beef | -0.43 | 1% | -0.43% | Relatively inelastic |
| (Example) Restaurant Meals | -2.3 | 1% | -2.3% | Highly elastic[3] |

## F.  Abnormal pricing during the Class Period demonstrates the success of the collusive scheme.

298. Beginning in 2015, the beef industry showed abnormal price movements as beef packers began to reap an increasing share of consumer spending on beef.

299. The average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to the present than it was in the preceding 5 years. And in those preceding years there was a smaller relative increase in the spread between wholesale and retail values of beef:

| | Farm-to-Wholesale Spread | Proportional Increase | Wholesale-to-Retail Spread | Proportional Increase |
|---|---|---|---|---|
| Jan 2010 - Dec 2014 | 34 | - | 215 | - |
| Jan 2015 - Dec 2018 | 54 | 59% | 270 | 26% |
| As of Jan 2019 | 69 | 27% | 264 | -2% |

300.   Beef processors have nearly doubled their share of consumer beef spending following the beginning of their collusive scheme to inflate their margins:

| | Approximate Allocation of $1 of Consumer Spending on Beef | | |
|---|---|---|---|
| | Farmer | Processor | Retailer |
| Jan 2010 – Dec 2014 | 42.4 cents | 6.8 cents | 50.8 cents |
| Jan 2015 – Dec 2018 | 44.9 cents | 9.0 cents | 46.1 cents |
| As of Jan 2019 | 44.5 cents | 11.7 cents | 43.8 cents |

## G.   Overcharges due to the cartel were passed through to the indirect purchaser class.

301.   The USDA has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."

302.   As a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to consumers in the form of higher retail prices. For a firm to be profitable, the firm must recover its marginal cost of production. In a perfectly competitive market, firms price at marginal cost and when marginal costs increase, the cost increases are passed through to the consumer 1:1 or at a 100 percent pass-through rate. As a general matter, the

- 143 -

pass-through rate will be determined by the relative elasticities of supply and demand. When demand is inelastic (as it is for beef) the pass-through rate is closer to 100 percent.

303.   Starting in 2015, the retail price of beef and the price paid for live steer diverged dramatically, as falling wholesale prices for live steer did not lead to matching decreases in the retail price of beef. This divergence from the prior historical pattern is a result of the Meatpacking Defendants' collusive activity:

**Figure 2: Fed Cattle Prices versus Retail Beef Prices**



304.   Publicly available data confirms that the consumer-class members were injured. Using the period prior to the conspiracy (2010 to 2014) as an approximation of the non-collusive processor markup, plaintiffs have modeled what the price of beef would

have been from 2015 to 2018 in the absence of a conspiracy. The orange dotted line in the following chart shows what the wholesale price of beef would have been, *but for* the existence of the conspiracy – demonstrating clear impact in the post-2015 period:

**Figure 51: Actual versus Modelled Wholesale Price Levels (2010-2018)**



305. The following diagrams clearly show the Meatpacking Defendants' anticompetitive conduct was successful at dramatically elevating their markup margins in the 2015 to 2018 period as compared to the benchmark pre-2015 period, where the anticompetitive conduct is presumed to be absent:

010808-11/1421601 V1

**Figure 52: Actual versus Modelled Packer Mark-Ups by Year**



**Figure 53: Estimated Anti-Competitive Packer Price Markup (2010-2018)**



**H.    The elevation in processor margins during the Class Period is not explained by changes in export levels or international demand for beef.**

306.  Changes in relative levels of export vs. import of beef during the relevant period do not explain the increase in processor margins because the United States has actually transitioned from being a net exporter of beef from 2010 to 2014 to being a net importer of beef from after 2015:

**Figure 54: Beef and Veal – U.S. Trade**



307.  This change in status from net exporter to net importer is consistent with an artificial bottleneck in domestic supply. It is not consistent with rising meatpacker margins being caused by increased foreign demand, as foreign demand, on net, fell in relation to domestic demand over the relevant period.

308.  Furthermore, export prices have increased since 2010, but the volume-weighted average export price has not increased faster than domestic prices. This result is

also inconsistent with the increase in processor margins being caused by changes in exporting amounts:

**Figure 55: Relative Export Price for Major U.S. Trade Partners**



309.   The change in meatpacking margins is also not explained by a change in international levels of demand. On the international level, there is strong historical evidence that the degree of international demand has very little impact on the wholesale or retail price of beef. Regression analysis shows that quarterly changes in the export amounts of beef has very little impact on changes in the wholesale or retail price of beef. The absence of any impact is particularly visible during the Mad Cow crisis of 2004. During this period, international demand for, and thus exports, of beef almost entirely collapsed, but there was almost no effect on the retail price of domestic beef:

**Figure 56: Beef Export Levels and Domestic Price of Beef**



I.      **The Meatpacking Defendants had numerous trade organizations and opportunities to meet and collude.**

310. Meatpacking Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations, including: the National Cattlemen's Beef Association ("NCBA"); the U.S. Meat Export Federation ("USMEF"); the Global and U.S. Roundtables for Sustainable Beef ("USRSB")[128]; and the North American Meat Institute ("NAMI") (which resulted from the merger of The North American Meat Association and the American Meat Institute).

---

[128] In 2015, Meatpacking Defendants were among the founding members of the USRSB. Meatpacking Defendants participate in its annual meetings (held in the spring), with JBS and Cargill additionally having leadership positions in certain working groups.

311. For example, the NCBA holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings.[129] The NCBA Product Council, which includes Meatpacking Defendants, other packers, and certain retailers and restaurants, meets quarterly for the Beef Executive Forum, an invitation-only event.[130] Representatives of each Meatpacking Defendant typically attend these events. Meatpacking Defendants also participate in meetings of the Beef Checkoff program run by the Federation of State Beef Councils that are held in conjunction with the NCBA summer and winter meetings.[131]

312. Similarly, the USMEF—a trade association that develops export opportunities for U.S. protein producers and whose leadership includes current and former employees and officers of Meatpacking Defendants—holds both spring and fall conferences and monthly international trade shows.[132]

---

[129] *NCBA Allied Industry Membership*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), www.beefusa.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20Brochure.pdf.

[130] *Id.*

[131] *See also The Association*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/theassociation.aspx; and *Federation*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/federation.aspx.

[132] *Events: Meetings*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/bod-meetings/; *Events: Trade Show Calendar*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/.

010808-11/1421601 V1

313.   The NAMI—which is a national trade association that represents companies that process 95% of red meat—conducts a series of annual conference and educational workshops all across the country.[133]

## J.   The Meatpacking Defendants have significant oversight of each other's prices and production decisions.

314.   Meatpacking Defendants' field buyers' weekly trips to inspect the feedlots in their territories provide an opportunity to meet and exchange commercially sensitive information among each other. Field buyers routinely communicate "market color" obtained from the field, including reports of their competitors' activities obtained from producers, back to their respective head offices and other field buyers through their daily conference calls.

315.   For example, Witness 2 reported that the field buyers from Tyson Fresh, Swift, CMS, and National Beef assigned to his feedlot would call him each week to confirm who bought his cattle that week and on what terms. The field buyers would request such information even when they had not placed a bid that week. Witness 2 felt obligated to provide such information and would acquiesce to their requests. Field buyers from Tyson, JBS, Cargill, and National Beef made similar inquiries of other producers and feedlots across the feeding regions. Most producers would provide such information on request, unwilling to risk alienating one of their buyers.

