## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE AND BEEF ANTITRUST LITIGATION<br><br>*This document relates to:*<br><br>ALL CASES | Case No. 20-cv-01319 (JRT/HB) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DOCUMENT CUSTODIANS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iv

INTRODUCTION ............................................................................................1

LEGAL STANDARD .......................................................................................1

DISPUTED CUSTODIANS ...............................................................................4

I.   Slaughter Plant-Level Management Staff .................................................5

II.  Executives and other Corporate Staff ...................................................12

**Tyson**
A.  Thomas Hayes ..............................................................................12

**JBS**
A.  Wesley Batista ..............................................................................14

**National Beef**
A.  David Grosenheider ......................................................................16

III. Sales Executive Positions ..................................................................17

**Tyson**
A.  Brad Bodine ................................................................................20

B.  Todd Nogelmeier ..........................................................................20

C.  Mark Gingerich ............................................................................21

D.  Jason Robertson ..........................................................................22

E.  Roel Andriessen ...........................................................................22

F.  Nathan Hodne ..............................................................................23

**JBS**
A.  John Flynn ..................................................................................25

B.  Chris Jensen ...............................................................................25

C.  Jason Kuan .................................................................................26

**Cargill**
A.  Nancy Lucas ...............................................................................27

B.  Charles Fox ................................................................................27

C.  Daniel Johnson ............................................................................28

**National Beef**
A.  Mark Domanski ...........................................................................28

B.  Randy Johnston ...........................................................................30

      C.   Zack Kimbell .............................................................................................. 30

CONCLUSION ............................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aspartame Antitrust Litig.,*
No. 2:06-CV-1732-LDD, 2008 WL 2275531 (E.D. Pa. May 13, 2008) ................... 3

*In re Auto. Refinishing Paint Antitrust Litig.,*
MDL No. 1426, 2004 U.S. Dist. LEXIS 21960 (E.D. Penn. Oct. 29,
2004) .......................................................................................................................... 2

*B–S Steel of Kan., Inc. v. Tex. Indus., Inc.,*
No. 01-2410-JAR, 2003 WL 21939019 (D. Kan. July 22, 2003) ............................... 2

*Bellingham v. BancInsure, Inc.,*
No. 13-0900, 2014 WL 12600277 (D. Minn. May 13, 2014) .................................... 1

*In re Broiler Chicken Antitrust Litig.,*
290 F. Supp. 3d 772 (N.D. Ill. 2017) .................................................................. 23, 32

*In re Broiler Chicken Antitrust Litig.,*
No. 16-cv-08637, ECF No. 540 (N.D. Ill. Nov. 15, 2017) ........................................ 3

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
No. C-07-5944-SC, 2014 WL 5462496 (N.D. Cal. Oct. 23, 2014) ........................... 2

*In re Cattle and Beef Antitrust Litig.,*
No. 20-cv-01319, Dkt. No. 238 (D. Minn. Sept. 14, 2021) ............................. *passim*

*Eisai Inc. v. Sanofi–Aventis U.S., LLC,*
No. 08–4168, 2012 WL 1299379 (D.N.J. April 16, 2012) ........................................ 3

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust
Litig.,*
No. 17-MD-2785-DDC-TJJ, 2018 WL 1440923 (D. Kan. Mar. 15,
2018) ..................................................................................................................... 3, 15

*Garcia Ramirez v. U.S. Immigr. & Customs Enf't,*
331 F.R.D. 194 (D.D.C. 2019) ............................................................................... 3, 4

*Hofer v. Mack Trucks, Inc.,*
   981 F.2d 377 (8th Cir. 1992) ........................................................................ 1

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.,*
   No. 15-cv-3183, 2016 WL 6997113 (D. Minn. Sept. 6, 2016).................................. 1

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,*
   340 F. Supp. 3d 285 (S.D.N.Y. 2018)........................................................... 9

*Jackson v. Senior Care Sols., Inc.,*
   No. 20-CV-2336 (TNL), 2021 WL 4099947 (D. Minn. Sept. 8, 2021) .................... 4

*Kleen Products LLC v. Packaging Corp. of America,*
   No. 10-C-5711, 2012 WL 4498465 (N.D. Ill. Sept 28, 2012)............................ 2, 3, 4

*Lynch v. Experian Info. Sols., Inc.,*
   No. 20-CV-2535, 2021 WL 5106006 (D. Minn. Nov. 3, 2021) ................................ 4

*U.S. ex rel. McBride v. Halliburton Co.,*
   272 F.R.D. 235 (D.D.C. 2011) .................................................................. 2

*Oppenheimer Fund, Inc. v. Sanders,*
   437 U.S. 340 (1978).............................................................................. 1

*Orduno v. Pietrzak,*
   No. 14-1393 ADM/JSM, 2016 WL 5853723 (D. Minn. Oct. 5, 2016) .................... 1

*U.S. v. Int'l Bus. Machs. Corp.,*
   66 F.R.D. 186 (S.D.N.Y) ......................................................................... 2

*United States v. Dentsply Int'l., Inc.,*
   No. Civ.A. 99-5 MMS, 2000 WL 654286 (D. Del. May 10, 2000) ...................... 2

*In re Urethane Antitrust Litig.,*
   261 F.R.D. 570 (D. Kan. 2009).................................................................. 2

**Rules**

Fed. R. Civ P. 26 ........................................................................................ 1

Fed. R. Civ. P. 26(b)(1)............................................................................. 1

Fed. R. Civ. P. 26(b)(2)(C) ....................................................................... 2

## Other Authorities

*Beef 2020 Export Highlights,* Foreign Agricultural Service,
  fas.usda.gov ...................................................................................................... 23

*Cattle Industry Issues Will Be Discussed this Week at Summer Business
  Meeting*, Ohio's Country Journal (Aug. 2, 2018) .................................................. 14

*Fresh Meats Leader Testifies about Beef Industry at Senate Hearing*,
  tysonfoods.com (July 28, 2021) ............................................................................ 11

Khorri Atkinson, *Indicted Chicken Execs Can't Strike FBI Agent's
  Testimony,* Law 360 (October 6, 2021) ................................................................. 18

Laura Hillen, *Todd Nogelmeier Named Vice President of Foodservice
  Sales for Tyson Fresh Meats,* delimarketnews.com (July 28, 2016) ...................... 21

*Members Listing,* usmef.org ........................................................................................ 23

*Niman Ranch Welcomes Industry Veteran John Flynn as Vice President of
  Sales*, Business Wire (Sept. 29, 2020) .................................................................... 25

Robert Schaulis, *SunFed Ranch Welcomes John Flynn as Vice President
  of Sales*, delimarketnews.com (April 4, 2018) ....................................................... 25

The United States Department of Justice, *Broiler Chicken Producer
  Indicted for Price Fixing and Bid Rigging*, justice.gov (May 20, 2021) ................... 18

The United States Department of Justice, *Four Executives and
  Company Charged with Price Fixing in Ongoing Investigation into
  Broiler Chicken Industry*, justice.gov (July 29, 2021) ............................................ 19

*USMEF Conference concludes with election of new officers,* High Plains
  Journals (Nov. 18, 2016) ...................................................................................... 23

## INTRODUCTION

Despite Plaintiffs' good faith efforts, they have reached an impasse with each Defendant regarding the document custodians proposed by Plaintiffs pursuant to § V(B) of the ESI Protocol. ECF No. 93. Specifically, each Defendant has refused to designate certain of their current and former employees as document custodians, notwithstanding that each of these custodians is likely to possess relevant, non-cumulative information. The proposed custodians broadly fall into the following categories: (a) slaughter plant management from each Defendant; (b) senior executives from JBS, Tyson, and National Beef, and a senior cattle procurement staffer from JBS; and (c) sales executives and staff from each Defendant.[1]

## LEGAL STANDARD

Federal Rule of Civil Procedure 26 permits a party to obtain discovery on any non-privileged matter relevant to a party's claim or defense and proportional to the needs of the case. Rule 26 is liberal in scope and interpretation. *Orduno v. Pietrzak*, No. 14-1393 ADM/JSM, 2016 WL 5853723, at *3 (D. Minn. Oct. 5, 2016); *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). The standard exists to allow the parties essentially equal access to the operative facts. *Bellingham v. BancInsure, Inc.*, No. CV 13-0900 (SRN/JJG), 2014 WL 12600277, at *1 (D. Minn. May 13, 2014). "Courts construe Rule 26(b)(1) broadly." *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-cv-3183 (ADM/LIB), 2016 WL 6997113, at *7 (D. Minn. Sept. 6, 2016) (citing *Oppenheimer Fund, Inc. v.*

---

[1] The parties also dispute the number of Defendant field buyers who should be document custodians, but have agreed to park that dispute pending the Defendants' responses, due February 28, 2022, to *Cattle* Plaintiffs' interrogatory requesting that Defendants identify each of their field buyers and provide certain details regarding their responsibilities.

