## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE CATTLE AND BEEF ANTITRUST LITIGATION*<br><br>This Document Relates To:<br><br>  All Actions. | Case No. 20-cv-1319 (JRT/HB) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DOCUMENTS

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................. 5

III.  ARGUMENT ...................................................................................................... 5

 A.  Legal Standard ............................................................................................... 5

 B.  Plaintiffs' Proposed Date Ranges Are Appropriate and Proportional .................... 7

  1.  Structured Data .......................................................................................... 8

  2.  Unstructured Data .................................................................................... 14

 C.  Defendants Should Produce Communications with Competing Non-Defendant
     Packers (Cattle RFP 4, Consumer RFP 2, and DPP RFP 3) ................................ 15

  1.  Defendants' Exclusion of Communications with Other Packers Is Improper ..... 18

 D.  Defendants Withhold Certain Key Productions to Regulators (Cattle RFP 3;
     Consumer RFP 3; DPP RFP 24(a)) .......................................................... 21

  1.  Defendants Should Produce All Future Productions Made in Existing
      Investigations Relating to the Allegations in These Cases .............................. 24

  2.  Defendants Should Produce Written Materials Related to JBS and National
      Beef's Acquisitions ................................................................................... 26

  3.  Defendants Should Produce the Regulatory Requests ................................... 27

  4.  Defendants Should Produce Written Interrogatory Responses and Presentations
      Made to the Regulators ............................................................................. 29

 E.  Defendants Should Produce All Contracts for the Purchase of Fed Cattle and Sale
     of Beef (Cattle RFPs 8 and 9; Consumer RFPs 6, 7 and 20; DPP RFP 35) ............ 30

 F.  Documents Concerning Defendants' Participation in the Agreed Trade
     Associations and Other Industry Gatherings Should Be Produced (Cattle RFP 16;
     DPP RFP 5) ................................................................................................. 34

  1.  Defendants Seek to Apply an Improper Subject Matter Limitation and
      Improperly Limit the Materials Requested and Sources Searched ..................... 37

 G.  Custodians' Diaries and Calendar Entries (Cattle RFP 17(a); DPP RFP 4(a)) ....... 39

 H.  Custodians' Contact Information (Cattle RFP 17(b); DPP RFP 4(b)) .................... 42

 I.  Document Custodians' Testimony in Other Matters (Cattle RFP 17(g); DPP RFP
     17(i) ........................................................................................................... 44

J.    Custodians' Severance Agreements and Disciplinary Records (Cattle RFP 17(i); DPP RFP 4(h) and (k)) ............................................................................................ 46

K.    Defendants' Attempts to Conceal Anticompetitive Conduct in Related Industries and in Relation to Their Live Cattle Futures Trading (Consumer RFP 10)............ 49

L.    JBS's Effort to Withhold Documents Held by JBS S.A. Custodians (Consumer RFP 4 and JBS's Scope Limitation 2)..................................................................... 54

IV.    CONCLUSION ...................................................................................................... 56

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*B–S Steel of Kan., Inc. v. Tex. Indus., Inc.*,
  No. 01-2410, 2003 WL 21939019 (D. Kan. July 22, 2003) .......................... 6

*Baker v. Cenlar FSB*,
  No. 20-CV-0967 (JRT/HB), 2021 WL 2493767 (D. Minn. June 18,
  2021) (Bowbeer, J.)...................................................................................... 39

*Bellingham v. BancInsure, Inc.*,
  No. 13-0900, 2014 WL 12600277 (D. Minn. May 13, 2014) ...................... 5

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)..................................................................................... 51

*CTI Servs. LLC v. Haremza*,
  No. 09-CV-144, 2011 WL 780489 (N.D. Okla. Feb. 25, 2011).................. 19

*Digan v. Euro-Am. Brands, LLC*,
  No. 10 C 799, 2012 WL 668993 (N.D. Ill. Feb. 29, 2012).......................... 48

*DURAG Inc. v. Kurzawski*,
  No. 17-CV-5325 (ECT/HB), 2019 WL 13124422 (D. Minn. Sept. 12,
  2019) (Bowbeer, J.)...................................................................................... 19

*Freedom Med., Inc. v. Premier Purchasing Partners, L.P.*,
  No. 09CV152, 2011 WL 13196168 (E.D. Tex. Apr. 29, 2011) .................. 52

*Hofer v. Mack Trucks, Inc.*,
  981 F.2d 377 (8th Cir. 1992) ........................................................................ 5

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*,
  No. 15-cv-3183, 2016 WL 6997113 (D. Minn. Sept. 6, 2016)..................... 6

*In re Aspartame Antitrust Litig.*,
  No. 2:06-CV-1732, 2008 WL 2275531 (E.D. Pa. May 13, 2008)................. 6

*In re Auto. Refinishing Paint Antitrust Litig.*,
  MDL No. 14262004, WL 7200711 (E.D. Pa. Oct. 29, 2004).......... 6, 37, 38

*In re Blue Cross Blue Shield Antitrust Litig.*,
  No. 2:13-CV-20000, 2015 WL 13755437 (N.D. Ala. Oct. 20, 2015) ................. 26, 27

*In re Broiler Chicken Antitrust Litig.*,
No. 16-cv-08637 (N.D. Ill.) ............................................................ 13, 24, 25

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. C-07-5944-SC, 2014 WL 5462496 (N.D. Cal. Oct. 23, 2014) ............................ 6

*In re Cattle and Beef Antitrust Litig.*,
No. 20-cv-01319 (D. Minn. Sept. 14, 2021) (Tunheim, J.) ........................... 5

*In re Cattle and Beef Antitrust Litig.*,
No. 20-cv-1319 (JRT/HB) (D. Minn) .......................................................... 1

*In re Cattle Antitrust Litig.*,
No. 19-cv-01222 (D. Minn. Dec. 28, 2020) ................................................. 1

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab.
Litig.*,
No. 17MD02777, 2018 WL 4826866 (N.D. Cal. Oct. 4, 2018) ................................ 28

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
No. 18-CV-864, 2018 WL 11260473 (N.D. Ill. Aug. 14, 2018) ............................ 26

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
846 F. Supp. 2d 1335 (N.D. Ga. 2012), *modified sub nom. on non-
related grounds in In re Delta/AirTran Baggage Fee Antitrust Litig.*,
No. CV 1:09-MD-2089, 2012 WL 12952328 (N.D. Ga. July 18, 2012) .............. 28, 38

*In re Domestic Air Transp. Antitrust Litig.*,
142 F.R.D. 354 (N.D. Ga. 1992) ............................................................... 45

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) .................................................... 52

*In re Generic Pharms. Pricing Antitrust Litig.*,
No. 2:16-md-02724 (E.D. Pa. Feb. 9, 2018) ............................................. 41

*In re Grand Jury Investigation*,
338 F. Supp. 1379 (W.D. Pa. 1972) ...................................................... 40, 41

*In re High Fructose Corn Syrup Antitrust Litig.*,
156 F. Supp. 2d 1017 (C.D. Ill. 2001), *rev'd on other grounds*, 295 F.3d
651 (7th Cir. 2002) ........................................................................ 51, 52

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) .................................................................. 9

*In re Milk Prod. Antitrust Litig.*,
  84 F. Supp. 2d 1016 (D. Minn. 1997) ........................................................ 24

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  929 F. Supp. 723 (S.D.N.Y. 1996) ............................................................ 45

*In re Polaroid Corp.*,
  No. 16-cv-1357 (JRT), 2017 WL 1183983 (D. Minn. Mar. 29, 2017) ........................ 6

*In re Pork Antitrust Litig.*,
  No. 18-cv-1776 (D. Minn.) ...................................................................... 13

*In re Potash Antitrust Litig.*,
  161 F.R.D. 405 (D. Minn. 1995) ................................................................ 18

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  No. MC07489PLFJMFAK, 2009 WL 10703132 (D.D.C. July 13, 2009) ................. 15

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) .................................................................... 37

*In re Urethane Antitrust Litig.*,
  261 F.R.D. 570 (D. Kan. 2009) .................................................................. 6

*Johnson v. Brewer*,
  521 F.2d 556 (8th Cir. 1975) .................................................................... 48

*Judd v. Take-Two Interactive Software, Inc.*,
  No. 07 CIV. 7932, 2009 WL 361958 (S.D.N.Y. Feb. 4, 2009) .................................. 41

*Kleen Prods. LLC v. Packaging Corp. of Am.*,
  No. 10 C 5711, 2012 WL 4498465 (N.D. Ill. Sept. 28, 2012) ............................ *passim*

*Klein v. Meta Platforms, Inc.*,
  3:20-CV-08570 (N.D. Cal. Apr. 2, 2021) ...................................................... 29

*Lynch v. Experian Info. Sols., Inc.*,
  No. 20-CV-2535, 2021 WL 5106006 (D. Minn. Nov. 3, 2021) ................................... 7

*Martin v. Monsanto Co.*,
  No. EDCV162168, 2017 WL 5172205 (C.D. Cal. Apr. 10, 2017) ............................ 28

*Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*,
  No. CV 08-6324, 2010 WL 11470364 (D. Minn. Nov. 3, 2010) ................... 24, 28, 29

*New Park Ent. L.L.C. v. Elec. Factory Concerts, Inc.*,
    No. CIV. A. 98-775, 2000 WL 62315 (E.D. Pa. Jan. 13, 2000) ................................. 13

*Oppenheimer Fund, Inc. v. Sanders*,
    437 U.S. 340 (1978) ........................................................................................................ 6

*Orduno v. Pietrzak*,
    No. 14-1393 ADM/JSM, 2016 WL 5853723 (D. Minn. Oct. 5, 2016) ........................ 5

*Ret. Sys. v. Wal-Mart Stores, Inc.*,
    No. 5:12-CV-5162, 2016 WL 7638495 (W.D. Ark. Sept. 28, 2016) ................... 25, 28

*SourceOne Dental, Inc. v. Patterson Cos., Inc.*,
    310 F. Supp. 3d 346 (E.D.N.Y. 2018) ........................................................................ 20

*Speed RMG Partners, LLC v. Arctic Cat Sales Inc.*,
    No. 20-CV-609, 2021 WL 5087280 (D. Minn. June 14, 2021), *aff'd in
    part, rev'd in part*, No. 20-CV-609, 2021 WL 4226070 (D. Minn. Sept.
    16, 2021) ...................................................................................................................... 41

*State Farm Mut. Auto. Ins. Co. v. Healthcare Chiropractic Clinic, Inc.*,
    No. 15-cv-2527 (SRN/HB), 2016 WL 9330708 (D. Minn. Sept. 2, 2016) ................. 7

*United States v. Dentsply Int'l., Inc.*,
    No. Civ. A. 99-5 MMS, 2000 WL 654286 (D. Del. May 10, 2000) ............................ 6

**Statutes, Rules, and Regulations**

Federal Rules of Civil Procedure
    Rule 26 ............................................................................................................ 5, 33, 43
    Rule 26(b)(1) ................................................................................................................. 6
    Rule 26(e)(1) ............................................................................................................... 25
    Rule 37(a) ...................................................................................................................... 6
    Rule 404(b) ................................................................................................. 51, 52, 53

**Other Authorities**

*Senate Hearing*, Tyson (July 28, 2021),
    https://www.tysonfoods.com/news/news-releases/2021/7/fresh-meats-
    leader-testifies-about-beef-industry-senate-hearing#:~:text=
    At%20Tyson%2C%20we%20are%20committed,the%20places%20we
    %20call%20home ........................................................................................................ 9

## I.    INTRODUCTION

Despite Plaintiffs'[1] good faith efforts across multiple meet and confers since mid-November 2021, the parties have reached impasses on eight discovery disputes arising from the Initial Requests for Production served by *Cattle*, Consumer, and DPP Plaintiffs.[2]

***First***, Plaintiffs require pre-Class Period structured data regarding Defendants' purchases, sales, and costs to construct econometric models to estimate damages flowing from Defendants' anticompetitive conduct and to establish class-wide impact. Unstructured data from the pre-Class Period bears on Plaintiffs' allegations regarding both Defendants' pre-Class Period conduct, including the formation of the conspiracy, and the parties' competing views on the market conditions that shaped cattle and beef prices during the Class Period.  While Defendants have agreed to produce structured data going back to 2010, they have refused to produce structured data back to 2006, despite raising many arguments in their motions to dismiss briefing and answers that rely upon market conditions during this period.  Moreover, Defendants decline to produce structured data

---

[1]    The term "Plaintiffs" refers collectively to *Cattle* Plaintiffs, DPP Plaintiffs, Commercial Indirect Plaintiffs, Consumer Plaintiffs, and Winn-Dixie Plaintiffs, whose actions are coordinated in the above-captioned matter.  All "¶," "¶¶," and "Figure" references are to the *Cattle* Plaintiffs' Third Consolidated Amended Class Action Complaint ("TAC"), *In re Cattle Antitrust Litig.*, No. 19-cv-01222 ("*Cattle*") (D. Minn. Dec. 28, 2020), ECF No. 312, unless stated otherwise; references to "ECF" are to the docket entries in *In re Cattle and Beef Antitrust Litig.*, No. 20-cv-1319 (JRT/HB) (D. Minn) ("*Beef*"), unless stated otherwise; and all emphasis is added and internal citations are omitted, unless stated otherwise.

[2]    *See* Exhibits A, B and C, attached to the Declaration of Patrick J. McGahan in Support of Plaintiffs' Motion to Compel Documents ("McGahan Decl."), filed herewith. The Consumer Initial RFPs were deemed served on Defendants by DPP Plaintiffs, Commercial Indirect Plaintiffs, and Winn-Dixie Plaintiffs.  ECF No. 271.

from July 2020 to December 2021, notwithstanding that the Court sustained Plaintiffs' continuing cartel allegations, and without articulating any concrete burden. Defendants also refuse to produce unstructured data from January 2012 to December 2013 even though Plaintiffs make direct allegations regarding Defendants' conduct during this period. Defendants should be compelled to produce responsive data and documents from these time periods.