---

[133] *See About NAMI*, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; *Events*, NAT'L AMERICAN MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

316.   Tyson, JBS, Cargill, and National Beef would also direct their field buyers and other staff to drive past their competitors' plants to determine and report upon those plants' operating levels (for example, whether the plant had reduced labor hours or was operating on Saturday). Tyson had a standing policy which precluded these directives, and the resulting reports about their competitors' operations, from being put into writing. Such communications were effectuated through phone calls. On information and belief, JBS, Cargill, and National Beef operate similar policies. The activities of their respective competitors, including their slaughter volumes, would also be discussed by those attending Tyson, JBS, Cargill, and National Beef's daily planning meetings.

317.   Tyson, JBS, Cargill, and National Beef also regularly purchased beef produced by each other. Each Meatpacking Defendant would typically use their competitor's beef to produce certain value-added beef products.

318.   These realities, combined with widespread formal and informal reporting of fed cattle and beef bids, transactions and volumes, and each slaughter plant's current and planned output, enable Meatpacking Defendants to monitor each other's adherence to any anticompetitive agreement. The purchasing dynamics of the fed cattle market, with its weekly cash trade, also provide Meatpacking Defendants with the ability to punish any suspected non-compliance with such an agreement.[134]

---

[134]   Research shows that markets, such as the fed cattle market, in which a large number of sellers make repetitive sales to a small group of purchasers, facilitate the formation and maintenance of price-fixing agreements as they provide opportunities for the purchasers to agree, sustain, and enforce market sharing arrangements. R. Posner, ANTITRUST LAW 68 (2nd ed. 2001); and *Price Fixing, Bid Rigging, and Market*

## VII.   THE MEATPACKING DEFENDANTS' CONDUCT IS THE SUBJECT OF ONGOING INVESTIGATIONS IN THIS AND RELATED INDUSTRIES

### A.   The DOJ Is Investigating the Meatpacking Defendants for Price-Fixing, Market Manipulation and Unfair Practices in the Cattle and Beef Markets.

319.   The Defendants' conduct described above is the subject of ongoing investigations by federal regulators and enforcers and has elicited calls for further investigations from numerous U.S. Senators, Members of Congress, State Attorneys General and other state officials.

320.   ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

321.   For instance, beginning in March, 2020, numerous U.S. Senators urged the DOJ to investigate anticompetitive practices in the cattle and beef packing industry including, among other things, price-fixing, market manipulation and unfair practices.[135]

_____

*Allocation Schemes: What They Are and What to Look For*, U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION, www.justice.gov/atr/public/guidelines/211578.htm.

[135] *See* Letter from U.S. Senators Rounds, Cramer, Hoeven, and Daines to U.S. Attorney General Barr and Assistant Attorney General Delrahim (Mar. 19, 2020), https://www.rounds.senate.gov/imo/media/doc/Letter%20to%20Department%20of%20Justice%20Regarding%20Cattle%20Prices.pdf; Letter from U.S. Senator Grassley to U.S. Department of Agriculture Secretary Perdue and U.S. Attorney General Barr (Mar. 31, 2020), https://www.grassley.senate.gov/sites/default/files/documents/2020-03-31%20CEG%20to%20DOJ%2C%20USDA%20%28Meat%20Packers%20Market%20Manipulation%29.pdf; Letter from U.S. Senator Thune to U.S. Attorney General Barr (Apr.

- 153 -

322.   State Attorneys General and other state officials have also urged the DOJ to investigate "the dynamics that are depriving cattle ranchers and American consumers of the benefits of a competitive cattle industry." [136] For example, in a letter to former Attorney General Barr dated May 5, 2020, numerous state Attorneys General offered to "work with [the DOJ] on a careful examination of the competitive dynamics of this industry."[137]

---

9, 2020), https://www.thune.senate.gov/public/_cache/files/44f205ea-bdbf-42b0-aa17-5799f6f8069e/A5F971C3A71FD1DB1FC60E98C2416856.4.9.2020-final-cattle-market-doj-letter.pdf; Letter from U.S. Senators Tester, Booker, Jones, and Merkley to U.S. Attorney General Barr (Apr. 23, 2020), https://www.jones.senate.gov/imo/media/doc/2020-04-23%20Letter%20to%20US%20AG%20Barr%20re%20Cattle%20Markets.pdf; Letter from U.S. Senators Fischer, Daines, Enzi, Hoeven, Cramer, Barrasso, McSally, Blackburn, Ernst, Baldwin, Crapo, Jones, Rounds, Smith, Hyde-Smith, Risch, Sasse, Hawley, and Thune to U.S. Attorney General Barr (May 12, 2020), https://www.fischer.senate.gov/public/_cache/files/86f483c7-9bcb-41c0-9b7c-01cb3d029104/final-senate-letter-to-doj-packers-investigation-request-finalwsignature.pdf. Similarly, on July 15, 2020, U.S. Senator Daines requested the DOJ and the USDA to actively coordinate efforts in the ongoing investigations into the "allegations of market manipulation and anti-competitive behavior by meat packers in the cattle industry." Letter from U.S. Senator Daines to U.S. Department of Agriculture Secretary Perdue and U.S. Attorney General Barr (July 15, 2020), https://www.daines.senate.gov/imo/media/doc/2020.07.15%20USDA%20DOJ%20Cattle%20Investigation%20Expansion.pdf.

[136] *See* Letter from Attorneys General Stenehjem (ND), Weiser (CO), Schmitt (MO), Fox (MT), Brnovich (AZ), Wasden (ID), Miller (IA), Ellison (MN), Peterson (NE), Ravnsborg (SD), and Hill (WY) to U.S. Attorney General Barr (May 5, 2020), https://attorneygeneral.nd.gov/sites/ag/files/documents/MediaAttachments/2020-05-05-Barr%2C%20AG%20William.pdf; *see also* Letter from Attorney General Reyes (UT) to U.S. Attorney General Barr (May 21, 2020), https://attorneygeneral.utah.gov/wp-content/uploads/2020/06/2020-05-21-Beef-Packing-Industry-Ltr-to-Attorney-General-William-Barr.pdf.

[137] *Id.*

323. Other officials have called for action,[138] including Texas Department of Agriculture Commissioner, Sid Miller[139] and U.S. Representative Lucas, who urged former Attorney General Barr "to share the findings of the Department's investigation with Congress as soon as possible so that policymakers can address the concerns of their investigation and restore confidence back into cattle markets."[140]

324. The DOJ's investigation remains ongoing.

**B.      The USDA Is Investigating Defendants' Activities in Light of the Fire at Tyson's Holcomb Plant and COVID-19-related Market Disruptions**

325. As noted above, on August 28, 2019, the USDA launched an investigation into the conduct of the Meatpacking Defendants in the aftermath of a fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019.

326. After the fire, Senator Thune, among others, raised concerns with the integrity of the cattle market, observing that "[t]he fact that losing just one beef plant in the United States created so much volatility in the cattle marketplace, including decreased cattle prices for producers and increased boxed beef prices, is deeply concerning."[141]

---

[138] Letter from Kentucky Commissioner of Agriculture Quarles and Kentucky Attorney General Cameron to U.S. Attorney General Barr (May 15, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=914.

[139] Letter from Texas Department of Agriculture Commissioner Miller to U.S. Attorney General Barr (May 7, 2020), https://www.texasagriculture.gov/Portals/0/forms/COMM/Media/Beef_Ind_to_AG_Barr 20_v2.pdf.

[140] Press Release, U.S. Representative Lucas, Lucas Statement on DOJ Investigation of Beef-Processing Industry (June 5, 2020), https://lucas.house.gov/news/press-releases/lucas-statement-doj-investigation-beef-processing-industry.

[141] Press Release, U.S. Senator Thune, Thune Hears From Livestock Industry Leaders on Market Transparency (Sept. 26, 2019),

327.   Seven months later, in March 2020, when beef packing plants were forced to close due to infections of plant employees from the COVID-19 virus, the Meatpacking Defendants' profits again soared—with the meat margin peaking at the highest level it had ever reached.