*Sanders*, 437 U.S. 340, 351 (1978)). Pursuant to the Rule, courts consider whether "(1) the discovery sought is unreasonably cumulative or duplicative, or obtainable from a cheaper and more convenient source; (2) the party seeking the discovery has had ample opportunity to obtain the sought information by earlier discovery; or (3) the burden of the discovery outweighs its utility." *Kleen Products LLC v. Packaging Corp. of America*, No. 10-C-5711, 2012 WL 4498465, at *13 (N.D. Ill. Sept 28, 2012), *citing U.S. ex rel. McBride v. Halliburton Co.,* 272 F.R.D. 235, 240 (D.D.C. 2011). The third factor requires the court to consider (a) the needs of the case; (b) the amount in controversy; (c) the parties' resources; (d) the importance of the issues at stake in the action; and (e) the importance of the discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2)(C)(iii).

In antitrust cases such as this, the "liberal policy favoring discovery is particularly appropriate." *See, e.g., In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009); *In re Auto. Refinishing Paint Atitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS 21960, at *7-8 (E.D. Penn. Oct. 29, 2004); *U.S. v. Int'l Bus. Machs. Corp.,* 66 F.R.D. 186, 189 (S.D.N.Y 1974) ("[D]iscovery in antitrust litigation is most broadly permitted and the burden or cost of providing the information sought is less weighty a consideration than in other cases."). "Broad discovery is permitted because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records." *Id.* (quoting *Auto. Refinishing Paint Antitrust Litig.*, 2004 WL 7200711, at *3); *B–S Steel of Kan., Inc. v. Tex. Indus., Inc.*, No. 01-2410-JAR, 2003 WL 21939019, at *3 (D. Kan. July 22, 2003); *United States v. Dentsply Int'l., Inc.*, No. Civ.A. 99-5 MMS, 2000 WL 654286, at *5 (D. Del. May 10, 2000); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2014 WL 5462496, at *8 (N.D. Cal. Oct. 23, 2014) ("'broad discovery may be needed to uncover evidence of invidious

2

design, pattern, or intent'" in antitrust cases) (internal citation omitted); *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732-LDD, 2008 WL 2275531, at *1 (E.D. Pa. May 13, 2008) ("This broad scope of discovery 'has been held to be particularly appropriate in antitrust cases.'" (internal citation omitted)).

Under that liberal standard, a party's burden to designate ESI custodians is low. The proponent of the discovery must show only that "the disputed custodian's ESI likely includes information *relevant* to the claims or defenses in the case." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018) (emphasis added). The selection of custodians is more than a mathematical count. Custodians must be designed to respond fully to document requests and to produce responsive, non-duplicative documents during the relevant period. *Kleen*, 2012 WL 4498465; *see also, generally, Eisai Inc. v. Sanofi–Aventis U.S., LLC,* No. CIV.A. 08–4168 MLC, 2012 WL 1299379, at *9 (D.N.J. April 16, 2012). Additional custodians will not be "unnecessarily cumulative" where they are distinguished from the existing custodians by (1) responsibility, (2) time period, or (3) location. *Garcia Ramirez v. U.S. Immigr. & Customs Enf't*, 331 F.R.D. 194, 197–98 (D.D.C. 2019) ("Defendants claim that the additional custodians would be cumulative and duplicative and that the cross-section represented by the original eighteen custodians was sufficient, but this assertion is speculative. . . . Rather, by distinguishing the new sixteen custodians by responsibility, time period, and location, Plaintiffs have shown that the new custodians would likely provide *unique* relevant information not already obtained." (internal citations omitted)); *cf. In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637, ECF No. 540 at 3 (N.D. Ill. Nov. 15, 2017) (concluding uniqueness is not a reason to exclude Tyson custodian if they have relevant information), attached as Kozen Decl., Exh. 12.

Once the party seeking the discovery has made a threshold showing of

relevance, the burden shifts to the party resisting discovery to show specific facts demonstrating that the discovery is not relevant, or how it is overly broad, burdensome, or oppressive. *See, e.g.*, *Lynch v. Experian Info. Sols., Inc.*, No. 20-CV-2535 (JRT/JFD), 2021 WL 5106006, at *2 (D. Minn. Nov. 3, 2021) ("[t]he burden of showing undue burden and disproportionality is on the party resisting disclosure"); *see also Kleen* , 2012 WL 4498465 at *13 ("The party opposing a motion to compel carries a 'heavy' burden of persuasion.").

The party resisting discovery cannot meet its burden simply through boilerplate contentions that the discovery is disproportionate, burdensome, or duplicative. *Garcia Ramirez*, 331 F.R.D. at 197-98. Instead, the resisting party "must allege facts which demonstrate the extent and nature of the burden imposed." *Lynch*, 2021 WL 5106006, at *2; *Jackson v. Senior Care Sols., Inc.*, No. 20-CV-2336 (TNL), 2021 WL 4099947, at *2 (D. Minn. Sept. 8, 2021) (A party objecting to discovery "cannot rely upon boilerplate objections, but rather they must . . . articulate the particular harm that would accrue if they were required to respond to the discovery.").

## DISPUTED CUSTODIANS

Here, the Rule 26 factors weigh heavily in favor of permitting broad discovery. Regarding the relative burden of discovery to its utility, each of the Defendants clearly have greater resources than Plaintiffs: Tyson is a multinational goliath in the chicken, pork, and beef markets; Cargill is the largest private company in the United States in terms of revenue; JBS is the largest processor of beef, chicken, and pork, by sales, in the world; and National Beef is the nation's fourth largest beef processor with annual revenue in the billions of dollars. *See Kleen*, 2012 WL 4498465 at *14 ("the Court can presume, given the nature of the antitrust claims and the size of the companies involved, that the

4

amount in controversy is very large and that Defendants' resources are greater than Plaintiffs'"). Likewise, given the nature and scope of the conspiracy alleged against Defendants, this case raises vital issues of public importance. Indeed, the involvement of the Department of Justice and several calls from members of congress for investigation into the meatpacking companies clearly demonstrates the vital public interests at stake. Finally, Defendants do not dispute that the sought-after custodians had direct involvement in the beef business. Kozen Decl., Exhs. 11, 17, 18, 19; Kozen Decl., Exh. 12, *Broiler Chicken* Order. Plaintiffs have accused Defendants of, amongst other matters, violating the Sherman Act, a crime punishable by imprisonment. It is therefore highly unlikely that one custodian would have reduced any illegal agreement to writing *and* widely circulated the agreement to all executives, making more than a handful of executives necessary to discover the agreement.

## I. Slaughter Plant-Level Management Staff

A central element of Plaintiffs' antitrust allegations is that Defendants each agreed to artificially manage fed cattle slaughter volumes, and consequently beef output, at their respective slaughter plants in order to obtain supra-competitive prices in the downstream beef market and suppress the prices paid to upstream cattle producers. That slaughter management was necessarily implemented at Defendants' slaughter plants by senior staff and plant management. Indeed, the Court has already credited Plaintiffs' allegations of direct evidence of conspiracy emanating from Defendants' slaughter plants, namely JBS's Cactus, Texas fabrication manager James Hooker's admission that Defendants would reduce the volume of fed cattle they purchased and slaughtered when cattle prices got

too high. *See Cattle* TAC ¶¶ 105, 116-119; and MTD Order,[2] Dkt. 238 at 11.

In response to Defendants' original custodian proposals, in which only National Beef and Cargill proposed any plant management custodians, Plaintiffs proposed that Defendants put forward as custodians the general manager, slaughter manager and fabrication manager of each of their U.S. slaughter plants. *See* Kozen Decl., Exhs. 1-8. A plant's general manager has overall responsibility for the operations of the plant, including its slaughter and fabrication activities. The slaughter and fabrication managers are key deputies to the plant's general manager, directly responsible for overseeing the volume of cattle harvested and the amount of beef produced. *Cattle* TAC, ¶¶ 105, 108-114. Plaintiffs understand that slaughter and fabrication managers would report both to the plant's general manager and head office operational staff. *Id.*

Defendants, as detailed below, largely rejected Plaintiffs' request, claiming it was disproportionate to the needs of the case for two reasons. First, they claimed that the alleged conspiracy, if it existed, must have been conducted by senior corporate staff located at Defendants' head offices, not their plants. Second, Defendants asserted that plant management have no decision-making authority and simply discharge ministerial duties related to Defendants' slaughter and fabrication operations. *E.g.* Kozen Decl., Exh. 9 at 6.