*Second*, Defendants refuse to produce their communications with the country's largest non-Defendant beef packers. These documents are relevant for two separate reasons. First, they may show that Defendants had additional co-conspirators. Second, such communications (or a relative paucity thereof) will likely show that the quantity and quality of inter-Defendant communications are atypical of Defendants' behavior towards non-Defendant packers. For both reasons, Defendants should produce their inter-firm communications with the specified other packers.

*Third*, Plaintiffs seek production of materials Defendants have produced to pertinent regulators. While Defendants have agreed to produce certain regulatory productions, they seek to exclude four important categories of documents:

1.  In relation to concurrent investigations being prosecuted by the U.S. Department of Justice ("DOJ"), Antitrust Division, certain State Attorneys General, and the U.S. Department of Agriculture, into the *very same allegations* at issue in this case, Defendants refuse to produce materials that are (a) dated after June 2020; or (b) were produced to those regulators in response to any demand issued after June 2020. Since these materials are highly relevant, are being collected and produced

in any event, and are necessary to place Plaintiffs on the same footing as Defendants and the regulators, Defendants should produce them here.

2.     Defendants also decline to produce materials submitted in response to two merger enquiries put in issue by Plaintiffs' complaints, notwithstanding that Plaintiffs narrowed the request to encompass only Defendants' written responses to request for information.  Since both acquisitions altered a Defendant's slaughter capacity, Defendants contemporaneous positions as to the import and effect of these acquisitions are highly relevant and should be produced.

3.     Defendants also decline to produce both the regulatory requests themselves and Defendants' written interrogatory-style responses to such requests, despite these being routinely produced in antitrust actions.

*Fourth*, Defendants refuse to produce their contracts to purchase fed cattle and those to sell the resultant beef.  The contract types (*e.g.*, formula vs. cash), how they determined prices, how they changed over time and to whom they were offered, amongst other matters, are relevant to allegations regarding the manner in which Defendants manipulated their contracting structure to push cattle prices down, and to measure and prove impact on a class-wide basis.

*Fifth*, Plaintiffs seek documents and communications relating to Defendants' participation in certain trade association and industry events, which, as this Court recognized in denying Defendants' motions to dismiss, provide businesses with opportunities to collude.  Defendants largely seek to restrict their production to events called to discuss issues relating to fed cattle procurement or boxed beef sales, ignoring that

inter-firm meetings are relevant not on the basis of their subject matter, but by virtue of who attended. Defendants should give discovery of all these opportunities to collude.

*Sixth*, Plaintiffs have sought targeted materials relating to Defendants' document custodians, including: (a) relevant diary and calendar entries; (b) contact information for other industry participants; (c) prior testimony in relevant investigations or litigation; and (d) their severance agreements and disciplinary records. Defendants seek to impose unjustified limitations on their production of diary and calendar entries, and to exclude categories of individuals from their production of contact information. Defendants also refuse to produce the custodian's prior testimony, severance agreements, and disciplinary records. All this material is relevant and proportionate to the needs of the case.

*Seventh*, Plaintiffs seek production of Defendants' attempts to conceal their anticompetitive conduct. Defendants seek to artificially cabin Plaintiffs' complaints to a narrow price-fixing allegation limited to Defendants' beef output and exclude attempts to conceal wrongdoing in closely related markets and in live cattle futures. However, Plaintiffs should receive discovery reflecting the breadth of their price-fixing allegations. Moreover, anticompetitive conduct in related industries is discoverable at this stage and likely admissible should this case proceed to trial. These materials should, likewise, be produced.

*Eighth*, Plaintiffs seek JBS S.A. to produce responsive documents found in the files of its employees designated as custodians pursuant to Plaintiffs' separate motion to compel custodians.

4

For these reasons, and the reasons set forth below, the Court should grant Plaintiffs'

motion and compel production of each of these categories of documents.

## II.   BACKGROUND

Following the Court's denial of Defendants' motions to dismiss (ECF No. 238),[3]

the parties met and conferred extensively from November 2021 to mid-February 2022,

regarding *Cattle* Plaintiffs' and Consumer Plaintiffs' Initial RFPs and certain overlapping

RFPs issued by the DPP Plaintiffs, in accordance with the Court's November 10, 2021

Order.  ECF No. 271.  As foreshadowed to the Court during the February 2, 2022 Case

Management Conference, despite narrowing much of their disagreements, certain disputes

remain, including a number of threshold discovery issues that will impact written discovery

across the consolidated cases.  Plaintiffs file this motion to resolve those disagreements.

## III.   ARGUMENT

### A.   Legal Standard

Federal Rule of Civil Procedure 26 allows discovery as to any nonprivileged matter

that is relevant to any party's claim or defense, taking into account whether the matter is

proportional to the needs of the case.  Rule 26 is liberal in scope and interpretation.  *Orduno*

*v. Pietrzak*, No. 14-1393 ADM/JSM, 2016 WL 5853723, at *3 (D. Minn. Oct. 5, 2016);

*Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992).  The goal of Rule 26 is to

ensure parties equal access to the material facts.  *Bellingham v. BancInsure, Inc.*, No. 13-

0900 (SRN/JJG), 2014 WL 12600277, at *1 (D. Minn. May 13, 2014).  "Courts construe

---

[3]      Citations to "MTD Order" refer to *In re Cattle and Beef Antitrust Litig.*, No. 20-cv-
01319 (D. Minn. Sept. 14, 2021) (Tunheim, J.), ECF No. 238.

5

Rule 26(b)(1) broadly." *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-cv-3183 (ADM/LIB), 2016 WL 6997113, at *7 (D. Minn. Sept. 6, 2016) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

This "liberal policy favoring discovery is particularly appropriate" in antitrust cases. *See, e.g.*, *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2014 WL 5462496, at *8 (N.D. Cal. Oct. 23, 2014) ("'broad discovery may be needed to uncover evidence of invidious design, pattern, or intent'" in antitrust cases); *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732, 2008 WL 2275531, at *1 (E.D. Pa. May 13, 2008) ("This broad scope of discovery 'has been held to be particularly appropriate in antitrust cases.'"). "'Broad discovery is permitted because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records.'" *Urethane*, 261 F.R.D. at 573 (quoting *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 14262004, WL 7200711, at *3 (E.D. Pa. Oct. 29, 2004)); *see also B–S Steel of Kan., Inc. v. Tex. Indus., Inc.*, No. 01-2410, 2003 WL 21939019, at *3 (D. Kan. July 22, 2003); *United States v. Dentsply Int'l., Inc.*, No. Civ. A. 99-5 MMS, 2000 WL 654286, at *5 (D. Del. May 10, 2000).

A party may pursue a motion to compel discovery if the opposing party fails to answer a discovery request or responds with an evasive or incomplete answer. Fed. R. Civ. P. 37(a); *In re Polaroid Corp.*, No. 16-cv-1357 (JRT), 2017 WL 1183983, at *6 (D. Minn. Mar. 29, 2017). Once the party seeking the discovery has made a threshold showing of

relevance, the burden shifts to the party resisting discovery to show specific facts demonstrating that the discovery is not relevant, or how it is overly broad, burdensome, or oppressive. *See, e.g.*, *Lynch v. Experian Info. Sols., Inc.*, No. 20-CV-2535 (JRT/JFD), 2021 WL 5106006, at *2 (D. Minn. Nov. 3, 2021) ("[t]he burden of showing undue burden and disproportionality is on the party resisting disclosure"); *see also Kleen Prods. LLC v. Packaging Corp. of Am.*, No. 10 C 5711, 2012 WL 4498465, at *13 (N.D. Ill. Sept. 28, 2012) ("The party opposing a motion to compel carries a 'heavy' burden of persuasion."). "[U]nsupported assertions of burdensomeness and lack of proportionality," lacking an "affidavit stating the expected cost and time associated with" the requested discovery, are not "persuasive." *State Farm Mut. Auto. Ins. Co. v. Healthcare Chiropractic Clinic, Inc.*, No. 15-cv-2527 (SRN/HB), 2016 WL 9330708, at **2-3 (D. Minn. Sept. 2, 2016).

### B.    Plaintiffs' Proposed Date Ranges Are Appropriate and Proportional

The first disputed issue concerns the date ranges for data to be produced.  In advance of Defendants' motions to dismiss, the Court determined that the appropriate date ranges for the parties' RFP negotiations were: (a) January 1, 2009 – June 30, 2020 for structured data; and (b) January 1, 2012 – June 30, 2020 for non-structured data.  *Cattle*, ECF No. 250.

Following the Court's denial of Defendants' motions to dismiss, the parties have met and conferred as to the relevant time period for requests for production.  They are in agreement that common date periods across all coordinated actions and all producing parties should govern requests for production: (a) calling for structured data; and (b) calling

for unstructured data.[4]   They, likewise, agree these date ranges should apply unless otherwise agreed or ordered for specific requests.

However, the parties have not reached agreement as to the parameters of these two date ranges.  The parties' competing positions are:

- Structured Data:

    a.      Plaintiffs' Position: January 1, 2006 to December 31, 2021.[5]

    b.      Defendants' Position: January 1, 2010 to June 30, 2020.

- Unstructured Data:

    a.      Plaintiffs' Position: January 1, 2012 to June 30, 2020.

    b.      Defendants' Position: January 1, 2014 to June 30, 2020.

## 1.     Structured Data

Plaintiffs have issued requests for Defendants to produce structured data detailing their cattle purchases, beef and by-product sales, plant and cold storage utilization, live cattle futures transactions, and related costs.  This information, as in most antitrust actions, is sought so Plaintiffs can build econometric model(s) to estimate the magnitude of the alleged underpayment to *Cattle* Plaintiffs for their cattle sales and the alleged overcharge inflicted on *Beef* Plaintiffs for their beef purchases.   Structured data produced by Defendants may also be incorporated into Plaintiffs' experts' analyses to assess whether

---

[4]      The parties also agree that "sufficient to show basis" requests should follow the date range for unstructured data, accepting, however, that the exact document date range necessary for a given sufficient to show request will vary by the nature of the request.

[5]      Plaintiffs would include in this date range unstructured documents necessary to understand structured data (*e.g.*, data dictionaries requested by Cattle RFP 18).

all, or nearly all, class members in the *Cattle* and *Beef* cases were impacted by these underpayments and overcharges, respectively. *Cf. In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153 (3d Cir. 2002) (affirming use of plaintiffs' ''multiple regression analysis'' to prove ''impact on a class-wide basis'' in price-fixing suit).

Plaintiffs' econometric methodologies will require "control" or "benchmark" periods of clean data, during which the markets were unaffected by the alleged anticompetitive conduct. This control period is necessary to estimate the changes in cattle and beef prices caused by Defendants' anticompetitive conduct during the conspiracy period. Typically, this "control" or "benchmark" period data is drawn from an unaffected pre-conspiracy-period, unaffected post-conspiracy period, or both. In selecting the benchmark period, it is important to consider the factual circumstances of the case and the market(s) in question and to select the most comparable and reliable clean period possible. *See generally*, McGahan Decl., Ex. D; and Ex. E, ¶39.

As Plaintiffs allege a continuing cartel[6] and make specific allegations regarding the impact of Defendants' conduct on cattle and beef prices during the COVID-19 pandemic,[7] a post-infringement "clean period" is likely not possible. *See, e.g.*, Figures 5 and 6

---

[6]     ¶¶8, 16, 426-32, 448, 458.

[7]     ¶¶263-65. *See also Fresh Meats Leader Testifies about Beef Industry at Senate Hearing*, Tyson (July 28, 2021), https://www.tysonfoods.com/news/news-releases/2021/7/fresh-meats-leader-testifies-about-beef-industry-senate-hearing#:~:text= At%20Tyson%2C%20we%20are%20committed,the%20places%20we%20call%20home (Shane Miller, Group President of Tyson Fresh Meats, testifying to U.S. Senate Committee on the Judiciary that "the present spread [between cattle and beef prices] has everything to do with the law of supply and demand and the unprecedented and massive – but we believe, temporary – system shock brought on by the COVID-19 pandemic").

(showing continuation of unprecedented meat margin post-June 2020). While Defendants protest that any cartel conduct would have ceased immediately after Plaintiffs' suits were filed, that is not what is alleged, and Defendants are not permitted to unilaterally resolve factual issues in their favor. Because the conspiracy is alleged to continue after June 2020, and because the proposed Class Period continues after June 2020, the data after June 2020 is obviously relevant to assessing the magnitude of the underpayments and overcharges during the proposed Class Period, as well as assessing common impact and calculating total class-wide damages.

Furthermore, even if Defendants' cartel ceased in mid-2019, their recent transaction records may not provide an appropriate "clean period," as the lingering impacts of their actions (sometimes referred to as the cartel "overhang"), combined with the events of the pandemic, likely render 2020-2022 insufficiently comparable to a Class Period stripped of Defendants' anticompetitive conduct. And Defendants are not even offering the recent transaction records but are unilaterally asserting that structured data from a period shortly following Plaintiffs' first-filed case should not be produced. No Defendant has articulated any concrete burden regarding the collection and production of this additional data from the near present. Nor do Plaintiffs envision there will be any substantive burden since Defendants will, in almost every instance, be collecting this data from the same databases that store their Class Period data.[8]

---

[8]     Plaintiffs' proposal of cutting off unstructured data productions at June 2020, but allowing for a further year-and-a-half of structured data productions, appropriately balances the parties' interests and burdens in these circumstances. *Kleen Prod. LLC*, 2013

Thus, the only "clean period" data that Plaintiffs are likely to be able to use in their analyses is from **before** the Class Period. While Defendants would like to limit that period to 2010 and later, a number of factors, in particular Defendants' past arguments, suggest Plaintiffs would be prejudiced without data beginning in 2006.