328.   Following calls for the expansion of USDA's investigation of beef pricing margins to include the market impacts arising from the COVID-19 plant shutdowns,[142] Secretary of Agriculture Sonny Purdue agreed, announcing on April 8, 2020 that the USDA would investigate cattle pricing throughout the pandemic, in conjunction with its continuing probe related to the 2019 Tyson plant fire.[143]

---

https://www.thune.senate.gov/public/index.cfm/2019/9/thune-hears-from-livestock-industry-leaders-on-market-transparency. Related concerns caused senators to request an investigation by the CFTC as to whether parties were taking advantage of the producers. *See* Letter from U.S. Senator Fischer to Commodity Futures Trading Commission Chairman Tarbert (Aug. 20, 2019), https://www.fischer.senate.gov/public/_cache/files/f33edda0-c81d-41bc-aa45-3ef1a7af3209/8.20.19-holcomb-letter-to-cftc.pdf.

[142] Letter from U.S. Senator Fischer to U.S. Department of Agriculture Secretary Perdue (Apr. 6, 2020), https://www.fischer.senate.gov/public/_cache/files/29ace091-e363-403e-b64d-96a35a31362e/4.6.20-df-letter-to-usda-psa---final.pdf; Letter from U.S. Senator Thune to U.S. Department of Agriculture Secretary Perdue (Apr. 8, 2020), https://www.thune.senate.gov/public/_cache/files/0ba58dff-e870-4e0e-98db-51f46b6f6d04/0A984CF95521AEFDB343398C84EE1564.4.8.2020-cattle-market-letter-to-perdue.pdf.

[143] Jacob Bunge & Brent Kendall, *Justice Department Issues Subpoenas to Beef-Processing Giants*, WALL STREET JOURNAL (June 5, 2020, 11:42 AM), https://www.wsj.com/articles/justice-department-issues-subpoenas-to-beef-processing-giants-11591371745.

329.   As noted above, on July 22, 2020, the USDA issued their initial report,[144] stating that the "[f]indings thus far do not preclude the possibility that individual entities or groups of entities violated the Packers and Stockyards Act during the aftermath of the Tyson Holcomb fire and the COVID-19 pandemic."[145] It also stated that the investigation into potential violations of the Packers and Stockyards Act was ongoing.[146]

## C.   JBA S.A.'s Brazilian Parent and Related Companies Are Guilty of Bribery and Corruption

330.   On October 14, 2020, J&F Investimentos, the parent company of Defendant JBS, S.A, pleaded guilty to violations of the Foreign Corrupt Practices Act (FCPA), and agreed to pay $128.25 million in criminal fines, half of the $256.5 million fines levied, due to settlements made with Brazilian authorities.[147]

331.   In referencing the investigations that lead to the indictment and plea, Senators Rubio and Menendez stated: "[w]e are troubled that JBS S.A. used the ill-gotten financing that it received . . .  which totaled more than $1.3 billion, to acquire American

---

[144] *Boxed Beef & Fed Cattle Price Spread Investigation Report*, U.S. DEP'T OF AGRIC. AGRIC. MKTG. SERV. (July 22, 2020), https://www.ams.usda.gov/sites/default/files/media/CattleandBeefPriceMarginReport.pdf

[145] *Id.* at 10.

[146] *Id.* at 2.

[147] Press Release, Dept. of Justice, J&F Investimentos S.A. Pleads Guilty and Agrees to Pay Over $256 Million to Resolve Criminal Foreign Bribery Case (Oct. 14, 2020), https://www.justice.gov/opa/pr/jf-investimentos-sa-pleads-guilty-and-agrees-pay-over-256-million-resolve-criminal-foreign; Jody Godoy & Sabrina Valle, *Parent of Brazil's JBS pleads guilty to U.S. foreign bribery charges*, REUTERS (Oct. 14, 2020, 11:07 AM), https://www.reuters.com/article/us-j-f-brazil-crime/parent-of-brazils-jbs-pleads-guilty-to-u-s-foreign-bribery-charges-idUSKBN26Z2FZ.

010808-11/1421601 V1

companies . . .". [148] "[This] only underscores our concerns that the ***questionable nature of JBS S.A.'s financial practices poses significant risks for its American subsidiaries*** and the U.S. food system."[149]

332.   The SEC also commenced a civil case against J&F, JBS, and related entities. It alleged that these companies engaged in a massive bribery scheme of Brazilian officials and others in order to obtain investments that would facilitate JBS' acquisition of Pilgrim's Pride Corporation, a U.S. company, and through that acquisition, its entry into the United States markets.[150] "'Engaging in bribery to finance their expansion into the U.S. markets and then continuing to engage in bribery while occupying senior board positions at Pilgrim's reflects a profound failure to exercise good corporate governance,' said Charles Cain, Chief of the SEC Enforcement Division's FCPA Unit. 'This brazen misconduct flies in the face of what investors should expect from those occupying the role of an officer or director of a U.S. issuer' the SEC stated.'"[151]

333.   J&F Investimentos S.A. and JBS S.A., a global meat and protein producer, and its principals have agreed to pay nearly $27 million to resolve the SEC charges.[152]

---

[148]   Letter from U.S. Senators Menendez and Rubio to U.S. Department of Treasury Secretary Mnuchin (Oct. 8, 2019), https://www.foreign.senate.gov/imo/media/doc/10-08-19%20RM%20Rubio%20letter%20Brazil%20CFIUS.pdf.

[149]   *Id.*

[150]   *In the Matter of JBS, S.A. et al.*, Exchange Act Release No. 90170 (Oct. 14, 2020).

[151]   Press Release, Sec. and Exch. Comm'n, SEC Charges Brazilian Meat Producers with FCPA Violations (Oct. 14, 2020), https://www.sec.gov/news/press-release/2020-254.

[152]   *Id.*

**D.      The Conduct Alleged Here is Similar to Conduct in the Broiler Chicken and Pork Markets.**

334.   The conduct of Meatpacking Defendants alleged herein is consistent with their previous use of production restraint to increase the price of other commodities such as broiler chicken and pork. JBS and Tyson maintain significant market shares in both the broiler chicken and pork processing markets. Cargill was the fourth largest U.S. pork processer until it sold its pork business to JBS in October 2015.

335.   The DOJ opened a grand jury investigation into an alleged conspiracy in relation to broiler chickens in 2019. In relation to that investigation, the DOJ issued subpoenas to Defendant Tyson, and Defendant JBS S.A.'s subsidiary, Pilgrim's Pride, along with other participants in the broiler chicken market.

336.   In June of 2020, Tyson announced that it is an ACPERA leniency applicant in relation to the criminal investigation.[153]

337.   In June of 2020, the DOJ announced indictments of several executives of Pilgrims' Pride for price-fixing and related criminal activity in the broiler chicken market.[154] In October, 2020, the DOJ announced a new set of indictments, expanding the

---

[153]  Tyson Foods, Inc., Current Report (Form 8-K) at 4 (June 10, 2020), http://d18rn0p25nwr6d.cloudfront.net/CIK-0000100493/e5ca416b-b5f0-4211-8ed1-5005577eabf0.pdf.