Plaintiffs maintain that Defendants' positions are misguided. Nevertheless, after meeting and conferring with Defendants, Plaintiffs proposed a compromise to address Defendants' burden and proportionality concerns but permit Plaintiffs an opportunity to take some discovery into the activities of Defendants' plants, each party reserving their rights as to subsequent plant-level discovery.

---

[2] Citations to "MTD Order" refer to *In re Cattle and Beef Antitrust Litig.*, No. 20-cv-01319, Dkt. No. 238 (D. Minn. Sept. 14, 2021) (Tunheim, J.).

6

Specifically, rather than seeking to designate all such managers, Plaintiffs proposed that Defendants include as custodians, the general managers, slaughter managers and fabrication managers at the sub-set of their plants listed below. For convenience, we detail the few plant-level custodians Defendants have agreed to add as custodians:

**Tyson**

Plaintiffs propose that plant management from just three of Tyson's six U.S. slaughter plants be added as custodians:

- Amarillo, TX: Tyson has agreed to include its Amarillo General Manager (Ernesto Sanchez), but not its slaughter or fabrication manager.
- Holcomb, KS and Dakota City, NE: Tyson has refused to include any plant management from these plants.

**JBS**

Plaintiffs propose that plant management from just three of JBS's nine U.S. slaughter plants, *Cattle* ¶¶ 49-50, be added as custodians:

- Cactus, TX: JBS has agreed to include the Cactus General Manager (Manny Guerrero), Fabrication Manager (Mr. Hooker), and Witness 1 (Jason F.), but not Slaughter Manager Ryan Wagnon.
- Greeley, CO and Grand Island, NE: JBS has refused to include any plant management from these plants.

**Cargill**:

Plaintiffs propose that plant management from just three of Cargill's six U.S. slaughter plants, *Cattle* ¶ 58, be added as custodians:

- Friona, TX; Schuyler, NE; and Dodge City, KS: Apart from Jarred Gillig, who briefly served as General Manager at Schuyler until March 2017, Cargill has refused to include any plant management from these plants.

**National Beef**:

7

Plaintiffs propose that full quota of plant management from just two of its four U.S. slaughter plants, *Cattle* ¶ 62, 190, be added as custodians:

- Liberal and Dodge City, KS plants: National has offered the individuals who acted as general managers of both plants (Dennis Boyles, Patrick Pridie, and Brian Webb at the Liberal, KS plant and Kris Ragan at the Dodge City, KS plant) as custodians, but not its slaughter and fabrication managers.

Plaintiffs also propose to include only one plant management employee from the Tama, IA plant that National Beef acquired in 2019, general manager John Surman.[3]

Plaintiffs therefore seek an order that the individuals serving in these positions be added as document custodians for the periods of time they served in the relevant role, without prejudice to Plaintiffs' ability to seek further discovery from plant staff should it become apparent that such discovery is warranted. This sampling approach is appropriate because: (1) the Court has already acknowledged the relevance of direct evidence from plant-level employees; (2) Plaintiffs have made other allegations relating to the operation of these specific plants (*i.e.* related to the fire at Tyson's Holcomb, KS plant, and Mr. Hooker's contact with nearby competitor plants); (3) the plant management will hold other unique ESI because of their position, tenure and location; and (4) it sensibly balances Plaintiffs' rights to take discovery relating to the serious allegations in

---

[3] Mr. Surman was the general manager of National Beef's Tama, IA plant, both before and after its acquisition by National Beef. National Beef may have made changes to the operations of the Tama plant to integrate it into the cartel arrangement after the acquisition. Mr. Surman's documents, as the plant manager, are likely to be relevant to conspiratorial onboarding, or to other changes which highlight the differences between Defendants and independent packers.

their complaints with Defendants' claimed burden concerns.

***The Court Has Already Acknowledged the Relevance of Plant-Level Direct Evidence.***

As noted above, the Court has already credited Plaintiffs' allegations of direct evidence of conspiracy emanating from JBS's Cactus, TX fabrication manager James Hooker's admission of Defendants' conspiracy. *Cattle* TAC ¶¶ 105, 116-119. In light of this, little credence can be given to Defendants' claim that direct evidence can only be found at their corporate headquarters, which is merely an attempt to improperly cabin discovery. *See Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 318 (S.D.N.Y. 2018) ("[A]n employee need not work in a particular position to know of and describe his employer's collusive conduct.").

Plaintiffs also specifically allege that Mr. Hooker regularly spoke with his replacement at Tyson's Amarillo plant, was in contact with individuals at other nearby competitors' plants, and often knew detailed information as to the current and future operations of nearby Tyson, Cargill, and National Beef plants. TAC ¶¶ 115-119. These allegations justify the plant management from Tyson's Amarillo, Cargill's Friona and National Beef's Liberal plants serving as custodians given that they are adjacent Mr. Hooker's Cactus plant.

***Plaintiffs Are Entitled to Discovery of Their Other Plant-Level Allegations.***

Plaintiffs make additional allegations which justify plant management custodians. For example, Plaintiffs also seek plant managers from Tyson, National Beef and Cargill's Kansas plants in light of Plaintiffs' allegations regarding Defendants' reactions to the fire at, and consequent closure of, Tyson's Holcomb, KS plant in August, 2019. TAC ¶ 256. In a competitive market the closure of the Holcomb plant would have resulted in Tyson's competitors acquiring the displaced cattle to increase their market share. TAC ¶¶ 256-260.

9

But, as the Court noted in its MTD Order, this did not happen. MTD Order, Dkt. 238 at 21.

Plant management at Defendants' Kansas plants are likely to have both followed the plant fire and its aftermath with interest, and possess unique documents relating to each Defendants' response to the same. For these reasons, the Kansas slaughter plant managers are appropriate document custodians.

**Plant Management Will Have Other Relevant Evidence.**

In refusing to designate plant managers, Defendants stress that such individuals are not production or pricing decision makers. But that is not the test for relevance, nor for whether an individual should be a custodian. As Plaintiffs emphasized during the parties' meet and confer discussions, plant-level managers' involvement in *implementing* decisions regarding production is crucial to establishing the allegations in the complaints. *E.g.,* Kozen Decl., Exh. 10 at 5. While it is debatable whether Defendants are correct when they claim that plant-level managers are not involved in the "how" or "why" of Defendants' output decisions, such managers certainly have information critical to establishing the "what," "when," "who," and "where" of the day-to-day operation of Defendants' attempts to slow production to effectuate the alleged conspiracy.

For the majority of Defendants' plants, Defendants have not offered any custodians who would possess evidence of instructions to, and feedback from, mid-level plant employees. These documents will shed light on plant production and the competitive information obtained by employees asked to engage in reconnaissance missions. Cattle ¶ 311 (alleging Defendants used staff to gather information on their competitors); *see also* Cattle ¶¶ 115, 118. The plant-level custodians requested by Plaintiffs, however, are likely to possess those documents. In addition, these custodians are likely to have documents in which they explain changes in capacity, run speed, or cooler usage to other plant

employees, and report on the same to head office. Similarly, slaughter and fabrication managers needed to understand their plants' harvest and fabrication schedules, and be aware of cattle and beef prices, to discharge their job responsibilities. *Cattle* TAC, ¶ 105. This means that they will likely possess documents related to slaughter and fabrication volume projections, along with explanations if slaughter levels deviated from those projections. Finally, they will possess many documents relating to the various public explanations Defendants have offered for their production constraints during the Class Period, including labor issues and COVID-19 measures.[4]

***Plaintiffs' Proposal Carefully Balances Both Parties' Interests.***

First, the proposed custodians come from the most relevant of Defendants' many slaughter plants, namely their largest plants, located in the heart of the nation's cattle feeding territory. These plants' higher slaughter capacity means that changes in their utilization would have the largest impact on the alleged conspiracy. Second, Plaintiffs have sought the plant management from no more than half of Defendants' plants—a reasonable proportion in consideration of the scope of the alleged conspiracy and the harm Plaintiffs have suffered.[5]

Despite numerous meet and confers, Defendants have offered little justification for their refusal to add plant management beyond their contention that they are not "decision makers." While Plaintiffs will receive their communications with the agreed corporate staff, Defendants have notably *not*

---

[4] *E.g. Fresh Meats Leader Testifies about Beef Industry at Senate Hearing*, tysonfoods.com (July 28, 2021), https://www.tysonfoods.com/news/news-releases/2021/7/fresh-meats-leader-testifies-about-beef-industry-senate-hearing#:~:text=At%20Tyson%2C%20we%20are%20committed,the%20places%20we%20call%20home.