In their motions to dismiss, during their meet and confers, and foreshadowed in their affirmative defenses, Defendants have repeatedly argued that the movements in cattle and beef prices across the Class Period are explained by anomalous market conditions from 2009 through 2014, which were ultimately corrected when cattle prices dramatically fell in mid-2015. *See, e.g.*, ECF No. 167, at 1 ("Fed cattle prices hit a historic peak in 2014, largely because a significant drought led to reduce supply"); 36 (arguing Defendants' closed their plants due to: "a 'shortage of fed cattle' between 2009 and 2014 caused by significant droughts"), 46-49 (Plaintiffs' grievances are explained by the "dramatic rise in prices that started in 2009" caused by "drought and 'strong beef demand,'" and that the subsequent fall in prices was due to end of drought and increase "in fed cattle supply"); *see also* ECF No. 318, at 120-21 ("incorporate by reference all arguments that they raised in Defendants' joint motion to dismiss") and 122 (denying liability for injuries caused by intervening causes including "global pandemics, [and] weather"). Defendants' defense appears, by all indications, to be that the Class Period simply saw a return to the 'normal' market conditions witnessed pre-2009. ECF No. 167, at 46-49. While Plaintiffs disagree

---

WL 120240, at *9 (granting five-year pre-cartel period, concluding that "[t]he larger window of economic data (as opposed to conduct documents) is warranted in order to provide an accurate economic picture").

with Defendants' assertions, Plaintiffs are entitled to data from the pre-2010 period to test these assertions. Plaintiffs' experts should have access to pre-2010 data to determine whether the benchmark period should appropriately include data from before 2010, and if so, to test whether their econometric models are robust to the inclusion of this data to guard against criticism Defendants' experts may level against econometric models that utilize only post-2009 data to establish the clean benchmark.

Moreover, January 2006 is an appropriate start date for structured data productions for a related reason. Plaintiffs expect Defendants to argue that price changes, and Defendants' actions, were also driven by the cattle cycle.[9] The cattle cycle is a concept endorsed by certain academics and Defendants, that purports to explain fluctuations in cattle numbers, and consequently prices, in the U.S. fed cattle market by demarcating the history of the cattle market into approximately 10-year periods, each containing both a 'boom' (*i.e.*, growth) and 'bust' (*i.e.*, contraction) phase of the U.S. cow herd size.[10] Proponents of this theory suggest that the prior cattle cycle started in 2004 and ended in 2014, with a new cycle starting in 2015. *Id.* Plaintiffs' proposal captures most of the prior cattle cycle, in particular, both its rise and fall, and would permit Plaintiffs to contest this

---

[9]     *See, e.g.*, n.7, *supra* (". . . [T]he cattle industry is susceptible to cycles the way other commodities are – from grain to aluminum. In this case, when COVID-19 hit, we were at the top of the cattle supply cycle, meaning that the country already had an ample supply of live cattle, and that any significant disruption in existing harvest capacity would have created a backlog of live cattle.").

[10]     *Cattle & Beef: Sector at a Glance*, USDA (Nov. 29, 2021), https://www.ers.usda.gov/topics/animal-products/cattle-beef/sector-at-a-glance/#:~:text=The%20cattle%20cycle%20is%20a,producers'%20response%20to%20profit%20fluctuations.

argument should Defendants continue to press it.  By contrast, cutting data off in 2010 would result in a benchmark period that contained only the "bust" phase (*i.e.*, contracting cow herd) of the prior cattle cycle.  Given Defendants' repeated arguments that Plaintiffs' claims are explained by increases in the cow herd, during the Class Period, (ECF No. 167, at 46-47), Plaintiffs should be afforded the opportunity to compare data from the growth phase of the cattle cycle during the Class Period to the last pre-Class Period cattle cycle growth phase in order to determine whether such data would appropriately be included as part of the benchmark period.[11]

Plaintiffs' proposal is also consistent with the structured data periods ordered or agreed in *Broiler* and *Pork* litigations.[12]  Plaintiffs' proposal calls for 16 years of structured data, in line with the 14 years ordered in *Broiler*[13] and the 16 years agreed to in *Pork*.  It is also consistent with other courts ordering substantive discovery into pre-cartel periods, where the conduct and activities of the Defendants during the control period is necessary to assess their conduct during the alleged conspiracy period.  *See, e.g.*, *New Park Ent. L.L.C. v. Elec. Factory Concerts, Inc.*, No. CIV. A. 98-775, 2000 WL 62315, at *3 (E.D. Pa. Jan. 13, 2000) (allowing discovery for seven years prior to start of alleged conspiracy, because it "will shed light upon [the] illegality [of Defendants' conduct]" and "discovery

---

[11]    The availability of certain USDA aggregate transaction series from 2001 onwards does not cure this potential prejudice as Defendants have consistently criticized Plaintiffs' use of USDA data in this case.  ECF. No. 167, at 2, 16, 17-19, 45.  To address this criticism, Plaintiffs should have access to individualized data from each Defendant.

[12]    "*Broiler*" refers to *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill.); "*Pork*" refers to *In re Pork Antitrust Litig.*, No. 18-cv-1776 (D. Minn.).

[13]    *Broiler*, ECF No. 580, at 4-5.

in antitrust litigation is most broadly permitted and the burden or cost of providing the information sought is less weighty a consideration than in other cases"); *Kleen Prod. LLC*, 2013 WL 120240, at *9 (ordering five years of pre-class period structured data discovery, finding that a "larger window of economic data . . . is warranted in order to provide an accurate economic picture").

Plaintiffs, therefore, request that structured data be produced from January 1, 2006 to December 31, 2021.

### 2.    Unstructured Data

As noted above, consistent with the Court's pre-motion to dismiss ruling, (*Cattle*, ECF No. 250), Plaintiffs propose a three-year pre-Class Period for unstructured data period beginning in January 2012 while Defendants propose a solitary year.  Plaintiffs' proposal is more appropriate for at least three reasons.  First, the complaints contain many allegations regarding both Defendants' pre- Class Period conduct and the market conditions that informed the parties' conspiracy period conduct.  *See, e.g.*, ¶¶82, 98, 130, 167, 185 n.77; 190-97, 202, 213, 230, 283-87 (addressing Defendants' pre- Class Period plant closures and slaughter volumes, and the market conditions during this period that impacted fed cattle supply and cattle and beef prices during the Class Period).  Further, as noted above, Defendants have raised multiple arguments regarding this period and its impact on the Class Period, which Plaintiffs should be permitted to test.  Second, evidence of Defendants' conduct during this period, when slaughter weight fed cattle availability was similar to that experienced in the first half of the Class Period, will better allow the Court to evaluate the parties' competing explanations for Defendants' procurement and

14

slaughter practices during the Class Period.  Third, Plaintiffs' proposal is consistent with other courts' practice on this issue in antitrust cases.  *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. MC07489PLFJMFAK, 2009 WL 10703132, at **2-3 (D.D.C. July 13, 2009) (ordering defendants to produce documents from three years prior to class period where those documents were relevant to defendants' justification of pricing during class period); *Kleen Prod. LLC*, 2013 WL 120240, at *9 (ordering defendants to produce documents for two years prior to class period based on their relevance as "stage-setting events").

Plaintiffs, therefore, request that unstructured data be produced from January 1, 2012 to June 30, 2020.

### C.  Defendants Should Produce Communications with Competing Non-Defendant Packers (Cattle RFP 4, Consumer RFP 2, and DPP RFP 3)

Reflecting the core allegations at issue in this antitrust suit, Plaintiffs' requests seek Defendants' inter-firm communications amongst themselves and with other fed cattle beef packers.  Specifically, Plaintiffs requested:

> **CATTLE REQUEST NO. 4:** All Communications or Documents Concerning Communications, agreements, or meetings between You and any Beef packer (including any other Defendant) concerning Your or another packer's Cattle Business, or the Cattle Business generally.  Excluded from this request are any Documents or Communications in which Defendants' or third party Beef packers' veterinary Employees were the exclusive senders and recipients.[14]

---

[14]    *See* McGahan Decl., Ex. A, at 18.

Consumer RFP 2 and DPP RFP 3 make similar requests for production.[15]  In their original and amended discovery responses, Defendants generally agreed to produce communications between their document custodians and employees of other Defendants that related to fed cattle purchases and prices, boxed beef sales or prices, fed cattle slaughter levels, live cattle futures transactions, and/or live cattle options transactions.  Defendants refused, however, to produce any communications with non-Defendant packers. Defendants' excerpted responses to Cattle RFP 4 are as follows:

**Tyson:**

> Subject to the objections above, and based on a reasonable investigation, Tyson will produce non-privileged documents constituting or reflecting communications between any Tyson document custodian and any other defendants regarding fed cattle purchases, boxed beef sales, or fed cattle slaughter levels, excluding communications between any person whose responsibilities include monitoring the health, safety, or well-being of animals.[16]

**JBS:**

> Subject to and without waiving those objections, JBS Defendants agree to produce the following documents to the extent this information is in their possession, custody or control, and able to be located by them through a reasonable search: responsive, non-Privileged documents created during the Relevant Time Period that constitute or reflect communications or relate to meetings between a Document Custodian at JBS, S.A., JBS USA, Swift Beef, or JBS Packerland and an employee of any other Defendant that relate to: (a) Cattle purchases and prices in the United States, (b) Cattle slaughter levels in the United States, (c) Beef sales or prices in the United States, or (e) live cattle futures or options on live cattle futures transactions involving trades on the CME, excluding any communications between any person

---

[15]    *See id.*, Ex. B, at 10; and Ex. C, at 11.
[16]    *See id.*, Ex. F, at 17-18.

whose responsibilities include monitoring the health, safety, or well-being of animals.[17]

**Cargill**:

Subject to and without waiving these objections and the General Objections, Objections to Plaintiffs' Instructions, and applicable Objections to Plaintiffs' Definitions above, which are incorporated herein by reference, Cargill and CMS state that they will produce the following responsive, non-privileged documents to the extent they exist in Cargill's or CMS's possession, custody, or control and are able to be located by Cargill or CMS through a reasonable search: documents that that constitute or reflect communications or relate to meetings between any employee of a Defendant and a Cargill or CMS Document Custodian related to fed cattle purchases and prices, boxed beef sales or prices, fed cattle slaughter levels, live cattle futures transactions, and/or live cattle options transactions that were created during the time period from January 1, 2014 to December 31, 2019, excluding communications between any person whose responsibilities include monitoring the health, safety, or well-being of animals.[18]

**National Beef**:

Subject to and without waiving the foregoing objections, National Beef states that it will conduct a reasonable search and produce responsive and non-privileged documents, if any exist, that constitute or reflect communications or relate to meetings between any employee of a Defendant and National Beef related to fed cattle purchases and prices, boxed beef sales or prices, or fed cattle slaughter levels.[19]

Subsequently, in meet-and-confers in response to Defendants' responses and objections, Plaintiffs revised Cattle RFP 4, Consumer RFP 2, and DPP RFP 3 to request:

Communications and Documents concerning communications, agreements, or meetings between You and any Defendant *or Other Packer* that (1) relate to: (a) fed cattle producers, supply, purchases, and prices in the United States, (b) fed cattle slaughter levels in the United States, (c) Beef supply, sales, customers, or prices in the United States, (d) live cattle futures or options on live cattle futures transactions involving trades on the CME, (e) participation in a Trade Association meeting or event, or other Industry

---

[17]   *See id.*, Ex. G, at 40-41.
[18]   *See id.*, Ex. H, at 22-23.
[19]   *See id.*, Ex. I, at 12.

Meeting or Investor Conference; or (2) evidencing [] proposed or actual meetings, phone calls or other communication of unspecified or unclear purpose.  Excluded are (a) communications between any person whose primary responsibilities are monitoring the health, safety, or well-being of animals, or (b) where the subject of the communication solely concerns the health, safety, or well-being of animals.

The parties are in agreement as to the language of the request, apart from the inclusion of communications and meetings with "Other Packers."  Plaintiffs note that a substantially similar dispute as to "Other Packers" exists in relation to Cattle RFP 17(a) and DPP RFP 5(a).  *See* §III(G), *infra*.  In an effort to reach a compromise, Plaintiffs proposed the following closed definition of Defendants' own defined term of "Other Packers":

> Nebraska Beef, Greater Omaha, American Food Groups, Caviness Beef Packers, Agri Beef Co., New Angus Aberdeen, Kane Beef, Central Valley Meat, Creekstone Farms Premium Beef, Iowa Premium Beef (prior to its acquisition by National Beef), FPL Food, DemKota Ranch Beef, and STX Beef Company.

### 1.   Defendants' Exclusion of Communications with Other Packers Is Improper

In response to this portion of the Request, "Defendants stand on their objection to decline to produce communications with non-defendant packers identified by plaintiffs because these communications are not relevant to plaintiffs' allegations."[20]  Contrary to Defendants' claim, however, their communications with non-Defendant packers are patently relevant to these actions.

---

[20]    *See* McGahan Decl., Ex. J, at 16.

Indeed, case law dictates that communications between Defendants and non-party competitors are relevant in antitrust actions. *See In re Potash Antitrust Litig.*, 161 F.R.D. 405, 409 (D. Minn. 1995) (rejecting "Defendants' view that the Plaintiffs be limited to discovering only those communications which have been exchanged by and between the Defendants" as the "analysis at this stage of the case" is driven by "fairly minimalistic precepts of relevancy").