[154]  Indictment, *United States v. Penn et al.*, 1:20-cr-00152-PAB, ECF No. 1 (D. Colo. June 2, 2020); *Pilgrim's Pride CEO indicted over alleged U.S. chicken price-fixing*, Reuters (June 3, 2020, 12:17 PM), https://www.reuters.com/article/us-usa-pilgrims-pride-charges/pilgrims-pride-ceo-indicted-over-alleged-u-s-chicken-price-fixing-idUSKBN23A2TF.

number of companies charged and employees linked to the criminal activity.[155] In addition to employees at Pilgrim's Pride (JBS), Claxton Foods, and George's Inc., former employees of defendant Tyson Foods are also included in the October indictment.[156]

338.   On October 13, 2020, Pilgrim's Pride (JBS) announced it entered into a plea deal with the DOJ and agreed to pay $110.5 million to resolve the claims against it.[157]

339.   Some of these Defendants are also accused of slaughter restraint and other coordinated activity in the pork market. Specifically, Defendants JBS and Tyson, along with other participants in the wholesale pork market, are alleged to have violated the Sherman Act and other laws "by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States." JBS has entered into an agreement to settle these claims in return for a payment of $24.5 million and the provision of cooperation to the Plaintiffs.[158]

---

[155] Superseding Indictment, *United States v. Penn et al.*, 1:20-cr-00152-PAB, ECF No. 101 (D. Colo. Oct. 6, 2020); Jacob Bunge & Brent Kendall, *Six Chicken-Industry Officials are Indicted in Price-Fixing Probe*, WALL STREET JOURNAL (Oct. 7, 2020, 9:05 PM), *available at* https://www.wsj.com/articles/six-chicken-industry-officials-are-indicted-in-price-fixing-probe-11602085637; Greg Henderson, *New Indictments In DOJ Chicken Price-Fixing Probe*, AGWEB FARM JOURNAL (Oct. 7, 2020, 2:48 PM), *available at* https://www.agweb.com/article/new-indictments-doj-chicken-price-fixing-probe.

[156] Michael Hirtzer, *Expanded U.S. Chicken Probe Points to Tyson's Involvement*, BLOOMBERG (Oct. 7, 2020, 1:30 PM), https://www.bloomberg.com/news/articles/2020-10-07/chicken-price-fixing-case-expanded-by-u-s-with-six-indictments.

[157] Pilgrim's Pride Corp., Current Report (Form 8-K) at 2, 4 (Oct. 14, 2020), https://ir.pilgrims.com/static-files/4518999a-2654-458d-b8f7-8bd04d7d8525.

[158] *See* Jennifer Shike, *JBS Pork Antitrust Lawsuit Plaintiffs Seek $24.5 Million Settlement*, FARM JOURNAL'S PORK (Dec. 3, 2020), https://www.porkbusiness.com/news/industry/jbs-pork-antitrust-lawsuit-plaintiffs-seek-245-million-settlement; Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of the Class Action Settlement between the Direct Purchaser

340. The below chart summarizes the regulatory investigations and actions concerning Meatpacking Defendants:

| Defendant | DOJ CIDs Issued | USDA Investigation | Guilty of Bribery and Corruption | SEC Civil Case | Broiler Chicken Indictments | Pork Case |
|---|---|---|---|---|---|---|
| **JBS** | ✓ | ✓ | ✓ | ✓ | ✓ (plea deal) | ✓ |
| **Cargill** | ✓ | ✓ | | | | |
| **Tyson** | ✓ | ✓ | | | ✓(ACPERA) | ✓ |
| **National Beef** | ✓ | ✓ | | | | |

## E.   The Meatpacking Defendants actively concealed the conspiracy.

341. Throughout the Class Period, the Meatpacking Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from plaintiffs and class members.

342. Meatpacking Defendants took affirmative steps to actively conceal their violations of law from Plaintiffs and both Classes by, among other matters, (i) giving false or pre-textual reasons for low fed cattle prices; (ii) offering pre-textual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade; (iii) explicitly and implicitly representing that the fed cattle bids and contract terms Meatpacking Defendants offered Plaintiffs and the Producer Class were the product of

---

Plaintiffs and Defendant JBS, *In re Pork Antitrust Litig.,* No. 18-cv-1776, ECF No. 542 (D. Minn. Dec. 1, 2020).

honest competition and not a conspiracy; (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and (v) misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to government officials and to the public.

343. Specifically, as alleged above, although each Meatpacking Defendant directed its field buyers and other staff to drive past their competitors' plants to determine and report upon those plants' operating levels (for example, whether the plant had reduced labor hours or was operating on Saturday), Tyson (and on information and belief, each of the other Defendants) had policies that precluded these directives, and the resulting reports about their competitors' operations, from being put into writing. Such communications were effectuated through phone calls only.

344. n addition, as alleged above, the Meatpacking Defendants offered pre-textual justifications for low fed cattle prices, plant closures, slaughter reductions, withdrawal from the cash cattle trade and their improved financial performance. Examples include, *inter alia*:

- In their SEC filings between 2015-2018, Tyson Foods stated that its U.S. fed cattle business had "limited or no control" over the production and pricing of cattle, rather, the price is "determined by constantly changing market forces of supply and demand." [159]

---

[159] Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report

- Tyson Foods stated, "[t]he Beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs." [160]

- Statements by JBS executives throughout 2016 and into 2017 claiming that its strong financial performance in the United States was due to "more cattle available in the U.S.,"[161] "cattle price[s] . . . [being] back to the normal level,"[162] "greater cattle availability,"[163] and "strong demand for beef."[164]

- In its 2017 Annual Report, Cargill reported that "favorable market conditions in North America" were simply the product of "[r]enewed consumer demand for beef . . . ."[165]

- In October 2016, Jefferies Financial Group, speaking for National Beef, touted that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when explaining how "[f]rom June 27, 2015 to June 25,

---

(Form 10-K) at 6 (Sept. 30, 2017); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018).

[160] Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Oct. 1, 2016); *see also* Tyson Foods, Inc., Annual Report (Form 10-K), at 23 (Sept. 30, 2017) ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson Foods, Inc., Annual Report (Form 10-K), at 25 (Sept. 29, 2018) (same).

[161] JBS, Q2 2016 Earnings Call, (Aug. 11, 2016) at 6.

[162] JBS, Q3 2016 Earnings Call, (Nov. 16, 2016) at 10.

[163] JBS, Q1 2017 Earnings Call, (May 16, 2017) at 2.

[164] JBS, Q2 2018 Earnings Call, (Aug. 15, 2018) at 4.

[165] Cargill, Inc., 2017 Annual Report at 1, https://www.cargill.com/doc/1432094802973/2017-annual-report.pdf.

2016, the average market price per pound of fed cattle has fallen from $1.48 to $1.16."[166]

- Marfrig executives, speaking for National Beef, stated on the company's earnings call for the third quarter of 2018 that "the U.S. beef industry has delivered record results" thanks to "an ample supply of cattle" and "strong demands [sic] in both the domestic and international markets."[167]

345.   At the same time, the Meatpacking Defendants publicly stated in their Annual Reports and other public documents that they complied with the antitrust laws and the laws and regulations that support fair competition and integrity in the marketplace, and that they act ethically and with integrity, all while colluding to suppress fed cattle prices for their own benefit and at the expense of the Classes.

346.   Because of Meatpacking Defendants' fraudulent concealment, Plaintiffs and Class Members had insufficient information concerning Meatpacking Defendants' misconduct on which to base a complaint until January 2019, when Witnesses 1 stepped forward with confidential information regarding Meatpacking Defendants' express agreement.

---

[166] Leucadia National Corporation (Jefferies Financial Group), 2016 Investor Meeting Presentation at 53 (Oct. 5, 2016).

[167] Marfrig, Q3 2018 Earnings Call, (Nov. 6, 2018) at 5. As pleaded above, Jefferies and Marfrig both owned a controlling share of National Beef for portions of the Class Period and shared a unity of corporate interest and operated as part of a single enterprise with National Beef during those periods. On information and belief, National Beef was the original and knowing source of every pre-textual public statement ostensibly made by Jefferies and/or Marfrig to conceal Defendants' conspiracy.

347.   Accordingly, the applicable statutes of limitations on Plaintiffs' claims were tolled. Defendants are also equitably estopped from asserting any statute of limitations defense.