[5] The exception to this is National Beef in light of Plaintiffs' request for a solitary custodian from its Tama, IA plant.

represented that plant-level managers do not communicate amongst themselves, to their subordinates, or with other Defendants, including in regard to the conduct alleged by Plaintiffs. Indeed, given the nature of their roles, and the vast number of staff they supervise,[6] it is clear they would possess unique relevant information.

## II.   Executives and other Corporate Staff

*Tyson*

### A.   Thomas Hayes

Thomas Hayes served as the CEO of Tyson Inc. from December 2016 until November 2018, President of Tyson Inc. from June 2016 until December 2016, as Chief Commercial Officer overseeing all North American Sales from June 2015 until June 2016; and as President of Tyson's Food Service Operations. Kozen Decl., Exh. 11 at 4.

Tyson has already tacitly admitted that the CEO of Tyson Inc. is likely to possess relevant non-duplicative information by voluntarily offering the two individuals who served as Mr. Hayes' predecessor and successor in the CEO seat, Donnie Smith and Noel White. Kozen Decl., Exh. 1. Plaintiffs seek Mr. Hayes' inclusion as a custodian for the two-and-half years during the Class Period when he served as President and CEO.

Despite having only received a smattering of responses to Plaintiffs' phone record subpoenas thus far, it is clear that CEO to CEO, and other senior executive contacts, are likely to be an important source of relevant information. For example, Plaintiffs have already identified many calls and text messages between National Beef CEO Tim Klein and Tyson's Donnie Smith and Noel White from

---

[6] Plants of this size regularly employ more than 2,000-3,000 employees. *Cattle* TAC ¶ 306.

Mr. Klein's phone records alone. *See* Kozen Decl., ¶¶ 16-19. Indeed, Tim Klein's calls with Tyson's Donnie Smith in August 2016 occurred just one month after Mr. Klein had multiple discussions with Andre Nogueira, JBS's U.S. CEO. If National Beef's CEO, whose only responsibility is National Beef's cattle and beef business, had multiple conversations with Mr. Hayes' predecessor and successor, and key individuals at JBS and Cargill, Kozen Decl., ¶¶ 16-19, it stands to reason that Mr. Hayes would also have engaged in such inter-Defendant communications.

On top of this, as President and CEO, Mr. Hayes was evidently regularly involved in Tyson's cattle and beef operations. He spoke regularly on these topics at earnings calls. *See* DPP Complaint ¶ 85, 180, 196 (referencing Tyson's Q4 2016, Q3 2017, Q2 2018 earnings calls on which Hayes spoke). On those calls, Mr. Hayes regularly offered in-depth detail regarding Tyson's beef segment, including information on profits, slaughter volume, trends, projections, and plant closures. This suggests he paid close attention to Tyson's business, which is unsurprising given the dramatic transformation in its performance and profitability during his tenure, and the initial scrutiny received from the Government Accountability Office. *Cattle* Complaint at ¶¶ 16 Figure 6, 17 Figure 17, 126, 277 Figure 43 (detailing change in profitability under Hayes' watch); and 283 and 435 (detailing R-CALF Jan. 5, 2016 letter which triggered GAO investigation and April 2018 report).

Mr. Hayes also regularly appeared and spoke at industry events attended by the other Defendants. As but one example, Mr. Hayes was the keynote speaker at the Cattle Industry Summer Business Meeting in Denver in August 2018. He is reported to have engaged in a discussion of "topics of prime

importance to the entire beef community."[7]

Unlike *Pork*, Tyson Inc. is a defendant in this case. Judge Tunheim found Plaintiffs had plausibly pled Tyson Inc.'s involvement in the alleged conspiracy, including through its alleged control over Tyson Fresh Meats. Dkt. 238 at 42-43. But Judge Tunheim noted Defendants could raise the issue again at summary judgment. *Id.* Accordingly, Plaintiffs must have discovery into the high-level executives from Tyson Inc. to prove their plausibly alleged claim. It is reasonable to believe that in conjunction with his appointment to a senior leadership position at Tyson, Mr. Hayes would have received briefings and memoranda covering the areas of Tyson's business implicated by the conspiracy alleged in Plaintiffs' complaints. It is largely for that reason that the court in *Broiler Chickens*, faced with similar arguments from Tyson, ordered that Mr. Hayes be designated a document custodian in that case. Kozen Decl., Exh. 12, *Broiler Chicken* Order. It is likely for similar reasons that Tyson volunteered Mr. Hayes as a custodian in *Pork*. Rissman Decl. ¶ 10. Mr. Hayes should be added as a custodian here too.

**JBS**

### A.    Wesley Batista

Ignoring the Court's denial of its motion to dismiss, JBS S.A. has participated in the Parties' meet and confers as if it had no discovery obligations. *See* MTD Order, Dkt. 238 at 43 (denying JBS S.A.'s motion to dismiss because "the Court has concluded that the allegations concerning the conspiracy and the acts attributed to JBS S.A. in furtherance of the conspiracy are plausible"). JBS has neither proposed nor agreed to a single custodian employed by JBS S.A. on the conclusory grounds that "few if any, Brazil-based or other overseas-based

---

[7] *Cattle Industry Issues Will Be Discussed this Week at Summer Business Meeting*, Ohio's Country Journal (Aug. 2, 2018), https://ocj.com/2018/08/cattle-industry-issues-will-be-discussed-this-week-at-summer-business-meeting/

individuals would have information relevant to Plaintiffs' allegations." Kozen
Decl., Exh. 13 at 3; *see also* Kozen Decl., Exh. 3 at 3 n.3. Despite relying on that
representation, JBS has refused to provide Plaintiffs with "information sufficient
to substantiate [JBS's assertion] that few if any, Brazil-based or other overseas
would have relevant information, including [] strategic point people in managing
[JBS's U.S.] business." Kozen Decl., Exh. 14 at 3.

     In defending its disregard of JBS S.A.'s discovery obligations, JBS suggests
that Plaintiffs should first identify relevant communications from its U.S.
custodians to JBS S.A. staff, and only then would Plaintiffs be entitled to
discovery from JBS S.A. Kozen Decl., Exh. 13 at 3. Notwithstanding that JBS's
position is inconsistent with the procedures laid out in the Federal Rules of Civil
Procedure, *see EpiPenAntitrust Litig.*, 2018 WL 1440923, at *2 (The proponent of
the discovery must show only that "the disputed custodian's ESI likely includes
information relevant to the claims or defenses in the case."), JBS had *also* declined
to provide any C-Suite custodians from the U.S.—the very people likely to be
communicating with JBS S.A. personnel.

     JBS S.A.'s failure to include Mr. Batista is even more egregious given
Plaintiffs' specific allegations showing Mr. Batista had ample opportunity to
collude with the other Defendants, TAC ¶ 303, hand-picked senior JBS U.S. staff,
*id.* ¶ 111, including Sergio Sampaio Nogueira, Head of Operations and EVP of
Plant Operations for JBS's Fed Beef Business, *Consumers* FAC ¶ 102, *DPP* TAC ¶
114, and was imprisoned for his role in JBS S.A.'s longstanding bribery and
corruption offences, the fruits of which were used to fund its U.S. operations,
*Cattle,* n.44, 328-31; *Consumers* FAC ¶¶ 102 n.15; *DPP* TAC ¶ 114 n.8. Mr. Bastista
was also involved with JBS's acquisition of Tyson and Cargill's Mexican and
Brazilian chicken and U.S. pork operations at the beginning of the conspiracy
period, which "started years" before it was finalized and provided him and other

15

JBS executives with additional opportunities to meet privately with Tyson and Cargill executives. *DPP* TAC ¶ 226. Seeking to brush these allegations aside, all of which JBS denies in its Answer, JBS S.A. argues they don't merit a custodian because the "allegations do not concern any decision-making about Fed Cattle procurement, slaughter and beef sales in the United States. Rather they pertain to allegations about conduct in Brazil by Mr. Batista, the CEO of JBS S.A., a Brazilian company." Kozen Decl., Exh. 13 at 3. But JBS cannot substitute its own constrained view of relevance in this manner to allegations it has denied.