To begin with, Defendants' communications with Other Packers may reveal that additional packers participated in or abetted the alleged conspiracy, and thus may enable Plaintiffs to identify and bring claims against additional co-conspirators.[21] *See DURAG Inc. v. Kurzawski*, No. 17-CV-5325 (ECT/HB), 2019 WL 13124422, at *7 (D. Minn. Sept. 12, 2019) (Bowbeer, J.) (permitting plaintiff to add a party because, *inter alia*, "the limited information available to [plaintiff] before it received Defendants' discovery was insufficient to support a good faith claim by [plaintiff] against [the newly added party]"); *CTI Servs. LLC v. Haremza*, No. 09-CV-144, 2011 WL 780489, at *2 (N.D. Okla. Feb. 25, 2011) (granting motion to amend complaint to add new parties explaining "review of documents produced . . . prompted their effort to amend").

Furthermore, even if Other Packers did not join the conspiracy, Defendants' communications with these competitors are nevertheless relevant, as they may provide evidence of actions taken by Defendants to accomplish their conspiratorial aims. To

---

[21]  Plaintiffs reserved the right to amend their Complaints once the identities of any further alleged conspirators are established or included unnamed co-conspirators in their Complaints. *See, e.g.*, *Cattle* TAC at 1 n.1.

effectuate their conspiracy, Defendants required market intelligence concerning the procurement and slaughter practices of other market participants.  Communications with Other Packers was one means of collecting this information.  Moreover, Defendants obviously regard communications with, and the actions of, Other Packers to be relevant, as they have directed a number of RFPs to Plaintiffs that concern Other Packers and Plaintiffs' interactions with them.  *See, e.g*., McGahan Decl., Ex. K, at Request Nos. 1 and 6; Ex. L, at Request Nos. 1 and 4; and Ex. M, at Request Nos. 1, 2 and 4 (certain of which call for communications with the Other Packers listed in Plaintiffs' Initial Disclosures).

Moreover, such communications (or a relative paucity thereof) will show that the quantity and quality of inter-Defendant communications are atypical of the nature and frequency of packers' communications with their competitors.  *See SourceOne Dental, Inc. v. Patterson Cos., Inc.*, 310 F. Supp. 3d 346, 359 (E.D.N.Y. 2018) ("What is suspicious about these inter-firm communications, in addition to their quantity, is that competitors communicated information with each other when, absent assurances of mutual support, doing so would have put each company individually at a competitive disadvantage.").

Finally, Defendants have not established that this Request is unduly burdensome or disproportionate to the needs of this case, especially given its relevance.  Defendants have yet to run test searches on potentially responsive documents, and thus have not shared any information that would permit the parties to evaluate the scope and breadth of potentially responsive documents.  Moreover, as described above and below, Plaintiffs further limited this Request to highly relevant subject matter, including by narrowing Defendants' own definition of Other Packers.

Defendants should be required to produce these responsive documents.

**D.    Defendants Withhold Certain Key Productions to Regulators (Cattle RFP 3; Consumer RFP 3; DPP RFP 24(a))**

Plaintiffs have requested that Defendants produce materials received from, and provided to, certain government regulators:

> **CATTLE REQUEST NO. 3:**   All Documents and Communications concerning Fed Cattle, Cattle Futures and/or Beef that You produced to or received from any regulatory body or government agency, including, the U.S. Department of Justice, U.S. Government Accountability Office, the USDA, U.S. Commodity Futures Trading Commission, CME, National Futures Association, U.S. Securities & Exchange Commission, U.S. Federal Trade Commission, Federal Bureau of Investigation, any state law enforcement agency official, or any committee or member of the United States Congress.   This Request includes all: (i) Documents or Communications produced pursuant to grand jury subpoenas, civil investigative demand or any other request for production of documents or information (whether formal or informal); (ii) copies of any such requests; (iii) all responses, objections, stipulations, modifications, production logs, privilege logs, or other parameters Concerning Your production of Documents and/or Communications to any such government or regulatory agency, (iv) transcripts of any governmental or regulatory proceedings or testimony; and (v) interrogatory answers, white papers, presentations, or other Documents or Communications produced to any such governmental or regulatory agency.[22]

In response, Defendants agreed to make a partial production of documents produced to certain regulators in response to formal investigations.  Defendants' excerpted responses to Cattle RFP 3 are set out below:

**Tyson:**

> Subject to the objections above, and based on a reasonable investigation, Tyson will produce non-privileged documents that it produced to the U.S. Department of Justice, U.S. Government Accountability Office, the USDA, U.S. Commodity Futures Trading Commission, CME, National Futures Association, U.S. Federal Trade Commission, or a states' attorney general in

---

[22]    McGahan Decl., Ex. A, at 17.  *See also id.*, Ex. B, at 10 and Ex. C, at 17-18.

response to a civil investigative demand or other investigative demand to the extent the investigation and the documents relate to whether there was anticompetitive coordination between defendants concerning the procurement or slaughter of fed cattle or manipulation of live cattle futures and/or live cattle options, to the extent not duplicative of documents otherwise produced to Plaintiffs.[23]

**JBS:**

Subject to and without waiving these objections and with regard to Relevant Time Period only, JBS Defendants agree to produce the following documents to the extent this information is in their possession, custody or control, and able to be located by them through a reasonable search: responsive, non-Privileged documents produced by Defendants during the Relevant Time Period to the Department of Justice, Federal Trade Commission, the United States Department of Agriculture, the Government Accountability Office, or states' attorneys general pursuant to a civil investigation demand, a grand jury demand, a grand jury subpoena or other investigative request to the extent the investigation and the documents relate to whether there was anticompetitive coordination between Defendants concerning the procurement or slaughter of Cattle or processing or sale of Beef in the United States, and to the extent not otherwise duplicative of documents that will be produced to Plaintiffs.[24]

**Cargill:**

Subject to and without waiving these objections and the General Objections, Objections to Plaintiffs' Instructions, and applicable Objections to Plaintiffs' Definitions above, which are incorporated herein by reference, Cargill and CMS state that they will produce the following responsive, non-privileged documents to the extent they exist in Cargill's or CMS's possession, custody, or control and are able to be located by Cargill or CMS through a reasonable search: documents produced, during the time period from January 1, 2014 to December 31, 2019, by Cargill or CMS to the Department of Justice, Federal Trade Commission, the United States Department of Agriculture, the Government Accountability Office, or states' attorneys general pursuant to a civil investigation demand, a grand jury demand, a grand jury subpoena, or other investigative request to the extent the investigation and the documents relate to whether there was anticompetitive coordination between Defendants concerning the procurement or slaughter of fed cattle or processing or sale of boxed beef,

---

[23]    *See id.*, Ex. F, at 15-16.

[24]    *See id.*, Ex. G, at 38-39.

and to the extent not duplicative of documents that will otherwise be produced to Plaintiffs.[25]

**National Beef:**

> Subject to and without waiving the foregoing objections, National Beef states that it will conduct a reasonable search and produce responsive and non-privileged documents, if any exist, that it produced to the Department of Justice, Federal Trade Commission, the United States Department of Agriculture, the Government Accountability Office, or states' attorneys general pursuant to a civil investigation demand, a grand jury demand, a grand jury subpoena, or other investigative request, to the extent the investigation and the documents relate to whether there was anti-competitive conduct concerning the procurement or slaughter of fed cattle or processing or sale of boxed beef, and to the extent not otherwise duplicative of documents that will be produced to Plaintiffs.[26]

Through meet and confers the parties have agreed the regulators and laws to which this request applies, but reached impasse regarding Defendants' refusal to produce: (a) productions made to the DOJ, State Attorneys General, and USDA in these three regulators' existing investigations into the unlawful conduct alleged in Plaintiffs' complaints: (i) in response to requests received after June 2020; or (ii) to the extent the productions include documents dated after June 2020; (b) written submissions or discovery submitted to any merger inquiry conducted in respect of National Beef's acquisition of Iowa Premium and JBS's acquisition of the U.S. assets of XL Foods; (c) the regulatory requests for information or documents themselves; and (d) written interrogatory style responses or presentations given or made in response to regulatory requests.

---

[25]    *See id.*, Ex. H, at 20-22.

[26]    *See id.*, Ex. I, at 11-12.

### 1.    Defendants Should Produce All Future Productions Made in Existing Investigations Relating to the Allegations in These Cases

The DOJ Antitrust Division, certain State Attorneys General antitrust divisions, and the USDA are all investigating the very same conduct put in issue by Plaintiffs' complaints. ¶¶263-65, 314-17, 320, 322-27.  Indeed, Plaintiffs understand that the DOJ's and State Attorneys Generals' actions were prompted by Plaintiffs' suits.  Because these investigations concern the very same alleged illegal actions, there is no risk Plaintiffs' request will capture irrelevant documents.  *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1027-28 (D. Minn. 1997) ("[T]o the extent that [documents produced to regulators] may lead to discoverable information, Defendants must turn them over."); *Broiler*, 2017 WL 4417447, at *5 ("The Court will not abandon its benefit-burden approach simply because the documents Plaintiffs are requesting previously have been provided to a governmental entity."); *cf. Cattle*, ECF No. 259, at 5-6, (Court permitted Defendants to conduct a relevance review of prior DOJ production since the DOJ's initial CID had requested Defendants' produce materials from unrelated investigations).

Defendants have agreed to produce to Plaintiffs' productions made in response to these investigations prior to the end of the Relevant Period, but not thereafter, claiming that they should not "incur ongoing obligations in perpetuity."  McGahan Decl., Ex. J, at 12. Courts routinely reject this same argument.  *See*, *e.g.*, *Minneapolis Firefighters' Relief Ass'n v. Medtronic*, *Inc.*, No. CV 08-6324 (PAM/AJB), 2010 WL 11470364, at *4 (D. Minn. Nov. 3, 2010) (ordering production of documents responsive to future subpoenas, stating "[t]he use of the language 'will be produced' does not render these discovery

requests overbroad because this language is consistent with Defendants' obligations under Fed. R. Civ. P. 26(e)(1)"); *Broiler*, 2017 WL 4417447, at *7 (ordering production of materials produced to Florida AG in future); *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, No. 5:12-CV-5162, 2016 WL 7638495, at *3 (W.D. Ark. Sept. 28, 2016) (allowing discovery of "any documents, agreements or communications between the SEC and Defendants" related to subject matter of lawsuit without time limitation). This Court should, likewise, reject Defendants' argument.

Importantly, there is little burden associated with this request as it requires no further collections or searches. Defendants need only provide Plaintiffs the materials they produced to these three specific regulators in response to these three specific investigations. And Defendants' arguments that their obligation would inure "in perpetuity" is overblown — the close of fact discovery is the end of all parties' discovery obligations as to this and every other document request. Also, Plaintiffs are willing to stipulate that any re-production to Plaintiffs of these documents could be designated "Highly Confidential" or "Confidential" under the Protective Order, removing the need for Defendants to undertake a confidentiality review. Lastly, Plaintiffs should be placed on even footing with Defendants and regulators so they can discuss discovery coordination on an informed basis. In this regard, Plaintiffs understand that the State Attorneys General have already approached certain Defendants to ask whether they would consent to the State Attorneys General being a designated third party permitted to receive Highly Confidential and Confidential materials under these actions' Protective Order in order to facilitate free discussion of the issues arising from the overlapping discovery processes.

### 2.     Defendants Should Produce Written Materials Related to JBS and National Beef's Acquisitions

Plaintiffs initially requested all productions made by Defendants in any merger inquiry considering a proposed acquisition in the U.S. cattle or beef markets.  In an effort to compromise, Plaintiffs narrowed their request, firstly to encompass only JBS's 2013 acquisition of the two U.S. slaughter plants of XL Foods[27] and National Beef's 2019 acquisition of Iowa Premium and its Tama IA slaughter plant, then subsequently to encompass only written submissions or discovery produced in relation to these inquiries. ¶¶14 n.6, 190.  The DOJ investigated both acquisitions, with the Iowa Premium merger additionally scrutinized by the Iowa Attorney General.  McGahan Decl., Exs. N and O.

Defendants should disclose these materials.  Documents related to mergers in the relevant market are discoverable.  *See, e.g.*, *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000, 2015 WL 13755437, at *2 (N.D. Ala. Oct. 20, 2015) (ordering defendants to produce merger documents, including those produced to regulators); *cf. In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-CV-864, 2018 WL 11260473, at *3 (N.D. Ill. Aug. 14, 2018) (defendant ordered to produce relevant documents previously produced to FTC during its inquiry into defendants proposed merger as they went to "competition in the [relevant] market").

---

[27]     JBS USA, LLC, *JBS USA Acquires U.S. Operations of XL Foods*, GlobeNewswire (Apr.   4,   2013),   https://www.globenewswire.com/news-release/2013/04/04/536014/ 17532/en/JBS-USA-Acquires-U-S-Operations-of-XL-Foods.html.   While both plants previously slaughtered cull cows and bulls, they could be used to slaughter fed cattle.

The mergers at issue here are plainly relevant – Plaintiffs make direct allegations regarding JBS and National Beef's use, or non-use in the case of JBS, of the plants they acquired.  ¶¶14, 84, 190, 197, 258, 305-06.  Moreover, Defendants' written statements, and the positions taken therein, will reflect their contemporaneous views as to the functioning of the market, the availability of cattle and their intended use of the additional slaughter capacity their acquisitions brought.  *See, e.g.*, McGahan Decl., Ex. P, at Questions 12-16 (relating to competition and entry), 19, 23 (pricing), and 24 (reasons for the transaction); *id.*, Ex. Q; *cf. Blue Cross Blue Shield*, 2015 WL 13755437, at *2 (merger documents relating to "market analysis, revenue, market share, service areas, BCBSA rules and their effects on competition, and assessments of the anti-competitive effect of the merger" are "plainly relevant" and discoverable).  Given that Defendants have already sought to weaponize their acquisition activity and capital expenditure as evidence foreclosing the existence of the cartel, Plaintiffs are entitled to test whether Defendants' present day views reflect those they held at the time.  *See* ECF No. 174, at 10; ECF No. 179, at 3-5, 13.