**F.     The Meatpacking Defendants' conspiracy continues through the present.**

348.   As alleged herein, the Meatpacking Defendants' price-fixing conspiracy lasted from at least January 1, 2015 and continues through the present.

349.   Tyson, JBS, Cargill, and National Beef each engaged in the conspiracy to fix and suppress the price of fed cattle in the United States.

350.   As a result of the anticompetitive conduct challenged in this Complaint, throughout the Class Period, the Meatpacking Defendants were able to and did purchase cattle at artificially suppressed cash prices and purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts throughout the Class Period.

351.   Each Meatpacking Defendant's purchase for fed cattle at artificial and non-competitive price constituted a new overt act causing injury to the proposed Classes.

352.   The Meatpacking Defendants' purchases pursuant to the conspiracy continued throughout the Class Period and, accordingly members of the proposed Class were injured and may recover for damages suffered at any point in the conspiracy.

353.   The Meatpacking Defendants continue to engage in the anticompetitive conduct alleged herein, and continue to be able to and do purchase cattle at artificially suppressed cash prices and purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts throughout the Class Period.

354.   The Meatpacking Defendants' unlawful communications regarding pricing and procurement decisions continue to this day.

## VIII.  CLASS ACTION ALLEGATIONS

355.   Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following classes:

A.   **Nationwide Injunctive Relief class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in the United States during the Class Period.

B.   **Arizona class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Arizona during the Class Period.

C.   **California class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in California during the Class Period.

D.   **District of Columbia class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in the District of Columbia during the Class Period.

E.   **Florida class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Florida during the Class Period.

F.   **Hawaii class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Hawaii during the Class Period.

G.   **Illinois class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Illinois during the Class Period.

010808-11/1421601 V1

H.   **Iowa class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Iowa during the Class Period.

I.   **Kansas class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Kansas during the Class Period.

J.   **Maine class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Maine during the Class Period.

K.   **Massachusetts class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Massachusetts during the Class Period.

L.   **Michigan class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Michigan during the Class Period.

M.   **Minnesota class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Minnesota during the Class Period.

N.   **Missouri class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Missouri during the Class Period.

O.   **Montana class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Montana during the Class Period.

P.   **Nebraska class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Nebraska during the Class Period.

Q.   **Nevada class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Nevada during the Class Period.

010808-11/1421601 V1

R.   **New Hampshire class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in New Hampshire during the Class Period.

S.   **New Mexico class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in New Mexico during the Class Period.

T.   **New York class:** All persons and who indirectly purchased beef from defendants or co-conspirators for personal use in New York during the Class Period.

U.   **North Carolina class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in North Carolina during the Class Period.

V.   **North Dakota class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in North Dakota during the Class Period.

W.   **Oregon class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Oregon during the Class Period.

X.   **Rhode Island class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Rhode Island during the Class Period.

Y.   **South Carolina class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in South Carolina during the Class Period.

Z.   **South Dakota class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in South Dakota during the Class Period.

AA.   **Tennessee class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Tennessee during the Class Period.

BB.   **Utah class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Utah during the Class Period.

- 168 -

CC. **West Virginia**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in West Virginia during the Class Period.

DD. **Wisconsin class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Wisconsin during the Class Period.

356.   The state classes are collectively referred to as the "classes" unless otherwise indicated. Specifically excluded from these classes are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded from these classes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action. Further excluded from the classes and National Injunctive Relief Class are purchasers of value-added products not manufactured, supplied or processed by defendants, or otherwise not under the control of defendants.

357.   Class Identity: The above-defined classes are readily identifiable and is one for which records should exist.

358.   Numerosity: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of beef. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members

- 169 -

geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

359. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the classes because plaintiffs purchased beef indirectly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the classes and the relief sought is common to the classes.

360. <u>Common Questions Predominate</u>: There are questions of law and fact common to the classes, including, but not limited to:

A. Whether defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of beef sold in interstate commerce in the United States;

B. The identity of the participants of the alleged conspiracy;

C. The duration of the conspiracy alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

D. Whether the alleged conspiracy violated the antitrust and consumer protection laws of the various states;

E. Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the classes;

F. The effect of defendants' alleged conspiracy on the prices of beef sold in the United States during the Class Period;

G. Whether plaintiffs and other members of the classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

H. The appropriate class-wide measure of damages.

010808-11/1421601 V1

These and other questions of law or fact, which are common to the members of the classes, predominate over any questions affecting only individual members of the classes.

361.   Adequacy: Plaintiffs will fairly and adequately protect the interests of the classes in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the classes who indirectly purchased beef from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the classes.

362.   Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the classes is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the classes compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the classes to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

363.   The prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

- 171 -

364.   Plaintiffs bring the classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more beef products that a defendant or co-conspirator produced for personal use during the respective class periods.

365.   Defendants have acted on grounds generally applicable to the classes, thereby making final injunctive relief appropriate with respect to the classes as a whole.

## IX.   ANTITRUST INJURY

366.   Defendants' anticompetitive conduct had the following effects, among others:

    A.   Price competition has been restrained or eliminated with respect to beef;

    B.   The prices of beef have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    C.   Indirect purchasers of beef have been deprived of free and open competition; and

    D.   End-user consumers of beef who indirectly purchased beef for personal use, including plaintiffs, paid artificially inflated prices.

367.   The beef that plaintiffs and class members purchased was in substantially the same form as when they were initially sold by defendants. As a result, the beef follows a traceable physical chain from defendants to plaintiffs and class members, and the overcharges on beef can be traced from defendants to plaintiffs and class members.

368.   As discussed in detail, as a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market,

- 172 -

which ultimately get passed to consumers, plaintiffs and class members here, in the form of higher retail prices. When demand is inelastic, as it is for beef, the pass-through rate to end users is at or near 100 percent.

369.   Consequently, while the direct purchasers were the first to pay supra-competitive prices, the overcharge was passed along the distribution chain and absorbed by plaintiffs and class members when they purchased the beef for personal use.

370.   Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution to end-user consumers. Thus, the economic harm to plaintiffs and the class member can be quantified.

371.   The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of beef and, as a direct and foreseeable result. Plaintiffs and the classes paid supra-competitive prices for beef during the Class Period.

372.   By reason of the alleged violations of the antitrust laws, plaintiffs and the classes have sustained injury to their businesses or property, having paid higher prices for beef than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

373.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X.   CAUSES OF ACTION

## VIOLATION OF THE SHERMAN ACT

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### 15 U.S.C. § 1
### (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF)

374.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

375.   Beginning at a time currently unknown to plaintiffs, but at least as early as 2015, and continuing through the present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for beef in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

376.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

A. Fixing, raising, and stabilizing the price of beef; and

B. Allocating among themselves and collusively reducing the production of beef.

377.   The combination and conspiracy alleged herein has had the following effects, among others:

A.  Price competition in the sale of beef has been restrained, suppressed, and/or eliminated in the United States;

B.  Prices for beef sold by defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

C.  Those who purchased beef indirectly from defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition.

378.   Plaintiffs and members of the classes have been injured and will continue to be injured in their businesses and property by paying more for beef purchased indirectly from the defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

379.   Plaintiffs and members of the classes are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST LAWS

380.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

381.   The following claims for relief are pleaded under the antitrust laws of each jurisdiction identified below on behalf of the indicated class.

010808-11/1421601 V1

## SECOND CLAIM FOR RELIEF
## VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. § 44-1401, *ET SEQ.* (ON BEHALF OF THE ARIZONA CLASS)

382.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

383.   By reason of the conduct alleged herein, defendants have violated Arizona Rev. Stat. § 44-1401, *et seq*.

384.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Arizona.

385.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

386.   Defendants' violations of Arizona law were flagrant.

387.   Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

388.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.