In refusing to dismiss JBS S.A., the Court made clear that it expected the parties to engage in fulsome discovery regarding JBS S.A.'s involvement, noting that it would re-examine its involvement at summary judgment because "discovery may disclose a different picture" than Plaintiffs' allegations. MTD Order, Dkt. 238 at 43. JBS's refusal to allow any discovery related to JBS S.A., notwithstanding Plaintiffs' agreement to table its other proposed JBS S.A. custodians, is therefore inconsistent with both the letter of the rules and the explicit expectation of the Court. Mr. Batista should be named a document custodian.

### *National Beef*

#### A.   **David Grosenheider**

David Grosenheider served as National Beef's Executive Vice President of Business Analysis from March 2013 until March 2017, during the alleged onset of the conspiracy. Mr. Grosenheider was succeeded by Doug Mascher, who National Beef has represented was responsible for much of National Beef's fiscal modeling and projections, and who National Beef offered to name as a document custodian in its initial custodian proposal. Kozen Decl., Exh. 7. National Beef has to date refused to articulate any basis as to why Mr. Grosenheider would not be

in possession of the same type of relevant documents as his successor. Given that National Beef has acknowledged the relevance of Mr. Mascher's job responsibilities to Plaintiffs' claims, Kozen Decl., Exh. 10 at 6, his predecessor during the class period is also an appropriate document custodian.

Plaintiffs have multiple RFPs directed to the type of modelling done by Mr. Mascher and Mr. Grosenheider. For example, pursuant to *Cattle* Request No. 13 National Beef has agreed to produce: "regularly prepared studies, predictive analyses, reports, white papers, and analytics regarding fed cattle purchases, fed cattle pricing, boxed beef sales, live cattle futures transactions, and/or live cattle options transactions" from the files of designated document custodians. Kozen Decl., Exh. 15 at 4. Similarly, *Cattle* Request No. 14 seeks analyses of "factors determining demand (such as population, income, tastes, substitute products, regulations, and all other factors You have described or discussed)."

These materials will be critical in assessing Defendants' defenses regarding unilateral conduct and intervening events. Moreover, it is important for Plaintiffs to receive such analysis from the pre-Conspiracy period and during alleged formation of the cartel, to amongst other matters, analysis of any relevant changes that impacted pricing during the Class Period. To obtain that information, Plaintiffs require documents from Mr. Grosenheider.

## III.    Sales Executive Positions

Sales executives generally and the individuals identified herein are key to proving Plaintiffs' allegations, as detailed below. In assessing potential custodians, it is important to note that Plaintiffs bear the burden of proving class-wide impact from Defendants' conspiracy. This requires proving that the supply restraint impacted all or nearly all customers in various sales channels such as grocery and foodservice. Similarly, Defendants' public-facing explanations—

17

such as those provided to beef purchasers—for why Defendants changed their prices will be in the possession of individuals who spoke directly with customers. Plaintiffs specifically allege that sales personnel participated in the conspiracy by, *inter alia,* selling beef to members of the various classes at artificially high prices, despite the fact that the prices for cattle continued to fall. *DPP* TAC at ¶ 165. This common pricing scheme was orchestrated by high-level sales and marketing executives, and each of Plaintiffs' requested document custodians likely offers relevant information that would not be encompassed in the files of other personnel.

The Department of Justice's ongoing investigation into the sprawling broiler chicken antitrust conspiracy demonstrate the active and important role that sales personnel play in such a conspiracy. For example, on October 7, 2020, a federal grand jury returned a superseding indictment charging six additional defendants for their role in fixing prices and rigging bids for broiler chickens. Tyson was the amnesty applicant and a sales manager Carl Pepper cooperated with the government.[8] A large majority of the other individuals indicted have been sales personnel. Those defendants included Jimmie Little, a sales director in Colorado, Timothy Mulrenin, a sales executive, William Kantola, another sales executive.[9] On July 29, 2021, four more executives from chicken producer Pilgrim's Pride (owned by JBS) were charged for their role in the conspiracy,

---

[8] Khorri Atkinson, *Indicted Chicken Execs Can't Strike FBI Agent's Testimony,* Law 360 (October 6, 2021), https://www.law360.com/articles/1428688/indicted-chicken-execs-can-t-strike-fbi-agent-s-testimony; https://www.linkedin.com/in/carl-pepper-b7a9b694 (listing Carl Pepper as National Sales Manager).

[9] The United States Department of Justice, *Broiler Chicken Producer Indicted for Price Fixing and Bid Rigging*, justice.gov (May 20, 2021), https://www.justice.gov/opa/pr/broiler-chicken-producer-indicted-price-fixing-and-bid-rigging.

including Jason McGuire, former Executive Vice President of Sales for Prepared Foods, Wesley Tucker, former National Accounts sales executive, and Justin Gay, former Director of Fresh Foodservice Sales.[10] This highly suggests that sales persons identified by Plaintiffs as document custodians will have unique and relevant information in this proceeding.

*Tyson*

Tyson has so far agreed to produce only three beef sales-related custodians. Without explanation, Tyson has refused to produce beef sales custodians such as Brad Bodine, the Vice President of Fresh Meat Sales in 2019 and Vice President of National Account Sales from 2014-2019, and Mark Gingerich, the Vice President of Fresh Meat Sales from 2014-2015—individuals that would undoubtedly have unique information relevant to Plaintiffs' claims. Tyson has declared the parties at an impasse over the remaining document custodians, reasoning that the three it has offered are sufficient. However, Tyson has made no representation that the three custodians offered would necessarily encompass all communications made by subordinates over a 6-year period. The six sales custodians requested by Plaintiffs are proportionate to the needs of the case and do not unreasonably burden Defendants.

At least certain Defendants have already contended that this is a supply-side only case with the primary mechanism being slaughter level restraint. If the beef sales side was not involved, beef prices would have lowered with lowering cattle prices. Yet, Plaintiffs have alleged that beef prices went up while cattle prices went down, directly implicating beef sales personnel. *See, e.g.*, DPP TAC ¶

---

[10] The United States Department of Justice, *Four Executives and Company Charged with Price Fixing in Ongoing Investigation into Broiler Chicken Industry*, justice.gov (July 29, 2021), https://www.justice.gov/opa/pr/four-executives-and-company-charged-price-fixing-ongoing-investigation-broiler-chicken.

19

21. Both *Pork* and *Broiler Chickens* are primarily supply restraint cases, and, based on Plaintiffs' best understanding, the Defendants involved in those cases produced custodians in greater numbers than offered here. In those cases, Tyson voluntarily produced seven and nine sales-related custodians respectively, Rissman Decl. ¶ 5, whereas here they offer an anemic three. Here, Defendants appear to be intentionally offering fewer sales custodians with the expectation that the Court would "split the baby" regarding the number of custodians. Plaintiffs believe this gamesmanship is inappropriate in light of the parties ESI Protocol (ECF No. 93), as well as Defendants' obligations under Rules 26 and 34 of the Federal Rules of Civil Procedure.

Plaintiffs move the Court for an Order compelling Defendants to produce the following individuals as document custodians:

### A.    Brad Bodine

Plaintiffs believe Brad Bodine, who served as VP of National Account Sales from January 1, 2014 to July 31, 2019 and as VP of Fresh Meat Sales from August 1, 2019 to December 31, 2019, would be a source of relevant information, as he was VP of National Accounts for much of the class period. Proving the largest customers were impacted by the alleged conspiracy is a crucial component of proving class-wide impact. Moreover, the representations made to large customers to conceal the alleged conspiracy would likely come from Mr. Bodine or his subordinates. In 2019, Mr. Bodine became VP of Fresh Meats Sales, which covers all beef sales. As noted below, Tyson voluntarily produced the VP of Fresh Meat Sales in the *Pork* litigation, Mark Gingerich. Rissman Decl. ¶ 6. Plaintiffs require discovery from these two crucial roles covered by Mr. Bodine.

### B.    Todd Nogelmeier

Todd Nogelmeier, in his role as VP of Food Service Sales from August 1,

2016 to December 31, 2019, was in charge of the foodservice sales of beef,[11] one of the two major domestic channels for beef sales. In his role, he led and directed the National Account Foodservice Sales team, selling beef to broadline and chain accounts.[12] For Commercial and Institutional Indirect Purchaser Plaintiffs, Mr. Nogelmeier was the person supervising the sale of beef to their class members. For Direct Purchaser Plaintiffs, the foodservice channel (*i.e.* restaurants) will comprise a large percentage of sales. As noted above, DPPs and potentially other plaintiffs will be required to prove impact across all domestic channels, and Mr. Nogelmeier's discussions with customers and competitors will be a crucial source of discovery.