### 3.    Defendants Should Produce the Regulatory Requests

Despite voluntarily producing the May 22, 2020 CIDs issued by the DOJ, Defendants have refused to produce other regulatory document and information requests caught by Plaintiffs' request (*e.g.*, the subpoenas and CIDs themselves).[28]  *See, e.g.*, Cattle,

---

[28]    Late in the evening of February 24, 2022, Defendants suggested that they were open to further discussions on this issue but asked that Plaintiffs park the matter and their dispute regarding Defendants' obligation to produce written interrogatory responses until after the Court resolves this information.  McGahan Decl., Ex. R.  Plaintiffs declined Defendants' proposal, as it is inefficient to delay resolution of this request, which has been negotiated

ECF No. 230 (exhibiting CID).  These documents are relevant and routinely produced in litigation.  *See, e.g.*, *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 17MD02777, 2018 WL 4826866, at *3 (N.D. Cal. Oct. 4, 2018) (specifically compelling Defendant to produce "communications" with regulators); *Martin v. Monsanto Co.*, No. EDCV162168, 2017 WL 5172205, at **4-5 (C.D. Cal. Apr. 10, 2017) (defendants' communications with regulators "relevant and discoverable"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1361-62 (N.D. Ga. 2012) (reopening discovery upon evidence that defendant did not include communications with regulators as part of production of regulatory materials), *modified sub nom. on non-related grounds in In re Delta/AirTran Baggage Fee Antitrust Litig.*, No. CV 1:09-MD-2089, 2012 WL 12952328 (N.D. Ga. July 18, 2012); *cf. Minneapolis Firefighters*, 2010 WL 11470364, at **1-2 (ordering production of documents "reflecting communications" with regulators); *City of Pontiac*, 2016 WL 7638495, at *3 (allowing discovery of "any documents, agreements or communications between the SEC and Defendants").

As these documents indicate the basis for the regulator's request and outline the requests themselves, they shed light on the scope of the investigation and the responsive production.  As a practical matter, without the requests, Plaintiffs are left in the dark as to what has, or has not, already been covered by regulatory productions, making it difficult to prevent duplicative requests.  Despite requesting them in the explicit terms of their Request,

---

since November, particularly since Defendants have had Plaintiffs' proposed compromise since February 18, 2022.  Plaintiffs will, of course, continue to speak with Defendants before their opposition is due to see whether a resolution is possible.

Plaintiffs remain willing, on a without prejudice basis, to table their request for subsequent communications between Defendants and the regulators relating to the scope of Defendants' productions (*e.g.*, negotiating applicable search terms). In these circumstances, Defendants should produce the regulatory demands responsive to Plaintiffs' Request, and the parties can revisit following Plaintiffs' review of the productions whether any subsequent communications between the regulators and Defendants should be produced.

### 4. Defendants Should Produce Written Interrogatory Responses and Presentations Made to the Regulators

Defendants have refused to agree to produce written responses (*e.g.*, interrogatory-style answers), presentations, and proffers made in response to relevant regulatory requests.[29] These materials are routinely produced as part of document productions calling for prior regulatory requests. *See, e.g.*, *Minneapolis Firefighters*, 2010 WL 11470364, at *4 (ordering production of "**all documents** produced in any other litigation or pursuant to any investigation by a U.S. governmental or administrative authority" only limited by subject matter, not document type); Case Management Order, *Klein v. Meta Platforms, Inc.*, 3:20-CV-08570 (N.D. Cal. Apr. 2, 2021), ECF No. 82 (ordering production of all documents produced to regulators without limitation as to document type).

Apart from providing relevant information, producing such materials is non-burdensome and may prevent unnecessary duplication for Defendants in relation to

---

[29] As noted in n.28, *supra*, Plaintiffs declined Defendants' last-minute offer to park this issue pending the Court's ruling on Plaintiffs' motion.

Plaintiffs' written discovery requests.  Defendants should be required to produce these materials.

### E.  Defendants Should Produce All Contracts for the Purchase of Fed Cattle and Sale of Beef (Cattle RFPs 8 and 9; Consumer RFPs 6, 7 and 20; DPP RFP 35)

Plaintiffs requested Defendants produce their actual and template contracts for the purchase of fed cattle and sale of beef, alongside other materials related to the contracting and negotiation process.  Specifically, Consumer RFP 20 asks for:

> **CONSUMER REQUEST NO. 20:**  All contracts, and any summaries of the terms (including duration, price protection, terms for price modification, surcharges, discounts, or rebates) for either your purchase or sale of Cattle, Cattle carcasses, or Beef in the U.S., including with your Cattle suppliers or third-party agents, including commercial feedlots and marketing cooperatives, who conducted marketing negotiations on their behalf and with your customers.[30]

Defendants' responses and objections offered a partial production, as these excerpts show:

**Tyson:**

> Subject to the objections above, and based on a reasonable investigation, Tyson will (i) produce non-privileged documents sufficient to show summaries of the terms of its sales of boxed beef in the United States and (ii) meet and confer with plaintiffs regarding production of a representative sample of such contracts.[31]

**Cargill:**

> Based on these objections, and subject to the General Objections above, which are incorporated herein by reference, Cargill states that it will produce the following responsive, non-privileged documents to the extent they exist, are able to be located by Cargill through a reasonable search: template

---

[30]  McGahan Decl., Ex. B, at 19.  *See also id.*, Ex. A, at 19-20; and Ex. C, at 21.

[31]  *See id.*, Ex. S, at 38.

contracts for the sale of boxed beef that were applicable during the time period from January 1, 2014 through December 31, 2019. Cargill will also meet and confer with Plaintiffs regarding production of a representative sample of contracts for the sale of boxed beef that were entered into during the time period from January 1, 2014 through December 31, 2019. Per General Objection No. 1, and subject to Cargill's ongoing investigation, Cargill does not anticipate the production of any responsive documents, as Cargill has not sold boxed beef.[32]

**JBS:**

Therefore, and subject to and without waiving these objections and further subject to Scope Limitation No. 3 within the Relevant Time Period only, the JBS Defendants agree to produce the following responsive, non-Privileged Documents to extent this information is in the JBS Defendants' possession, custody or control, and able to be located by the JBS Defendants through a reasonable search: (a) template contracts concerning the procurement of Cattle or sale of Beef in the United States, (b) exemplar contracts concerning the procurement of Cattle or sale of Beef in the United States, which are based on the sales data the JBS Defendants may produce, provided that the parties meet and confer concerning the potential numbers of template contracts and exemplar contracts for production.[33]

**National Beef:**

Subject to and without waiving the foregoing objections, National Beef states that it will conduct a reasonable search and produce responsive and non-privileged documents, if any exist, that contain compiled summaries of the terms of contracts for the purchase of fed cattle or sale of boxed beef in the United States, as well as a documents sufficient to show a representative sample of such contracts.[34]

Following their meet and confers on Consumer Request 20 and the other related requests, Defendants agreed to produce policies, agreements and templates that reflect how

---

[32]     *See id.*, Ex. T, at 41-43.

[33]     *See id.*, Ex. U, at 49-50.

[34]     *See id.*, Ex. V, at 21-22.

pricing is set for Beef sales, price lists for boxed beef, and template contracts for Cattle purchases and Beef sales, and materials that concern the negotiations, setting, and final pricing of Beef or Cattle. Defendants, however, have refused to produce concluded cattle purchase and beef sales agreements, citing burden concerns and Plaintiffs' access to structured data productions.[35] Plaintiffs seek an order that Defendants be required to conduct a reasonable search across their agreed or ordered custodial and non-custodial sources, and any known central repository of executed contracts, and produce any concluded contracts located.

The completed contracts that Plaintiffs have requested are critical to all Plaintiffs' cases. The contract types (*e.g.*, formula vs cash), how they determined price, how they changed over time, to whom they were offered, amongst other matters, are relevant to assess Plaintiffs' allegations, including their allegations that Defendants used formula and forward contracts, at times, as a means of further reducing price competition in the cash cattle market, thereby placing downward pressure on fed cattle prices. *See, e.g.*, ¶¶93-94, 140; *Consumer* Compl., ¶132. Because cash cattle prices are used to set the prices paid by Defendants under their formula contracts and directly impact the Live Cattle futures prices incorporated into forward agreements, a reduction in cash cattle prices reduces the price paid by Packing Defendants for cattle bought on a contract basis. ¶94. Thus, an analysis

---

[35]     Plaintiffs received late, last-minute offers of production today (by JBS), the evening of February 24, 2022 (by Tyson and National Beef), and the evening of February 23, 2022 (by Cargill) to resolve Plaintiffs' request for concluded cattle and beef contracts. Plaintiffs do not know if an agreement is possible but will continue to work with Defendants after the filing of this brief and will notify the Court of any agreement reached. Plaintiffs and Defendants continue to discuss these requests in their separate structured data requests.

of the formulas used in the contracts, and the indices and reported prices they incorporated, will likely be required to show impact across members of the proposed classes. Beef Plaintiffs also must understand whether there were any terms that Defendants may argue could alter the impact of the supply restraint, such as fixed term contracts and contracts tied to corn, grain or other input costs.

*Cattle* Plaintiffs require Defendants' completed cattle purchase contracts in order to determine the method by which Defendants arrived at the final price paid for cattle. Defendants' proposed structured data productions do not sufficiently outline the price terms of these contracts. For example, in relation to Cattle purchases, that data typically only records the total dressed cost of the pen; it does not indicate how Defendants arrived at that final cost (*e.g.*, was it the conversion of a cash sale made on a live weight basis, a negotiated grid, or a formula sale, and if so, the terms of the grid or formula applied). Plaintiffs must, therefore, associate those completed contracts with the applicable transactions records in order to discern how the final dressed cost per pen was arrived at. Similar issues arise in relation to Defendants' recording of price terms in the beef sales structured data.

Moreover, as Plaintiffs are limiting Defendants' search obligations to the agreed or ordered custodial sources, and known central repositories of contracts, the burden associated with this request is not substantive. In this regard, Plaintiffs note that Defendants have not offered as custodians the beef sales team members who would possess the bulk of the written record of beef sales. Accordingly, all Rule 26 proportionality factors

favor Plaintiffs in this instance and Defendants should be ordered to conduct a reasonable search for responsive contracts and produce the same.

###### F. Documents Concerning Defendants' Participation in the Agreed Trade Associations and Other Industry Gatherings Should Be Produced (Cattle RFP 16; DPP RFP 5)

Plaintiffs have requested documents and communications concerning Defendants' employees' participation in certain trade associations, industry meetings and investor conferences.  Specifically, Plaintiffs requested:

> **CATTLE REQUEST NO. 16:**   All documents and communications concerning any Trade Association meetings, industry conferences, charity events, or other functions that were or may have been attended by any of Your Employees whose job function concerned Your Cattle Business, including: (a) meeting announcements; (b) agendas; (c) minutes; (d) notes; (e) invitee and attendee lists; (f) handouts; (g) reports; (h) statistical bulletins; (i) correspondence; and (j) Documents and Communications concerning Your participation in those meetings.[36]

Defendants each offered a partial production in their response and objections, which are excerpted below:

**Tyson:**

> Subject to the objections above, based on a reasonable investigation, Tyson will produce non-privileged meeting announcements, agendas, and minutes for National Cattlemen's Beef Association, U.S. Meat Export Federation, Global Roundtable for Sustainable Beef, U.S. Roundtables for Sustainable Beef, and North American Meat Institute meetings attended by Tyson employees identified in Part I.6 to its June 12, 2020 Disclosure Pursuant to Order Regarding Discovery Pending Resolution of Motions to Dismiss.[37]

**JBS:**

---

[36]   *See* McGahan Decl., Ex. A, at 23; *see also* Ex. C, at 13.

[37]   *See id.*, Ex. F, at 31-32.

Subject to and without waiving those objections, JBS Defendants agree to produce the following documents to the extent this information is in their possession, custody or control, and able to be located by them through a reasonable search: responsive, non-Privileged meeting announcements, agendas, and minutes for National Cattlemen's Beef Association, U.S. Meat Export Federation, Global Roundtable for Sustainable Beef, U.S. Roundtable for Sustainable Beef, and North American Meat Institute meetings occurring during the Relevant Time Period that were attended by JBS Defendants employees who are their Document Custodians.[38]

**Cargill:**

Subject to and without waiving these objections and the General Objections, Objections to Plaintiffs' Instructions, and applicable Objections to Plaintiffs' Definitions above, which are incorporated herein by reference, Cargill and CMS state that they will produce the following responsive, non-privileged documents to the extent they exist in Cargill's or CMS's possession, custody, or control and are able to be located by Cargill or CMS through a reasonable search: meeting announcements, agendas, and minutes for National Cattlemen's Beef Association, U.S. Meat Export Federation, Global Roundtable for Sustainable Beef, U.S. Roundtables for Sustainable Beef, and North American Meat Institute meetings occurring between January 1, 2014 and December 31, 2019 that were attended by CMS employees identified in section 1.i.6 to its June 12, 2020 Disclosure Pursuant to Order Regarding Discovery Pending Resolution of Motions to Dismiss.[39]

**National Beef:**

Subject to and without waiving the foregoing objections, National Beef states that it will conduct a reasonable search and produce responsive and non-privileged documents, if any exist, that constitute meeting announcements, agendas, and minutes for National Cattlemen's Beef.[40]

Plaintiffs revised Cattle Request 16 and DPP Request 5 to seek the following:

Documents and communications in the possession of Your document custodians concerning any Trade Association meeting or conference (*e.g.*, NAMI's annual Meat Conference), Industry Meeting, and Investor

---

[38]    *See id.*, Ex. G, at 61-62.