389.   By reason of the foregoing, plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

## THIRD CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16700, *ET SEQ.* (ON BEHALF OF THE CALIFORNIA CLASS)

390.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

391.   The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

392.   California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

393.   Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

394.   A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

- 177 -

395.   Plaintiffs purchased beef within the State of California during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

396.   Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

397.   Plaintiffs and members of the California Class were injured in their business or property, with respect to purchases of beef in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501, *ET SEQ*. (ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)

398.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

399.   The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

400.   Plaintiffs purchased beef within the District of Columbia during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

401.   Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

402.   Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for beef within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq*.

403.   Plaintiffs and members of the District of Columbia Class were injured with respect to purchases of beef in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ*.**
**(ON BEHALF OF THE ILLINOIS CLASS)**

404.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

405.   The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade. . . ." 740 ILCS 10/2.

010808-11/1421601 V1

406.   Plaintiffs purchased beef within the State of Illinois during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

407.   Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

408.   Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for beef sold, and/or for allocating customers or markets for beef within the intrastate commerce of Illinois.

409.   Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for beef in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq*.

410.   Plaintiffs and members of the Illinois Class were injured with respect to purchases of beef in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

## SIXTH CLAIM FOR RELIEF
### VIOLATION OF THE IOWA COMPETITION LAW
### IOWA CODE § 553.1, *ET SEQ.*
### (ON BEHALF OF THE IOWA CLASS)

411.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

010808-11/1421601 V1

412.   The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

413.   Plaintiffs purchased beef within the State of Iowa during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

414.   Defendants contracted, combined or conspired to restrain or monopolize trade in the market for beef, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for beef, in violation of Iowa Code § 553.1, *et seq.*

415.   Plaintiffs and members of the Iowa Class were injured with respect to purchases of beef in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## SEVENTH CLAIM FOR RELIEF
### VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT
### KAN. STAT. ANN. § 50-101, *ET SEQ.*
### (ON BEHALF OF THE KANSAS CLASS)

416.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

417.   The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

- 181 -

418.   Plaintiffs purchased beef within the State of Kansas during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

419.   Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

420.   Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of beef, increasing the price of beef, preventing competition in the sale of beef, or binding themselves not to sell beef, in a manner that established the price of beef and precluded free and unrestricted competition among themselves in the sale of beef, in violation of Kan. Stat. Ann. § 50-101, *et seq*.

421.   Plaintiffs and members of the Kansas Class were injured with respect to purchases of beef in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

### EIGHTH CLAIM FOR RELIEF
### VIOLATION OF THE MAINE'S ANTITRUST STATUTE
### ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.*
### (ON BEHALF OF THE MAINE CLASS)

422.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

423.   Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally

prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

424.  Plaintiffs purchased beef within the State of Maine during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

425.  Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

426.  Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of beef within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq*.

427.  Plaintiffs and members of the Maine Class were injured with respect to purchases of beef in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

## NINTH CLAIM FOR RELIEF
### VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT
### MICH. COMP. LAWS § 445.771, *ET SEQ.*
### (ON BEHALF OF THE MICHIGAN CLASS)

428.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

429.  The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit

- 183 -

er

monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

430.  Plaintiffs purchased beef within the State of Michigan during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

431.  Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

432.  Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for beef, in violation of Mich. Comp. Laws § 445.772, *et seq.*

433.  Plaintiffs and members of the Michigan Class were injured with respect to purchases of beef in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## TENTH CLAIM FOR RELIEF
## VIOLATION OF THE MINNESOTA ANTITRUST LAW,
## MINN. STAT. § 325D.49, *ET SEQ.*
## (ON BEHALF OF THE MINNESOTA CLASS)

434.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

435. The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in

Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

436.   Plaintiffs purchased beef within the State of Minnesota during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

437.   Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

438.   Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for beef within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for beef within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for beef within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

439.   Plaintiffs and members of the Minnesota Class were injured with respect to purchases of beef in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

## ELEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. ANN. STAT. § 407.010, *ET SEQ*. (ON BEHALF OF THE MISSOURI CLASS)

440.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

441.  Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

442.  Plaintiffs purchased beef within the State of Missouri during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

443.  Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc*., 216 S.W.3d 667, 669 (Mo. 2007).

444.  Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the market for beef within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq*.

445.  Plaintiffs and members of the Missouri Class were injured with respect to purchases of beef in Missouri and are entitled to all forms of relief, including actual

damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**TWELFTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEBRASKA JUNKIN ACT,**
**NEB. REV. STAT. § 59-801, *ET SEQ*.**
**(ON BEHALF OF THE NEBRASKA CLASS)**

446.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

447.   Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

448.   Plaintiffs purchased beef within the State of Nebraska during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

449.   Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

450.   Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for beef within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through

- 187 -

agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

451.   Plaintiffs and members of the Nebraska Class were injured with respect to purchases of beef in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**THIRTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,**
**NEV. REV. STAT. § 598A.010, *ET SEQ.***
**(ON BEHALF OF THE NEVADA CLASS)**

452.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

453.   The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

454.   The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

010808-11/1421601 V1

455.   Plaintiffs purchased beef within the State of Nevada during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

456.   Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

457.   Defendants fixed prices by agreeing to establish prices for beef in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of beef within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq*.

458.   Plaintiffs and members of the Nevada Class were injured with respect to purchases of beef in Nevada in that at least thousands of sales of defendants' beef took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by defendants' conduct.

459.   Accordingly, plaintiffs and members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

460.   In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by plaintiffs.

**FOURTEENTH CLAIM FOR RELIEF**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.***
**(ON BEHALF OF THE NEW HAMPSHIRE CLASS)**

461.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

462.   Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

463.   Plaintiffs purchased beef within the State of New Hampshire during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

464.   Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

465.   Defendants fixed, controlled or maintained prices for beef, allocated customers or markets for beef, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

466.   Plaintiffs and members of the New Hampshire Class were injured with respect to purchases of beef in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

## FIFTEENTH CLAIM FOR RELIEF
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
N.M. STAT. ANN. §§ 57-1-1, *ET SEQ*.
(ON BEHALF OF THE NEW MEXICO CLASS)**

467.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

468.   The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

469.   Plaintiffs purchased beef within the State of New Mexico during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

470.   Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

471.   Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for beef within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

472.   Plaintiffs and members of the New Mexico Class were injured with respect to purchases of beef in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## SIXTEENTH CLAIM FOR RELIEF
**VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS
LAW
(ON BEHALF OF THE NEW YORK CLASS)**

473.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

474. Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

475. Plaintiffs purchased beef within the State of New York during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

476. Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

477. Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of beef and restrained competition in the free exercise of the conduct of the business of beef within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

478. Plaintiffs and members of the New York Class were injured with respect to purchases of beef in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

## SEVENTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES, N.C. GEN. STAT. § 75-1, *ET SEQ.* (ON BEHALF OF THE NORTH CAROLINA CLASS)

479. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

- 192 -

480.   Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the beef market, a substantial part of which occurred within North Carolina.

481.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

482.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

483.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

484.   By reason of the foregoing, plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

## EIGHTEENTH CLAIM FOR RELIEF
## VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE § 51-08.1, *ET SEQ*. (ON BEHALF OF THE NORTH DAKOTA CLASS)

485.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

486.   The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, *et seq.*

- 193 -

487.   Plaintiffs purchased beef within the State of North Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

488.   Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

489.   Defendants contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for beef, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or controlling, fixing or maintaining prices for beef, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

490.   Plaintiffs and members of the North Dakota Class were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

<u>NINETEENTH CLAIM FOR RELIEF</u>
**VIOLATION OF THE OREGON ANTITRUST LAW,
OR. REV. STAT. § 646.705, *ET SEQ.*
(ON BEHALF OF THE OREGON CLASS)**

491.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

492.   Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust

violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

493. Plaintiffs purchased beef within the State of Oregon during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

494. Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

495. Defendants contracted, combined, or conspired in restraint of trade or commerce of beef, and monopolized or attempted to monopolize the trade or commerce of beef, in violation of Or. Rev. Stat. § 646.705, *et seq.*

496. Plaintiffs and members of the Oregon Class were injured with respect to purchases of beef within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**TWENTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,**
**R.I. GEN LAWS § 6-36-1, *ET SEQ.***
**(ON BEHALF OF THE RHODE ISLAND CLASS)**

497. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

- 195 -

498.   The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 636-2(a)(2).

499.   Plaintiffs purchased beef within the State of Rhode Island during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

500.   Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a). In Rhode Island, the claims of plaintiffs and the Class alleged herein run from January 1, 2008, through the date that the effects of defendants' anticompetitive conduct cease.