### C.    Mark Gingerich

As VP of Fresh Meat Sales from before the class period until December 31, 2015, which covers all beef sales, Mark Gingerich would have had internal discussions amongst executives or lower-level employees regarding changes in price and supply. Mr. Gingerich would therefore offer insight into different communications and information exchanges which would not be encompassed by any superior's files. Mr. Gingerich was in a key role at the alleged beginning of the conspiracy and massive shift in defendant behavior. Furthermore, Tyson provided Mr. Gingerich as custodian in *Pork*, also a supply restraint case, and concede the relevance of his sales role. Rissman Decl. ¶ 6. Defendants further concede the relevance of the position, by offering Keith Culver (SVP Fresh Meats Sales & Marketing) who was in a highly similar position from mid-2015 to 2019.

---

[11] Laura Hillen, *Todd Nogelmeier Named Vice President of Foodservice Sales for Tyson Fresh Meats,* delimarketnews.com (July 28, 2016), https://www.delimarketnews.com/meat/todd-nogelmeier-named-vice-president-foodservice-sales-tyson-fresh-meats/laura-hillen/thu-07282016-1200/3615.

[12] *Id.*

Kozen Decl., Exh. 11 at 5; Kozen Decl., Exh. 12, *Broiler Chicken Order* at 2 (concluding Tyson conceded relevance of position by offering custodians at same position in different parts of class period). As a sales executive during the crucial years of this case, from before the beginning of the class period until the end of 2015, Mr. Gingerich is an invaluable source of discovery for Plaintiffs.

### D.   Jason Robertson

Jason Robertson was the VP of Case Ready Margin Optimization from January 1, 2014 to December 31, 2019. Plaintiffs explicitly allege that Defendants' conspiracy extended to and affected case-ready beef. *See, e.g.,* TAC at ¶ 1 fn. 1. Defendants have conceded that the definition of "beef" in this case extends to case-ready beef, which is essentially all beef sold at the meat department in grocery stores, a huge segment of the class damages. Rissman Decl. ¶ 7; Kozen Dec. Exh. 21 at 2. Further, the case ready sales encompass the majority of sales to the Consumer and Indirect Purchaser Plaintiff class. His role in margin optimization makes Mr. Robertson an essential actor in the conspiracy. Each beef purchaser class complaint provides detailed allegations about the Defendants colluding to raise their meat margin, that is paying less for cattle and charging more for beef. DPP TAC, ECF No. 304, at 9-11. Mr. Robertson is the person charged with accomplishing this goal for the case-ready segment of the class.

### E.   Roel Andriessen

In his position as SVP of International Sales from January 1, 2014 to January 2, 2017, Roel Andriessen has unique information regarding Tyson's levels and pricing of internationally sold beef. Exporting beef is a key mechanism for controlling the supply of domestic beef. There are significant allegations in *Broilers*, Tyson uses international "dumping"—selling products internationally when there is unmet domestic demand—in order to artificially reduce domestic

supply and further increase Tyson's profit margins. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 784, 786 (N.D. Ill. 2017) (holding increases in exports plausibly demonstrated a mechanism of conspiracy). The reduction in available supply and increase in beef prices goes to the heart of this case. Publicly available records demonstrate that beef exports skyrocketed during the conspiracy period, increasing from 6.3 billion in 2016 to as high as 8.4 billion in 2018, with an average of 7.5 billion between 2016-2020, with each year and the average representing significant increases from 2016.[13] *Id.* (noting increase in exports in denying motion to dismiss).

Mr. Andriessen was also active in the industry trade association U.S. Meat Export Federation ("USMEF"), serving as chairman in 2016-2017,[14] providing an opportunity for Tyson to meet with competitors on export and supply restraint.[15] Crucially, after initially producing documents in *Pork*, Tyson agreed to add Mr. Andriessen as a custodian, demonstrating the relevance of his position as SVP of International Sales. Rissman Decl. ¶ 9.

### F. Nathan Hodne

Nathan Hodne was the SVP and GM of Value Added and Case Ready products from January 18, 2019 to December 31, 2019, and the SVP of Case Ready Beef and Pork from February 4, 2018 to January 27, 2019. In this role, Mr. Hodne

---

[13] *Beef 2020 Export Highlights,* Foreign Agricultural Service, fas.usda.gov, https://www.fas.usda.gov/beef-2020-export-highlights (last accessed Feb. 22, 2022).
[14] *USMEF Conference concludes with election of new officers,* High Plains Journals (Nov. 18, 2016) https://www.hpj.com/livestock/usmef-conference-concludes-with-election-of-new-officers/article_d224b90e-a981-5924-8e5b-9ef7d5455843.html.
[15] *Members Listing,* usmef.org, https://www.usmef.org/about-usmef/membership/usmef-members (Tyson, JBS, National Beef and Cargill as members among others).

addressed case-ready operations and sales to national grocery chains and value-added operations sales to restaurants for beef products. As noted, Plaintiffs allege that Defendants' conspiracy included and impacted case-ready beef. Thus, Mr. Hodne is likely to have relevant communications regarding, for example, supply and pricing of case-ready beef that would not be captured by other document custodians. Plaintiffs also note that Mr. Hodne was not included as a custodian in *Pork* in exchange for providing *two* custodians that were Mr. Hodne's SVP case-ready predecessors. Rissman Decl. ¶ 8. Tyson therefore conceded the relevance of this position. Given that Plaintiffs in this case seek only one custodian rather than the two offered in *Pork*, the request for Mr. Hodne is less burdensome than what Tyson agreed to produce in *Pork*.

*JBS*

JBS has refused to include four key custodians identified by Plaintiffs: Chris Jensen, the Vice President of Sales from 2011 to 2019; John Flynn, a specialist in domestic sales and marketing for JBS from 2014-2019; Kim Holzner, the Head of Imports from July 2005 through the present; and Jason Kaun, the President of Case Ready Business from 2014-2017. These four individuals—with different roles within JBS—were responsible for making key decisions regarding the sale of beef and undoubtedly have unique information relevant to Plaintiffs' claims, including information about JBS's sales to commercial purchasers and consumers. Plaintiffs' request for these sales custodians is remarkably constrained, given the size of the JBS, the impact that JBS's sales had on numerous commercial entities and consumers, and the fact that this is case involves both the cattle and beef markets. Respectfully, Plaintiffs request that the Court compel Defendants to include the following four individuals as document custodians:

24

### A.     John Flynn

John Flynn served as VP of Beef Sales, Marketing, Product Management, and Category Management from 2014-2019. He has been commended by beef processors having "led a large sales and marketing team and developed revenue generating strategies" during his time at JBS.[16] As a leader of JBS's the sales and marketing team, Mr. Flynn likely possesses relevant, non-duplicative information about the sales of class products through the distribution chain, including documents that reflect JBS's strategy to increase revenue through beef sales. Mr. Flynn has also been recognized for his "decades of experience working with national grocery chains, neighborhood specialty markets and regional foodservice distributors."[17] His communications with these direct purchasers about price increases and his knowledge of the distribution chain are relevant to show how the supply restraint conspiracy impacted prices.

### B.     Chris Jensen

Chris Jensen served as VP of Sales from 2011-2019. Plaintiffs believe that Chris Jensen strong source of relevant information regarding JBS's sales to commercial entities and consumers. Jensen notes his own experience at JBS involved leading "various sized teams up to 20 selling 600+ customers across all channels."[18] Jensen was also responsible for "marketing functions for a $3.6

---

[16] *See* Robert Schaulis, *SunFed Ranch Welcomes John Flynn as Vice President of Sales*, delimarketnews.com (April 4, 2018), https://www.delimarketnews.com/meat/sunfed-ranch-welcomes-john-flynn-vice-president-sales/robert-schaulis/wed-04042018-1115/5775.
[17] *Niman Ranch Welcomes Industry Veteran John Flynn as Vice President of Sales*, Business Wire (Sept. 29, 2020), https://www.businesswire.com/news/home/20200929005296/en/Niman-Ranch-Welcomes-Industry-Veteran-John-Flynn-as-Vice-President-of-Sales.
[18] *Chris Jensen*, linkedin.com, https://www.linkedin.com/in/chris-jensen-0414bb1b/.

billion beef division[,] and key account business development for the $4.4 billion Northeast, Southeast, and Midwest regions." As a Vice President of Sales, Mr. Jensen likely had communications with beef purchasers that reflect the price increases and the pretextual reasons given for the increases that concealed the conspiracy. As such, he is a critical custodian.