[39]    *See id.*, Ex. H, at 40-41.

[40]    *See id.*, Ex. I, at 21-22.

Conference, or functions that were or may have been attended by any of Your Employees whose job function concerned Your cattle and/or beef business and constituting: (a) meeting announcements; (b) agendas; (c) minutes; (d) notes; (e) invitee and attendee lists; (f) handouts or presentations (including speaking notes, where applicable); (g) reports; (h) statistical bulletins; (i) correspondence; (j) expense reports related to attendance at these meetings; and (k) documents and communications concerning Your participation in those meetings.

During meet and confers, the parties agreed to narrowed and closed definitions of

"Trade Association," "Industry Meeting" and "Investor Conference":

"Trade Associations" means the North American Meat Institute, American Meat Institute, American Meat Institute Foundation, The North American Meat Association, Global and U.S Roundtables for Sustainable Beef, National Cattlemen's Beef Association, U.S. Meat Export Federation, Federation of State Beef Councils, Cattlemen's Beef Promotion and Research Board, and the International Meat Secretariat.

"Industry Meeting" means any public or industry-wide meeting or conference hosted by CattleFax or CFTC (*e.g.*, AgCon) relating to the fed cattle and/or beef industry.

"Investor Conference" means any public or industry-wide meeting or conference relating to the fed cattle and/or beef industry, hosted by Rabobank, JPMorgan, Cleveland Research Company, The Vertical Trading Group, BMO Capital Markets, Jefferies, Goldman Sachs, Bank of America, and/or Barclays, and the Consumer Analyst Group of New York Conference.

While the areas of disagreement among the parties have been substantially narrowed, disputes nevertheless remain. First, National Beef, Cargill, and Tyson each seek to apply a subject matter limitation to their productions, namely that the responsive meetings and/or document or communication must concern fed cattle procurement, Beef

36

production, and/or Beef sales.  McGahan Decl., Ex. W, at 2; Ex. X, at 24-25; and Ex. Y, at 1-3.[41]  Second, National Beef refuses to produce certain listed materials.

As discussed below, each of these limitations are inappropriate.  Opportunities to collude arise whenever competitors meet, irrespective of the formal subject matter of the meeting.

1.     **Defendants Seek to Apply an Improper Subject Matter Limitation and Improperly Limit the Materials Requested and Sources Searched**

The additional subject matter limitations that Defendants seek to impose on this request are inappropriate, particularly since Plaintiffs have already limited the request to certain specified Trade Associations that regularly host events and meetings relating to the Cattle and Beef industry, and to Industry Meetings and Investor Conferences, which by their definitions, "relat[e] to the fed cattle and/or beef industry."[42]

But, more importantly, regardless of whether a meeting was nominally called to discuss cattle supply, pork exports, or the leadership structure of the trade association, the mere fact that Defendants had an opportunity to meet is relevant.  *See Auto. Refinishing Paint*, 2004 WL 7200711, at *3 ("It is widely understood that trade associations can be used to facilitate the creation and maintenance of price-fixing conspiracies"); *Kleen Prod.*

---

[41]     Unlike Cargill and National Beef, Tyson has agreed to produce meeting announcements, agendas, attendance rosters, or minutes for any responsive meeting without a subject matter limitation.  But Tyson stands on its objection that other communications related to responsive meetings or events must concern fed cattle procurement, Beef production, and/or Beef sales.
[42]     These meetings and conferences, however, do not have to solely, or primarily, relate to the Cattle and Beef industry.

*LLC*, 775 F. Supp. 2d at 1080 ("belonging to a trade association or attending industry events and exchanging price information . . . 'facilitates price fixing'") (quoting *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010)).

The complaints also contain specific allegations regarding Defendants' opportunities to collude through their attendance and participation at Trade Association meetings and conferences, Industry Meetings, and Investor Conferences. *See* ¶¶297-302. Judge Tunheim recognized this in his MTD Order. *Id.* at 14 (concluding that the plus factors alleged by Plaintiffs, including "Defendants can regularly communicate through trade associations and other industry events" were "undoubtedly strong and are of the type often used to support an inference of an agreement").

National Beef attempts to further limit the list of requested materials and restrict its search to the files of the document custodians, excluding the agreed non-custodial sources.[43] These further limitations, however, are unwarranted. Plaintiffs have already specified a closed list of materials relating to these conferences and meetings, and these materials bear on the issue of whether Defendants used these meetings and conferences as an opportunity to collude. Moreover, as Defendants' searches are limited to the agreed or ordered document custodians and/or non-custodial sources, Defendants' searches are unlikely to generate many documents or communications that do not relate to the cattle or beef industry.

---

[43]    National Beef offered to produce meeting announcements, agendas, minutes, emails, calendar invitations, and presentations, but not the other documents requested. McGahan Decl., Ex. W, at 2.

These documents could provide evidence demonstrating that Defendants used these meetings and conferences to collude with other Defendants. *See Delta/AirTran*, 733 F. Supp. at 1352 n.10 ("The Court rejects Defendants' argument that Plaintiffs should be barred from exploring the content of these [investor conference] break-out discussions during discovery to determine what exactly was discussed and whether these discussions may support Plaintiffs' overall theory of this case.").

Defendants do not provide a cogent explanation as to why Plaintiffs' subject matter and search limitations are not sufficient, especially given the relevance of the information requested to the allegations in the Complaints. *See Baker v. Cenlar FSB*, No. 20-CV-0967 (JRT/HB), 2021 WL 2493767, at *3 (D. Minn. June 18, 2021) (Bowbeer, J.) ("[o]nce the party seeking the discovery has made a threshold showing of relevance, the court generally looks to the party resisting discovery to show specific facts demonstrating lack of relevancy or undue burden").  Indeed, their proposed subject matter limitations here are significantly narrower than those agreed in relation to Plaintiffs' requests for interfirm communications. *See* discussion of Cattle RFP 4 at §III(C), *infra*.  These materials should therefore be produced here.

### G. Custodians' Diaries and Calendar Entries (Cattle RFP 17(a); DPP RFP 4(a))

Plaintiffs have requested Defendants' document custodians' diaries and calendars. Specifically, Plaintiffs requested:

**CATTLE REQUEST NO. 17(a):**  For each Document Custodian, all:

electronic and hard copy diaries, calendars, appointment books or notes, notebooks, or to-do lists;[44]

Each Defendant initially refused to make any production in response to Cattle RFP 17, principally because they argued that its sub-parts exceeded the 20 document requests allowed by the Court's April 14, 2020 Order on Discovery Pending Resolution of Motions to Dismiss (*Cattle*, ECF No. 196), at 4.[45]  After Defendants' second motion to dismiss was denied, however, Defendants dropped this objection, and the parties sought to negotiate the production of documents.  As to Cattle RFP 17(a) and DPP RFP 4(a), the parties largely agreed on the following production:

> . . . non-privileged electronic and hard copy diaries, calendars, appointment books or notes, notebooks, or to-do lists, to the entries (i) concern fed cattle procurement, Beef processing, and Beef sales in the United States; or (ii) reflect communications or relate to meetings between a Cargill or CMS Document Custodian and an employee of any other Defendant *or Other Packer* that (1) relate to:  (a) fed cattle producers, supply, purchases and prices in the United States, (b) fed cattle slaughter levels in the United States, (c) Beef supply, sales, customers or prices in the United States, (d) live cattle futures or options on live cattle futures transactions involving trades on the CME, (e) participation in a Trade Association, Investor Conference, or Industry Meeting; or (2) evidence proposed or actual meetings, phone calls, or other communication of unspecified or unclear purpose.  Excluded are any communications between any person whose primary responsibilities are monitoring the health, safety, or well-being of animals.

Consistent with the parties' dispute as to Cattle RFP 4, only the portions bolded and italicized are disputed.  For the reasons stated in §II(C), *infra*, in relation to Cattle Request 4, these materials are both relevant and proportional.  Plaintiffs additionally note the following:

---

[44]   *See* McGahan Decl., Ex. A, at 23-24.

[45]   *See id.*, Ex. F, at 34; Ex. G, at 64; Ex. H, at 43-44; and Ex. I, at 22-23.

**Calendars**

Custodians' calendars, even when they contain matters not related to the subject of a litigation, are discoverable.  In *In re Grand Jury Investigation*, 338 F. Supp. 1379, 1380 (W.D. Pa. 1972), the court ordered entire calendars produced even though they "contained a significant number of notations of clearly personal appointments" and "were not paid for or provided by the employer corporation."  The calendars were pertinent to the alleged conspirator's business and thus subject to production just as they are here.  *Id.*; *see also Speed RMG Partners, LLC v. Arctic Cat Sales Inc.*, No. 20-CV-609 (NEB/LIB), 2021 WL 5087280, at *21 (D. Minn. June 14, 2021), *aff'd in part, rev'd in part*, No. 20-CV-609 (NEB/LIB), 2021 WL 4226070 (D. Minn. Sept. 16, 2021) (ordering the production of a diary that referenced materials relevant to the litigation); *In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:16-md-02724 (E.D. Pa. Feb. 9, 2018), ECF No. 560 ("all calendars, appointment books, and appointment notes"); *Judd v. Take-Two Interactive Software, Inc.*, No. 07 CIV. 7932, 2009 WL 361958, at *1 (S.D.N.Y. Feb. 4, 2009) (entire work calendar in contract case).

**Other Packers**

As noted above, communications with Other Packers will shed light on whether the inter-Defendant communications were anomalous and evidence of the alleged conspiracy. For example, if Defendants regularly exchanged commercially sensitive information amongst themselves, but did not share that information with Other Packers, this type of information exchange tends to support Plaintiffs' claims and is thus highly relevant and discoverable.

### H.    Custodians' Contact Information (Cattle RFP 17(b); DPP RFP 4(b))

Plaintiffs sought the following contact information:

**CATTLE REQUEST NO. 17(b):**  For each Document Custodian, all:

> contact information maintained in electronic or hard copy format, for any person who is or was an owner, Employee, consultant, officer, board member, representative, or agent of: (i) a Beef packer; (ii) a Producer; (iii) an industry or financial analyst; (iv) an Employee of a trade association; (v) future commission merchants or brokerage and clearing organizations; (vi) an Employee of a non-Defendant that provides financing to Beef packers;[46]

Plaintiffs subsequently withdrew or tabled (ii), (v), and (vi), and provided a closed list definition for industry and financial analyst.[47]  Accordingly, Plaintiffs' request is now:

> "contact information regularly maintained by Your document custodians in Microsoft Outlook (or similar program), cell phones, Rolodex cards, or other contact repository, for any person who is or was an owner, Employee, consultant, officer, board member, representative, or agent of: (i) a

---

[46]    *See* McGahan Decl., Ex. A, at 23.

[47]    A "cattle/beef industry or financial analyst", means the following individuals or Employees of the following entities/organizations/publications:

    a) Industry Publications: Cassandra Fish; Drovers/Cattlenetwork; Meatingplace; Cattle Buyers Weekly; Meat + Poultry; Western Ag Reporter; Beef Magazine; Hedgers Edge; DTN/Progressive Farmer; Tri-State Livestock News; and/or Wall Street Journal.

    b) Industry Analysts/Professors: Darren Peel; Bart Fischer; Joe Outlaw; David Anderson; Andrew McKenzie; James Mitchell; Christopher Bastian; Chian Ritten; Amy Nagler; Ted Schroeder; Brian Coffey; Glynn Tonsor; Stephen Koontz; Joshua Maples; Kenneth Burdine; Scott Brown; Charley Martinez; Justin Benavidez; Jayson Lusk; and/or John Riley.

    c) Financial Analysts: market and equity analysts at the following institutions: Rabobank; JPMorgan; Cleveland Research Company; The Vertical Trading Group; BMO Capital Markets; Jefferies; Goldman Sachs; Bank of America; and/or Barclays.

Defendant *or Other Packer*; (ii) *an cattle/beef industry or financial analyst*; (iii) an *Employee or officer of a Trade Association*."

Defendants have agreed to this modified production, save that Tyson, Cargill and National Beef refuse to produce contact information with Other Packers (discussed above) and "cattle/beef industry or financial analysts," and Tyson additionally refused to produce communications with Employees or officers of Trade Association.[48]   Along with subject matter limitations, the parties have agreed to a closed definition of Trade Association, and Plaintiffs provided Defendants with a closed and tailored definition for "cattle/beef industry or financial analyst" to narrow the dispute and target only documents and information relevant to Plaintiffs' claims, which include Defendants' contacts with other members of the cattle/beef industry.  Such persons may have been used as go-betweens or other vehicles to convey information between the Defendants in furtherance of their conspiracy.  Moreover, many of the Industry Analysts/Professors are often engaged by Defendants' trade associations to speak on Defendants' behalf.  The requested contact information will also assist Plaintiffs' review of the phone records they have and will obtain from third party phone carriers.  Nor is this request burdensome as it only seeks contact information held in easily accessible locations, rather than communications with the specified individuals.[49]   No further limitation to this request is warranted under the

---

[48]   JBS has agreed to produce such contact information subject to discussing further with Plaintiffs the scope of the proposed definitions of "Other Packers" and "cattle/beef industry or financial analyst."

[49]   Plaintiffs' request is also consistent with Section V(D)(2) of the ESI Protocol, which states that contact information should only be redacted if they do not relate to a custodian's work (*i.e.*, family or friends not involved in the cattle or beef industry).

circumstances and doing so contradicts the liberal scope of discovery contemplated by Rule 26, resulting in the withholding of relevant, responsive information.