501.   Defendants contracted, combined and conspired in restraint of trade of beef within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of beef for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

502.   Plaintiffs and members of the Rhode Island Class were injured with respect to purchases of beef in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

## TWENTY-FIRST CLAIM FOR RELIEF
## VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,
## S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ.*
## (ON BEHALF OF THE SOUTH DAKOTA CLASS)

503.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

504.   Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

505.   Plaintiffs purchased beef within the State of South Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

506.   Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

507.   Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of beef within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, *et seq.*

508.   Plaintiffs and members of the South Dakota Class were injured with respect to purchases of beef in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

010808-11/1421601 V1

**TWENTY-SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**TENN. CODE, § 47-25-101, *ET SEQ*.**
**(ON BEHALF OF THE TENNESSEE CLASS)**

509.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

510.   The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.

511.   Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

512.   Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, defendants' combination or conspiracy had the following effects: (1) price competition for beef was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for beef were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) plaintiffs and the Tennessee Class were

- 198 -

deprived of free and open competition; and (4) plaintiffs and the Tennessee Class paid supra-competitive, artificially inflated prices for beef.

513.   During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce as beef was sold in Tennessee.

514.   Plaintiffs and the Tennessee Class purchased beef within the State of Tennessee during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and the Tennessee Class have been injured in their business and property and are threatened with further injury

515.   Under Tennessee law, indirect purchasers (such as plaintiffs and the Tennessee Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

516.   Plaintiffs and members of the Tennessee Class were injured with respect to purchases of beef in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

## TWENTY-THIRD CLAIM FOR RELIEF
### VIOLATION OF THE UTAH ANTITRUST ACT,
### UTAH CODE ANN. §§ 76-10-911, *ET SEQ.*
### (ON BEHALF OF THE UTAH CLASS)

517.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

518.   The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

519.   Plaintiffs purchased beef within the State of Utah during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

520.   Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

521.   Defendants contracted, combined or conspired in restraint of trade or commerce of beef, and monopolized or attempted to monopolize trade or commerce of beef, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

522.   Plaintiffs and members of the Utah Class who are either Utah residents or Utah citizens were injured with respect to purchases of beef in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## TWENTY-FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W. VA. CODE §47-18-1, *ET SEQ.* (ON BEHALF OF THE WEST VIRGINIA CLASS)

523.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

- 200 -

524.   The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

525.   During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, *et seq*.

526.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

527.   As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the West Virginia Class have been injured in their business and property in that they paid more for beef than they otherwise would have paid in the absence of defendants' unlawful conduct. As a result of defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, plaintiffs and members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

## TWENTY-FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE WISCONSIN ANTITRUST ACT, WIS. STAT. ANN. § 133.01(1), *ET SEQ*. (ON BEHALF OF THE WISCONSIN CLASS)

528.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

529.   Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and

- 201 -

to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

530.  Plaintiffs purchased beef within the State of Wisconsin during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

531.  Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

532.  Defendants contracted, combined or conspired in restraint of trade or commerce of beef, and monopolized or attempted to monopolize the trade or commerce of beef, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq*.

533.  Plaintiffs and members of the Wisconsin Class were injured with respect to purchases of beef in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for defendants' beef in Wisconsin.

534.  Accordingly, plaintiffs and members of the Wisconsin Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

535. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to the Wisconsin Class. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced beef from

- 202 -

defendants, and (2) paying higher prices for defendants' beef than they would have in the absence of defendants' conduct. These injuries are of the type of the laws of Wisconsin were designed to prevent, and flow from that which makes defendants' conduct unlawful.

536.   Defendants are jointly and severally liable for all damages suffered by plaintiffs and members of the Wisconsin Class.

## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

537.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

538.   The following claims for relief are pled under the consumer protection or similar laws of each jurisdiction identified below, on behalf of the indicated class.

## TWENTY-SIXTH CLAIM FOR RELIEF
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
## CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. (THE "UCL")
## (ON BEHALF OF THE CALIFORNIA CLASS)

539.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

540.   The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq.* of California Business and Professions Code.

541.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

010808-11/1421601 V1

542.   This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated the UCL.

543.   The defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

544.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

545.   Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

546.   The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

547.   The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiffs and the members of the California Class to pay supra-competitive and artificially inflated prices for beef sold in

the State of California. Plaintiffs and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

548.   As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Plaintiffs and the members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

**TWENTY-SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT,**
**D.C. CODE § 28-3901, *ET SEQ*.**
**(ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)**

549.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

550.   Plaintiffs and members of the District of Columbia Class purchased beef for personal, family, or household purposes.

551.   By reason of the conduct alleged herein, defendants have violated D.C. Code § 28-3901*, et seq.*

552.   Defendants are "merchants" within the meaning of D.C. Code § 28-3901(a)(3).

553.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Beef market, a substantial part of which occurred within the District of Columbia.

554.   Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Beef Market.

555.   Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

556.   Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

557.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the District of Columbia Class have been injured in their business or property and are threatened with further injury.

558.   By reason of the foregoing, plaintiffs and members of the District of Columbia Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

## TWENTY-EIGHTH CLAIM FOR RELIEF
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201(2), *ET SEQ.* (ON BEHALF OF THE FLORIDA CLASS)

559.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

560.   The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

561.   The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

562.   A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

563.   Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

564.   Plaintiffs purchased beef within the State of Florida during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

- 207 -

565.   Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Florida.

566.   Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for beef, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2008 and continuing through the date of this filing.

567.   Accordingly, defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

568.   Defendants' unlawful conduct substantially affected Florida's trade and commerce.

569.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for beef and are threatened with further injury.

570.   By reason of the foregoing, plaintiffs and the members of the Florida Class is entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

010808-11/1421601 V1

## TWENTY-NINTH CLAIM FOR RELIEF
## VIOLATION OF THE HAWAII REVISED STATUTES ANNOTATED §§ 480-1, *ET SEQ.*
## (ON BEHALF OF HAWAII CLASS)

571.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

572.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

573.   Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) beef prices were, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) plaintiffs and members of the Hawaii Class were deprived of free and open competition; and (4) plaintiffs and members of the Hawaii Class paid supra-competitive, artificially inflated prices for beef.

574.   During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

575.   As a direct and proximate result of Defendants' unlawful conduct, plaintiffs and members of the Hawaii Class have been injured and are threatened with further injury.

## THIRTIETH CLAIM FOR RELIEF
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,
## 815 ILL. COMP. STAT. ANN. 505/10A, *ET SEQ.*
## (ON BEHALF OF THE ILLINOIS CLASS)

576.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

577.   By reason of the conduct alleged herein, defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

578.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Illinois.

579.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

580.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

581.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the classes.

582.   Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

010808-11/1421601 V1

583.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Illinois Class were actually deceived and have been injured in their business or property and are threatened with further injury.