### C.    Jason Kuan

Jason Kuan was the President of the Case Ready Business division of JBS during a key period of the class: 2014-2017. "Case ready" is an industry term that refers to the meat fresh meat products that packaged to appear in the fresh meat section of the grocery store. As the leader of this division, Mr. Kuan likely led a team of individuals who sold JBS's beef to grocery stores. His documents reflecting sales would certainly relate to proving that case ready products were impacted by the alleged conspiracy, which is a crucial component of proving class-wide impact for the Consumer class. Moreover, the representations made to large customers to conceal the alleged conspiracy would likely come from Mr. Kuan or his subordinates.

*Cargill*

Like Tyson, Cargill has rejected several key sales personnel as custodians despite their own disclosures identifying each of these three individuals as having "responsibilities relating to cattle and/or beef." Kozen Decl., Exh. 16 at 2-3.[19] Despite their admitted involvement in beef sales pricing, Cargill contends that these custodians would not have relevant *and* unique information. Given the diversity in roles served by the additional custodians sought, and that each proposed custodian has a title indicating a unique portfolios not encompassed by

---

[19] Plaintiffs note that the pagination of Cargill's Attachment 1 disclosures is not linear. The identification of these custodians appear on pdf pages 3-5 of the Exhibit.

any of the other sales-related custodians, these additional three individuals should be designated as custodians.

### A.   Nancy Lucas

Nancy Lucas served as VP of Strategic Pricing from March 2017 to August 2019. Beyond conceding that Ms. Lucas held responsibilities with respect to beef, Cargill and CMS's 26(a) disclosures specifically identified Ms. Lucas as being an individual that they may use to support their claims and defenses as they relate to "beef prices, supply, and demand." Kozen Decl., Exh. 19 at 3. Nonetheless, Cargill has refused to include her as a custodian, contending that she would not possess unique and relevant information.

This contention is belied by Ms. Lucas's title. Understanding Cargill's pricing and pricing strategies is at the core of Plaintiffs' claims and information in her possession is likely essential to proving common class-wide impact and responding to Cargill's affirmative defenses. Even if others ultimately communicate pricing, understanding the process by which those prices are determined is likely essential to understanding Cargill's pricing model and any variances from it. Ms. Lucas clearly undeniably relevant information; indeed, Cargill has proffered a custodian with a similar title (Hal Sankey, vice president, beef pricing strategist) as a proposed custodian. Cargill's own concession that Ms. Lucas may be called upon to provide evidence in this matter demonstrates that she would not be wholly duplicated by Mr. Sankey or, indeed, any other custodian.

### B.   Charles Fox

Charles Fox—Vice President, Sales from March 2017 to March 2020 and Food Service Sales for Cargill Beef from October 2013 to March 2017—too has unique significance in that he would be the only sales custodian who specifically

addressed food service sales, a market segment that will likely encompass a large percentage of Direct Purchaser Plaintiffs' purchases. Cargill's creation of a separate role aimed at sales to this particular market segment is strongly suggestive that Mr. Fox would necessarily possess documents unique to him and his food service segment in that timeframe. These documents could include, for instance, communications made directly to customers in the food service segment and statements aimed at concealing the antitrust conspiracy.

### C.    Daniel Johnson

Lastly, Plaintiffs seek to add Daniel Johnson as a custodian. Mr. Johnson served as vice president, beef sales, program pricing lead for a period of nearly ten years, before shifting roles to vice president at CMS in 2017. In both positions, Mr. Johnson held responsibilities with respect to beef, according to Cargill and CMS's disclosures.

Like the other proposed additional custodians, Mr. Johnson held a role that is not encompassed by Cargill's proposed sales personnel custodians. Mr. Johnson's role as a "program pricing lead" would be unique among custodians and likely necessary to capture a full understanding of Cargill's beef pricing to all market segments.

### *National Beef*

Just like the other Defendants, National Beef contends that individuals involved in sales are not relevant given Plaintiffs' theory of the case. As detailed throughout, that assertion is inaccurate. Plaintiffs seek an order adding the following three individuals as custodians:

### A.    Mark Domanski

Mark Domanski served as President of National Beef International Sales from March 21, 2013 to February 2019. Due to his position, Mr. Domanski likely

28

has unique information relevant to Plaintiffs' claims that Defendants artificially restrained their beef output. Specifically, Plaintiffs allege that during the relevant time period, the U.S. changed from a net exporter of beef to a net importer of beef at a time when domestic slaughter decreased, which is consistent with an artificial bottleneck in domestic supply. *Consumers* FAC ¶307; *Cattle* TAC ¶288. As the President of International Sales for National Beef, Mr. Domanski's documents are necessary to show that National Beef did appreciably increase beef imports during the class period. Additionally, to the extent that National Beef further restricted supply by exporting American-produced beef, Mr. Domanski's documents are highly relevant. Mr. Domanski would thus possess key information regarding these allegations—information that is unlikely to be found in other custodians' documents and communication.

Mr. Domanski is important for another reason. Plaintiffs allege that membership in various trade and industry organizations provided Defendants' management and employees with numerous opportunities to meet and collude. *Consumers* FAC ¶310. One such association was the U.S. Meat Export Federation ("USMEF"), which develops export opportunities for U.S. protein producers. USMEF holds bi-annual conferences and monthly international trade shows, and its leadership includes current and former employees of Defendants. *Consumers* FAC ¶ 312. Mr. Domanski was one of those individuals, having served on the Export Committee of the USMEF. Mr. Domanski was joined by Pat Binger, former CMS/Cargill Vice President of International Sales, who was an officer, board member, or a formally designated participant of the USMEF; Roel Andriessen, former Tyson Foods Senior Vice President of International Sales, who served as the Chair, Vice Chair, and on the Executive Committee of the USMEF; Robert Shuey, former Tyson Foods Senior Vice President of International Sales and Vice President of International Sales, who was a formal

29

participant of the USMEF; Peter Michalski, National Beef International President and former Vice President of International Sales, who served on the Export Committee of the USMEF. *Cattle* TAC ¶299. Not only did employees of National Beef's competitors serve in leadership roles with Mr. Domanski in the USMEF, but they also attended USMEF's bi-annual conferences. For example, Tyson's Roel Andriessen and CMS's Pat Binger both attended the USMEF Strategic Planning Conference in Tucson, Arizona in November 2017.

For these reasons, Mr. Domanski is a valuable source of relevant, responsive information.

### B.    Randy Johnston

Randy Johnston served as National Beef's VP of Food Service Sales from August 3, 2015 to July 28, 2017—a critical time during the conspiracy. Plaintiffs believe that Mr. Johnston is a key source of relevant information regarding National Beef's sales to commercial companies involved in the foodservice industry. Mr. Johnston had sales responsibility for a number of large direct purchasers of beef. In fact, National Beef conceded that "Mr. Johnston was responsible for sales of consumer-ready products to food services companies and . . . interacted with other beef packers as part of this role." Mr. Johnston's interactions with other beef packers provided an opportunity to collude, and his communications with large foodservice companies will reveal the pretextual reasons given by National Beef for supply restraints and price increases.

### C.    Zack Kimbell

Zach Kimbell has held many relevant titles for National Beef during a critical period of this case. Since March 24, 2017, he has served the VP of Case Ready Sales. From March 11, 2016 to March 24, 2017, he was the VP of Case Ready Business Development. And between November 15, 2011 and March 11,

2016, he was the VP of Case Ready Sales. Defendants agreed to include case-ready beef in the definition of "Beef" for unstructured data requests, and Mr. Kimbell will certainly possess unique documents on that subject for National Beef. Yet, National Beef has not offered any custodians involved with its case-ready business. Wholesale and retail beef prices are at the core of this case and based on Plaintiffs' experience in other protein cases, conspiratorial evidence is often found in the possession of individuals responsible for selling proteins to supermarkets. Finally, Defendants have already agreed to include case-ready beef in the definition of "Beef" for unstructured data requests, and Mr. Kimbell will certainly possess unique documents on that subject for National Beef. These documents are critical to proving that case-ready beef was impacted by the alleged conspiracy, which is necessary for establishing class-wide impact at the class certification stage. Finally, his communications with supermarkets will reveal the reasons National Beef provided for supply shortages and price increases.