### I.   Document Custodians' Testimony in Other Matters (Cattle RFP 17(g); DPP RFP 17(i)

Plaintiffs seek any testimony Defendants' Document Custodians have provided in relevant investigations or litigations:

> **CATTLE REQUEST NO. 17(g):**  For each Document Custodian, all:
>
> copies of any transcripts or recordings of any testimony of the Document Custodian relating to Your or another packer's Cattle Business, such as testimony at a deposition, trial, or public hearing;[50]

After meeting and conferring with Defendants, Plaintiffs agreed to modify their request to exclude testimony provided in:  employment actions other than any claims arising from the issues pled in these actions; environmental actions; food safety actions; and disputes in which the responding Defendant, or one of its employees, merely offered testimony related to the quality or grading of beef or cattle.  Plaintiffs also offered to work with each Defendant to manage any protective order issues that might arise from the production of such testimony, including by agreeing to the production of redacted versions initially, and/or notification where responsive documents are completely covered by the protective order.   All Defendants have objected to this request as irrelevant and burdensome.

Prior testimony by Defendants' custodians on subjects relevant to this litigation will illuminate whether they have adopted consistent positions as to the functioning of the

---

[50]   *See* McGahan Decl., Ex. A, at 24.

market, other Defendants' actions within that market, and their own actions within that market. Plaintiffs tried to reach common ground with Defendants by significantly narrowing the scope of the request. Defendants' other statements on the record regarding their cattle or beef operations are clearly relevant and discoverable here. Nor have Defendants articulate to Plaintiffs any particular burden concerns.

Unless Defendants produce responsive testimony pursuant to this request, they will not produce any testimony pursuant to the regulatory investigations captured by *Cattle* Request 4 (§III(D), *infra*), as Defendants claim that *Cattle* Request 17 should govern the scope of such productions. Given those investigations concern the same alleged unlawful conduct, Defendants should not be allowed to shield from Plaintiffs potentially relevant (or inconsistent) testimony provided contemporaneously to the DOJ, State Attorneys General, and USDA.[51]

Given the exclusions proposed by Plaintiffs, Plaintiffs do not believe that a significant volume of litigation would be captured by the request during the relevant time period. Moreover, identifying potentially relevant testimony is likely to be as simple as asking the custodian whether they have given testimony before. Courts regularly order production of these materials in antitrust cases. *See, e.g.*, *In re Domestic Air Transp. Antitrust Litig.*, 142 F.R.D. 354, 355-57 (N.D. Ga. 1992) (ordering defendants to produce "copies of all CID transcripts within their possession" from related antitrust investigation because the transcripts were relevant and not privileged); *In re NASDAQ Mkt.-Makers*

---

[51]     For the same reasons stated above, the relevant time period for this portion of the request should be extended to the end of the fact discovery period.

*Antitrust Litig.*, 929 F. Supp. 723, 725-27 (S.D.N.Y. 1996) (ordering defendants to produce FTC CID deposition transcripts in related civil antitrust case because CID deposition transcripts are not privileged and "could provide additional evidence regarding liability and damages and potential impeachment material and lead to the discovery of other admissible evidence").

Defendants should produce these materials.

### J.    Custodians' Severance Agreements and Disciplinary Records (Cattle RFP 17(i); DPP RFP 4(h) and (k))

Plaintiffs seek any severance agreement with Defendants' document custodians, and their personnel files:

> **CATTLE REQUEST NO. 17(i):**  For each Document Custodian, all: . . .
>
> Any severance agreements in connection with the Document Custodian ceasing employment or changing employment status with You (without time limitation).[52]
>
> **DPP REQUEST NO. 4(h):**  For each Document Custodian, all: . . .
>
> personnel file, including any discipline or performance evaluations, and any terms of employment (such as confidentiality or non-compete agreements);[53]

As to Cattle RFP 17(i), each Defendant stood on its objections and has refused to produce any documents in response to this request.  In short, each Defendant claims that this "request calls for personal and confidential documents that are neither relevant to the issues in these complaints nor proportional to the needs of this case.  These materials implicate privacy rights of former employees and separate confidentiality agreements may

---

[52]       *See* McGahan Decl., Ex. A, at 24.

[53]       *See* McGahan Decl., Ex. C, at 12.

protect against such disclosure, imposing an additional burden on [Defendant] to negotiate for the right to release the records."[54]

As to DPP RFP 4(h), each Defendant[55] refused to produce responsive documents.

Their responses to DPP RFP 4(h) are excerpted below:

**Tyson**

Tyson further objects that the Requests are overbroad, unduly burdensome, vague, irrelevant, and disproportionate to the needs of the case to the extent all eleven Requests encompass an excessive number of Documents not identified with reasonable particularity and irrelevant Documents . . . Therefore, Tyson declines to produce any Documents in response to this Request but agrees to meet and confer with Plaintiffs to further discuss.[56]

**Cargill**

Cargill and CMS further object to this request as overly broad and unduly burdensome and invasive, and calling for irrelevant documents, to the extent it requests a Document Custodian's "personnel file, including any discipline or performance evaluations, and any terms of employment (such as confidentiality or non-compete agreements)" and "severance agreements in connection with the Document Custodian ceasing employment or changing employment status with You (without time limitation) . . . Therefore, Cargill and CMS decline to produce any documents in response to this request but are willing to meet and confer regarding an appropriate scope.[57]

**National Beef**

National Beef objects to this Request as overly broad, unduly burdensome, and disproportionate to the needs of the case because it seeks an extensive amount of information about individuals that is not relevant to the claims and allegations of the Complaint and is highly intrusive on the privacy of the individuals whose information this Request seeks . . . Subject to and without waiving the foregoing objections, National Beef declines to produce documents in response to this Request, but states that it will confer with

---

[54]    *See, e.g.*, McGahan Decl., Ex. Z (as an illustrative example).

[55]    We have excluded JBS's response here given its proposed settlement with DPPs.

[56]    *See* McGahan Decl., Ex. AA, at 14-15.

[57]    *Id.*, Ex. BB, at 19-21.

Plaintiffs regarding production of responsive and non-privileged documents, if any, that are limited to an appropriate scope and relevant to the claims and allegations at issue in this litigation.[58]

During meet and confers Plaintiffs modified DPP RFP 4(h) to:

Documents concerning any performance evaluations, records, or disciplinary matters that relate to the allegations in the case, including cattle procurement, beef sales, live cattle futures, compliance with [Defendants'] antitrust/competition policies, or contacts with competitors.

Still, Defendants stand by their objections. These requests, which are limited to document custodians, are relevant and necessary to test the bias of potential witnesses. Because "[t]he credibility of witnesses is always a material issue," *Johnson v. Brewer*, 521 F.2d 556, 561 (8th Cir. 1975), the requested documents are discoverable. *See, e.g.*, *Digan v. Euro-Am. Brands, LLC*, No. 10 C 799, 2012 WL 668993, at *5 (N.D. Ill. Feb. 29, 2012) (ordering production of personnel files, including compensation records and severance agreements, stating that "[a]s potential witnesses for EAB, this information is relevant to these witnesses' possible bias").

Disciplinary records are highly relevant to show compliance with internal policies regarding competitor contact. The existence (or absence) of a disciplinary action against an employee who violated rules governing the sharing of information with other Defendants or packers would be relevant to Plaintiffs' claims of a conspiracy. Knowing what conduct warranted disciplinary action could shed light on how zealously a Defendant enforced any rules or policies relevant to Plaintiffs' claims.

---

[58]     McGahan Decl., Ex. CC, at 9-10.

As to Defendants' privacy concerns, Plaintiffs note Defendants have taken the position that privacy concerns alone are addressed by the Protective Order.  McGahan Decl., Ex. DD, at 2-3.  Plaintiffs are willing to agree that any severance agreement be designated Highly Confidential.  As to any restriction on disclosure, Plaintiffs are willing to work with Defendants on these as and when these issues arise.

### K.    Defendants' Attempts to Conceal Anticompetitive Conduct in Related Industries and in Relation to Their Live Cattle Futures Trading (Consumer RFP 10)

Plaintiffs seek documents evidencing Defendants' attempts to conceal relevant illegal conduct.  Specifically, Plaintiffs requested:

> **CONSUMER REQUEST NO. 10:**   Documents relating to actions to conceal or avoid detection of any potential violations of federal, state, or international antitrust laws, competition laws, anti-monopoly laws, anti-cartel laws, unfair competition laws, anti-bribery laws and any similar laws, rules or regulations (including the use of code words or otherwise masking the identity of any Person or entity, meeting in locations or communicating at times or via methods with the intent to avoid detection by any Person or entity, using non-traceable prepaid calling cards or cellphones, non-contract or disposable cell phones, placing calls from public phones, and destroying, secreting, altering or forging Documents).[59]

Defendants' responses sought to limit their production obligations to certain breaches related to antitrust laws by their cattle and/or beef business units.  Their excerpted responses were:

**Tyson:**

> Subject to the objections above, and based on a reasonable investigation, Tyson will produce non-privileged documents discussing any efforts to conceal or avoid detection of any potential violations of state or federal antitrust laws involving price fixing of either fed cattle and boxed beef.

---

[59]    *See* McGahan Decl., Ex. B, at 13-14.

**JBS:**

> Therefore, and subject to and without waiving these objections and further subject to Scope Limitation No. 3 and within the Relevant Time Period only, the JBS Defendants agree to produce the following responsive, non-Privileged Documents to extent this information is in the JBS Defendants' possession, custody or control, and able to be located by the JBS Defendants through a reasonable search: documents relating to an attempt to conceal the existence of the purported conspiracy among Defendants to "constrain beef supplies in the United States." Direct Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint (Dkt. 256), ¶1.

**Cargill:**

> Based on these objections, and subject to the General Objections above, which are incorporated herein by reference, Cargill states that it will produce the following responsive, non-privileged documents to the extent they exist, are able to be located by Cargill through a reasonable search, and were created during the time period from January 1, 2014 through December 31, 2019: documents in the possession of Document Custodians discussing any efforts to conceal or avoid detection of any of either fed cattle or boxed beef, if any. Per General Objection No. 1, and subject to Cargill's ongoing investigation, Cargill does not anticipate the production of any responsive documents.

**National Beef:**

> Subject to and without waiving these objections, National Beef states that it does not believe documents responsive to this Request, but that it will conduct a reasonable search and produce responsive and non-privileged documents, if any exist, discussing any efforts to conceal or avoid detection of any potential violations of state or federal antitrust laws with regard to fixing the prices of either fed cattle and boxed beef.

Through their negotiations the parties have agreed to expanded productions.

However, Defendants have sought to restrict the scope of production only to documents relating to price-fixing claims (National Beef, Cargill, and Tyson) or only to documents relating to supply constraint claims (JBS), arguing that anything more would exceed what Plaintiffs have pled in the complaints. In doing so, Defendants also seek to exclude

violations for conduct "outside of the beef industry."  In addition, JBS and Cargill refuse to produce documents relating to violations of the Commodity Exchange Act ("CEA") or CME regulations, as well as violations of any similar trading regulations because Consumer Plaintiffs, who issued the request, do not assert a CEA claim.  But Plaintiffs have alleged a broad conspiracy with multiple documented mechanisms, including price-fixing (Consumers' Fourth Amended Consolidated Complaint ("Fourth Amd. Compl."), ¶¶4, 23, 319-24, 348-49, 360), supply constraints (*id.*, ¶¶1, 6-20, 118-22, 179-87), bid-rigging (*id.*, ¶¶131-63), and group boycott (*id.*, ¶¶165-70), as well as similar conduct in related Broiler Chicken and Pork markets (*id.*, ¶¶334-40), and in the case of *Cattle* Plaintiffs, manipulation of live cattle futures and options (TAC, ¶¶339-414).  Put simply, all Plaintiffs state a claim under Section 1 of the Sherman Act – not a "price fixing claim," as Defendants endeavor to characterize it.

Defendants' attempt to carefully excise documents relating to certain illegal conduct (but not other illegal conduct) from their production runs afoul of black letter antitrust law. "In [conspiracy cases], plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962).[60] Defendants should

---

[60]     *See also In re High Fructose Corn Syrup Antitrust Litig*., 156 F. Supp. 2d 1017 (C.D. Ill. 2001), *rev'd on other grounds*, 295 F.3d 651 (7th Cir. 2002).  In this antitrust case involving the fixing of prices of high fructose corn syrup, the court found that evidence

not be able to withhold documents that show the concealment of their illegal conduct simply because they read Plaintiffs' complaints too narrowly.

This argument has been raised and rejected by several courts. In *In re Flash Memory Antitrust Litig.*, the court found that evidence of a defendant's price-fixing was relevant for purposes of proving the same defendant's supply constraints in the flash memory market. The court noted that the plaintiffs' complaint expressly alleged both supply constraints and attempts to "fix, raise, maintain, and stabilize" price – but even if plaintiffs had "focused more on affecting output, the fact remains that the purpose of both conspiracies was to artificially control and impact the memory market in order to generate or preserve profits." 643 F. Supp. 2d 1133, 1148-49 (N.D. Cal. 2009); *see also Freedom Med., Inc. v. Premier Purchasing Partners, L.P.*, No. 09CV152, 2011 WL 13196168, at *2 (E.D. Tex. Apr. 29,

---

of anticompetitive, "conspiratorial activity" in other unrelated industries was relevant and admissible under Rule 404(b) as potentially probative of "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Id.* at 1025-27. At issue in that case was evidence derived from undercover tapes recorded by the DOJ and made with the assistance of an employee of Archer Daniels Midland ("ADM"), one of the defendants. *Id.* at 1025. While the "tapes contain[ed] extensive evidence of conspiratorial activity in the lysine and citric acid conspiracies, [high fructose corn syrup was] mentioned only tangentially in a handful of the hundreds of hours of taped conversations." *Id.* The plaintiffs wanted to introduce that evidence relating to conspiracies in two different product markets against the other three defendants at trial. *Id.* Recognizing that Rule 404(b) provides for the admission of evidence of a party's other bad acts when introduced as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," the court "agree[d] that the tapes could possibly be probative for these alternative purposes with respect to ADM." *Id.* And the court later recognized that these admissions relating to the lysine and citric acid conspiracies had relevance to the alleged high fructose corn syrup conspiracy and was admissible under Rule 404(b) against ADM. *Id.* at 1027. Notably, this ruling came at the summary judgment stage, not the discovery stage.