584.   By reason of the foregoing, plaintiffs and members of the Illinois Class are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*

### THIRTY-FIRST CLAIM FOR RELIEF
### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS CH. 93A § 1, *ET SEQ.* (ON BEHALF OF THE MASSACHUSETTS CLASS)

585.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

586.   Plaintiffs reserve their right to bring a claim under Mass. Gen. Laws Ch. 93A *et seq.* Pursuant to Mass. Gen. Laws Ch. 93A § 9, plaintiffs served all defendants on April 26, 2019, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters explained the unfair acts, the injury suffered, and requested relief from the defendants within 30 days. If necessary, plaintiffs will amend to add specific claims under Mass. Gen. Laws Ch. 93A *et seq.*

### THIRTY-SECOND CLAIM FOR RELIEF
### VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT, MINN. STAT. § 325F.68, *ET SEQ.* (ON BEHALF OF THE MINNESOTA CLASS)

587.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

588.   By reason of the conduct alleged herein, defendants have violated Minn. Stat. § 325F.68, et seq.

589.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

590.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the beef market.

591.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

592.   Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

593.   Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

594.   Defendants' conduct was willful.

595.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

596.   By reason of the foregoing, plaintiffs and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.

## THIRTY-THIRD CLAIM FOR RELIEF
## VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1970, MONT. CODE, §§ 30-14-103, *ET SEQ.*, AND §§ 30-14-201, *ET. SEQ.* (ON BEHALF OF THE MONTANA CLASS)

597.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

598.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*

599.   Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Montana; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) plaintiffs and members of the Montana Class were deprived of free and open competition; and (4) plaintiffs and members of the Montana Class paid supra-competitive, artificially inflated prices for beef.

600.   During the Class Period, defendants' illegal conduct substantially affected Montana commerce and consumers.

601.   As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Montana Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*,

- 213 -

and, accordingly, plaintiffs and members of the Montana Class seek all relief available under that statute.

## THIRTY-FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. § 598.0903, *ET SEQ*. (ON BEHALF OF THE NEVADA CLASS)

602. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

603. By reason of the conduct alleged herein, defendants have violated Nev. Rev. Stat. § 598.0903, *et seq.*

604. Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

605. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

606. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

607. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

608. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

609. Defendants' conduct was willful.

610.  As a direct and proximate cause of defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

611.  By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

## THIRTY-FIFTH CLAIM FOR RELIEF
## VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-3, *ET SEQ*. (ON BEHALF OF THE NEW MEXICO CLASS)

612.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

613.  By reason of the conduct alleged herein, defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

614.  Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within New Mexico.

615.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

616.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

617.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the New Mexico Class.

618.   Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

619.   Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico Class members and the price paid by them for beef as set forth in N.M. Stat. Ann. § 57-12-2E.

620.   Defendants' conduct was willful.

621.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

622.   By reason of the foregoing, plaintiffs and members of the New Mexico Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

### THIRTY-SIXTH CLAIM FOR RELIEF
### VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT,
### N.C. GEN. STAT. § 75-1.1, *ET SEQ*.
### (ON BEHALF OF THE NORTH CAROLINA CLASS)

623.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

624.   By reason of the conduct alleged herein, defendants have violated N.C. Gen. Stat. § 75-1.1*, et seq.*

625.   Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within North Carolina.

626.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

627.   Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

628.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the North Carolina Class.

629.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

630.   Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

631.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

632.   By reason of the foregoing, plaintiffs and the members of the North Carolina Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 7516.

**THIRTY-SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH DAKOTA UNFAIR TRADE PRACTICES LAW,**
**N.D. CENT. CODE § 51-10, *ET SEQ*.**
**(ON BEHALF OF THE NORTH DAKOTA CLASS)**

633.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

634.   By reason of the conduct alleged herein, defendants have violated N.D. Cent. Code § 51-10-01, et seq.

635.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

636.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within North Dakota, for the purpose of controlling, fixing, or maintaining prices in the beef market.

637.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Dakota.

638.   Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

639.   Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

640.   Defendants' conduct was willful.

641.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

642.   By reason of the foregoing, plaintiffs and the members of the North Dakota Class are entitled to seek all forms of relief, including injunctive relief under N.D. Cent. Code § 51-10-06.

**THIRTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,**
**R.I. GEN. LAWS § 6-13.1-1, *ET SEQ*.**
**(ON BEHALF OF THE RHODE ISLAND CLASS)**

643.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

644.   By reason of the conduct alleged herein, defendants have violated R.I. Gen Laws § 6-13.1-1, *et seq.*

645.   Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

646.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the beef market.

647.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

010808-11/1421601 V1

648. Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

649. Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

650. Defendants' conduct was willful.

651. Defendants deliberately failed to disclose material facts to plaintiffs and members of the Rhode Island Class concerning defendants' unlawful activities, including the horizontal conspiracy and artificially-inflated prices for beef.

652. Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of beef, constitutes information necessary to plaintiffs and members of the Rhode Island Class relating to the cost of beef purchased.

653. Plaintiffs and members of the Rhode Island class purchased goods, namely beef, primarily for personal, family, or household purposes.

654. As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

655. By reason of the foregoing, plaintiffs and the members of the Rhode Island Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen Laws § 6-13.1-5.2.

## THIRTY-NINTH CLAIM FOR RELIEF
## VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT,
## S.C. CODE ANN. §§ 39-5-10, *ET SEQ*.
## (ON BEHALF OF THE SOUTH CAROLINA CLASS)

656.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

657.   By reason of the conduct alleged herein, defendants have violated S.C. Code Ann. §§ 39-5-10.

658.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within South Carolina.

659.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

660.   Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of defendants' actions within the stream of South Carolina commerce.

661.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

662.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs' and members of the South Carolina Class's ability to protect themselves.

- 221 -

663.   Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

664.   Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as nearly all members of the public purchase and consume beef.

**FORTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT,**
**UTAH CODE ANN. §§ 13-11-1, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

665.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

666.   By reason of the conduct alleged herein, defendants have violated Utah Code Ann. §§ 13-11-1, *et seq*.

667.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Utah.

668.   Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11-3.

669.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

670.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

- 222 -

671.  Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions.

672.  Defendants knew or had reason to know that their conduct was unconscionable.

673.  Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the Utah Class.

674.  Defendants' unlawful conduct substantially affected Utah's trade and commerce.

675.  As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

676.  By reason of the foregoing, plaintiffs and the members of the Utah Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

## FORTY-FIRST CLAIM FOR RELIEF
### UNJUST ENRICHMENT

677.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

678.  As a result of their unlawful conduct described above, defendants have and will continued to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of beef.

- 223 -

679.  Under common law principles of unjust enrichment, defendants should not be permitted to retain the benefits conferred on them by overpayments by plaintiffs and members of the classes in the following states: Arizona, California, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

## XI.    REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the classes of all others so similarly situated, respectfully requests judgment against defendants as follows:

680.  The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

681.  The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

682.  Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of plaintiffs and the members of the Classes be entered against defendants in an amount to be trebled to the extent such laws permit;

683. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

684. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

685. Plaintiffs and the members of the classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

686. Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

687. Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

688.   Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules

of Civil Procedure, of all issues so triable.

Dated: October 14, 2021

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:   *s/ Steve W. Berman*
   STEVE W. BERMAN (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
T: (206) 623-7292
F: (206) 623-0594
steve@hbsslaw.com

Shana E. Scarlett
Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
T: (510) 725-3000
F: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

*s/ Brian D. Clark*
W. Joseph Bruckner (MN #0147758)
BRIAN D. CLARK (MN #0390069)
Arielle S. Wagner (MN #0398332)
Kyle Pozan (*pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com
kjpozan@locklaw.com

- 226 -

J. Barton Goplerud
Shindler, Anderson, Goplerud & Weese, PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
T: (515) 223-4567
F: (515) 223-8887
goplerud@sagwlaw.com

*Counsel for Plaintiffs and the Proposed*
*Consumer Indirect Purchaser Classes*