## CONCLUSION

Even with the additions requested by Plaintiffs, the number of document custodians will be proportionate to the size and scope of the case, and the amount of damages at stake. Tyson, JBS, Cargill, and National Beef will have only have 40, 31, 37, and 28 custodians respectively.[20] To put that into perspective:

In comparison, defendants in the *Pork* antitrust litigation produced documents from 173 custodians including 113 from the four largest defendants.

---

[20] Plaintiffs note that these numbers exclude Defendants' field buyers and related personnel and certain JBS personnel related to futures trading and risk management, which remain in dispute but are not ripe for determination by the Court.

Rissman Decl. ¶ 12. Similarly, in the *Broiler Chicken* antitrust litigation, Tyson produced documents from 49 custodians and Pilgrim's Pride, a JBS subsidiary, produced documents from 44. Rissman Decl., ¶ 11. But unlike in the *Broiler Chicken* and *Pork* cases, each of which involved only allegations related to manipulation of downstream sale prices, this case involves multiple side of the market. While the *Beef* Plaintiffs allege similar manipulation of downstream sales prices, the *Cattle* Plaintiffs also allege manipulation of upstream purchase prices.

Cattle and beef production is the largest segment in American agriculture and Defendants dominate that industry, each employing tens of thousands of people or more. The conspiracy Plaintiffs allege touches all corners of those businesses. Indeed, Tyson, JBS, Cargill, and National Beef themselves identified 81, 57, 95, and 52 individuals on their respective Appendix 1 disclosures, for a total of 285 individuals, all of whom have roles are likely to result in them possessing relevant information. Damages across the classes, using even a modest estimate of underpayments and overcharges, will likely stretch into the billions of dollars. Given the scope and impact of the conspiracy alleged, and the relevance of the requested custodians to that conspiracy, each is an appropriate custodian and proportionate to the needs of the case.

Finally, Defendants have themselves sought extensive custodians. *Cattle* Plaintiffs alone, for example, have agreed (at Defendants' insistence) to designate twenty-seven individuals as document custodians—despite having far fewer documents relevant to any claims and defenses.

For the above reasons, the Court should compel Defendants to name the relevant employees identified above as document custodians.

Dated: February 25, 2022          Respectfully Submitted,

**ROBINS KAPLAN LLP**

*/s/ Geoffrey H. Kozen*
Geoffrey H. Kozen (Bar No. 0398626)
Thomas J. Undlin (Bar No. 0183751)
Stacey P. Slaughter (Bar No. 0296971)
K. Craig Wildfang (Bar No. 0117043)
Eric P. Barstad (Bar No. 0398979)
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Tel: 612-349-8500
Fax: 612-339-4181
gkozen@robinskaplan.com
tundlin@robinskaplan.com
sslaughter@robinskaplan.com
kcwildfang@robinskaplan.com
ebarstad@robinskaplan.com

*Liaison Counsel for the Cattle Plaintiffs*

Christopher M. Burke (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
cburke@scott-scott.com

David R. Scott (*pro hac vice*)
Amanda F. Lawrence (*pro hac vice*)
Patrick J. McGahan (*pro hac vice*)
Michael P. Srodoski (Bar No. 0398250)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**

156 South Main Street
P.O. Box 192
Colchester, CT 06415
Tel.: 860-537-5537
Fax: 860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Anthony F. Fata (*pro hac vice*)
Jennifer W. Sprengel (*pro hac vice*)
Daniel O. Herrera
Kaitlin Naughton
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
135 South LaSalle St., Suite 3210
Chicago, IL 60603
Tel.: 312-782-4882
Fax: 312-782-4485
afata@caffertyclobes.com
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
knaughton@caffertyclobes.com

Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
205 N. Monroe St.
Media, PA 19063
Tel.: 215-864-2800
emeriwether@caffertyclobes.com

*Interim Co-Lead Counsel for the Cattle
Plaintiffs*

Michael L. Schrag (*pro hac vice*)
Joshua Bloomfield (*pro hac vice*)
George Sampson (*pro hac vice*)
Kyla Jenny Gibboney

**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Tel: (510) 350-9700
mls@classlawgroup.com
jjb@classlawgroup.com
gws@classlawgroup.com
kjg@classlawgroup.com

David E. Kovel (*pro hac vice*)
Thomas W. Elrod (*pro hac vice*)
Karen M. Lerner (*pro hac vice*)
Anthony E. Maneiro (*pro hac vice*)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, NY 10177
Tel: (212) 371-6600
dkovel@kmllp.com
telrod@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

Richard M. Paul III (*pro hac vice*)
Sean Cooper (*pro hac vice forthcoming*)
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Tel: (816) 984-8100
Rick@PaulLLP.com
Sean@PaulLLP.com

Melissa S. Weiner (Bar No. 0387900)
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel: (612) 389-0600
mweiner@pswlaw.com

Bruce L. Simon (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Tel: (415) 433-9000
bsimon@pswlaw.com

Daniel L. Warshaw (*pro hac vice*)
Bobby Pouya (*pro hac vice*)
Matthew A. Pearson (*pro hac vice*)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Tel: (818) 788-8300
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mapearson@pswlaw.com

*Plaintiffs' Executive Committee*

*/s/ Shana E. Scarlett*
Shana E. Scarlett (*pro hac vice*)
Rio S. Pierce (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO
LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Breanna Van Engelen (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO
LLP**

1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

W. Joseph Bruckner (MN #0147758)
Brian D. Clark (MN #0390069)
Arielle S. Wagner (MN #0398332)
Kyle Pozan (*pro hac vice*)
R. David Hahn (MN #0401262)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com
kjpozan@locklaw.com
rdhahn@locklaw.com

*Interim Co-Lead Class Counsel for
Plaintiffs in the Peterson Action*


*/s/ Joshua J. Rissman*
Daniel E. Gustafson (MN #202241)
Daniel C. Hedlund (MN #258337)
Michelle J. Looby (MN #0388166)
Joshua J. Rissman (MN #0391500)
**GUSTAFSON GLUEK PLLC**

Canadian Pacific Plaza
120 Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

Dennis J. Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17thFloor
San Diego, CA 92101
Tel: (612) 333-8844
Fax: (612) 339-6622
dstewart@gustafsongluek.com

Adam J. Zapala (*pro hac vice*)
Elizabeth Tran Castillo (*pro hac vice*)
Reid W. Gaa (*pro hac vice*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
rgaa@cpmlegal.com

Alexander E. Barnett (*pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street, 10th Floor
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Jason S. Hartley (*pro hac vice*)
**HARTLEY LLP**
101 W. Broadway, Suite 820
San Diego, CA 92101
Tel: (619) 400-5822
hartley@hartleyllp.com

Megan E. Jones (*pro hac vice forthcoming*)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
mjones@hausfeld.com

*Interim Co-Lead Counsel for the Proposed
Direct Purchaser Plaintiffs*

*/s/ Blaine Finley*
Jonathan W. Cuneo (*pro hac vice*)
Blaine Finley (*pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
jonc@cuneolaw.com
bfinley@cuneolaw.com

Shawn M. Raiter (MN #240424)
**LARSON KING LLP**
30 East Seventh Street, Suite 2800
Street Paul, MN 55101
Tel: (651) 312-6518
sraiter@larsonking.com

Don Barrett (*pro hac vice*)
Katherine Barrett Riley (*pro hac vice*)
David McMullan (*pro hac vice*)
Sterling Starns (*pro hac vice*)
**BARRETT LAW GROUP, P.A.**

P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095-0927
Tel: (662) 834-9168
Fax: (662) 834-2628
donbarrettpa@gmail.com
kbriley@BarrettLawGroup.com
dmcmullan@BarrettLawGroup.com
sstarns@barrettlawgroup.com

*Counsel for Commercial and Institutional
Indirect Purchaser Plaintiff Erbert & Gerbert's,
Inc.*

Patrick J. Ahern (*pro hac vice*)
Theodore B. Bell (*pro hac vice*)
**AHERN AND ASSOCIATES, P.C.**
Willoughby Tower
8 South Michigan Avenue, Suite 3600
Chicago, Illinois 60603
Tel: (312) 404-3760
patrick.ahern@ahernandassociatespc.com
theo.bell@ahernandassociatespc.com

Patrick J. Lee-O'Halloran (#269074)
**THOMPSON TARASEK LEE-
O'HALLORAN PLLC**
7101 York Avenue South, Suite 255
Edina, MN 55435
Tel: (612) 568-0132
Fax: (612) 564-6976
patrick@ttlolaw.com

*Counsel for Plaintiffs Winn-Dixie Stores, Inc.,
and Bi-Lo Holding, LLC*