2011) ("Discovery in antitrust cases is broad and not limited to the allegation of the pleadings."). Similarly, *Consumer* Plaintiffs are alleging that "the suppression of cattle prices and the artificial maintenance of retail prices for beef from 2015 to the present is indicative of the ***same underlying agreement*** to reduce throughput" and that "[t]he ***principal (but not exclusive)*** method by which defendants implemented and executed their conspiracy" was "coordinating on collusive conduct that depressed the price, and thus future supply, of cattle that they purchased while continuing to maintain an elevated price at which they sold beef to retail operations." Fourth Amd. Compl., ¶¶19, 6.

Defendants are attempting a maneuver that failed in *Broiler*, where Tyson was also a defendant. Magistrate Judge Jeffrey Gilbert overruled the Defendants' objection to Plaintiffs' request for production of documents relating to conspiracies "unrelated" to the one alleged in the complaint. Judge Gilbert stated that if there was a document within the class period "relat[ing] to an agreement to fix prices, reduce output, limit production, limit capacity, limit supplies, limit inventory or allocate customers, product lines or territories for broilers sold in the U.S." and an otherwise identical document that "doesn't relate to these allegations, but it relates to ***some other conspiracy***," Rule 404(b) states that both would be relevant to the antitrust claims or defenses and thus producible. *See Broiler*, ECF No. 508, at 14-15; *id.*, Feb. 7, 2018 Hr'g Tr. at 78:22-84:16. Applying the same reasoning here, Defendants' attempt to impermissibly narrow Consumers' RFP 10 should fail. Defendants should provide any responsive document that potentially shows the concealment of the conspiracy – whether it relates to concealing price-fixing or concealing the coordination of supply.

**L.    JBS's Effort to Withhold Documents Held by JBS S.A. Custodians (Consumer RFP 4 and JBS's Scope Limitation 2)**

Plaintiffs seek copies of telephone records from Defendants for phone numbers used in their Cattle and Beef businesses.  Specifically, Plaintiffs requested:

> **CONSUMER REQUEST NO. 4:**  Copies of all Telephone Records in your possession, custody, or control, including Telephone Records of your main phone number(s), main fax number(s), and any phone number used as a switchboard for any of your relevant facilities such as your headquarters, administrative offices, Cattle Farms, Beef Processing Facilities, and Beef sales offices.[61]

JBS initially objected to the request on various grounds and declined to provide any responsive documents. JBS's excerpted response was:

> [S]ubject to and without waiving these objections, and per Scope Limitation No 3, the JBS Defendants will not produce any responsive documents.  The JBS Defendants are willing to meet and confer to better understand the scope of this request.

Through negotiations with JBS, JBS has agreed to produce documents responsive to this request:

> JBS agrees to search for and produce records associated with any JBS-issued (not personal) custodian phone numbers to the extent they exist and are non-duplicative.

JBS has also set forth what it refers to as a "Scope Limitation" – effectively, an improper general objection – that is consistent with this artificial limitation:

> The JBS Defendants further object to the Requests to the extent they are not limited to Cattle procurement, Beef production or Beef sales in the United States, and the JBS Defendants will not produce documents concerning non-U.S. procurement production and sales.  In particular, Plaintiffs have named JBS S.A. as a defendant in this action, despite the fact that JBS S.A. is a Brazilian entity that has limited to no involvement with Beef production

---

[61]    *See* McGahan Decl., Ex. B, at 11.

54

and/or Cattle procurement in the United States. Accordingly, JBS S.A. will not produce documents in its possession, custody, or control relating to any of its direct and indirect subsidiaries and their respective employees, officers, directors and known agents, to the extent said documents are similar or duplicative of documents in the possession, custody, or control of JBS USA, Swift, and/or Packerland. Further, JBS S.A. will not produce documents in its possession, custody, or control that are related to operations outside of the United States.

JBS has since narrowed its Scope Limitation 2 and is generally offering to produce the following:

[D]ocuments held by agreed-to and Court-ordered custodians of the U.S.-based JBS entities that relate to the export of Beef or Cattle from the United States or the import of Beef or Cattle to the United States and that bear on pricing or output in the United States.

In both instances, JBS has sought to restrict the scope of production to only documents in the possession of agreed-upon or court-ordered custodians at the JBS U.S. entities, thereby excluding documents in the possession of agreed-upon or court-ordered custodians at JBS S.A. Generally, it is JBS's position that JBS S.A. is a Brazilian entity that has limited to no involvement with Beef production and/or Cattle procurement in the United States. Yet, JBS S.A. is a named Defendant in this case. Plaintiffs' allegations against JBS S.A. survived Defendants' motions to dismiss. JBS has not offered a single custodian employed by JBS S.A. Plaintiffs are therefore moving the Court for the inclusion of Wesley Batista as a custodian. Mr. Batista, who recently served time in prison in Brazil for his involvement in a bribery and corruption scandal, personally installed his right hand man as CEO of JBS's U.S. beef operations and had ample opportunity to collude with the other Defendants, including through JBS's acquisition of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork operations, respectively, at the beginning of the conspiracy

period, which enabled Mr. Batista to meet or communicate privately with Tyson and Cargill executives.  If the Court orders his inclusion as a custodian, Plaintiffs expect that JBS will include records associated with Mr. Batista's JBS-issued phone numbers and "that relate to the export of Beef or Cattle from the United States or the import of Beef or Cattle to the United States and that bear on pricing or output in the United States."

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court grant Plaintiffs' motion.

Dated: February 25, 2022                              Respectfully submitted,

  s/ Patrick J. McGahan                              s/ Joshua J. Rissman
David R. Scott (*pro hac vice*)                 Daniel E. Gustafson (#202241)
Amanda F. Lawrence (*pro hac vice*)       Daniel C. Hedlund (#258337)
Patrick J. McGahan (*pro hac vice*)         Michelle J. Looby (#0388166)
Michael P. Srodoski (Bar No. 0398250)    Joshua J. Rissman (#0391500)
**SCOTT+SCOTT**                                    Anthony J. Stauber (#0401093)
**ATTORNEYS AT LAW LLP**                    **GUSTAFSON GLUEK PLLC**
156 Main Street                                       Canadian Pacific Plaza
P.O. Box 192                                           120 So. Sixth Street, Suite 2600
Colchester, CT 06415                               Minneapolis, MN 55402
Tel.:  860-537-5537                                  Tel.:  612-333-8844
Fax: 860-537-4432                                   Fax: 612-339-6622
david.scott@scott-scott.com                    dgustafson@gustafsongluek.com
alawrence@scott-scott.com                      dhedlund@gustafsongluek.com
pmcgahan@scott-scott.com                     mlooby@gustafsongluek.com
msrodoski@scott-scott.com                     jrissman@gustafsongluek.com
                                                            tstauber@gustafsongluek.com

Christopher M. Burke (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel:  619-233-4565
Fax: 619-233-0508
cburke@scott-scott.com

Joseph P. Guglielmo (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel:  212-223-6444
Fax: 212-223-6334
jguglielmo@scott-scott.com

Anthony F. Fata (*pro hac vice*)
Jennifer W. Sprengel (*pro hac vice*)
Daniel Herrera
(*pro hac vice* to be filed shortly)
Edward Khatskin
(*pro hac vice* to be filed shortly)
Kaitlin Naughton
(*pro hac vice* to be filed shortly)
**CAFFERTY CLOBES MERIWETHER &**
**SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603
Tel:  312-782-4882
Fax: 312-782-4485
afata@caffertyclobes.com
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
ekhatskin@caffertyclobes.com
knaughton@caffertyclobes.com

Dennis J. Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Floor
San Diego, CA 92101
Tel:  612-333-8844
Fax: 612-339-6622
dstewart@gustafsongluek.com

Adam J. Zapala (*pro hac vice*)
Elizabeth T. Castillo (*pro hac vice*)
James G. Dallal (*pro hac vice*)
**COTCHETT, PITRE & MCCARTHY,**
**LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel:  650-697-6000
Fax: 650-697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

Alexander E. Barnett (*pro hac vice*)
**COTCHETT, PITRE & MCCARTHY,**
**LLP**
40 Worth Street Suite 602
New York, NY 10013
Tel:  212-201-6820
Fax: 917-398-7753
abarnett@cpmlegal.com

Jason S. Hartley (*pro hac vice*)
Jason M. Lindner
Dylan McFarland (*pro hac vice*)
**HARTLEY LLP**
101 W. Broadway, Suite 820
San Diego, CA 92101
Tel: (619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com
mcfarland@hartleyllp.com

Ellen Meriwether (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
205 N. Monroe Street
Media, PA 19063
Tel:  215-864-2800
Fax: 215-864-2810
emeriwether@caffertyclobes.com

*Interim Co-Lead Counsel for the Cattle
Plaintiffs*

K. Craig Wildfang (Bar No. 0117043)
Thomas J. Undlin (Bar No. 0183751)
Stacey P. Slaughter (Bar No. 0296971)
Geoff Kozen (Bar No. 0398626)
Eric P. Barstad (appearance to be filed shortly)
Austin Hurt (appearance to be filed shortly)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel:  612-349-8500
Fax: 612-339-4181
kcwildfang@robinskaplan.com
tundlin@robinskaplan.com
sslaughter@robinskaplan.com
gkozen@robinskaplan.com
ebarstad@robinskaplan.com
ahurt@RobinsKaplan.com

*Liaison Counsel for the Cattle Plaintiffs*

  s/ Alec Blaine Finley
Jonathan W. Cuneo
Alec Blaine Finley
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20002
Tel:  202-789-3960
Fax: 202-789-1813
jonc@cuneolaw.com
bfinley@cuneolaw.com

Megan E. Jones (*pro hac vice*)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: 415-633-1908
mjones@hausfeld.com

Timothy S. Kearns (*pro hac vice*)
**HAUSFELD LLP**
888 16th St. NW, Suite 300
Washington, DC 20006
Tel:  202-540-7200
tkearns@hausfeld.com

*Interim Co-Lead Counsel for the Proposed
Direct Purchaser Plaintiffs*

  s/ Shana E. Scarlett
Shana E. Scarlett (*pro hac vice*)
Rio S. Pierce (*pro hac vice*)
Abby Wolf (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO
LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel:  510-725-3000
Fax: 510-725-3001
shanas@hbsslaw.com
riop@hbsslaw.com
abbyw@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Breanna Van Engelen (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO
LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel:  206-623-7292
Fax: 206-623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

John W. ("Don") Barrett
David McMullan, Jr.
Katherine Riley
Sarah Sterling Aldridge
**BARRETT LAW GROUP, P.A.**
404 Court Square N
P.O. Box 927
Lexington, MS 39095
Tel: 662-834-2488
Fax: 662-834-2628
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
kbriley@barrettlawgroup.com
saldridge@barrettlawgroup.com

Shawn M. Raiter
**LARSON KING, LLP**
30 E 7th St., Suite 2800
St. Paul, MN 55101-4922
Tel: 651-312-6500
Fax: 651-312-6615
sraiter@larsonking.com

Anthony Carter
Jon Tostrud
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: 310-278-2600
Fax: 310-278-2640
acarter@tostrudlaw.com
jtostrud@tostrudlaw.com

W. Joseph Bruckner (MN #0147758)
Brian D. Clark (MN #0390069)
Arielle S. Wagner (MN #0398332)
Kyle Pozan (*pro hac vice*)
R. David Hahn (MN #0401262)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
Fax: 612-339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com
kjpozan@locklaw.com
rdhahn@locklaw.com

*Co-Lead Counsel for Consumer Indirect Purchaser Plaintiffs*

Armand Derfner
Jonathan S. Altman
**DERFNER & ALTMAN, LLC**
575 King Street, Suite B
Charleston, SC 29403
Tel:  843-723-9804
Fax: 843-723-7446
rsavini@derfneraltman.com
jaltman@derfneraltman.com

*Counsel for the Commercial and Institutional*
*Indirect Purchaser Plaintiffs*

  s/ Patrick J. Ahern
Patrick J. Ahern
Theodore B. Bell
**AHERN AND ASSOCIATES, P.C.**
Willoughby Tower
8 South Michigan Avenue, Suite 3600
Chicago, IL 60603
Tel: (312) 404-3760
patrick.ahern@ahernandassociatespc.com
theo.bell@ahernandassociatespc.com

Patrick J. Lee-O'Halloran (#269074)
**THOMPSON TARASEK LEE-O'HALLORAN
PLLC**
7101 York Avenue South, Suite 255
Edina, MN 55435
Tel: (612) 568-0132
Fax: (612) 564-6976
patrick@ttlolaw.com

*Attorneys for Plaintiffs Winn-Dixie Stores, Inc.*
*and Bi-Lo Holding, LLC*

## **CERTIFICATE OF SERVICE**

I, Patrick J. McGahan, hereby certify that on February 25, 2022, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on February 25, 2022, at Colchester, Connecticut.

s/ Patrick J. McGahan
Patrick J. McGahan (*pro hac vice*)